**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

JAN 1 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| | ) |
| v. | ) **Criminal No.  07-00152 (ESH)** |
| | ) |
| **ANTHONY MAURICE SUGGS**, *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions: (1) defendant Price's motion to sever his case from that of the other defendants, or in the alternative, to sever certain counts in the indictment and 2) defendants' motion to suppress the evidence obtained through electronic surveillance conducted on a telephone belonging to defendant Suggs.  For the reasons stated herein, defendant Price's motion to sever will be granted in part and denied in part, and defendants' motion to suppress the evidence obtained through electronic surveillance will be denied.

## BACKGROUND

Defendants Anthony Maurice Suggs, James Lawrence Parker, Ernest Milton Glover, Glendale Earl Lee, and Helery Price are charged in a 10-count Superseding Indictment (the "Indictment."). The Indictment alleges that from sometime on or around August 1, 2005, and continuing until at least June 11, 2007, defendants and others conspired to possess with intent to distribute large quantities of PCP in the District of Columbia, Maryland, Georgia, Missouri, California, and elsewhere.  Much of the evidence in this case was gathered through electronic surveillance conducted pursuant to eleven court orders issued by the Honorable Rosemary M.

Collyer of this Court.[1]  They resulted in the interception of 26,444 separate activations and 21,183 completed calls.  This investigation also resulted in a second related indictment in *United States v. Lonnell G. Glover*, Crim. No. 07-153, which now charges 16 defendants in a superceding indictment with one count of conspiracy involving the distribution and possession with intent to distribute one kilogram or more each of PCP and heroin and charges certain individual defendants with thirteen substantive drug and gun offenses.

The *Suggs* Indictment charges all defendants with Conspiracy to Possess with Intent to Distribute One Kilogram or More of Phencyclidine, in violation of 21 U.S.C. § 846 (Count 1).  There are also nine substantive counts against individual defendants.  Defendant Ernest Glover is charged with Unlawful Possession with Intent to Distribute Phencyclidine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Unlawful Possession of Heroin in violation of 21 U.S.C. § 844; and two counts of Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for One Year in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Defendant Suggs is charged with Unlawful Possession with Intent to Distribute One Kilogram or More of Phencyclidine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iv); Unlawful Distribution of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and two counts of Unlawful Distribution of Phencyclidine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Defendant Parker is charged with Unlawful Distribution of Phencyclidine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  The Indictment also includes a Forfeiture Allegation against all defendants.

---

[1] The court-ordered wiretaps covered defendant Suggs's cellular phone, as well as the surveillance of Lonnell Glover's cellular phone and his truck, and Velma Williams's cellular phone.  The latter two defendants are only charged in the related *Glover* indictment, Crim. No. 07-153.

## ANALYSIS

I.    **Defendants' Joint Motion To Suppress Wiretap Evidence**

Defendants move to suppress all evidence obtained through electronic surveillance conducted on a telephone belonging to Suggs. In support of their motion, defendants argue that (1) the continuation of the wiretap past the first thirty days violated the necessity requirement of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act"), 18 U.S.C. § 2510 *et seq.*, and (2) the government impermissibly failed to minimize the intercepted wire communications.

The government's interception of phone calls is governed by the Wiretap Act. It requires that an application for the interception of certain oral, wire, or electronic communications shall be in writing, under oath, and shall contain certain information including a "full and complete statement of the facts and circumstances relied upon by the applicant[] to justify his belief that an order should be issued." *Id.* § 2518(1). On the basis of the facts submitted by the applicant, a district court may authorize a wiretap upon finding that (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception; (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried"; and (4) probable cause exists to believe that the communication facility sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense." *Id.* § 2518(3)(a)-(d); *see also United States v. Donovan*, 429 U.S. 413, 435 (1977). The determination that "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous,"

3

18 U.S.C. § 2518(3)(c), is referred to as the "necessity requirement," which is the "keystone of congressional regulation of electronic eavesdropping." *United States v. Williams*, 580 F.2d 578, 587-88 (D.C. Cir. 1978). "An issuing judge's finding of necessity is reviewed for abuse of discretion." *United States v. Eiland*, 398 F.Supp.2d 160, 173 (D.D.C. 2005).

The statute also requires that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5). This is referred to as the "minimization requirement." The minimization requirement "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets, and those who, often innocently, come into contact with such suspects." *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987). Although "[t]he statute does not forbid the interception of all nonrelevant conversations," the government must make reasonable efforts to "minimize" the interception of such conversations. *Scott v. United States*, 436 U.S. 128 , 139-40 (1978).

A.      Necessity

Although defendants have conceded that the government demonstrated probable cause and necessity in the initial wiretap application, they contend that the wiretap should not have been extended beyond the initial thirty-day period. (Defs' Mot. to Suppress at 9.) They argue that by the end of the first thirty days, the major purposes of the wiretap had been achieved, and any further investigation could have been done through other means.

Congress created the necessity requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United*

*States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).   Thus, a court should "give close scrutiny" to a contested wiretap application" and "reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Williams*, 580 F.2d at 588.   Because, however, the "statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, the government will meet its burden of demonstrating necessity if it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of these avenues of investigation." *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (citation and internal quotation marks omitted).   Furthermore, the fact that a wiretap has previously been productive does not automatically mean that continued surveillance is no longer "necessary." "The necessity requirement is not meant to work as an impediment to making a good case better, or a strong case airtight." *United States v. Jones*, 451 F.Supp.2d 71, 83 (D.D.C. 2006).

After a careful review of the lengthy affidavits that were submitted to Judge Collyer, the Court concludes that defendants' argument must be rejected. Each affidavit summarized the information obtained as result of the wiretap surveillance and provided a detailed update on the progress of the investigation.   Each affidavit then specified the kinds of information that the investigators expected to obtain through continued electronic surveillance, together with a explanation of why other investigative techniques would be unlikely to disclose these types of information about the Suggs/Glover operation.

For example, in the sealed affidavit filed on February 8, 2007, in support of the first extension, the affiant explains that although the source of the organization's supply of cocaine appeared to be in the Houston, Texas area, the investigation had not yet been able to determine how

5

the cocaine was entering the United States and how and by whom it was being transported to the Washington D.C. area. The affiant also explained that although Lonnell Glover had been identified as a source of PCP for Suggs, the investigation had not yet been able to determine where the PCP distributed by the organization was manufactured or how it was transported into the Washington D.C. area. The affiant also addressed the issue of why other forms of investigation, *i.e.*, controlled buys, physical surveillance, and search warrants, were unlikely to be successful. For example, the affiant explained that law enforcement learned from monitoring Suggs's calls that he is extremely surveillance conscious and that he had refused to continue to meet with a particular customer after detecting surveillance during their meeting.

The affidavit filed on March 9, 2007, which was submitted in support of the second extension, also included similarly detailed information about the progress of the investigation and about the information that law enforcement hoped to collect through continued surveillance. One issue that the affiant raised specifically was that the use of the cooperating witnesses alone would not have provided the type and quality of evidence necessary to prosecute Suggs. During the second extension, law enforcement learned through the wiretap that Suggs was storing his PCP supply at his girlfriend/co-conspirator's home, and as a result, they were able to seize the supply, thereby providing the physical evidence necessary for a prosecution.

Defendants make much of the fact that some of the objectives laid out in the affidavits do not appear to have been accomplished, even with further surveillance. (*See* Defs' Mot. to Suppress at 11-12.) This kind of hindsight analysis is not helpful in determining whether the issuing judge abused her discretion in determining that continued electronic surveillance was necessary to complete the investigation. Morever, the fact that Judge Collyer terminated interceptions on one

cellular telephone line when the expected results were not forthcoming (*see* Govt's Opp'n at 4),

indicates that Judge Collyer was not merely rubber-stamping the government's "fishing expedition

(Defs' Mot. to Suppress at 13), but rather, as one would expect, she was carefully considering

whether the results of each wire justified and necessitated further surveillance.

In short, the affidavits were "not based merely on conclusory statements about the difficulties

of investigating large-scale narcotics distribution conspiracies in general, but instead provided

specific information about the [*Suggs/Glover*] *operation* that limited the effectiveness of

conventional investigative methods, and made the request for wiretaps not merely useful but

indispensible." *Jones*, 451 F.Supp.2d at 83 (emphasis in original).   In light of the thoroughness of

each affidavit, including the specific justifications given for the continuation of the wiretap, the

Court concludes that Judge Collyer did not abuse her discretion in authorizing the wiretap extensions

on February 7, 2007 and March 9, 2007.

### B.    Minimization

Defendants next argue that the government impermissibly failed to minimize the intercepted

wire communications. They maintain that the ratio of minimized, non-pertinent calls to non-

minimized, non-pertinent calls demonstrates that the government did not comply with the statutory

minimization requirements.  (Defs' Mot. to Suppress at 1 at 16-17.)   They further argue that this

ratio worsened over time, indicating that the agents "were getting *worse*, not better, at minimizing

non-pertinent calls." (*Id.* at 17 (emphasis in original)). Defendants provide a list of 149 calls[2] which

they claim should have been minimized and a list of six calls (three of which are included in the

---

[2] Since the list provided to the Court was unnumbered, it has conducted its own hand-
count of the linesheets received.

longer list) which they claim were privileged.[3]

There is no "absolute prohibition on the interception of non-relevant conversations." *United States v. Anderson*, 39 F.3d 331, 342 (D.C. Cir. 1994), *rev'd on other grounds*, 59 F.3d 1323 (D.C. Cir. 1995) (en banc). Rather, in reviewing a minimization challenge, courts must consider "the 'reasonableness' of the minimization efforts, under the totality of the circumstances." *United States v. Hull*, 456 F.3d 133, 142 (3d Cir. 2006) (citations omitted). In determining whether the minimization efforts were reasonable, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott*, 436 U.S. at 140. Rather, the reasonableness determination will "depend on the facts and circumstances of each case." *Id.* "The minimization requirement is satisfied if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.'" *United States v. James*, 494 F.2d 1007, 1018 (D.C. Cir. 1974) (quoting *United States v. Tortorello*, 480 F.2d 764, 784 (2d Cir. 1973)).

Courts have looked to a variety of factors to determine whether the government's minimization efforts were reasonable. If a conspiracy is believed to be widespread, "more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140. This is especially important "when . . . the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to

---

[3] *See Carter*, 449 F.3d at 1295 (holding that the defendant "must identify particular conversations so that the government can explain their non-minimization" in order to bring "the issue of reasonable minimization .... in[to] play."). In response to this requirement, defense counsel has done a thorough and careful analysis of thousands of pages of linesheets in order to comply with *Carter*'s demands, and the Court is well-aware of the heavy burden that counsel has undertaken to accomplish this task.

incriminate the person whose phones are tapped." *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1976). More latitude is also afforded when the phone that is tapped is unlikely to be used by persons other than the target of the conspiracy. *See Scott*, 436 U.S. at 140. Moreover, "during the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter," *id.* at 141, and throughout the investigation, short calls may continue to be intercepted "because the determination of relevancy cannot be made before the call is completed." *Id.* When members of the conspiracy are believed to speak in code or use jargon, "criminal conversations [are] more difficult to detect and decipher" and investigators must be afforded additional leeway in their surveillance efforts. *United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989).

Applying these standards, the Court concludes that the calls identified by the defendants do not permit the Court to conclude that the government's surveillance efforts were unreasonable. The wiretap that was placed on defendant Suggs's cellular phone was in place for approximately three months and produced 4,849 completed calls,[4] of which 662 were minimized. (Govt's Opp'n at 6.) A review of the linesheets for the 149 calls that defendants have identified as calls that should have been minimized reveals that the vast majority of the calls are of the type which the Supreme Court and other courts have found may reasonably be intercepted by law enforcement.[5] First, over half

---

[4] The government has cited both 4849 and 6478 as the number of calls intercepted during the surveillance of Suggs's cellular phone. (*Compare* Govt's Opp'n at 6 *with* Govt's Suppl. Opp'n at 2.) Out of an abundance of caution, the Court therefore relies upon the lower number for purposes of its "reasonableness" analysis.

[5] In its Supplemental Opposition, the government does its own numerical breakdown of the calls. (*See* Govt's Suppl. Opp'n at 3.) Because, however, the government has failed to provide activation numbers for most of its categories of calls or an explanation of its methodology, the Court was unable to confirm the government's calculations and has therefore

of these calls (82) were less than three minutes in duration.[6]  *See United States v. Mansoori*, 304

F.3d 635, 647 (7th Cir. 2002) ("A number of . . . courts have found that two to three minutes is a

reasonable period of time within which to make an initial judgment as to the pertinence of a

conversation."); *United States v. Losing*, 560 F.2d 906, 909 n. 1 (8th Cir. 1977); *Scott*, 436 U.S. at

141.[7]   Five calls were intercepted during the first 25 hours of interception.[8]  *See United States v.*

---

done its own review of the linesheets that are at issue.  Many of the calls could be classified in
multiple "categories," but the Court has assigned each call to only one category to avoid "double-
counting," since the purpose of this inquiry is determine how many of the challenged calls the
government failed to minimize.  The method of placing each call in only one category may
account for the discrepancy between the Court's calculations and those of the government.

[6] *See* Linesheet Nos. 177, 394,398, 441, 460, 559, 709, 768, 788, 947, 1016, 1028, 1083,
1120, 1175, 1462, 1576, 2057, 2066, 2069, 2113, 2212, 2377, 2437, 2701, 2821, 2830, 2863,
2870, 2876, 2892, 2916, 2921, 3025, 3080, 3124, 3236, 3325, 3327, 3336, 3385, 3407, 3487,
3501, 3626, 3663, 3833, 3851, 3853, 3879, 3965, 3979, 4006, 4112, 4191, 4472, 4490, 4582,
4587, 4871, 4932, 5005, 5012, 5072, 5085, 5114, 5137, 5173, 5359, 5512, 5530, 5568, 5654,
5941, 6074, 6076, 6141, 6177, 6289, 6291, 6463.
    Two of the calls appear to have lasted longer than three minutes, but were actually
composed of two calls, each one of which was likely to have been shorter than two minutes and
certainly less than three minutes.  This occurred when the original phone call was interrupted by
call waiting.  (*See* Linesheet Nos. 1575, 2113).

[7] Defendants argue that two minutes should be set as the threshold for making a
determination about the criminal nature of the call.  They are correct that some courts have found
that the interception of *all* calls for an initial two-minute period is permissible and have therefore
excluded all calls under two minutes from the reasonableness inquiry.  This does not mean,
however, that when reviewing for reasonableness, the duration of the call is irrelevant if it lasts
slightly longer than two minutes.  Particularly in a conspiracy investigation of this scope,
additional time may be needed to establish whether the conversation is pertinent.
    A review of the conversations that lasted less than three minutes actually provides some
insight into why the additional time was necessary to determine the relevance of many of these
calls.  Sixteen calls were with one of the suspected co-conspirators.  (*See* Linesheet Nos. 177,
398, 1028, 2876, 2921, 3080, 3327, 4191, 5085, 5359, 5568, 5654, 6076, 6141, 6289, 6291.)
Nine calls included a discussion of the activities of one of the co-conspirators or were with a
person whom law enforcement had reason to believe might be involved in the conspiracy. (*See*
Linesheet Nos. 1120, 2863, 3487, 3501, 4472, 4490, 4871, 5005, 5530.)  Fourteen involved an
unknown caller. (*See* Linesheet Nos. 441, 768, 947, 1016, 2701, 2821, 2830, 3124, 3385, 3979,
4587, 5072, 5137, 5173.)   Finally, approximately one quarter of these calls (22) lasted 2

10

*Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989) ("It has been recognized that monitors may need to listen for longer periods of time in the early stages of such investigations in order to determine identity of speakers and significance of conversations.")  Eleven calls were with persons currently or recently incarcerated for drug trafficking or related offenses[9] and at least three calls involved persons unknown to the monitoring agents.[10]  *Daly*, 535 F.2d at 441 (leeway is required when the purpose of the wiretap is to learn the identities of co-conspirators and to define the reach of the conspiracy).   Finally, 19 calls were between Suggs and one of his co-conspirators,[11] and four calls involved suspicious persons or included discussions with a third party about one of the co-conspirator's movements or activities.[12]  *See United States v. McGuire*, 307 F.3d 1192, 1201 (9th Cir. 2002) ("Law enforcement is entitled to latitude to scrutinize messages by conspirators, because such messages may contain double meanings and implied purposes or even be conveyed in secret

---

minutes and 10 seconds or less, which means that after subtracting the time when the phone was ringing, the actual call time was under the two minute threshold advocated by the defendants.

Moreover, the Court is unwilling to adopt defendants' contention that the time during which the phone was ringing may not be subtracted in considering the length of the call. (Defs' Reply at 7, n.3.)  This overly technical perspective misses the point of the 2-minute threshold, which is simply the *minimum* amount of time that some courts have viewed as necessary for determining the nature of a particular conversation. Obviously, any time spent listening to the ringing of the telephone is of no use in making that determination.

[8] *See* Linesheet Nos. 29, 57, 85, 93, 125.

[9] *See* Linesheet Nos. 372, 452, 927, 956, 1128, 1173, 2221, 2406, 3347, 3929, 5877, 6156)

[10] *See* Linesheet Nos. 140, 2529, 3488.

[11] *See* Linesheet Nos. 1551 (E. Glover), 2075 (Johnson), 2476 (E. Glover), 3594 (E. Glover), 3863 (E. Glover), 4001 (Johnson), 4005 (Johnson), 4145 (Johnson), 4194 (Johnson), 4323 (Lee), 4361 (Johnson), 4384 (Johnson), 5075 (Johnson), 5578 (Price), 5657 (Johnson), 5916 (Joy), 6034 (Lee), 6067 (E. Glover), 6142 (Joy).

[12] *See* Linesheet Nos. 3708, 3448, 5167, 5865.

11

code.")

Defendants have also submitted a separate list of six calls which they claim are protected under the attorney-client privilege and should therefore have been minimized.[13]   This characterization is not accurate. These six calls involved four different attorneys and four different law offices. (Defs' Reply at 11.)  As the government explains in its sealed submission, one of these calls (# 5912) was not minimized because the person contacted was not covered by the privilege.[14] Two calls (# 5803 and # 6132) were well under two minutes and contained no confidential communications, but  appear to have involved conversations with the attorneys' secretaries about reaching the attorney.[15]   Two additional calls (# 6257 and # 6258) were listed as minimized, but defendants maintain that the call summaries include "the entirety of the conversations." (Defs' Reply at 11.) Because the linesheets for these calls were not provided, the Court cannot evaluate the accuracy of this contention. However, from the synopses provided by defendants, it is apparent that both of these short calls were between the defendant and the attorney's secretary and again only involved a scheduling matter.   These five calls are therefore not covered by the attorney-client

---

[13]  *See* Linesheet Nos. 5803, 5912, 6132, 6257, 6258, 6302. Three of these calls are also included in the general list of challenged calls.

[14] This call was between Mr. Suggs and a disbarred attorney who was known by law enforcement to have a history of drug abuse.   Law enforcement monitored a conversation in this case in which Mr. Glover told Suggs that Daniel Thompson, who was named in the indictment in the related *Glover* case, sold "dope" to this attorney. The government therefore monitored the conversation under the correct belief that having been disbarred, the former attorney's communications were no longer protected by the attorney-client privilege and because of the concern that the former attorney could also be implicated in the conspiracy.

[15] Neither party provided the Court with the linesheets for these calls, so the Court's assessment is based upon the summaries provided by the defendants. (Defs' Mot. to Suppress Ex. 4 [Calls To and From Lawyers].)

privilege and were not impermissibly monitored.[16]  Finally, the last call (# 6302) was with attorney

Doug Ellis and was inadvertently monitored when Mr. Ellis returned a call without announcing

himself as an attorney.  When it was determined that the call was privileged, it was sealed, the

monitor was relieved of his duties on this case, and all monitors were reminded of their obligations

regarding privileged communications. (Govt's Opp'n at 6.)  Of these six calls, this is the only call

that should have been minimized.  However, the Court finds that the government responded

reasonably once the error was discovered.

The Court therefore concludes that of the 152 total challenged calls, only approximately 20

calls should have been minimized and were not.[17]  Although an explanation is not available to

explain the non-minimization of every call on the sample list, in a case of this scope even the most

diligent efforts at monitoring will necessarily be imperfect.   Morever, it bears noting that with the

exception of one attorney-client conversation (# 6302), the calls that were not minimized did not

result in any particular pattern, nor was there anything significant or prejudicial about them.  Given

the totality of the circumstances, the Court does not believe that the government must be required

to provide any further explanation for the relatively low number of non-pertinent, non-minimized

---

[16] "The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services." *In re Lindsey*, 158 F.3d 1263, 1268 (D.C. Cir. 1998).  "It is the substance of the communications which is protected, . . . not the fact that there have been communications." *United States v. Kendrick*, 331 F.2d 110, 113 (4th Cir. 1964).  "[C]ommunications that are not relevant to a client's legal problem are not shielded from disclosure by the attorney-client privilege." *United States v. Jackson*, 2007 WL 4225403, at *2 (D.D.C. Nov. 30, 2007).  None of these calls involved any substantive legal discussions and therefore they are not covered by the privilege.

[17] Using the total number of 4,849, this works out to an error rate of approximately 4%, over 3 months of surveillance.

calls. This investigation targeted a large, interstate narcotics trafficking conspiracy whose members

discussed their activities using veiled language and code.   (*See* Govt's Opp'n at 16-17).   The

difficulty in determining the pertinence of a particular call in such investigations is well-recognized.

*See, e.g., Hoffman*, 832 F.2d at 1308 (When considering the investigation of a drug conspiracy "the

need to allow latitude to eavesdroppers is close to its zenith."); *United States v. Quintana*, 508 F.2d

867, 874 (7th Cir. 1975) (compared to other types of crimes, "large and sophisticated narcotics

conspiracies may justify considerably more interception."). "[B]ecause we review minimization for

the reasonableness of the efforts of law enforcement officials and not the perfection of their results,"

*United States v. Ramirez*, 479 F.3d 1229, 1243 (10th Cir. 2007), the Court cannot conclude that the

fact that law enforcement failed to minimize a small number of calls renders their electronic

surveillance unreasonable.

But even if defendants could argue that the government's minimization efforts were not

sufficiently reasonable, the Court would be unwilling to suppress the entire wiretap as a remedy for

the non-minimization of a relatively small number of irrelevant calls. Rather, "the appropriate relief

likely would be to suppress any conversations or conversations that were inappropriately monitored."

*Mansoori*, 304 F.3d at 648.[18]  Total suppression "is not appropriate unless the moving party shows

---

[18]  Although the appropriate remedy for a violation of the minimization requirement has
not been addressed by the Supreme Court and "is open in this circuit," *Carter*, 449 F.3d at 1296,
other circuits have indicated that total suppression is only warranted under extreme
circumstances. *See, e.g., United States v. Gaytan*, 74 F.3d 545, 554 (5th Cir. 1996) (the
appropriate remedy for minimization violations is the exclusion of the interceptions that were
improperly obtained because "[t]he exclusionary rule does not require the exclusion of those
conversations that were properly intercepted as well."); *United States v. Cox*, 462 F.2d 1293,
1301 (8th Cir. 1972) ("Clearly Congress did not intend that evidence directly within the ambit of
a lawful order should be suppressed because the officers, while awaiting incriminating evidence,
also gathered extraneous conversations.").
And even though the D.C. Circuit has yet to address the appropriate remedy for a

that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief," *United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001) (internal quotation marks and citation omitted), and is reserved for the "particularly horrendous case," *Hoffman*, 832 F.2d at 1309, "where the government has made effectively no effort towards minimization whatsoever." *United States v. Cleveland*, 964 F.Supp. 1073, 1092 (E.D. La. 1997).   There is simply no indication that this is such a case.   This wiretap investigation was conducted pursuant to a search warrant and under judicial supervision,[19] and the ultimate error rate was quite small.   Therefore, even if law enforcement's minimization efforts were somehow deficient, which they were not, the appropriate remedy, in the absence of egregious conduct, would only extend to suppression of the challenged conversations, not all intercepted communications from this wiretap.

---

violation of the minimization requirement," *Carter*, 449 F.3d at 1296, it is logical to treat a minimization failure similarly to any other search that exceeds the scope of a valid search warrant.   In *United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981), the D.C. Circuit rejected the argument that total suppression of all seized documents *(including those listed in the warrant)* was required because the search exceeded the scope of the warrant.   *Id.* at 1262.   While noting that "in some cases a flagrant disregard for the limitations in a warrant" might require "the entire fruits of the search warrant to be suppressed," *id.* at 1259,   the Court concluded that "[a]bsent that sort of flagrant disregard, the appropriate rule seems to be that where officers seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant."   *Id.   See also United States v. Baldwin*, 987 F.2d 1432, 1436 (9th Cir. 1993) (holding that only items seized pursuant to invalid portions of warrant must be suppressed).   Applying this rule to electronic surveillance leads to the conclusion that "total suppression can be imposed only when the defendant can establish that agents acted in 'flagrant disregard' of their minimization duties." *United States v. Lamantia*, 1996 WL 559950, at *14 (N.D. Ill. Sept. 30, 1996).

[19]   The parties have argued at length about the exact extent of the judicial supervision in this case. Because the Court finds that the minimization efforts in this case were reasonable without reference to the factor of judicial supervision over the warrant process, this dispute over the extent to which Judge Collyer was made aware of the specifics of law enforcement's minimization efforts as part of her overall supervision of the electronic surveillance need not be resolved.

For the above reasons, defendants' motion to suppress the wiretap evidence is denied.

## II.   Defendant Helery Price's Motion to Sever Counts And/Or Defendants

Defendant Helery Price moves the Court to sever his case from those of the other defendants, or alternatively, to sever those counts unrelated to the charged PCP conspiracy from the indictment. Price argues that the evidence against him is *de minimus*, as compared to that which the government will introduce against his co-defendants. (Price's Mot. to Sever at 10.)  Additionally, Price contends that Counts II through V against Ernest Glover and Count IX against Anthony Suggs are misjoined with the conspiracy count because they do not relate to the PCP conspiracy or because the offenses giving rise to those counts occurred outside the time frame of the conspiracy. (*Id.* at 8-10.)  Price has therefore raised two issues: first whether the defendants and counts in this case are properly joined under Federal Rule of Criminal Procedure 8(b); and second, even if properly joined, whether he is entitled to severance under Federal Rule of Criminal Procedure 14.[20]

### A.   Joinder

It is well-established in this Circuit that the "propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and . . . Rule 8(a) has no application." *United States v. Jackson*, 562 F.2d 789, 794 (D.C. Cir. 1977).   Rule 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts

---

[20]  Given the Court's instruction, a motion filed by one defendant will be deemed filed as to all defendants unless a defendant excludes himself.  It is therefore assumed that all defendants have joined in this motion to sever counts based on misjoinder.  In addition, defendant Lee has joined defendant Price's motion to sever his case from that of the other defendants, arguing that the evidence against him is also *de minimus*. (*See* Defendant Lee's Motion to Sever Counts and/or Defendants at 1.)

16

together or separately.   All of the defendants need not be charged in
each count.

Fed. R. Crim. P. 8(b).  Under Rule 8(b), charges are properly joined when they are based on a "series

of acts or transactions" that are part of "a common scheme or plan."  *United States v. Brown*, 823

F.2d 591, 598 (D.C. Cir. 1987) (quoting *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)).

"[J]oinder is preferred in conspiracy cases," *United States v. Eiland*, 406 F.Supp.2d 46, 50 (D.D.C.

2005), because the conspiracy charge provides a "common thread that ties all of the defendants and

charges together."  *United States v. Edelin*, 118 F.Supp.2d 36, 39 (D.D.C. 2000).

Although this Circuit construes Rule 8(b) broadly in favor of joinder, "there are definite

limits to what the government can put together in a single indictment."  *United States v. Nicely*, 922

F.2d 850, 853 (D.C. Cir. 1991).  Rule 8(b) "may not be read to embrace similar or even identical

offenses, *unless* those offenses are related." *Perry*, 731 F.2d at 990 (emphasis in original).[21]  "[T]here

must be a logical relationship between the acts or transactions within the series." *Id.*  In this case, all

defendants are charged as participants in a PCP distribution conspiracy, and three of the defendants,

Glover, Suggs, and Parker, are also charged with individual offenses related to the possession and

distribution of PCP.  The relationship of these individual counts to the overall conspiracy is plain.[22]

_____

[21] *See also United States v. Irizarry*, 341 F.3d 273, 289 (3d Cir. 2003) (Rule 8(b) "permits
joinder of defendants charged with participating in the same racketeering enterprise or
conspiracy, even when different defendants are charged with different acts, so long as
indictments indicate all the acts charged against each joined defendant (even separately charged
substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of,
or in association with a commonly charged RICO enterprise or conspiracy.")

[22] Price argues that the charge in Count II against defendant Glover alleging possession of
PCP with intent to distribute that occurred on June 19, 2007, should be severed because it is
outside the scope of the conspiracy, which is alleged to have continued until "at least June 11,
2007." (Price's Mot. to Sever at 5-6.)  The government explains that this offense is based on an
individual search warrant that was executed in conjunction with the "take-down" in this case.

17

Two of the defendants are also charged with individual non-PCP offenses. Defendant Glover is charged with possession of heroin (Count III) and with being a felon in possession of a firearm (Counts IV and V). Defendant Suggs is charged with distribution of cocaine (Count IX). In its pleadings, the government explains that the charges involving cocaine, heroin, and firearms resulted from the execution of a search warrant and an undercover buy, which occurred during law enforcement's investigation of the PCP conspiracy.[23] (Govt's Opp'n to Mot. to Sever at 3.) Based on the government's representations, the only common theme linking the PCP and other non-PCP offenses is that the non-PCP offenses were uncovered during course of the law enforcement investigation, not any relationship between the offenses themselves.[24] This is obviously a misreading of Rule 8(b), since it ignores the requirement that the charges be based on a "series of acts or transactions" that are part of "a common scheme or plan." *Perry*, 731 F.2d at 990.[25]

Relying principally on *United States v. Gorecki*, 813 F.2d 40 (3d Cir. 1987), the government argues that the joinder of the gun charges with the drug charges is permissible here because the guns

_____

(Govt's Opp'n to Mot. to Sever at 4-5.) The government has alleged sufficient facts to demonstrate that this individual PCP offense is part of the same "series of acts or transactions" to warrant joinder.

[23] "In determining whether joinder of multiple defendants in a single prosecution is proper, this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the Government." *United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994).

[24] This is not a case in which the indictment or pre-trial pleadings establish that the "firearms violation . . . was an overt act of the conspiracy." *United States v. Jones*, 880 F.2d 55, 61 (8th Cir. 1989). Nor is this a case in which the indictment alleges that the firearm was used in relation to a drug trafficking crime. *See, e.g., United States v. Brown*, 16 F.3d 423, 425 (D.C. Cir. 1994).

[25] If one were to accept the government's logic, a defendant charged in a multi-defendant drug conspiracy could also be charged with violating child pornography laws if the search of his residence revealed both drugs and child pornography.

were found during the same search that uncovered the PCP at Glover's residence. (Govt's Supp. Mem. at 3.) *Gorecki* is distinguishable both as a matter of law and on its facts. Most notably, Gorecki was not a multi-defendant case and therefore was decided under Rule 8(a), which is, as discussed herein, substantially more lenient than Rule 8(b). Furthermore, in finding joinder permissible, the *Gorecki* court noted that "[t]here was evidence that Gorecki's house was used and had been used for a long time for major cocaine dealings, indeed that Gorecki had acquired it from a predecessor dealer for that purpose," and concluded that "it [was therefore] reasonable to assume that the firearm [found in the house] could have been used as a vital part of a plan to possess and distribute drugs . . . ." *Id.* at 42. Contrary to the government's assertions, it was not solely the discovery of the guns and drugs during the execution of the search warrant that permitted joinder. Rather, the information the government provided about the location where the search occurred linked the offenses and made joinder under 8(a) appropriate.[26]

The government also argues, again citing *Gorecki*, that the non-PCP drug and gun charges should be joined with the PCP-related charges because this contraband would be admissible as 404(b) evidence. (Govt's Supp. Mem. at 3-4.) The government points to no case law, however, that would indicate that this is a consideration in a Rule 8(b) analysis, although it could be relevant under Rule 8(a). Rule 8(a) is more permissive than Rule 8(b) as it provides for the joinder of offenses if they "are of the same or similar character *or* are based on the same act or transaction or on two or more acts or transactions connected together or constituting part of a common scheme or plan." Fed.

---

[26] The *Gorecki* court itself noted that its holding was not "that narcotics-related and weapon-related charges may be joined in all cases," for "[t]here may be circumstances in which they are not sufficiently connected temporally or logically to support the conclusion that the two crimes are part of the same transaction or plan." *Gorecki*, 813 F.3d at 42. In this case, it is the logical link between the offenses that is missing.

R. Crim. P. 8(a).  As the D.C. Circuit has explained,

> When similar but unrelated offenses are jointly charged to a single
> defendant, some prejudice almost necessarily results, and the same is
> true when several defendants are jointly charged with a single offense
> or related offenses.  Rule 8(a) permits the first sort of prejudice and
> Rule 8(b) the second.  But the Rules do not permit cumulation of
> prejudice by charging several defendants with similar but unrelated
> offenses.

*Cupo v. United States*, 359 F.2d 990, 993 (D.C. Cir. 1966) (footnote omitted).  Were the defendants

to be tried separately, the fact that the non-PCP drug and gun charges could potentially be introduced

as 404(b) evidence would be a factor in determining whether these charges could properly be joined

with the PCP charges under Rule 8(a).  *See, e.g., United States v. Montes-Cardenas*, 746 F.2d 771,

777 (11th Cir. 1984) ("The same logic used to admit weapons into evidence at drug trials directs us

to conclude that, especially when, as here, weapons and drugs are found during the same search,

joinder of a weapons offense with drug charges is proper under Rule 8(a).").  However, because the

defendants are being tried together, the fact that the relevant evidence may come in under 404(b) is

irrelevant to determining whether joinder is proper under Rule 8(b).  Morever in the cases that have

addressed facts similar to those presented here,  courts have been reluctant to permit joinder under

Rule 8(b).  For example, in *United States v. Chavis*, 296 F.3d 450 (6th Cir. 2002), the Sixth Circuit

found the firearm and drug offenses misjoined because "[t]here [was] no evidence or allegation in

the indictment suggesting that Chavis's possession of cocaine base . . . was part of 'the same act or

transaction' as the purchase of the handgun . . . ." and there was also no "common thread of an

overarching criminal scheme connecting these two crimes." *Id.* at 458.    *See also United States v.*

*Hatcher*, 680 F.2d 438 (6th Cir. 1982) (finding misjoinder of individual counts of cocaine

distribution and possession with shared counts of heroin possession and distribution).

Finally, the government suggests that the current joinder of the defendants and offenses is permissible because it would "promote economy of judicial and prosecutorial resources" without prejudicing the defendants. (Govt's Supp. Mem. at 3 (quoting *Gorecki*, 813 F.2d at 42)). While the government is correct that joint trials are preferred, "it is also true that failure to meet the requirements of [Rule 8] constitutes misjoinder as a matter of law," *United States v. Hatcher*, 680 F.2d at 440, and therefore, the Court has no discretionary authority to join offenses that do not meet the requirements of Rule 8. *See United States v. Hernandez*, 921 F.2d 1569, 1579 (11th Cir. 1991) ("Rule 14's concern is to provide the trial court with some flexibility when a joint trial may appear to risk prejudice to a party . . . . Rule 8(b), however, requires the granting of a motion for severance unless its standards are met, even in the absence of prejudice . . . .").

The Court concludes that the fact that the government discovered evidence of unrelated types of criminal activity by some of the co-conspirators during the course of their investigation is insufficient to create a "logical relationship between the acts and transactions within the series" of offenses listed in the indictment. *Perry*, 731 F.2d at 990. The Court will therefore grant defendant's motion and sever Counts III, IV, V, and IX.[27]

**B.      Severance**

Price and Lee also argue that the "disparity of the evidence" warrants a severance of their trials from that of their co-conspirators. Pursuant to Federal Rule of Criminal Procedure 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trails of counts, sever the defendant's trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a). In general, severance will not be granted

---

[27] The reference to heroin in the Forfeiture Count will also be stricken.

absent a showing of substantial prejudice by the defendant. *Zafiro v. United States*, 506 U.S. 534, 540 (1993). A defendant is not entitled to severance simply because he might have a better chance of acquittal if he were tried separately. *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991). To make out a showing of substantial prejudice, the Supreme Court has held that the defendant must demonstrate "a serious risk that a joint trial would compromise a specific trial right of the one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Price and Lee have failed to meet this heavy burden. Although in rare cases, severance may be warranted on the basis of disparate evidence, *see, e.g.*, *United States v. Sampol*, 636 F.2d 621, 643 (D.C. Cir. 1980), simply "showing that there is more evidence against one defendant, that there are more charges against one defendant, or that the evidence is stronger against one defendant than against the others is insufficient to prevail on a demand for severance." *United States v. Gray*, 173 F.Supp.2d 1, 10 (D.D.C. 2001) (citing *Blumenthal v. United States*, 332 U.S. 539 (1947); *United States v. Perholtz*, 657 F.Supp. 603 (D.D.C. 1986)). It is in "the nature of a conspiracy . . . that there are different quanta of evidence against various defendants." *Edelin*, 118 F.Supp.2d at 43. Particularly in drug conspiracies, it is to be expected that "a kingpin will be more visible and culpable than a distributor." *Id.* The question therefore is not whether the government has more or different evidence against one defendant than against the other, but rather whether the jury can "reasonably be expected to compartmentalize the evidence as it relates to separate defendants . . . ." *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir. 1971). Most of the evidence in this case, particularly that which relates to defendants Price and Lee, will consist of recorded telephone conversations in which they are recorded speaking to their codefendants. This kind of evidence

minimizes the likelihood that the jurors will use evidence of one defendant's guilt against another. *See, e.g., United States v. Spriggs*, 102 F.3d 1245, 1256 (D.C. Cir. 1996) (holding that government had minimized the possibility of prejudice "by presenting the evidence of each transaction, consisting largely of tape recordings of the participants' own words, separately and in chronological order.")   Furthermore, the Court will "instruct the jury as to the different evidence and the jury's responsibility in determining the guilt or innocence of each of the different defendants on the basis of that evidence."   *Edelin*, 118 F.Supp.2d at 44.   Finally, given the Court's decision to grant severance as to several counts against the other defendants, any claim of prejudicial spillover by Lee and Prices has been greatly diminished.  Accordingly, defendant Price's and defendant Lee's motions for severance will be denied.

## CONCLUSION

For the reasons stated herein, defendants' joint motion [88] for suppression of wiretap evidence is DENIED.  Defendant Price's motion [70] to sever counts and/or defendants are DENIED in part and GRANTED insofar as Counts III, IV, V, and IX are severed.[28]

ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 16, 2008

---

[28] Since defendant Lee has specifically joined in defendant Price's motion, defendant Lee's motion [118] is also DENIED in part and GRANTED in part.