UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

FEB 1 1 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>)<br>v.           )<br>)<br>ANTHONY MAURICE SUGGS, et al., )<br>)<br>Defendants.       )<br>) | Criminal No. 07-00152 (ESH) |

## MEMORANDUM OPINION AND ORDER

Defendant Anthony Suggs and four co-defendants have been charged in a Superseding Indictment, which alleges that from approximately August 1, 2005, and continuing until at least June 11, 2007, defendants and others conspired to possess with intent to distribute and to distribute large quantities of PCP in the District of Columbia, Maryland, Georgia, Missouri, California, and elsewhere. Defendant Suggs is also charged with Unlawful Possession with Intent to Distribute One Kilogram or More of Phencyclidine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iv), and two counts of Unlawful Distribution of Phencyclidine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Defendant Suggs has moved to suppress the evidence seized at his residence at 4000 10th Street N.E., on March 27, 2007. In support of his motion, he argues that (1) law enforcement officers conducted a warrantless search of the residence; (2) the affidavit in support of the search warrant failed to allege facts sufficient to support a finding of probable cause; (3) the affidavit was intentionally misleading; and (4) the warrant was over-broad. (Def.'s Mot. 6-7.) On February 5, 2008, the Court conducted an evidentiary hearing at which the following witnesses testified: David

Jones, a defense investigator; Susan Drew Thomas and her husband, Lorenzo Thomas, residents of 4004 10th Street N.E.; Lieutenant Richard David Morris of the D.C. Fire Department ("DCFD") ; Sergeant Marcus Moon of the DCFD; and Investigator Michael Eames of the Fourth District Vice Unit of the Metropolitan Police Department ("MPD"). Having reviewed the testimony, the pleadings, and the relevant law, the Court denies defendant's motion based on the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In early 2007, the FBI and the MPD were conducting a joint narcotics investigation in which Suggs was one of the targets. Eames was the lead investigator from MPD on this team and had extensive experience working on PCP investigations. On March 27, 2007, at 6:28 p.m., the FBI agents who were monitoring defendant Suggs's cellular telephone pursuant to a Title III wire intercept heard a conversation between Suggs and his former girlfriend Ngozi Joy, with whom he resided at 4000 10th Street N.E. During the call, Joy told Suggs that she could "smell that stuff when I pulled up . . . ." and expressed her concern that a police officer who was riding his bicycle in the area might have been able to smell it because "if you know what the smell is, you know what the smell is." (Def.'s Mot 8-9.) Joy said that she could smell it "when she got on the sidewalk" and thought it might be strong "cause the upstairs window was open . . . ." (*Id.*)

After hearing this interception, the monitoring FBI officers called Eames, who drove with Inspector Singletary of the MPD to the FBI building where they met with FBI Agents Ryan Pardee and John Bevington. Eames and Singletary listened to the call and then Eames, Pardee, Singletary, and Bevington discussed the possibility of obtaining a search warrant for the 10th Street address. Eames asked Singletary to call Investigator Kyle, another member of Fourth District Vice Unit, to

tell him to start the process of obtaining a search warrant affidavit and to notify DCFD because, as explained by Eames, MPD protocol requires that DCFD be notified of any reports of a chemical order emanating from a building. Eames, Singletary, and Pardee then proceeded to Suggs's residence. Investigator Kyle contacted Investigator Janczyk who, posing as a neighbor, placed an anonymous 911 call to DCFD to report a chemical odor coming from the 10th Street address, and claimed to be worried about the neighbors who lived there and about the effect of the chemical odor on his children. Eames did not provide any direction to Kyle or Janczyk regarding the substance of this call.

In response to the 911 call, which was received at 7:02 p.m., DCFD responded by dispatching numerous DCFD engines and vehicles, which began arriving on the scene at approximately 7:06 p.m. Lieutenant Morris was in charge of a five-person Hazmat unit that was also dispatched to the scene. At 7:10 pm., the Engine 17 company reported no odor outside in the rear of the house. Three minutes later, at 7:13 p.m., the Engine 14 company reported no odor in the home. Morris and his Hazmat unit arrived on the scene at 7:13 p.m.[1] Two members of the Hazmat team (Sergeant Moon and PFC Fireman Campbell) put on firefighting gear and their self-contained breathing apparatuses ("SCBA") and entered the residence after asking the occupants (Suggs and Joy's daughter) to leave the premises. Moon testified that while wearing the SCBA inside the house, he was unable to smell any odors due to the apparatus. Moon and Campbell reported to Morris, who was standing outside the door, that all the readings inside were normal. At that point Morris entered the house. All he

---

[1] Morris confirmed that he was not present at the time the Engine 14 company entered the house and could not explain what they had done, because regular firefighters "should not make entry" in response to a suspicious odor call.

could smell was some incense burning. Morris confirmed that incense can be used to alleviate or mask other smells. He testified that his team did not use the "clandestine test kit," which would have allowed them to test for the presence of PCP. As explained by Moon, normal results from the standard tests would not "give [him] a clue one way or another" whether PCP was present. The atmospheric readings were: Oxygen - 19.8%;[2] Volatile Organic Compound ("VOC") - 2.3%; Carbon Monoxide - 6ppm (slight elevation attributable to incense burning); flammability - no hazard; radiation - normal background. (Def.'s Ex. 2 [After Action Report].)

At some point shortly before DCFD completed its investigation and left the scene, Morris was told by Chief Wayne Benson that MPD believed that there might be PCP in the house. DCFD did not investigate further. Morris also testified that he did not see any MPD officers enter the residence while he was on the scene.

When the emergency vehicles began to congregate outside 4000 10th Street, the Thomases, who reside two houses away from Suggs's residence, came out of their home to find out what was happening. Susan Thomas remained on her porch. Lorenzo Thomas came down to the street to talk to Suggs who was sitting on a small retaining wall on the sidewalk. Neither of them smelled anything unusual. Susan Thomas believed they stayed out there for approximately thirty minutes. Lorenzo Thomas remembered that they went back into the house after only a few minutes. Neither remembered what the weather conditions were that night, nor was either familiar with the smell of PCP.

---

[2] In his testimony, Morris opined that the reported oxygen reading could not be correct and that he must have made an error, since the reading of 19.8%, while not abnormal, was sufficiently low to require further investigation.

Around the same time that Morris and his Hazmat crew arrived on the scene, Eames also arrived with Singletary and Pardee. Eames saw Morris and two firefighters wearing SCBA enter the residence. As Eames approached the house, he could smell a chemical odor consistent with ether emanating from the residence. Eames testified that the day was warm and there was no wind. One of the firefighters, Sergeant Moon, came out of the house, and pulled up his SCBA. Eames asked him if he could "smell it," and Moon said he could. Eames said, "that's the ether right there" and Moon said that he was "getting an organic reading." Eames then called Kyle sometime between 6:45 and 7:00 p.m. to tell him that he had smelled a chemical odor consistent with PCP coming out of the house and that one of the fire fighters had also smelled the odor. Eames testified that he was not told about the "no odor" reports from Engines 14 and 17, nor about the specific results of the tests done by the Hazmat team, and Morris confirmed that he did not relay that information to Eames, but spoke to the MPD personnel only "in passing" to tell them that it was safe to enter the house.

Sometime around 7:45 p.m., Eames noticed vapors coming from an open attic window. He called Kyle back to provide this additional information, but Kyle said that he had already written up the affidavit and was working with Assistant United States Attorney ("AUSA") William O'Malley, who said they had enough. This was the last conversation between Eames and Kyle before Kyle obtained the authorization for the search warrant from a Superior Court judge. After DCFD left the scene, Eames and Pardee conducted a "protective sweep" of the premises to make sure that no one was left inside who could destroy evidence while MPD waited for a search warrant. At 7:57 p.m., FBI agents listening on the wire heard a second phone call between Suggs and Joy in which Suggs told Joy that she needed to come home because law enforcement officers were entering her residence

without a warrant. Suggs told Joy that "they talking about got a chemical smell or something . . . ." (Gov't Surreply 6.) Eames and Pardee swept the house looking in spaces where a person could be hiding. While in the basement, Eames again smelled PCP. No evidence was seized during the sweep. MPD secured the premises and waited for the search warrant.

Shortly before 10:00 p.m., law enforcement officers executed a search warrant approved by D.C. Superior Court Judge Rafael Diaz, which permitted a search of the premises for "illicit drugs, drug paraphernalia, photographic or video evidence demonstrating the existence of illegal activity, safes, documents or records relating to the possession or distribution of illicit drugs . . . and money derived from drug trafficking . . . ." (Def.'s Ex. 1 [Aff./ Search Warrant] at 4.) In the basement, the officers found a white foam cooler containing seven bottles of PCP, a pair of rubber gloves, three facial masks, two funnels, black trash bags containing large buckets, and a glass Pyrex measuring cup. (*Id.*) They also found seven 32-ounce bottles containing PCP in the attic and $7,000 in cash and a withdrawal receipt for that amount in Suggs's name in a jacket in the bedroom closet. (*Id.*) Finally, they recovered a large quantity of incense. (*Id.*)

Having heard the testimony, the Court credits Investigator Eames's testimony that he smelled a chemical odor consistent with PCP outside 4000 10th Street N.E. Eames testified that he had smelled PCP over 50 times prior to this investigation. His observation is corroborated by the first phone call between Joy and Suggs, in which Joy specifically said that she could smell the PCP.[3]

---

[3] The disparity between Eames's testimony and that of Morris and the neighbors can be explained by their lack of familiarity with the smell of PCP and by their location. Morris testified that he "is not extremely familiar with PCP" and is "not an expert in that field at all." Neither of the Thomases had ever smelled PCP. Morris spent most of his brief time on the scene either in the home or on the porch, where the smell was masked by the incense and Susan Thomas remained on her porch two doors down for the duration of the incident. Only Lorenzo

Eames's testimony is also confirmed by Moon, who testified that he smelled a chemical odor outside the residence, although he was unable to describe the odor or confirm that it smelled like PCP, and by the second intercepted conversation in which Suggs told Joy that the police told him they were investigating a chemical smell.[4] The Court therefore finds that Eames provided credible information to Kyle for inclusion in the affidavit.

## ANALYSIS

Suggs argues that the physical evidence recovered at 4000 10th Street N.E. must be suppressed because law enforcement conducted a warrantless search of the premises. The government maintains that no search occurred prior to the execution of the warrant and that exigent circumstances justified the officers' protective sweep of the premises. The Court need not resolve this dispute, however, because even if the initial warrantless entry was unlawful, the evidence seized pursuant to the search warrant is admissible "because there was an independent source for the warrant under which that evidence was seized." *United States v. Segura*, 468 U.S. 796, 813-14 (1984). The affidavit submitted to Judge Diaz in support of the warrant application indicates that:

> [T]he D.C. Fire Department responded to 4000 10 Street, N.E. for a suspicious odor. Investigator Michael Eames assisted the D.C. Fire Department and smelled a strong chemical odor consistent with PCP emanating from inside 4000 10th Street N.E. The odor was also observed by D.C. Fire Department personnel on the scene.

---

Thomas was near the location where Eames was standing, and he testified that he came over and spoke with Suggs only briefly and then went back to his home because "there were so many police there" and he "didn't want to become a part of whatever was going on."

[4] Moon testified that he had previously smelled PCP but was unable to describe the odor that he had smelled on March 24. As he explained, his memory of the events of that day was not good given the length of time that has passed, but he clearly remembered telling Eames that he smelled an odor.

(Def.'s Ex. 1 at 4.) Eames detected a chemical odor consistent with PCP emanating from 4000 10th Street N.E. and this odor was also observed by the DCFD. It is clear from the testimony that law enforcement was aware of this information *before* the initial entry into Suggs's residence. Eames made both his first and second call to Kyle regarding the affidavit before the protective sweep, which, according to the call between Suggs and Joy, occurred sometime around 8:00 p.m. Furthermore, the affidavit included no information that had been gathered during the sweep. Because the information in the affidavit upon which the warrant was based "came from sources wholly unconnected with the initial entry," it "constituted an independent source for the discovery and seizure of the evidence" that is the subject of Suggs's motion to suppress. *Id.* at 814. The legality of the initial entry is therefore "wholly irrelevant," *id.*, and the only question before the Court is whether the search pursuant to the warrant was valid.

Suggs first challenges the warrant issued by Judge Diaz on the grounds that it was not supported by probable cause. In reviewing the issuance of a search warrant, the Court must inquire whether the issuing court had "a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). "Because there is a strong preference that Fourth Amendment searches be conducted pursuant to a warrant, reviewing courts should avoid "a grudging or negative attitude . . . towards warrants." *United States v. Hopkins*, 128 F.Supp.2d 1, 4 (D.D.C. 2000) (quoting *Gates*, 462 U.S. at 236) (internal citation omitted). The issuing court's determination that probable cause exists "should be paid great deference by reviewing courts." *Spinelli v. United States*, 329 U.S. 410, 419 (1969). Moreover, in reviewing a warrant application, courts must treat the affidavit "in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of

elaborate specificity once exacted under common law pleading have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Applying this standard, the Court concludes that the information contained in this affidavit was sufficient to establish probable cause for the search of the residence at 4000 10th Street N.E. Eames, a trained law enforcement investigator with substantial experience dealing with PCP, represented to Kyle, the affiant, that he had detected the distinctive chemical odor associated with PCP emanating from the residence and that Moon had also noticed the odor. "The Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search." *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989) (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948) (the odor of an illegal substance testified to by a qualified affiant "might very well be found to be evidence of a most persuasive character")). Other courts have found probable cause on the basis of a trained law enforcement officer's identification of the smell of PCP and methamphetamines. *See Leatherman v. Tarrant County Narcotics Intelligence & Coord. Unit*, 28 F.3d 1388, 1393-94 (5th Cir. 1994) (upholding search warrant based on trained officer's statement that he smelled a strong chemical odor associated with the manufacturing of methamphetamines coming from the residence"); *United States v. Clayton*, 210 F.3d 841, 845 (8th Cir. 2000) (officer "developed probable cause for a search based upon his immediate perception of an odor associated with methamphetamine production").

In short, Eames's statement that he detected a "strong chemical odor consistent with PCP" created "reasonable cause to believe that the specific 'things' to be searched for and seized [were] located on the property to which entry is sought," *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978), and therefore, there was sufficient information to establish probable cause.

But even if it were arguable that the search warrant was unsupported by probable cause, the law enforcement officers who executed it were entitled to rely in good faith on a search warrant issued by a detached and neutral judge. *See United States v. Leon*, 468 U.S. 897, 920-21 (1984). Suggs contends that the *Leon* good faith exception does not apply in this case because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* at 923 (internal quotation marks and citation omitted), and because the affidavit submitted in support of the warrant was intentionally misleading. *Id.* Neither of these arguments has merit.

First, even if the chemical smell of PCP alone were insufficient to establish probable cause, this is not a case in which the affidavit was so sparse that no reasonably well-trained officer could have believed that there existed probable cause to search the residence. *See Leon*, 468 U.S. at 923.[5] The purpose of the exclusionary rule is not "to prevent judicial officers from making erroneous probable cause determinations in approving warrant applications." *United States v. Pelham*, 749 F.Supp. 304, 310 (D.D.C. 1990). Rather, it is designed to "alter the behavior of individual law enforcement officers or the policies of their departments." *Leon*, 468 U.S. at 918. While the challenged affidavit could possibly have been more expansive, Kyle "did everything else that reasonably could be expected of him under the Fourth Amendment: he showed the supporting affidavit to an Assistant United States Attorney, who approved it, and then he presented . . . [it] to a detached, neutral Superior Court Judge, who made a probable cause determination and authorized

---

[5] Notably, in a factually similar case, the Ninth Circuit concluded that the smell of ether, without more, was insufficient to establish probable cause to search a residence, but nonetheless, determined that a reasonably well-trained police officer could have relied in good faith upon the warrant issued by the magistrate. *United States v. Tate*, 795 F.2d 1487, 1491 (9th Cir. 1986).

a detached, neutral Superior Court Judge, who made a probable cause determination and authorized the search." *Pelham*, 749 F.Supp. at 310 (citation omitted).[6] "Under these circumstances, [the officer's] reliance on the [judge's] determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate." *Leon*, 468 U.S. at 926.

Suggs's second argument is no more persuasive. Suggs maintains that the affidavit was intentionally or recklessly misleading because (1) the statements made by Investigator Eames in support of the affidavit were false (Def.'s Reply 8); (2) the affidavit does not explain that the complaint received by the fire department was actually from the law enforcement officers who were monitoring the wiretap (Def.'s Mot. 9); and (3) the warrant made no reference to the two prior "searches" by the DCFD and MPD. (*Id.* 8.) The Court has already found Eames's testimony to be credible, and therefore it rejects Suggs's contention that Eames's statements in support of the affidavit were untrue. Furthermore, Suggs offers no explanation as to how the inclusion of any of the omitted information would have altered Judge Diaz's finding as to probable cause. Presumably, had Judge Diaz been aware of the wiretap call between Suggs and Joy and of Eames's report that he smelled PCP in the basement, that would only have *strengthened* the basis for his probable cause finding. In this case, the officers who applied for the warrant made a strategic decision not to reference the wiretap information so as to protect the integrity of the ongoing investigation into Suggs and his co-conspirators. By choosing not to include this additional information, they ran the risk of being denied permission to search -- they did not, however, intentionally or recklessly mislead the issuing judge. *See United States v. Jones*, 451 F.Supp.2d 71, 79 (D.D.C. 2006). Therefore, even

---

[6] In fact, Eames attempted to make the affidavit more thorough, but was told by Kyle that he had consulted with AUSA O'Malley and that they already had enough for the warrant.

were the Court to find that the warrant was not supported by probable cause, the *Leon* "good faith" exception would apply and the evidence discovered as a result of the search would be admissible.[7]

Finally, Suggs argues that the facts in the affidavit were insufficient to support a warrant authorizing a complete search of the premises. Suggs offers no explanation, however, as to how the warrant should or could have been limited, given the information provided in the affidavit. The affidavit indicated that the chemical odor of PCP was emanating from 4000 10th Street N.E. It was therefore logical that the warrant would authorize a complete search of that residence to locate the source of the odor. Furthermore, the affidavit contains a list of the items subject to seizure that is "tailored to allow only the seizure of items related to the alleged criminal act[ivities]" believed to be occurring in the residence. *United States v. Sumler*, 924 F.Supp. 249, 251 (D.D.C. 1996). The Court therefore finds that the warrant was not overly broad.

## CONCLUSION

For these reasons, defendant Suggs's motion to suppress [71] is DENIED.

*/s/ Ellen S. Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: February 11, 2008

---

[7] The *Leon* Court identified two other situations in which it is not appropriate to apply the "good faith" exception -- where the issuing magistrate failed to act in a neutral or detached manner and where the warrant is "so facially deficient i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. These exceptions are not at issue in this case.