2-19-08.txt

1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2


3
       UNITED STATES OF AMERICA,     .
4                                    .
                 Plaintiff,          .
5                                    .  CR No. 07-152
            v.                       .
6                                    .
       ANTHONY SUGGS and             .  Washington, D.C.
7      GLENDALE LEE,                 .  Tuesday, February 19, 2008
                                     .  At about 1:45 p.m.
8                 Defendants.        .
                                     .
9        . . . . . . . . . . . . .   .

10

11              TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                   UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     For the Government:        ANTHONY SCARPELLI, ESQ.
                                  JOHN K. HAN, ESQ.
15                                U.S. Attorney's Office
                                  555 Fourth Street, NW
16                                Room 4816
                                  Washington, D.C.  20530
17                                202-353-1679

18     For the Defendant:        PATRICK M. DONOHUE, ESQ.
       Suggs                      Donohue Law Firm
19                                18 West Street
                                  Annapolis, Maryland  21401
20                                410-280-2023

21     For Defendant:            RON EARNEST, ESQ.
       Lee                        8121 Georgia Avenue, Suite 406
22                                Silver Spring, Maryland  20910
                                  240-401-5277
23


24
       APPEARANCES con't. on next page.
25


                        Jacqueline Sullivan, RPR
                        Official Court Reporter

2

Page 1

2-19-08.txt

```
 1      APPEARANCES, con't.

 2

 3      For Defendant:          RICHARD K. GILBERT, ESQ.
        Price                   P.O. Box 70448
 4                              Washington, D.C.  20024
                                202-898-0857
 5

 6      For Defendant:          ANTHONY D. MARTIN, ESQ.
        Ernest Glover           7841 Belle Point Drive
 7                              Greenbelt, Maryland  20770
                                301-220-3700
 8
        For Defendant:          CURTIS A. BOYKIN, ESQ.
 9      Ernest Glover           1850 M Street, NW
                                Suite 640
10                              Washington, D.C.  20036
                                202-776-0370
11

12

13

14      Court Reporter:              JACQUELINE M. SULLIVAN, RPR
                                     Official Court Reporter
15                                   U.S. Courthouse, Room 6720
                                     333 Constitution Avenue, NW
16                                   Washington, D.C. 20001
                                     202-354-3187
17

18

19
        Proceedings reported by machine shorthand, transcript produced
20      by computer-aided transcription.

21

22

23

24

25
```

Jacqueline Sullivan, RPR
Official Court Reporter

3

Page 2

```
                                 2-19-08.txt
```
 1                        P R O C E E D I N G S

 2              THE COURT:  Are we going to leave that up?  Do you

 3     have to keep that board up?

 4              MR. SCARPELLI:  I believe so, your Honor.

 5              THE COURT:  It blocks my view of the audience rather

 6     dramatically.

 7              Has everybody seen the new 604?

 8              MR. SCARPELLI:  Yes, your Honor.

 9              THE COURT:  Is there anything specific objected to?

10              MR. SCARPELLI:  No.

11              THE COURT:  Fine.  Then I don't need to worry about

12     the issue anymore.  Thank you.

13              Then your book is ready to go as far as I can tell.

14     I'm unaware, so when you start to play the tapes pass out the

15     books.

16              MR. SCARPELLI:  Yes, your Honor.  Maybe you can

17     instruct the jury to stay on the page in the area where we are,

18     not to look forward or backwards.

19              THE COURT:  Well, I also have to instruct them on

20     tapes in general.

21              Second of all, counsel, when are you about to do a

22     404?  I have to instruct on that one and I'd like to get an

23     agreement on it, so can you give me a heads up on that before

24     you do it?

25              MR. SCARPELLI:  Yes, your Honor.


                       Jacqueline Sullivan, RPR
                       Official Court Reporter
                                                                    4



 1              THE COURT:  Are you going to play tapes through the

 2     next agent?

2-19-08.txt

3           MR. SCARPELLI:  Special Agent John Bevington.

4           THE COURT:  Okay.  Well, then, I'll have to give them

5    the instruction.  Okay.  Sorry.

6           MR. GILBERT:  Your Honor, there is one, if we're going

7    to start playing tapes, there's one preliminary matter that I'd

8    like to, on behalf of defense, bring to the Court's attention

9    that has to do with the issue of the agent's opinion as to the

10   meaning of the phone calls.  I'm aware, and from having --

11          THE COURT:  Is this the guy who's going to give

12   opinions?  Wait a minute.  I mean, the tapes can be played

13   without -- is this your guy who is going to start talking about

14   the word X means Y?

15          MR. SCARPELLI:  Yes.

16          THE COURT:  Go ahead.  How are you going to start with

17   this?  This is your strongest suit here?

18          MR. SCARPELLI:  We're going to start with an overview

19   and then we're going to have some calls.

20          THE COURT:  Is he going to try to interpret what words

21   mean?

22          MR. SCARPELLI:  Yes.

23          MR. GILBERT:  Well --

24          THE COURT:  That's your best evidence to start this

25   case, to have an agent talking about what a word means in a

Jacqueline Sullivan, RPR
Official Court Reporter

5

1    tape?

2           MR. SCARPELLI:  Yes, your Honor, and we're not

3    qualifying him as an expert.  He's going to give an opinion to

Page 4

2-19-08.txt

4    certain words, and we're following the Island opinion that Judge

5    Lamberth wrote, and that set forth that this witness can in fact

6    give his opinion as to what certain code words are.

7         THE COURT:  Well, wait.  What's his opinion?  How can

8    he give an opinion?  All he's saying is I listened to all the

9    tapes, and every time they used this word they were -- you know,

10    go ahead.  I just, I find this kind of testimony adds nothing,

11    absolutely nothing, but it certainly puts the government in

12    their sort of conspiratorial finding conspiracy.  It just back-

13    files.

14         What is it, Mr. Gilbert, and why didn't we take this

15    up before?  The guy's about to testify.  You knew he was coming.

16    Go ahead.

17         MR. GILBERT:  Your Honor, my view with respect to that

18    is that to a limited degree it is permissible.  However, it is

19    our view that his opinion has to be based, it talks about the

20    Rule 701 says rationally based on the perception of the witness.

21    The Island case talks about the perception of the witness as to

22    the recording about which the witness is issuing his opinion,

23    meaning the witness has to have listened to the recording.  No

24    problem with that.  My concern is twofold.  One is if they -- if

25    the agent either by preface of the question or in his own answer


Jacqueline Sullivan, RPR
Official Court Reporter

6


1    or in cross-examination says I reached that conclusion based on

2    my experience, then that puts it in the realm of 702, which is

3    precluded by Rule 701(c), so in other words, they can't get it

4    in by virtue of this guy as an expert, and that includes in my

5    view his referring to his experience as to why he's reaching

2-19-08.txt

6      that conclusion.

7              THE COURT:  It depends what the word is, that's the

8      problem.

9              MR. GILBERT:  I agree.

10             THE COURT:  If he says gallons refer to PCP, in my

11     experience that's one thing.  You know, if the jury can't figure

12     out these tapes on their own the government will be in big

13     trouble.  What is this gentleman going to do, and can I have a

14     copy of the Island -- we are not going to be taking these things

15     up four minutes before the jury comes.  Mr. Gilbert, you had to

16     know whatever this guy.

17             I had no idea Bevington was your expert, none, and

18     find experts as a matter of --

19             MR. SCARPELLI:  He's not an expert, your Honor.  He's

20     not testifying as an expert.

21             THE COURT:  Fine.  Where's Bevington?  I mean, where's

22     the -- what is this that is in Island?

23             MR. SCARPELLI:  The pages aren't numbered.

24             MR. GILBERT:  Your Honor, I'm just really sort of

25     making a motion.  I want to preclude the agent where the

Jacqueline Sullivan, RPR
Official Court Reporter

7

1      prosecutor in his questions from saying his opinion is based on

2      his experience.  That's one objection.  Secondly, I want, I

3      believe that it goes too far if he's allowed to base his opinion

4      not just on the phone call or the phone calls around it but on

5      his overall knowledge of the investigation, and I'm very

6      concerned that he'll either volunteer that or in

Page 6

2-19-08.txt

7    cross-examination or in redirect examination it will come out

8    why do you think this word means this and he'll start talking

9    about the affidavits and he'll talk about -- there's just all

10   kinds of stuff that can come in if he is relying on his

11   interpretation based on his overall view of the whole case, and

12   then I would be objecting to that.

13         THE COURT:  He's not an expert.  I don't know exactly

14   what he can bring except that he can say I listened to all the

15   tapes and they used this word consistently.  They can do that,

16   he's the person, but in terms of expert testimony I have no idea

17   what they're going to do, but I think we're about to listen.

18   But just keep in mind, Mr. Scarpelli, I am not going to allow

19   him to be a sort of a mouth piece for the government's

20   interpretation of the entire case.  I don't like these kind of

21   witnesses one bit to begin with.  I think that it crosses the

22   line.  If a jury can't figure out what people are talking about

23   on a tape, he doesn't add anything.  We learned this the first

24   time in Jones, believe me, but fine.

25         MR. SCARPELLI:  Your Honor, I don't plan on having him


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                         8



1    interpret every specific word, but the Island opinion does

2    permit him, if he listened to all the calls, based on this case,

3    to give his opinion on certain words.

4          THE COURT:  But all that he's saying now is he doesn't

5    want him to go beyond the calls.  I don't know whether you

6    intend to have him go beyond the calls.  The problem is, I mean,

7    a perfect example is this hair dryer.  Is he going to come on

8    and say hair dryer means, when it's used once in the calls?
                         Page 7

2-19-08.txt

```
 9                MR. SCARPELLI:  Yes, your Honor.
10                THE COURT:  And on what basis will he do it if it's
11    used once?
12                MR. SCARPELLI:  I believe based on knowledge that Mr.
13    Johnson has a shaved head, and that they're using -- there's a
14    series of materials that they used out of context, and that
15    those are terms to signal to each other that they're drug words.
16                THE COURT:  You know, that's exactly why you're here.
17    To the extent you're being paid by the U.S. government to make
18    an argument, that's an argument.  I just, I have never
19    understood this, why he can say what a hair dryer is.  I'll hear
20    it, and we'll have to go line by line.  I don't know why you
21    didn't learn, I mean, we went through this, and I'll tell you
22    the last trial, the first Jones trial, we had somebody who did
23    this kind of stuff in a way but it was much more consistent sort
24    of words.  It wasn't tickets.  It was said over and over and
25    over again, and I can tell you the jury didn't buy it and she
```

Jacqueline Sullivan, RPR
Official Court Reporter

9

```
 1    got completely cross-examined up and down, so the second time
 2    around they learned from that.  They didn't try to make their
 3    case through some police officer who listens to all the tapes.
 4    If you want the jury to listen to tapes you play them for them
 5    and you argue it based on it.  See, I don't understand how he's
 6    going to have a better sense that a hair dryer means drugs than
 7    I would.  What do we need him telling us what a hair dryer is?
 8    I mean, you've already made the argument, but if he can base it
 9    on the tape and he has some rational view, but I have a feeling
```

Page 8

2-19-08.txt

10   he's just going to open himself up to unnecessary

11   cross-examination.  I've never never found this to be useful.

12   If the jury doesn't listen to the tapes and agree with you,

13   Officer Bevington isn't going to make one bit of difference.

14         If we have problems like this, Mr. Gilbert, I don't

15   expect you to be raising them.  We were here at 12:30.  You

16   could have raised this.  You knew Bevington was the first

17   person.  How am I supposed to know?

18         MR. GILBERT:  I'm sorry, your Honor.  It seemed like

19   everyone was in a hurry to get out and get some lunch.

20         THE COURT:  No.  Think again next time.

21         MR. GILBERT:  I'll do that.

22         THE COURT:  We were here.  We were taking up other

23   matters.

24         Bring in the jury.

25         I'll read this opinion.  I can tell you that, Mr.


Jacqueline Sullivan, RPR
Official Court Reporter

10


1   Scarpelli, I have an inbred dislike of having a government agent

2   trying to tell the jury what a tape means.  You can tell them

3   what it means based on the tapes.  That's what argument is.

4         I'd like to just make it clear, you know, the last

5   time when a person testified there was a question of talking

6   about half tickets, quarter tickets, and so it made perfect

7   sense when the word was used over and over and over again for

8   the person to say I have listened to it.  There's no such thing

9   as a half ticket to walk into a bar, and it was used five times

10   and it's only -- I mean fifty times, and it was only used with

11   these people.  That makes sense.  To me to say a hair dryer

2-19-08.txt

12    means drugs, without some further basis I may sustain an

13    objection to that question.

14              (Jury enters courtroom at about 1:55 p.m.)

15              THE COURT:  Good afternoon, ladies and gentlemen.  I

16    hope you had a good lunch.

17              All right.  Call your first witness.

18              MR. SCARPELLI:  Your Honor, the government calls FBI

19    Special Agent John Bevington to the stand.

20              THE COURT:  Thank you.

21              (Sworn by courtroom deputy.)

22    SPECIAL AGENT JOHN BEVINGTON, WITNESS FOR THE GOVERNMENT, SWORN

23                      DIRECT EXAMINATION

24    BY MR. SCARPELLI:

25    Q.   Good afternoon.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          11


1     A.   Good afternoon.

2     Q.   Can you please state your first name, last name, and spell

3     your last name for us?

4     A.   John Bevington.  The last name is spelled

5     B-e-v-i-n-g-t-o-n.

6     Q.   Can you tell us where you're employed?

7     A.   I'm an agent assigned to the FBI's Washington field office.

8     Q.   And what is your current assignment?

9     A.   I'm assigned to an organized crime slash drug squad.  I

10    work here in Washington, D.C.

11    Q.   How long have you been assigned to that unit?

12    A.   I've been assigned to this particular squad since May or

2-19-08.txt

13     June of 2000.

14     Q.   And can you briefly give us your training and experience

15     with respect to your position as an FBI special agent?

16     A.   I went to the FBI academy in 1987.  That lasted for

17     thirteen weeks.  Since that time I've had several training

18     sessions with respect to drug investigations.  One put on by the

19     U.S. Attorney's Office, another put on by the Department of

20     Justice, and I've been working in drug and violent crime

21     investigations since 1992.

22     Q.   Can you give us your educational background?

23     A.   I have an undergraduate degree in political science and

24     history, and a law degree.

25     Q.   During the course of your profession with the FBI can you

Jacqueline M. Sullivan, RPR
Official Court Reporter

12

1      estimate for us approximately how many drug investigations

2      you've participated in?

3      A.   Participated in would be over a hundred.  I would break it

4      down more in cases that I've actually been assigned to, and then

5      cases that I've assisted with or participated in.

6      Q.   Let's break it down that way.  Can you explain that to us?

7      A.   Since being assigned to work on drugs and violent crimes

8      I've probably, I would be assigned to eight to ten long-term

9      investigations that would last one, two, three, four years, and

10     then within that I would have probably dozens or several dozen

11     other smaller short-term cases that might be from a series of

12     controlled purchases or a search warrant case, and then I would

13     have assisted on just dozens, over a hundred cases, other agents

14     on our squad.

Page 11

2-19-08.txt

15          MR. MARTIN:  Objection; narrative and relevance.

16          THE COURT:  Overruled.

17          THE WITNESS:  I've assisted other agents in our office

18   work with the Police Officer Drug Enforcement Administration, so

19   I would have worked on a lot of cases in those capacities.

20   BY MR. SCARPELLI:

21   Q.   With respect to your position with the FBI, have you worked

22   on cases or participated in cases where there was court-approved

23   wiretaps?

24   A.   Yes.

25   Q.   And approximately how many have you participated in?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                          13


1    A.   Participated in, probably at least a couple of dozen.

2    Actually been assigned to, since -- probably six, I would say,

3    maybe seven.

4    Q.   Have you monitored calls over court-approved wiretaps?

5    A.   Yes, I have.

6    Q.   Can you explain to us what it means to monitor a call?

7    A.   Monitor a call is actually to listen to the call and then

8    minimize it when appropriate and prepare a short synopsis.

9    Q.   With respect to the six or eight wiretap investigations

10   that you controlled, can you tell us what role you played in

11   that?

12   A.   At one time or another I've served in every role that is

13   involved in a wiretap investigation.  From being just a monitor,

14   listening to the calls, participating in surveillance, search

15   warrants in conjunction with the intercepts, and --

                           Page 12

2-19-08.txt

16          MR. MARTIN:  Objection.  May I approach?

17          THE COURT:  Yes.

18          Excuse us, ladies and gentlemen.

19          (Bench conference as follows):

20          MR. MARTIN:  Your Honor, I'm so sorry to approach, but

21 my understanding was that this witness was not being called as

22 an expert, that he was being called as a layperson.  It seems to

23 me that he's being qualified now as an expert, and that's why I

24 objected earlier.  It seemed to me --

25          THE COURT:  I understand you objected and I overruled

Jacqueline M. Sullivan, RPR
Official Court Reporter

14

1  it then and I overrule it again.  He can give him his

2  background.  If he's expected to talk about what he hears on

3  tapes and makes these great statements about what he understands

4  all these years of listening to the tapes, they're relevant even

5  as a layperson.  You're not offering him in any expert capacity.

6  I understand.  Overruled.

7          (End of bench conference.)

8  BY MR. SCARPELLI:

9  Q.   Sir, do you need me to ask the question again or can you

10 continue?

11 A.   No, I can continue.

12          As I was saying, participate in surveillance, and I've

13 also been what we call in the FBI an administration or

14 administrative agent, which is the person that's responsible for

15 scheduling the monitors, making sure we have somebody to sit

16 each of the shifts, and then it's that person who is also

17 responsible for listening to every single call and then

2-19-08.txt

18  preparing the daily reports that we provide to the U.S.

19  Attorney's Office.

20  Q.   Can you estimate for us how many hours you have monitored

21  calls over court-approved wiretaps?

22  A.   It would be thousands of hours, both that would include

23  monitoring, actually listening to the live calls, and then also

24  reviewing calls.

25  Q.   Can you give us the benefit of some of the investigative

Jacqueline M. Sullivan, RPR
Official Court Reporter

15

1  tools that you have as a special agent in investigating drug

2  distribution cases?

3  A.   We have several different things that are kind of our bread

4  and butter.  One thing that we start with typically or begins an

5  investigation is source, source information people that are in

6  the community and know, have information about drug trafficking.

7  We would also contact other law enforcement agencies, whether it

8  be the Drug Enforcement Administration, the local police

9  department, the U.S. Attorney's Office.  We do what are called

10  controlled purchases, which can be either a source, a

11  cooperating witness, or an undercover officer making a purchase

12  from somebody that's selling drugs.  We conduct surveillance.

13  We use pen registers, which are pen register is a way by which

14  you get the numbers that are either dialed from a number or

15  called into that number, so if I have a phone and I make a call,

16  that shows the date and time and the number called as well as

17  the duration of the call.  Likewise, if I receive a call it will

18  show that same information.  We execute search warrants to

Page 14

2-19-08.txt

19   recover evidence, and then in drug cases we also from time to

20   time use court-authorized wiretaps or wiretap intercepts,

21   listening to phone calls, or it could be a microphone in an

22   office, a vehicle, in almost anywhere where people would be

23   talking.

24   Q.   Have you participated in interviewing defendants upon their

25   arrest on drug charges?

Jacqueline M. Sullivan, RPR
Official Court Reporter

16

1    A.   Yes.

2    Q.   And how does that assist you in your investigation of drug

3    cases?

4    A.   Well, the people that we arrest are the people that have

5    the information.  They're involved in it on a day-to-day basis

6    and they know what's going on he, so by interviewing them we

7    basically get their knowledge of what is occurring.

8    Q.   Going back to cooperating witnesses, how many cooperating

9    witnesses have you supervised?

10   A.   I would say supervised myself it would probably be in the

11   range of 25 to 50.

12   Q.   And in supervising these 25 to 50 cooperating witnesses,

13   have you utilized them to make controlled buys?

14   A.   Yes.

15   Q.   I don't know if it was clear, but can you explain to us

16   what is a controlled buy?

17   A.   A controlled buy is where a person that's working with us,

18   again it could be a cooperating witness or an undercover

19   officer, they will contact somebody that's selling drugs and

20   make an arrangement to make a purchase, and we provide the

2-19-08.txt

21     money.  They're given usually a body recorder as well as a

22     transmitter which allows -- the transmitter allows us to listen

23     to it as it's occurring, and they will meet with the person,

24     conduct the purchase and then meet with us and provide us with

25     the drugs that they bought.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              17


1      Q.   How do you document these controlled purchases with

2      cooperating witnesses?

3      A.   First, they're documented by usually by the recording.  The

4      phone call setting up are usually recorded, and the person will

5      typically wear a body recorder that may just be audio or it

6      could be audio as well as video, and then we also interview them

7      after the purchase is complete and prepare a report.

8      Q.   The telephone calls you refer to with a cooperating

9      witness, does that have a specific name?

10     A.   We typically call them consensual or consensual calls or

11     consensually-monitored calls.

12     Q.   What does that mean to you?

13     A.   That means that it was recorded usually in our presence.

14     Q.   With respect to making controlled purchases, what, if

15     anything, do you do with the cooperating witness himself before

16     he is sent in to make a purchase?

17     A.   We will explain how we would like to see the purchase go,

18     and that means, you know, which location, where.  There are

19     certain places that we feel more comfortable doing these deals,

20     and then we give them the money, and prior to them leaving we

21     will search the cooperating witness.

2-19-08.txt

22    Q.    And why do you search the cooperating witness?

23    A.    We want to make sure that they're not bringing their own

24    money to the deal or that they would be bringing drugs to the

25    deal.  We want to be able to prove that these drugs came from

Jacqueline M. Sullivan, RPR
Official Court Reporter

18

1     the person that we're making the purchase from.

2     Q.    Is there any other time that you search the cooperating

3     witness?

4     A.    Yes, after the buy is complete and we've met with them and

5     recovered the drugs from them we will again search them.

6     Q.    Did there come a time when your drug squad initiated an

7     investigation with respect to Anthony Suggs?

8     A.    Yes.

9     Q.    And why did you initiate the investigation with respect to

10    Anthony Suggs?

11    A.    Because we had information that Mr. Suggs was --

12             MR. DONOHUE:  I'm going to object.

13             THE COURT:  Sustained.

14    BY MR. SCARPELLI:

15    Q.    Based on the initiation of the investigation did you learn

16    what Mr. Suggs' nicknames were?

17    A.    Yes, I did.

18    Q.    How did you learn that?

19    A.    Since the beginning of the investigation?

20    Q.    Or any time during this investigation.

21    A.    We ultimately had court-ordered wire interception of Mr.

22    Suggs' cellular telephone, and from that -- I mean, I already

23    knew Apple Jack was a nickname on the phone.  He was frequently

Page 17

2-19-08.txt

24    referred to as Ap or Jack.  He and certain other individuals

25    would refer to each other as fool or Bob, cousin, couz.  Those

Jacqueline M. Sullivan, RPR
Official Court Reporter

19

1     were the most common.

2     Q.   Did you learn through the investigation where Mr. Suggs

3     worked?

4     A.   Yes.

5     Q.   And where did he work?

6     A.   He worked for the D.C. Department of Public Works on trash

7     collection.

8     Q.   And how did you learn that?

9     A.   He talked about it on the phone.  We conducted surveillance

10    of his vehicle from the parking lot or yard where he worked.  I

11    saw him in a uniform from the Department of Public Works.

12    Q.   At around the same time did you initiate an investigation

13    into an individual by the name of James Parker?

14    A.   Yes.  Around the same time we began investigating Mr.

15    Parker.

16    Q.   Did you learn Mr. Parker's nickname?

17    A.   I knew Mr. Parker's nickname prior to this current

18    investigation.

19    Q.   And what was his nickname?

20    A.   Yoggie.

21    Q.   Now, at some point did the FBI request court authorization

22    to intercept conversations over Mr. Suggs' telephone?

23    A.   Yes, we did.

24    Q.   And why did you decide to intercept the calls over the

Page 18

25     cellular telephone used by Mr. Suggs?


                              Jacqueline M. Sullivan, RPR
                                 Official Court Reporter

                                                                        20



 1     A.    Our primary goal when we do these type of investigations is

 2     to identify an organization, and ultimately in this case the

 3     best way to do that was to intercept calls from Mr. Suggs'

 4     telephone to identify both his customers and his source of

 5     supply.

 6     Q.    What telephone did you request court authorization to

 7     intercept the calls?

 8     A.    The number?

 9     Q.    Yes.

10     A.    (240) 988-7588.

11     Q.    And why did you choose this number?

12     A.    From looking at pen register activity it appeared that this

13     was the phone that he was using the most at the time.

14     Q.    Was that telephone in Mr. Suggs' name?

15     A.    No, it was not.

16     Q.    Do you recall whose name the telephone was in?

17     A.    Irving York.

18     Q.    How did you know it was Mr. Suggs' telephone, then, or he

19     was using it?

20     A.    We had information that he was using.

21                 MR. DONOHUE:  Objection.

22                 THE COURT:  Do you want to approach?

23                 MR. SCARPELLI:  Yes.

24                 (Bench conference as follows):

25                 MR. DONOHUE:  It just sounds like we're going to get

Jacqueline M. Sullivan, RPR
Official Court Reporter

21

1    straight hearsay.

2              THE COURT:  I thought so too.  It's not background.

3              MR. SCARPELLI:  It's actually not being offered for

4    the truth because it's not being offered that it's his phone.

5    It's just that it's not Anthony Suggs.

6              THE COURT:  What was he about to say?

7              MR. SCARPELLI:  Irving York's phone.

8              THE COURT:  That was all he was going to say?

9              MR. SCARPELLI:  Yes.

10             THE COURT:  Your question was?

11             MR. SCARPELLI:  Yes, I'm sorry.

12             THE COURT:  How do you know it was Suggs' phone when

13   he was using it.

14             MR. SCARPELLI:  And I think what he would say is he

15   obtained it from source information.

16             MR. DONOHUE:  That's my objection.

17             THE COURT:  It has to be offered for the truth,

18   because what other purpose is it coming in for?  Sustained.

19   BY MR. SCARPELLI:

20   Q.   At some point when the court authorization was approved on

21   cellular telephone (240) 988-7588, did you learn that Mr. Suggs

22   was using that telephone?

23   A.   Yes.

24   Q.   And how did you learn once the court authorization was

25   approved?

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-19-08.txt

1    A.    There were many times where he was identified by his

2    nickname.  He also identified himself a number of times as

3    Anthony Suggs.

4    Q.    Did there come a point where in this investigation that the

5    FBI decided to put a listening device in Lionel Glover's truck?

6    A.    Yes.

7    Q.    How did that come about?

8    A.    As we were conducting our investigation we identified

9    Lionel Glover as Mr. Suggs' source of supply for PCP, and as we

10   were continuing the investigation we noticed that Mr. Glover was

11   meeting with a lot of people inside of his truck, and we had

12   belief that he would talk more candidly inside the truck than on

13   the telephone.

14   Q.    And eventually did you get court authorization to intercept

15   the conversations inside Mr. Glover's truck?

16   A.    Yes, we did.

17   Q.    Let me show you what's been marked as Government's Exhibit

18   1208.  Do you recognize this item?

19   A.    Yes, I do.

20   Q.    And how do you recognize what I just handed you?

21   A.    I recognize it because it's Mr. Glover's truck.  It was --

22   this is a still taken from a video during surveillance of Mr.

23   Glover.

24   Q.    Did you observe that video?

25   A.    Yes.

2-19-08.txt

```
 1              THE COURT:  Any objection to the picture?
 2              MR. DONOHUE:  No.
 3              MR. GILBERT:  It's not on our screen, your Honor.
 4              THE COURT:  No, so I want to put it on the screen.
 5     Have you seen it, the picture?
 6              MR. DONOHUE:  Yes.
 7              MR. GILBERT:  No objection, your Honor.
 8              THE COURT:  Okay.  Yes, we'd like to put that on the
 9     screen so everybody can see what he's looking at.
10              MR. SCARPELLI:  Your Honor, the government moves
11     Government's Exhibit 1208 into evidence.
12              THE COURT:  Admitted.  No objection.  1208.
13              Do you have the exhibits?
14              (Government's Exhibit No. 1208 was admitted into
15              evidence at about 2:15 p.m.)
16     BY MR. SCARPELLI:
17     Q.   Do you recall when that photograph was taken?
18     A.   It's from a video that was taken on April 7th of 2007.
19     Q.   After you obtained court authorization to intercept the
20     calls over the telephone used by Mr. Suggs, what role did you
21     play with respect to the intercept of those calls?
22     A.   I was what I previously described as the administrative
23     agent for that particular line.
24     Q.   And just so we're clear, what does it mean to intercept a
25     call?
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

24

2-19-08.txt

1    A.    It means that we listen to the call and the call is

2    recorded.

3    Q.    How do you obtain access to eventually listen to a call?

4    A.    After the order is signed by a judge we provide the order

5    to the phone company, their legal people will review it.  Once

6    they're satisfied that it's a legal order, they provide both the

7    audio from the phone calls and the call data into our office.

8    Q.    And once you receive the approval from the phone company

9    how does the call actually get to the FBI?

10   A.    It comes in on lines into a computer system that we use to

11   record these calls.

12   Q.    Can you explain that a little further, what system is used?

13   A.    It's a computer system.  The software is called Voice Box,

14   and what happens is whenever a particular phone that we're

15   intercepting either makes a call or receives a call we get that

16   same information as well as the audio in our computer system.

17   Q.    Do you recall when wire interceptions began with respect to

18   Mr. Suggs' telephone?

19   A.    January 9th of 2007.

20   Q.    And do you recall when the wire intercept was terminated?

21   A.    The orders are good for thirty days.  We renewed this one

22   twice, and the last renewal expired on April 7th of 2007.

23   Q.    With respect to the listening device placed in Mr. Lionel

24   Glover's truck, when did you receive court authorization to

25   place that listening device inside the truck?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                            25



1    A.    March 19th of 2007.

2    Q.    When did you actually start listening to calls,
                          Page 23

2-19-08.txt

3 conversations inside Mr. Glover's truck?

4 A. March 22nd of 2007.

5 Q. Why was there a three-day delay?

6 A. Mr. Glover was out of town at the time or he went out of

7 town shortly after the order was signed.  That's when we had the

8 opportunity to install the listening device, and then he

9 returned either late on March 21st or early March 22nd and

10 that's when we began the intercepts.

11 Q. Do you know how long the intercepts lasted with respect to

12 Mr. Glover's truck?

13 A. Those were also good for thirty days.  We had two renewals.

14 They continued until June 19th of 2007.

15 Q. Can you explain to us how it was that the FBI was able to

16 put a listening device inside Mr. Glover's trucks?

17 A. As I said, Mr. Glover had gone out of town, and therefore

18 at that time we had access to his truck and our technical agents

19 installed recorders.

20 Q. Can you explain to us how it is that the FBI receives calls

21 or recorded the conversations of Mr. Glover's inside the truck?

22 A. I'm not a technical person, but simply they used a cellular

23 telephone line to pipe the audio into our office and it came

24 into the same computer system, the Voice Box system, and it

25 would record activations just like a cell phone or a telephone,

Jacqueline M. Sullivan, RPR
Official Court Reporter

26

1 except for we had to initiate the interceptions.  It didn't

2 automatically activate if he got in the car or started speaking.

3 Q. How is it that you were able to obtain, when you should be

Page 24

2-19-08.txt

4      listening inside the truck?

5      A.   It was a combination of things.  Using surveillance,

6      watching when he was in the truck meeting with people we would

7      then activate it.  If we had a belief that he was going to meet

8      with somebody, we would periodically activate it, either

9      minimize it or turn it off and just keep going until we could

10     tell that he was meeting with somebody in the truck.

11     Q.   What is the name of the software system that the FBI uses

12     in order to intercept telephone conversations?

13     A.   It's called Voice Box.

14     Q.   And when a monitor is listening to a specific call, what,

15     if anything, are they doing with regards to the call?

16     A.   As the monitor listens to the call they will prepare a

17     short synopsis and they have to determine whether or not that

18     particular call or in the truck a conversation should be

19     minimized.

20     Q.   Who actually monitors the calls?

21     A.   It's a combination of agents in our office and other

22     personnel in our office that have received training.  We create

23     a schedule and people volunteer to sit usually eight-hour

24     shifts.

25     Q.   After the day's calls are listened to and recorded, who, if

Jacqueline M. Sullivan, RPR
Official Court Reporter

27

1      anyone, goes back and listens to those calls?

2      A.   It's the person that's serving as the administrative agent

3      for a particular line.  I mean, the other case agents may also

4      review, certainly will review certain calls, but the

5      administrative agent will review all the calls.

Page 25

2-19-08.txt

6   Q.   Did you review all the calls with respect to Anthony Suggs'

7   cellular telephone?

8   A.   Yes, I did.

9   Q.   Have you also reviewed all the calls with respect to Lionel

10   Glover's pickup truck?

11   A.   I have.  I was not the administrative agent for the pickup

12   truck, but I have reviewed all the interceptions.

13   Q.   Now, when the interception period is terminated, what, if

14   anything, is done with the calls?

15   A.   The calls are recorded on to a magnetic optical disk or

16   it's referred to as an MO disk.  The original MO disk is sealed

17   and then placed in our electronic surveillance evidence room.

18   Q.   In this case let's first start with Anthony Suggs'

19   intercepted telephone calls.  After the termination of the

20   intercepts were those calls then downloaded into the sanctioned

21   software system?

22   A.   Yes.

23   Q.   And that's the software system that we have in here in the

24   computer?

25   A.   Correct.  Not all the calls were downloaded into that

Jacqueline M. Sullivan, RPR
Official Court Reporter

28

1   computer.

2   Q.   Okay.  And what calls were downloaded into the computer?

3   A.   Calls that were potentially going to be played in a trial.

4   Q.   What about the length of the calls, was anything done to

5   the length of the calls?

6   A.   Some of the calls that were lengthy have been shortened.

Page 26

2-19-08.txt

7    Q.    And with respect to the calls that were downloaded into the

8    Sanctions computer, what, if anything, was then done with the

9    calls that were inside the Sanctions computer?

10   A.    They were burned to a disk.

11   Q.    And do you know who burned it to the disk?

12   A.    Yes.

13   Q.    Who did?

14   A.    Jim Mazatelli.

15   Q.    How do you know that?

16   A.    Because I watched him do that.

17   Q.    Then once the disk was burned what, if anything, did you do

18   with respect to the disk?

19   A.    I listened to the disk.  We actually created two disks:

20   one for the phone and one for the truck conversations.

21   Q.    And now I'm going to go to the truck.

22   A.    Okay.

23   Q.    With respect to the truck did you go through the same

24   procedure with respect to the magnetic optical disk?

25   A.    Yes.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                    29



1    Q.    And again explain to us what occurred.

2    A.    The calls are saved on the MO disk.  The MO, from the MO

3    disk calls were copied on to a DVD and downloaded into the

4    Sanctions computer.  From the Sanctions -- or not all the calls,

5    but pertinent or relevant calls that were intended to be played

6    in the trial were put on the Sanctions computer.  From that they

7    were burned to a disk and then I listened to the disk.

8    Q.    Have you also reviewed the calls in the Sanctions computer?

                              Page 27

2-19-08.txt

```
 9    A.   Yes, I have.

10    Q.   I'm going to show you what's been marked as WT 7 and ask

11    you if you recognize that item.

12    A.   Yes.  This is the disk of the calls that were burned from

13    the Sanctions program.

14    Q.   And how do you know that?

15    A.   It has the phone number on it, (240) 988-7588, as well as

16    my initials and date on it.

17    Q.   Is that the date that you reviewed?

18    A.   Yes.

19    Q.   And do the calls on that disk fairly and accurately depict

20    the calls as you recall them from the magnetic optical disk?

21    A.   Yes, they do.

22         MR. SCARPELLI:  Your Honor, at this time the

23    government would move WT 7 into evidence.

24              THE COURT:  This is all the calls from the cell phone?

25              MR. SCARPELLI:  No.  These are all the calls that we
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

30

```
 1    potentially will play.

 2              THE COURT:  Sorry.

 3              MR. GILBERT:  Can we approach?

 4              THE COURT:  Yes.

 5              (Bench conference as follows):

 6              THE COURT:  For both the truck and the cell?

 7              MR. SCARPELLI:  No.  This was just the cell.

 8              THE COURT:  Okay.

 9              MR. GILBERT:  My only objection, your Honor, is that I
```

Page 28

2-19-08.txt

10    mean obviously, you know, you may have restrictions on some of

11    the calls and some of them may not be admitted and all that.

12    I'm just concerned that agreeing to the admission of this

13    therefore puts in theory all of the calls before the jury.

14         MR. SCARPELLI:  Maybe this can alleviate defense

15    counsel's concern.  We could move it in subject to the, at the

16    end of the case, replacing the disk with the calls, only the

17    calls that came in.

18         THE COURT:  Right.  I think at the moment the point is

19    that that is the universe of what they continued to play.

20    Hopefully as we go along they're going to cut them down anyways

21    and the ultimate disk that will go back to the jury and

22    transcripts will be only what actually gets played, so for the

23    moment no juror is going to be listening to this anyways, but

24    the one that does go to them will be WT 7 perhaps A or something

25    like that or another number which will constitute what will be

Jacqueline M. Sullivan, RPR
Official Court Reporter

31

1     played inevitably as we go along.  They're not going to play

2     every one they intended, so that's what should be, and you'll

3     have the opportunity to double-check him.

4          MR. GILBERT:  Right.  I just want the limitations on

5     my nonobjection.  Does that make sense?  In other words, I'm

6     not -- I'm all right with it being admitted based on the way

7     that you've described it, but I'm not conceding that every call

8     on that is admissible or that every call on that tape should be

9     played for the jury.

10         THE COURT:  The ultimate tape that goes to the jury

11    will only reflect what they've heard.  I understood.  I ruled on

Page 29

2-19-08.txt

12    all objections to transcripts, so I'd be very surprised for you

13    to be standing up popping around telling me there's something in

14    this book of transcripts, and so that the book of transcripts,

15    if we don't play them all, we'll take some of the transcripts

16    out and the tape ultimately will only be what we have, but I

17    don't have any more objections as far as I know about the

18    substance of the transcripts.

19            MR. GILBERT:  I understand.

20            THE COURT:  Okay.  That's fine.

21            (End of bench conference).

22            THE COURT:  WT 7 is admitted.

23            (Government's Exhibit No. WT 7 is admitted into

24            evidence at about 2:28 p.m.)

25            THE COURT:  Ultimately, ladies and gentlemen, I want


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        32


1    to assure you that whatever tape gets -- that you get, you will

2    have during your deliberations a tape of all the ones that are

3    actually played in court as part of the evidence.  I'm going

4    to -- are you about to play a tape?

5            MR. SCARPELLI:  No, your Honor.

6            THE COURT:  I do want to tell you, we're going to give

7    you transcript books soon, but the transcript are not the

8    evidence.  What is the evidence is the tape, and that's WT 7.

9    It may be that over the course of the trial a fewer number than

10    are reflected will be played, but transcripts are not -- they're

11    meant to help you, and I'll talk to you a little more about them

12    just before we start to play tapes, but the tapes are the

                        Page 30

2-19-08.txt

13    evidence.

14          WT 7 will be admitted, but if it turns out we don't

15    use them all, which I'm also advocating, less is better, then we

16    will make a new tape and the jury will have that.

17          What page is WT 7 on in this exhibit?

18          COURTROOM DEPUTY:  Page two.

19          THE COURT:  Okay.  Go ahead.

20    BY MR. SCARPELLI:

21    Q.   I'm going to show you what's been marked as WT 9 and ask if

22    you recognize this item.

23    A.   Yes, I do.

24    Q.   And how do you recognize that item?

25    A.   It is labeled "Audio From Truck Bug," and then it has my


                        Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              33


1     initials and the date on it.

2           THE COURT:  What do you call it, truck what?

3           THE WITNESS:  Bug.

4           THE COURT:  Oh, bug.  All right.

5     BY MR. SCARPELLI:

6     Q.   How would you spell that, just so we're clear?

7     A.   B-u-g.

8           THE COURT:  That's Mr. Lionel Glover's truck, the bug

9     on the truck.

10    BY MR. SCARPELLI:

11    Q.   What you're saying is, you're referring to the calls

12    intercepted over the truck as a truck bug?

13    A.   Correct.

14          MR. SCARPELLI:  Your Honor, at this time the

2-19-08.txt

15    government would move WT 9 into evidence.

16              THE COURT:  All right.  Subject to exactly what we

17    talked about, it will be admitted.  If it turns out, you will

18    have the opportunity to double-check whatever the tape is that

19    the jury does get ultimately, it only consists of what is place

20    in court.

21              (Government's Exhibit No. WT 9 was admitted into

22              evidence at about 2:30 p.m.)

23    BY MR. SCARPELLI:

24    Q.   I'm going to show you what's been marked as WT 10 and ask

25    you if you recognize that.


                     Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              34


1     A.   Yes.

2     Q.   How do you recognize that?

3     A.   It's a binder of transcripts that I've reviewed.

4     Q.   And what is a binder of transcripts?

5              THE COURT:  Do you need some water or a lozenge?  I

6     always have lozenges, Halls.  Okay.

7              THE WITNESS:  It's transcripts from both Mr. Suggs'

8     cellular telephone and the conversations recorded, some of the

9     conversations recorded from inside Mr. Glover's pickup truck.

10    BY MR. SCARPELLI:

11    Q.   Have you compared each transcript with each call that we

12    potentially will be playing in this courtroom?

13    A.   Yes, I have.

14    Q.   And how do they compare the transcripts to the calls?

15    A.   They're accurate to the best of my ability.  There are

2-19-08.txt

16    places where some words are hard to hear, and usually that's

17    noted with a UI for unintelligible.

18          MR. SCARPELLI:  Your Honor, at this time the

19    government would move WT 10 into evidence.

20          THE COURT:  Subject to the instruction I'm about to

21    give.  It isn't really evidence.  I think we ought to have it

22    marked so everybody knows.  I think the jury is going to get to

23    use WT, what is it, 10?

24          COURTROOM DEPUTY:  WT 10.

25          THE COURT:  So that's this book of transcripts.  I am

                     Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              35


 1    hesitant to call it, to admit it as evidence.  It is going to be

 2    provided to the jury.  Everybody is going to have a book of

 3    transcripts so that you can follow along, but, I mean, as I just

 4    said, transcripts aren't evidence.  What's evidence are the

 5    tapes, but we want you to have the benefit, and I'll tell you

 6    this again:  If what you hear is different than what's in the

 7    transcript it's what you hear that counts, so WT 10 is marked

 8    for identification.  It will be available to the jury, but it's

 9    not properly called evidence.  It's an aid to them, and when

10    you're ready to pass it out I'll give them my formal

11    instruction.

12          You're all going to have a book of transcripts and

13    you'll be able to put your initials on them and they'll be here

14    for you.  As people play tapes you can follow along, so that's

15    for ID.

16          Go ahead.

17    BY MR. SCARPELLI:

                      Page 33

2-19-08.txt

18    Q.   Let me show you what's been marked as Government's Exhibit

19    No. 1209 and ask you if you recognize that item.

20    A.   Yes, I do.

21    Q.   And how do you recognize that item?

22    A.   It's a photograph taken from a video.

23         THE COURT:   Okay.  Do we have any objection to what,

24    No. 9?

25         MR. SCARPELLI:  1209.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              36


1         THE COURT:   1209.  I just assume get it on the screen.

2    1209 is admitted, so that we can all look and see what we're

3    talking about.  1209.

4         (Government Exhibit No. 1209 was admitted into

5         evidence at about 2:34 p.m.)

6    BY MR. SCARPELLI:

7    Q.   Special Agent Bevington, can you tell us what we're looking

8    at?

9    A.   It is a still photograph taken from a video, and it depicts

10   Mr. Suggs' Chevrolet SUV Tahoe.

11   Q.   Do you know when the video was taken?

12   A.   I didn't participate in that particular surveillance, so I

13   don't know the date.

14   Q.   I'm going to now show you what's been marked as

15   Government's Exhibit 1210 and ask you if you recognize that.

16         THE COURT:   Any objection?

17         MR. DONOHUE:   No objection, your Honor.

18         THE COURT:   It looks pretty similar to me, but that's

                           Page 34

2-19-08.txt
19    okay, that's admitted, 1210.

20              Go ahead.

21              (Government's Exhibit No. 1210 was admitted into

22              evidence at about 2:35 p.m.)

23    BY MR. SCARPELLI:

24    Q.   Can you describe for us what is in 1210?

25    A.   It's again Mr. Suggs' truck, and Lionel Glover is


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              37



1     approaching from the truck from the right rear.

2     Q.   And how do you know that's Lionel Glover?

3     A.   Because I've seen Mr. Glover many times and I can recognize

4     him in the photo.

5     Q.   Now I'm going to show you what's been marked Government's

6     Exhibit 1211 and ask you if you recognize this photograph.

7     A.   Yes.

8     Q.   And what is in that photograph?

9     A.   It's a photograph of the tag for Mr. Suggs' Tahoe.

10              MR. SCARPELLI:  At this time the government would move

11    Government's Exhibit 1211 into evidence.

12              THE COURT:  Any objection?

13              MR. GILBERT:  No objection.

14              THE COURT:  Admitted.

15              (Government's Exhibit No. 1211 was admitted into

16              evidence at about 2:36 p.m.)

17    BY MR. SCARPELLI:

18    Q.   Can you just tell us what Mr. Suggs' vehicle tag is?

19    A.   865M412.  It's a Maryland tag.

20              THE COURT:  412?
                          Page 35

                              2-19-08.txt
21            THE WITNESS:  Yes.

22            THE COURT:  Okay.  Maryland.  Admitted, 1211.

23    BY MR. SCARPELLI:

24    Q.   I'm going to show you what's been marked as Government's

25    Exhibit 1408 and ask you if you recognize this photograph.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter
                                                                  38


1    A.   Yes, I do.

2    Q.   And how do you recognize this photograph?

3    A.   Because I know the individual in the photograph.

4    Q.   Who is in the photograph?

5    A.   Lionel Glover.

6             THE COURT:  What number is it?

7             MR. SCARPELLI:  1408, your Honor.

8             THE COURT:  Okay, no objection.  1408 will go in.

9    We've discussed this before.  Okay.  1408 is admitted.

10            (Government's Exhibit No. 1408 was admitted into

11            evidence at about 2:37 p.m.)

12    BY MR. SCARPELLI:

13    Q.   Let me show you what's been marked as Government's Exhibit

14    No. 1410.  Do you recognize that photograph?

15    A.   Yes, I do.

16    Q.   And how do you recognize that photograph?

17    A.   I recognize that as Julian Johnson.  He was another person

18    that we investigated in this case.

19            THE COURT:  Any objection to his picture being on the

20    Elmo?  I think we've gone through all the pictures, so I think

21    you can just have him identify them.  Are you about to put in

                              Page 36

22    1400 through 1409, just out of curiosity?

23            MR. SCARPELLI:  Yes, your Honor.

24            THE COURT:  You've seen them all, right?  We don't

25    have any objection to those, so they're all admitted and he can


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              39


 1    tell the jury who they are.

 2            MR. GILBERT:  1400?

 3            THE COURT:  I think so.  They're just photos.  We've

 4    talked about them.  Half of them, some of them at least are on

 5    that board, so I can't imagine they're not -- okay.  Just tell

 6    me what numbers you're going to use.

 7            (Government Exhibit Nos. 1400-1409 admitted into

 8             evidence at about 2:38 p.m.)

 9            MR. SCARPELLI:  This is 1210, your Honor.

10            THE COURT:  That's Mr. Julian Johnson?

11    BY MR. SCARPELLI:

12    Q.   During the course of this investigation did you learn

13    whether or not Mr. Johnson had a nickname?

14    A.   Yes, I did.

15    Q.   And what was it?

16    A.   It was Ju-Ju or Ju.  He and Mr. Suggs would also call each

17    other Bob or Canon.

18            THE COURT:  Bob?

19            THE WITNESS:  Bob like B-o-b.  Couz, Cousin.

20    BY MR. SCARPELLI:

21    Q.   I'm going to show you what's been marked Government's

22    Exhibit 1407 and has been introduced into evidence.  Do you

23    recognize the individual in that photograph?

                           Page 37

2-19-08.txt

24    A.    Yes.  That's Ngozi Joy, who her nickname was Nickie.

25    Q.    Let me show you what's been marked as Government's Exhibit

Jacqueline M. Sullivan, RPR
Official Court Reporter

40

1     1409.  Do you recognize who's in that photograph?

2     A.    Yes, I do.

3           THE COURT:  It's been admitted as 1409.

4     BY MR. SCARPELLI:

5     Q.    Who is that?

6     A.    That is Christian Donaldson.

7     Q.    And just to complete, I'm showing you what's been admitted

8     at Government's Exhibit 1405.  Do you recognize that photograph?

9     A.    Yes.

10    Q.    And who is that?

11    A.    That's James Parker, whose nickname was Joe Guy.

12    Q.    I'm going to show you what's been admitted as Government's

13    Exhibit 1404 and ask you if you recognize who's in that

14    photograph.

15    A.    Yes.  That's Anthony Suggs.

16    Q.    I'm going to show you what's been admitted as Government's

17    Exhibit 1403 and ask you if you recognize who's in that

18    photograph.

19    A.    Yes.  That's Hillary Price.

20    Q.    I'm showing you what's been introduced at Government's

21    Exhibit 1402 and ask you if you recognize that photograph.

22    A.    Yes.  That's Glendale Lee.

23    Q.    And now I'm going to show you what's been marked as

24    Government's Exhibit 1401 and ask you, which actually has been

Page 38

2-19-08.txt
25      introduced as Government's Exhibit 1401, and ask you if you

1      recognize who's in that photograph.

2      A.   Yes, I do.  That's Ernest Glover.

3      Q.   And finally, I'm going to ask you to take a look at what's

4      been marked and introduced as Government's Exhibit 1400 and ask

5      you do recognize who's in that photograph?

6      A.   Yes.  That's Cornell Glover.

7      Q.   How is it that you know each one of these individuals?

8      A.   From the investigation that we conducted since January of

9      last year, many hours of surveillance.

10      Q.   Now I want to talk about this actual investigation.  I want

11      to ask you what was the goal of this investigation?

12      A.   Our goal was to identify the organization and trace

13      identify the organization to include Mr. Suggs' customers as

14      well as his source of supply and trace back the source of supply

15      as far as we could.  PCP is typically manufactured in the United

16      States, primarily in California.

17                MR. DONOHUE:  Objection to the narrative, your Honor.

18                THE COURT:  Overruled.  He's educating.

19                Go ahead.

20                THE WITNESS:  And whereas with many other drugs,

21      typically they're not manufactured here, which gives us an

22      opportunity potentially to go back to the very source.

23      BY MR. SCARPELLI:

24      Q.   Okay.

25      A.   Or a better opportunity, I should say.

Page 39

Jacqueline M. Sullivan, RPR
Official Court Reporter

42

1          MR. MARTIN:  There's no question pending, your Honor.

2          MR. SCARPELLI:  He's finishing his answer.

3          THE COURT:  Yes, I think he is.

4    BY MR. SCARPELLI:

5    Q.   Is one of your goals of this investigation --

6          MR. MARTIN:  Objection; leading.

7          THE COURT:  That's true.

8    BY MR. SCARPELLI:

9    Q.   Who, if anyone, aside from Mr. Suggs as the investigation

10   began were you targeting?

11   A.   We wanted to identify people that were being supplied by

12   Mr. Suggs as well as the person that was supplying Mr. Suggs.

13   Q.   Did you learn who was supplying Mr. Suggs?

14   A.   Yes, we did.

15   Q.   And who was that?

16   A.   Lionel Glover.

17   Q.   How did you learn that?

18   A.   Through the interceptions on Mr. Suggs' phone as well as

19   surveillance.

20   Q.   Can you elaborate a little bit more what you mean?

21   A.   Well, when we first began listening to the calls, you know,

22   we knew certain people that he was dealing with right away and

23   we were intercepting calls with Lionel Glover at the time.  We

24   just didn't know who it was, and then on January 18 he arranged

25   to meet with this individual who was not identified at that

2-19-08.txt

43

1    particular time and we were conducting surveillance and at that

2    time we saw Mr. Suggs' SUV close to a pickup truck, and at that

3    time we got a partial tag, the last four digits of the tag.  It

4    was a D.C. tag.  They were 0597, and I'd actually called them

5    all out over the radio but nobody was hearing me, but I

6    remembered the 0597, so there we had a pickup truck and a

7    partial tag, and two days later they had phone calls and

8    arranged to meet.  We conducted surveillance again.

9             MR. DONOHUE:  Your Honor, I'm going to object.  They

10   can play the phone calls, but he doesn't need to recite that

11   kind of evidence in court.

12            THE COURT:  You're not going to repeat the calls.

13   He's not going to try to do that.

14            MR. SCARPELLI:  I'm sorry?

15            THE COURT:  He's not going to talk about the call, per

16   se.  He's just explaining how he identified Glover, right?

17            MR. SCARPELLI:  Correct.

18            THE COURT:  Overruled.

19            THE WITNESS:  So they arranged to meet on the morning

20   of January 10 and they agreed to meet at the Home Depot in Oxen

21   Hill, so we conducted surveillance there, and at that time it

22   was daylight now.  I saw the truck again and it was a D.C. tag,

23   BZ 0597, and from there we identified Lionel Glover.

24   BY MR. SCARPELLI:

25   Q.   And how did you identify Lionel Glover there?

Jacqueline M. Sullivan, RPR
Official Court Reporter

44

2-19-08.txt

1    A.    The vehicle is registered to Lionel Glover.

2              MR. SCARPELLI:  Your Honor, I believe at this time

3    might be a good time to hand out the binders.

4              THE COURT:  Okay, that's fine.  You're about to play a

5    few of the transcripts?

6              MR. SCARPELLI:  Correct.

7              THE COURT:  I want to remind you, ladies and

8    gentlemen, we are providing to you a book of transcripts.  You

9    should kindly, when we identify one for you to look at, instead

10   of roaming around the book resist that temptation.  Who knows?

11   Maybe we'll be lucky and they won't introduce them all, so just

12   focus on the ones that are being played.  The transcripts of

13   these tape-recorded conversations are being furnished to you for

14   your convenience and guidance as you listen to the recording to

15   help clarify portions of the recording which may be difficult to

16   hear and help you identify the speakers.  However, the

17   recordings are the evidence in this case.  That's going to be

18   the disk that you ultimately have.  The transcripts, although

19   they're available for your use during trial and will be

20   available to you during deliberations, are not themselves

21   evidence.  They're merely an aid to you.  The transcripts have

22   been provided or are being provided right now in binders.  If

23   you perceive any variation between the transcripts and the

24   recordings you are to be guided solely by the recordings and not

25   by the transcripts.  If you cannot determine from the recording

Jacqueline M. Sullivan, RPR
Official Court Reporter

45

Page 42

2-19-08.txt

1   the particular words that were spoken you should disregard the

2   transcripts so far as those words are concerned.  You will find

3   through these transcripts, and maybe you can hear what somebody

4   is saying, the person who transcribed used the abbreviation UI

5   to mean unintelligible, so it sometimes happens in these kind of

6   tapes people talk over each other, you can't tell what they're

7   saying.  You can tell that's okay.  Sometimes you won't agree

8   with what somebody else has decided, but the tape itself, what

9   you're hearing is the evidence, what you're seeing is merely to

10   help you.

11           Okay.  Anything further than in that regard?

12           MR. SCARPELLI:  No, your Honor.

13           THE COURT:  Okay.  Where are we?  What tape and how

14   are you -- you have --

15           MR. SCARPELLI:  I'll simplify it for everybody.

16   BY MR. SCARPELLI:

17   Q.   I want to take your attention to activation 825, which is

18   at tab 38.

19           THE COURT:  38.  So this has all been put together by

20   tabs with a Bates stamp in the right bottom as well?

21           MR. GILBERT:  Your Honor, could he use the Bates stamp

22   as well?  We don't have tabs.

23           THE COURT:  Oh, dear.  I'm so sorry.

24           MR. GILBERT:  But we do have the Bates.

25           THE COURT:  We'll do that.  51.

                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              46

1           MR. SCARPELLI:  051.

2           THE COURT:  0051 is the Bates stamp that refers to the

                            Page 43

2-19-08.txt

3    numbers down in the right corner, but the tab, apparently some

4    people didn't get tabs.  I got tabs and the jury got tabs.  You

5    can borrow my tabs if you need them.  It's line is 9887588, so

6    we should all be on the same page.  Everybody there?

7              THE JURY:  Yes.

8              THE COURT:  Yes, no?

9              THE JURY:  Yes.

10             THE COURT:  I don't want to lose anybody.  Thank you.

11             MR. SCARPELLI:  Are you ready?

12             THE COURT:  I am.

13   BY MR. SCARPELLI:

14   Q.   Do you recall activation 825?

15   A.   I think so.  I do.

16   Q.   Do you recall the date of that call?

17   A.   Yes; January 18.

18   Q.   And do you recall the time of the call?

19   A.   5:26 p.m.

20   Q.   And do you recall who the speakers were?

21   A.   It was Anthony Suggs and Lionel Glover.

22   Q.   How are you able to identify the voice of Anthony Suggs and

23   Lionel Glover?

24   A.   I've heard their voices through many phone conversations

25   and I know their voices, plus the phone numbers are both known.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              47



1    Mr. Suggs' phone number is known as well as Mr. Glover's.

2              THE COURT:  The 988 number is what, is what again?

3              MR. SCARPELLI:  That's the telephone.

                          **Page 44**

                              2-19-08.txt
4                THE COURT:  No, no.  Not us.  I have to ask him.

5                THE WITNESS:  That's Mr. Suggs' cellular telephone.

6                THE COURT:  But it's not in his name, it's in some

7    other guy's name?

8                THE WITNESS:  Correct.

9                THE COURT:  So this is the cell number.

10               MR. SCARPELLI:  Your Honor, at this time the

11   government would move into evidence activation 825 and play it

12   for the jury.

13               THE COURT:  Well, the activations are all in.

14               MR. SCARPELLI:  We'll play activation 825 for the

15   jury.

16               THE COURT:  Okay.

17               (Audio tape played.)

18   BY MR. SCARPELLI:

19   Q.   Now, that intercepted conversation, what role did that play

20   with respect to you being able to identify Lionel Glover?

21   A.   From this call we knew they were going to meet and we

22   conducted surveillance during which we identified the partial

23   tag for Mr. Glover.

24               MR. SCARPELLI:  And now I want to move to activation

25   971, which I believe is at tab 48.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    48


1                THE COURT:  Hold up.  So that's Bates 63.  971 is your

2    call?

3                MR. SCARPELLI:  Correct.

4                THE COURT:  On January 20th.

5                Everybody okay?  Sir?  Everybody?  It's Bates stamped

2-19-08.txt

6      90063, tab 48.

7      BY MR. SCARPELLI:

8      Q.    Okay.  Do you recall activation 971?

9      A.    Yes, I do.

10     Q.    And do you recall the time of the call?

11     A.    11:31 a.m.

12     Q.    Do you recall the date of the call?

13     A.    January 20th, 2007.

14     Q.    And do you recall who the speakers were?

15     A.    It was again Anthony Suggs and Lionel Glover.

16            MR. SCARPELLI:  Your Honor, at this time the

17     government would play activation 971 for the jury.

18            THE COURT:  Sure.

19            (Audio tape played.)

20     BY MR. SCARPELLI:

21     Q.    Now, based on that conversation is that what directed you

22     to the Home Depot in Oxen Hill?

23     A.    Yes, it is.

24     Q.    What, if anything, did you have with you to assist you when

25     you went to the Home Depot in Oxen Hill?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            49


1      A.    I had a video camera.

2      Q.    Have you had an opportunity to review what's been marked as

3      Government's Exhibit SV 12?

4      A.    Yes, I have.

5      Q.    And that's SV 12.  And what is SV 12?

6      A.    It is a videotape of Mr. Glover at the Home Depot in Oxen

                            **Page 46**

2-19-08.txt

7  Hill on January 20th.

8  Q.   Who, if anybody, did Mr. Glover meet at the Home Depot in

9  Oxen Hill on January 20th?

10  A.   He met with Mr. Suggs.

11  Q.   Is that a fair and accurate representation of the

12  recordings from the meeting of Mr. Suggs and Mr. Glover on

13  January 20th, 2007?

14  A.   Yes.  The video is actually Mr. Glover after he and Mr.

15  Suggs have met.

16       MR. SCARPELLI:  Your Honor, at this time the

17  government would move into evidence SV 12 and play it for the

18  jury.

19       THE COURT:  Sure.  I take it there's no objection.  I

20  don't hear any objection.

21       MR. DONOHUE:  No objection.

22       THE COURT:  This is taken on the 20th of January '07,

23  right?

24       MR. SCARPELLI:  Yes, your Honor.

25       (Government's Exhibit No. SV 12 was admitted into

Jacqueline M. Sullivan, RPR
Official Court Reporter

50

1       evidence at about 2:53 p.m.)

2       (Audio tape played.)

3  BY MR. SCARPELLI:

4  Q.   Who was the camera videotaping what we saw there?

5  A.   It was Mr. Glover inside his pickup truck.

6       THE COURT:  Which one is the pickup truck?  Can you go

7  back a little?  Which one is the pickup?  There are a lot of

8  trucks there.

2-19-08.txt

```
 9              THE WITNESS:  It's the furthest one -- well, almost
10     the furthest one away.  There's a little bit of a post or
11     something kind of going across the door.
12              THE COURT:  So it's the third car back?
13              THE WITNESS:  Yes.
14              THE COURT:  For lack of a better word.  Okay.  Thank
15     you.
16     BY MR. SCARPELLI:
17     Q.   Now, you just told us about two meetings between Mr. Suggs
18     and Mr. Glover.  How through this investigation were you able to
19     determine that Mr. Suggs was receiving his PCP from Mr. Glover?
20     A.   Through subsequent interceptions we determined it for sure.
21     Also later that afternoon the cooperating witness was able to
22     make a controlled purchase from Mr. Suggs.
23     Q.   And what about later on in the investigation, what, if
24     anything, did you learn with respect to Mr. Suggs with Mr.
25     Glover with respect to this investigation?
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

51

```
 1     A.   We learned that Mr. Glover was being supplied with multiple
 2     gallons of PCP.
 3              MR. DONOHUE:  I'm going to object.  Motion to strike.
 4     This is all tapes.
 5              THE COURT:  First of all, you have to talk in the
 6     mike.  Come on up to the mike.
 7              Excuse us, ladies and gentlemen.
 8              (Bench conference as follows):
 9              THE COURT:  If you want to object, I understand this.
```

2-19-08.txt

10   He's listened to it.

11         MR. DONOHUE:  We're going to personally listen to them

12   all too.  The question is is it appropriate for Agent Bevington

13   now to sit back, and we're being playing, essentially it seems

14   to me looking through what is going to come later on in the

15   tapes.  The tapes, the recordings are the evidence, not Mr.

16   Bevington's opinions about it.

17         MR. SCARPELLI:  As long as PCP, and that's what he was

18   saying.  Mr. Suggs was gaining --

19         THE COURT:  I know, but at this point the best

20   evidence is let's hear the call.  Why do we need him to tell us?

21         MR. SCARPELLI:  I think there's a summary.  We keep

22   playing calls.  They have a certain method to doing this, and at

23   this point other than he's already said --

24         THE COURT:  You're about to play the call?

25         MR. SCARPELLI:  No.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        52



1          THE COURT:  Yes, but his point is he's then coming in

2    to summarize the calls.  First he was going to come on and

3    explain, but he can then play anything.

4    BY MR. SCARPELLI:

5    Q.   During a series of calls over Mr. Suggs' telephone at some

6    point did you target Julian, Ju-Ju Johnson?

7    A.   Through the interceptions we learned that Mr. Suggs was

8    supplying Mr. Johnson, yes.

9    Q.   And were you able to intercept calls between Mr. Johnson

10   and Mr. Suggs?

11   A.   Yes, we were.
                         Page 49

2-19-08.txt

12    Q.    I'm going to take your attention to activation 89, which is

13    Bates stamped three and also tab three.  Do you recall that

14    activation?

15    A.    Yes, I do.

16    Q.    And when did that activation occur?

17    A.    January 10 of 2007.

18    Q.    And do you recall what time it occurred?

19    A.    5:30 p.m.

20    Q.    Who were the speakers?

21    A.    Anthony Suggs and Julian Johnson.

22            MR. SCARPELLI:  Your Honor, at this time the

23    government will play activation 89 for the jury.

24            THE COURT:  Okay.

25            (Audio tape played.)


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                          53


1    BY MR. SCARPELLI:

2    Q.    When Mr. Johnson said to Mr. Suggs you dead now, do you

3    know what that meant?

4            MR. DONOHUE:  Objection.

5            THE COURT:  Who's objected?

6            MR. DONOHUE:  I am.  I'm sorry.  For the reasons we

7    discussed prior to.

8            (Bench conference as follows):

9            THE COURT:  He's going to say he had the drugs.

10           MR. SCARPELLI:  Um-hmm.

11           THE COURT:  Why don't you need it?

12           MR. SCARPELLI:  Well, your Honor is sitting in a

                         Page 50

2-19-08.txt

13    different position than the jurors.

14         THE COURT:  I know.  You know, at what point do you

15    raise this?  These people are saying them.

16         MR. SCARPELLI:  That's good enough.

17         MR. GILBERT:  It's meetings, one of which is --

18         THE COURT:  Is this a crime expression?

19         MR. SCARPELLI:  I don't think it's specifically, but

20    it's a term, one of many terms they used.

21         THE COURT:  Well, do the main, for any length of them.

22    It baffles me.  We sat through too many of these.

23         MR. SCARPELLI:  Well, our goal, your Honor, is as we

24    go along to do less and less interpretation, but we're not going

25    to.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              54


1          THE COURT:  It does, though.

2          MR. EARNEST:  It's a slippery slope, your Honor, if I

3     may.

4          THE COURT:  It's not based on -- it's helpful to have

5     a clear understanding of the witness' testimony or determine the

6     issue or a fact of the issue.  The question is I'd love to ask

7     how helpful this is, give you a little leeway, but it's not

8     helpful.  If I had to figure it out, if you think that I

9     don't --

10         MR. GILBERT:  I don't.

11         MR. DONOHUE:  I don't want to have to delay this, and

12    I object, and if I can just make my record.  If the Court wants

13    to talk to us that's fine.  I hate to keep coming up.

14         THE COURT:  Mr. Gilbert, you can't just take it across

2-19-08.txt

15     the board.  He has the right to play an opinion-relayed

16     testimony.  There are criteria.  And that's where just because a

17     word is not in the dictionary define that word doesn't make him

18     really that helpful.  If this is one goal, you may have to take

19     it out.  I think this is, to the extent this is sort of

20     immaterial --

21             MR. EARNEST:  Your Honor, may I make a small comment?

22     I think it's prejudicial and unacceptable to make words because

23     there are -- it's going to the -- is it going to what he means,

24     is he going to define what the truck means?  This is not code.

25     It's beautiful to address it as this was essential speak.


                     Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            55


1               THE COURT:  Well, go ahead and try to avoid.  Okay.

2      Overruled.

3               (End of bench conference.)

4               THE COURT:  We'll take a break pretty soon, ladies and

5      gentlemen.  Sorry.

6      BY MR. SCARPELLI:

7      Q.   Do you recall my last question or should I repeat it?

8      A.   No.  I recall it.

9      Q.   Can you give us an answer?

10     A.   Yes.  When he said you dead now he meant does that mean you

11     don't have any PCP.

12     Q.   And how did you come to that conclusion?

13     A.   It's a little bit common sense and a little bit hearing

14     these calls and context.  Many times they'll say things like

15     stand still, laying on a call, all things that indicate that

                             Page 52

2-19-08.txt

16    they're waiting or they don't have what the other person is

17    looking for at that particular time.

18          THE COURT:  I'm limiting you to talking about what you

19    heard on these tapes.  I can't tell when you're saying stand

20    still, is that a phrase that you heard on these tapes?

21          THE WITNESS:  Yes.  Both stand still, your Honor, and

22    laying are common phrases that were used on these particular

23    calls.

24    BY MR. SCARPELLI:

25    Q.   What an about a comment slow motion?


Jacqueline M. Sullivan, RPR
Official Court Reporter

56


1     A.   Slow motion is another term that was used during these

2     court-ordered wiretap interceptions.

3     Q.   And one last question with regard to activation 89.  Do you

4     understand what Mr. Johnson meant when he said I want to go

5     heavy?

6     A.   Yes.  He wanted to get a large quantity.

7     Q.   How do you know that?

8     A.   "Heavy" would indicate a lot, but then you can even get

9     more because he indicates that he doesn't have a storage bin.

10    He doesn't have a storage bin to accommodate a large quantity.

11          THE COURT:  Is this a good place to break or do you

12    got one more call?

13          MR. SCARPELLI:  I think one more.

14          THE COURT:  That's okay.

15    BY MR. SCARPELLI:

16    Q.   We're going to go to Bates Stamp No. 10, which is also tab

17    number nine.  And it's activation 191.  If you can draw your

Page 53

2-19-08.txt

18    attention to that activation.  Do you recall that activation?

19    A.   Yes, I do.

20    Q.   Do you recall what time that activation occurred?

21    A.   8:32 p.m.

22    Q.   Do you recall what was the date of that activation?

23    A.   January 11, 2007.

24    Q.   Do you remember who the speakers were?

25    A.   Anthony Suggs and Julian Johnson.


                          Jacqueline M. Sullivan, RPR
                             Official Court Reporter

                                                                    57


1              MR. SCARPELLI:  At this time the government will play

2    activation 191.

3                   (Audio tape played.)

4    BY MR. SCARPELLI:

5    Q.   Just one question with regards to that call.  Do you, in

6    January, January and/or February of 2007, did you have an

7    opportunity to see Mr. Julian Johnson?

8    A.   Yes.

9    Q.   Can you describe his hair style for us?

10   A.   His hair was cut very short or very close.

11             MR. SCARPELLI:  This might be a good time to stop.

12             THE COURT:  Okay.  All right, ladies and gentlemen,

13   we'll break until quarter past.  Just leave everything.  Please

14   do not discuss the case.  Just put it under your chair.  It will

15   be here.  Quarter past, please.

16                  (Recess taken at about 3:05 p.m.)

17                  (Back on the record at about 3:23 p.m.)

18                  (Jury enters courtroom at about 3:23 p.m.)

                              Page 54

2-19-08.txt
19          THE COURT:  Okay.  Go ahead, Mr. Scarpelli.

20   BY MR. SCARPELLI:

21   Q.   Special Agent Bevington, I want to take your attention to

22   activation 181, which is in tab seven and Bates stamped eight.

23   Can you tell us the date and time and the speakers of that

24   activation?

25   A.   Yes.  The date of the activation was January 11, 2007.  The


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                                 58



1    time was 71:67 p.m., and the speakers were Anthony Suggs and

2    Julian Johnson.

3               THE COURT:  I missed the Bates Stamp No.

4               MR. SCARPELLI:  It's number eight.

5               THE COURT:  Bates stamped eight or tab eight?

6               MR. SCARPELLI:  I'm sorry.

7               THE COURT:  Either one.

8               MR. SCARPELLI:  Tab seven, Bates stamp eight.

9               THE COURT:  Okay.  Everybody, Bates stamp eight.

10   That's it.

11              (Audio tape played.)

12   BY MR. SCARPELLI:

13   Q.   So on January 11th at 7:16 p.m. what was Mr. Johnson

14   looking for?

15   A.   He was looking to be supplied with PCP, and this call

16   actually precedes the call that we had listened to before the

17   break where they were talking about the hair dryer.

18   Q.   I missed 181.  So at 7:16 p.m. Mr. Johnson was looking for

19   luggage?

20   A.   Correct.  He says I thought you would have had my little
                            Page 55

2-19-08.txt

21    luggage with you.

22    Q.    And then at 8:32 p.m. what does Mr. Suggs say he's bringing

23    you?

24    A.    He then references a hair dryer.

25    Q.    Just so we're clear, Special Agent Bevington, when you're

Jacqueline M. Sullivan, RPR
Official Court Reporter

59

1     giving your opinion, keep it within this investigation.

2     A.    Correct.

3     Q.    Now I want to go to activation 1054, which is at tab 51 and

4     Bates stamp 66.  Can you tell us the date, the time, and who the

5     speakers are?

6              THE COURT:  Tab 51?

7              MR. SCARPELLI:  And Bates stamp 66.

8              THE COURT:  Maybe you ought to use the activation with

9     the last so that he knows the tabs and Bates stamped first.

10             Okay, everybody, this is January 21.  Can you all find

11    it all right?

12             THE JURY:  Yes.

13             THE WITNESS:  7:58 p.m., Anthony Suggs and Julian

14    Johnson.

15    BY MR. SCARPELLI:

16    Q.    What was the date?

17    A.    January 21st.

18             (Audio tape played.)

19    BY MR. SCARPELLI:

20    Q.    What significance, if any, does the terms when Mr. Suggs

21    and Mr. Johnson discussed 16th Street and 32nd Street?

2-19-08.txt

22   A.    PCP is commonly sold in quantities of 16 ounces and 32

23   ounces.

24   Q.    And what do you think they're referring to when they talk

25   about 16th Street and 32nd Street?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                60



 1   A.    Mr. Suggs is indicating he has 16 ounces and Mr. Johnson

 2   comments that you previously supplied me with 32 ounces because

 3   he says you ain't putting me on nothing but 32nd Street.  That's

 4   gone.

 5   Q.    Now let's go to tab 64 and Bates stamp 86, which is

 6   activation 1529.  Can you tell us the date and time and the

 7   speakers?

 8   A.    The date is January 26, 2007.  The time is 10:01 p.m., and

 9   the speakers are again Anthony Suggs and Julian Johnson.

10   Q.    That's tab 86?

11             THE COURT:  Tab 86 or 64?

12             MR. SCARPELLI:  I'm sorry.  Bates stamp 86, tab 64.

13             THE COURT:  Everybody, okay, January 26.  It's Bates

14   stamp 0086.  Good.  It's getting late already.  Okay.  Go ahead.

15             (Audio tape played.)

16   BY MR. SCARPELLI:

17   Q.    Now I want to take you to truck interception activation

18   number 83, which is Bates stamped page 159 and tab 112.

19             THE COURT:  112 tab and then Bates stamps 159.  This

20   is from the truck.  That's when you have truck mike up at the

21   top there?

22             MR. SCARPELLI:  That's correct.

23             THE COURT:  Okay.
                          Page 57

2-19-08.txt

24          (Audio tape played.)
25   BY MR. SCARPELLI:


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              61


1    Q.   Let's stop it for one second.  Special Agent Bevington, can
2    you tell us who the speakers are and the date and time of that
3    activation?
4    A.   The speakers are Christian Donaldson and Lionel Glover.
5    The date is March 27th of 2007.  The activation initiated at
6    10:47 p.m., and depending on how long it went, it might be later
7    than that actual time when this particular part of the
8    conversation occurred, because when we activate the truck mike
9    and then minimize it the time keeps going, so it could be later
10   than 10:47 when the actual conversation occurred.
11   Q.   Was this conversation short?
12   A.   Yes, it was.
13   Q.   And who is Christian --
14          THE COURT:  Why don't you explain what that means
15   when you say was it shortened?  You mean you have edited out
16   parts that you don't care to --
17   BY MR. SCARPELLI:
18   Q.   Can you explain to us what you meant by shortened or how
19   this was shortened?
20   A.   This was a lengthy conversation between Ms. Donaldson and
21   Mr. Glover.  Some of it was relevant to this particular trial
22   and some of it was not, so the conversation, we've made clips or
23   just short portions that pertain to this particular trial.
24          THE COURT:  You should understand, ladies and
                      Page 58

2-19-08.txt

25      gentlemen, that the whole call was made available to everybody,

1       but in order to try to keep the case moving and shorten things

2       up, I've urged everybody to pick what's really relevant instead

3       of having a lot of yak-yak, so there is, these stars, that means

4       something has been deleted, right?

5               THE WITNESS:  Correct, your Honor.

6               THE COURT:  When you see these, just a bunch of stars,

7       that means that they have edited it, but it's not because

8       they're trying to keep something from you.  It's to get rid of

9       some of the extraneous stuff they've edited.

10          Okay.

11      BY MR. SCARPELLI:

12      Q.   Who is Christian Donaldson?

13      A.   Christian Donaldson was one of Mr. Glover's customers.  She

14      also is his girlfriend or his former girlfriend's daughter.

15              MR. SCARPELLI:  I'm going to play activation 83.

16              (Audio tape played).

17      BY MR. SCARPELLI:

18      Q.   A couple quick questions, Special Agent Bevington.  When

19      Christian Donaldson in the beginning referred to the boat, do

20      you know what he meant by the boat?

21      A.   Boat is marijuana laced with PCP.  It's frequently referred

22      to or historically it's been referred to as love boat and many

23      times just boat for short.

24      Q.   When Mr. Glover said Ju-Ju is getting it from my man, do

25      you know who he was referring to when he said "my man"?

2-19-08.txt
Jacqueline M. Sullivan, RPR
Official Court Reporter

63

1    A.   Anthony Suggs.

2    Q.   How do you know that?

3    A.   Based on the phone conversations between Mr. Suggs and Mr.

4    Johnson.

5    Q.   Now, later in that conversation Mr. Glover said see all the

6    water, the heroin, all that, is coming from me.  What do you

7    know the word "water" to mean?

8    A.   Water is a nickname or slang for PCP, if you will.  PCP is

9    in a liquid form.  Therefore it's referred to as water.

10   Q.   And at the very bottom Mr. Glover said I give it to the boy

11   for 22,000 a gallon.  He must hid it.  Now, who is Mr. Glover

12   referring to when he says he gives it to the boy for 22,000?

13   A.   Anthony Suggs.

14   Q.   How do you know that?

15   A.   Based on his relationship from the interception we know

16   that he was Mr. Suggs' source of supply.

17   Q.   What about the term "hit it," what does that mean?

18   A.   That means to use another substance, another liquid.  It

19   somewhat dilutes the strength of it and it also extends it or

20   gives it more -- gives them more quantity.  If you put

21   additional liquid on it, therefore you're going to have more and

22   therefore would have more to sell and in turn make more money.

23   Q.   Finally, the statement on the last page, page two, when Mr.

24   Glover said Ju-Ju probably let's say 32, he probably give it to

25   Ju-Ju for 65, do you know what that means?

2-19-08.txt

1    A.    That means he would sell it to Mr. Johnson, 32 ounces of
2    PCP, for $6,500.
3    Q.    Again, how do you know that?
4    A.    Thirty-two ounces, it is a common quantity, and there
5    are -- there were different interceptions where they discussed
6    the price of $6,500 being within a normal price.  It could be,
7    you know, different people are going to sell it for more or
8    less, but $6,500 is not an unreasonable or an unusual price for
9    32 ounces.
10   Q.    Now I want to switch gears and I want to talk about Ngozi
11   Joy and Mr. Suggs.  During this investigation did you learn
12   where Mr. Suggs was residing?
13   A.    Yes, we did.
14   Q.    And where was he residing?
15   A.    4000 10th Street, Northeast, Washington, D.C.
16   Q.    How did you learn that?
17   A.    We learned it through surveillance and through the court-
18   ordered wiretap interception.
19   Q.    During your investigation did you also learn who else lived
20   at 4000 10th Street with Ms. Joy and Mr. Suggs?
21   A.    Yes.
22   Q.    Who?
23   A.    Her son, Nico, and her daughter, Denver.
24   Q.    I want to take your attention back to March 27, 2007.  Do
25   you recall that day?

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-19-08.txt

1    A.   Yes, I do.

2    Q.   Were you working that day?

3    A.   Yes, I was.

4    Q.   What occurred, if anything, with regard to this

5    investigation?

6    A.   It was late in the day, sometime after six p.m., and I was

7    in the room where the interceptions occur and a call came in and

8    I wasn't listening to it live, but as soon as the call ended the

9    monitor said I think you're going to want to listen to this, and

10   that's at that point I did listen to the call.

11   Q.   And of what significance was that call?

12   A.   Ms. Joy called Mr. Suggs and talked about an odor that was

13   coming out of 4000 10th Street.

14   Q.   I'm going to take your attention to activation 5773, which

15   is tab 91 and Bates stamp 124.  Can you tell us the date, time,

16   and the speakers in that call, Bates stamp 124 and tab 91?

17   A.   The date was March 27th, 2007.  The time was 6:28 p.m., and

18   the speakers were Anthony Suggs and Ngozi Joy.

19   Q.   And how do you know that one of the speakers was Ngozi Joy?

20   A.   Prior to this there had been many different conversations

21   between Mr. Suggs and Ms. Joy at several different numbers, two

22   of which were subscribed to in her name and another number, it

23   was her place of employment.

24            MR. DONOHUE:  Your Honor, may we approach?

25            THE COURT:  Yes.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            66


                          Page 62

```
                           2-19-08.txt
 1              (Bench conference as follows):
 2              MR. DONOHUE:  My apologies.  I just wanted to make
 3    sure that I can understand how prior objections to transcripts
 4    translated in trial.  I have objection obviously to these
 5    transcripts that he's about to play or we objected to it.  This
 6    is Ngozi Joy.
 7              THE COURT:  You heard it in opening.
 8              MR. DONOHUE:  Do I need to renew my objection?  I want
 9    to make sure my record is clear.  I have an objection to this
10    coming in.
11              THE COURT:  Well, you said she wasn't part of the
12    conspiracy.
13              MR. DONOHUE:  Right.  I mean, I may -- what point do
14    we need to renew our objections on the transcripts?
15              THE COURT:  Well, your objection is that she shouldn't
16    be, they can't --
17              MR. DONOHUE:  So --
18              THE COURT:  Hear from her.
19              MR. DONOHUE:  And that this is -- yes.  That applies
20    to the three tapes that we applied.  I can't say it applies to
21    something else.
22              MR. MARTIN:  Well --
23              THE COURT:  Thank you.  Okay.
24              (End of bench conference.)
25              THE COURT:  What number?
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

                                                                    67

```
 1              MR. SCARPELLI:  5773.
 2              THE COURT:  Bates stamp?
```

2-19-08.txt

3    MR. SCARPELLI:  I'm sorry.  Bates stamp 124, tab 91.

4    (Audio tape played.)

5 BY MR. SCARPELLI:

6 Q. I'm going to take your attention to activation 5793, which

7 is actually the next tab, 29, and Bates stamped 126.  Do you

8 recall that call?

9 A. Yes, I do.

10 Q. Can you tell us the time, date, and speakers?

11 A. The date is March 27, 2007.  The time is 7:55 p.m.  Ms.

12 Joy's daughter places a call and speaks with a woman named

13 Monique, and then Ms. Joy and Mr. Suggs are on the phone.

14    (Audio tape played.)

15    MR. SCARPELLI:  If I may just have one moment.

16    THE COURT:  Is this a witness you may recall back

17 later for other things?

18    MR. SCARPELLI:  Yes.

19    THE COURT:  Well, if anybody has cross now that's

20 fine, or later, that's fine too.

21    The last call that was played was what number again?

22 I'm sorry.

23    THE WITNESS:  5793, your Honor.

24    THE COURT:  Because that's the activation number.  How

25 about a Bates stamp?


       Jacqueline M. Sullivan, RPR
        Official Court Reporter

                  68


1    MR. BOYKIN:  It's 126, your Honor, 126.

2    THE COURT:  126.  Okay.

3        CROSS-EXAMINATION

Page 64

2-19-08.txt

4    BY MR. DONOHUE:

5    Q.    Good afternoon, Special Agent.

6    A.    Good afternoon, Mr. Donohue.

7    Q.    Special Agent, did I understand you to say you have

8    listened to all of the calls?

9    A.    On Mr. Suggs' line.

10   Q.    Right.

11   A.    Yes.

12   Q.    And those calls were recorded from January 9th until about

13   April 9th of 2007, correct?

14   A.    April 7th of 2007, yes.

15   Q.    And there were, I think, 6,500 or more activations, isn't

16   that right?

17   A.    I think it was just under 6,500.  I think it's 64-

18   something.

19   Q.    So 6,400 activations.  And of those activations about 2,500

20   of those were actual calls where people talked or left messages

21   and so forth, correct?

22   A.    I'm not sure I understand.  You're saying out of the 6,400,

23   2,500 there were actual conversations?

24   Q.    Sure.

25   A.    I don't know that.  I have not calculated those numbers.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter
                                                        69


1    Q.    There weren't 6,500 telephone conversations.  An activation

2    can include more than two people talking, is that true?

3    A.    An activation could be something where there was a call and

4    there was no conversation where nobody picked up and just hung

5    up, or if Mr. Suggs made a call and it was not answered.

2-19-08.txt

6    Q.   And there are about 6,500 things you would characterize as

7    activations, correct?

8    A.   Yes, 64-whatever total activations, and some of the

9    incoming calls are actually recorded twice, so there's not that

10   many activations.  There's not that many actual conversations.

11   There are less than 6,400.

12   Q.   So if my calculations are that there are about 2,500 phone

13   calls with conversations or messages left, you don't have any

14   reason to dispute that, right?

15   A.   I haven't calculated, so, no, I don't know.

16   Q.   But you've listened to all of them, right?

17   A.   I've listened to all of the conversations, yes.

18   Q.   In all of those conversations over that three-month period

19   would you listen to them basically every day or every other day

20   you monitored them, you just didn't sit down at the end,

21   correct?

22   A.   No.  My typical practice would be to come in the next

23   morning and listen to the call.  There would be other times

24   where I would listen to them before that.  For instance, I might

25   end up sitting a four-to-midnight shift and at that time I would

Jacqueline M. Sullivan, RPR
Official Court Reporter

70

1    listen to the calls that occurred that day.

2    Q.   I understand.  It was a process.  You listened to them as

3    the wire was administered, correct?

4    A.   Correct.

5    Q.   And as you sit here today can you direct me, in any of

6    those 6,500 activations, can you direct me to any calls in which

2-19-08.txt

7    Mr. Suggs spoke with Velma Williams?

8    A.   No.  There were no conversations between Mr. Suggs and Ms.

9    Williams.

10    Q.   All right.  And in those 6,500 activations can you point to

11    one time where Mr. Suggs had a telephone conversation with Tony

12    Glover?

13    A.   There were no -- on that line there were no conversations

14    between those two individuals, no.

15    Q.   And of those 6,500 activations, Coolridge Bell, did Anthony

16    Suggs to your knowledge ever have a conversation on the phone

17    over this period with Coolridge Bell?

18    A.   Mr. Suggs, to my knowledge Mr. Suggs never spoke with

19    Coolridge Bell.

20    Q.   And that's true also for Charles Gladden, is it not, no

21    conversations in the 6,500 activations for Mr. Gladden, correct?

22    A.   Correct.

23    Q.   And Henry Brown, that would be true of Henry Brown too,

24    would it not?

25    A.   Yes, it would.

Jacqueline M. Sullivan, RPR
Official Court Reporter

71

1    Q.   And Ronald Cook same thing, no conversations with Ronald?

2    And take your time if you want to think about it.

3    A.   No, I'm thinking about it.  No, none with Mr. Cook.

4    Q.   And with Leslie Wood, any conversations over all these

5    6,500 activations with Leslie Wood?

6    A.   No.

7    Q.   Or Christian Donaldson, the woman we just heard on the

8    tape?

2-19-08.txt

```
 9    A.    No phone conversations, no.

10    Q.    All right.  What about Diane Holmes?

11    A.    No.

12    Q.    Jerome Hampton?

13    A.    No.

14    Q.    Joe Brown?

15    A.    No.

16    Q.    Lena Brown?

17    A.    No.

18    Q.    John Chrome?

19    A.    No.

20    Q.    I mean, you conducted surveillance, correct, in this case?

21    A.    Yes, we did.

22    Q.    And I take it your surveillance went six months or so?

23    A.    Yes.  From early January through June 19th of 2007.

24    Q.    All right.  In that period of time you'll agree with me

25    that you don't have any indication that Mr. Suggs ever went to
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

72

```
 1    Georgia, correct?

 2    A.    Not that I recall.

 3    Q.    And you don't have any indication, you're the main guy,

 4    right, on this?

 5    A.    I'm one of three, and we were also working with the police

 6    department, so it was a group of us.

 7    Q.    You're one of the main guys then?

 8    A.    Yes.

 9    Q.    You're being humble.
```

Page 68

2-19-08.txt

10    A.    No.  I'm just telling you the way it is.  These cases are

11    so large that one person can't do it alone.

12    Q.    But you're the go-to guy on the Suggs cell phone, correct?

13    A.    I'm the one that listened to all the calls on the Suggs

14    line, yes.

15    Q.    As far as you know -- and you can participate in a lot of

16    surveillance too, right?

17    A.    Absolutely.

18    Q.    As far as you know to the best of your knowledge Mr. Suggs

19    never traveled either by train, plane, auto, to Georgia,

20    correct?

21    A.    I don't know that he did, no.  I don't know.  My reluctance

22    is he went to Alabama.  I don't know if he went through Georgia.

23    Q.    Fair enough.  And he's got his daughter at a university out

24    there?

25    A.    Correct.  I think it was Alabama State.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    73



1          THE COURT:  Don't talk over each other, please.

2    BY MR. DONOHUE:

3    Q.    Alabama State.  I think you're right.  And that's why he

4    was down there, right?

5    A.    Yes.

6    Q.    And to your knowledge Mr. Suggs never traveled to Missouri,

7    right?

8    A.    Not my knowledge, no.

9    Q.    And he never traveled to California, correct?

10    A.    During this time period?

11    Q.    Correct.

2-19-08.txt

12    A.    Correct.

13    Q.    You're not aware that he ever went to California in his

14    life?

15    A.    That's right.  I don't know if he did or did not.

16    Q.    Or Missouri or Georgia?

17    A.    Correct, correct.

18    Q.    Now, Mr. Suggs, the day he was arrested in June, were you

19    there?

20    A.    No, I was not.

21    Q.    Now, you all knew that his routine was he went to bed, in

22    the morning, 4:30, quarter to five, and getting on the road to

23    get to work by his start time, six o'clock, correct?

24    A.    Yes.  We knew that he had to be to work and went to work

25    early in the morning, yes.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                            74


1    Q.    And I'm correct that he spent five days a week, 52 weeks a

2    year, riding the trash truck working, right?

3    A.    Yes.  I mean, he was working at the time.  Yes, absolutely.

4    Q.    And that's what he did, correct, for the entire period

5    you -- for the entire period that you were on surveillance, was

6    it January?

7    A.    When we began intercepting his phone calls in January, yes.

8    Q.    January to June he was working at the Department of Public

9    Works, correct?

10    A.    Yes, he did.

11    Q.    Throughout any of that period can you direct me to any

12    point in time where during a work week he wasn't getting out of

2-19-08.txt

13    bed and showing up for work?

14    A.    No.  He went to work.

15    Q.    Now, I didn't want to go through all those names again, but

16    you have a pen register that you were running, correct?

17    A.    Yes.

18    Q.    That pen register, that runs from, you ran it from January

19    through June; is that right?

20          THE COURT:  Better explain --

21          MR. DONOHUE:  I'm sorry.

22    BY MR. DONOHUE:

23    Q.    Pen register is, for lack of a better term because I'm not

24    a techie, is a machine that can track phone calls, the calls to

25    and from, correct?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              75


1     A.    Right.  It records both incoming and outgoing phone calls,

2     phone numbers.

3           THE COURT:  Not the substance of the call?

4           THE WITNESS:  No, not the substance.

5           And it also gives you the date it occurred, the time

6     it occurred, and the duration of the call.

7     BY MR. DONOHUE:

8     Q.    And you had a pen register on Mr. Suggs' cell from January

9     until June, correct?

10    A.    I'm not sure when it ended.  It certainly began at least in

11    January, and he had more than one phone so we had more than one

12    pen on his phone, on those phones, yes.

13    Q.    And that pen register that was run, I listed all those

14    people, any indication on a pen register that there was ever any

2-19-08.txt

15    telephone traffic?  I'm not talking about overhearing a

16    conversation, I'm talking about just telephone traffic, a missed

17    call, for any of the people?  Do you want me to read these

18    people off again?

19    A.    No.  I don't need you to.

20    Q.    You know, do you not, that no calls were made from Suggs to

21    any of those people, correct?

22    A.    No, that's not correct.

23    Q.    Do you have pen register data that shows that Anthony

24    Suggs' telephone made a call to Velma Williams?

25    A.    No.

1    Q.    Do you have pen register data to show that Suggs' telephone

2    made a call to a number associated with Coolridge Bell?

3    A.    No.

4    Q.    Do you have pen register data to show that he called

5    Charles Gladden?

6    A.    No.

7    Q.    Or Ronald Cook?

8    A.    No.

9    Q.    Or Leslie Wood?

10    A.    No.

11    Q.    Or Christian Donaldson?

12    A.    No.

13    Q.    Diane Holmes?

14    A.    No.

15    Q.    Or Jerome Hampton?

                            2-19-08.txt
16    A.    No.

17    Q.    Or Joe Brown?

18    A.    No.

19    Q.    Or Lena Brown?

20    A.    No.

21    Q.    John Drum?

22    A.    No.

23    Q.    Now, agent, I'd like to direct you to the first call that

24    you listened to.  I have Bates Stamp No. 51, but I'm not --

25              THE COURT:  Bates stamp 51 is okay.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                              77



1     BY MR. DONOHUE:

2     Q.    Do you have Bates stamps on your pages?

3               THE COURT:  Yes, yes, yes.  They have both tabs and

4     Bates stamps.

5               MR. DONOHUE:  We on this side use Bates stamped.

6               THE COURT:  51.  Bates stamp 51 is tab 38.

7     BY MR. DONOHUE:

8     Q.    Do you have that in front of you?

9     A.    Yes.

10    Q.    And that's a call on January 18th between Mr. Suggs and

11    Lionel Glover, correct?

12    A.    That's correct.

13    Q.    All right.  And do you film that meeting that day, did you

14    make any surveillance that day?

15    A.    I can conducted surveillance, yes.

16    Q.    That's where you got half a tag?

17    A.    Yes.
                            Page 73

2-19-08.txt

18    Q.    Any film, any film surveillance?

19    A.    No.

20    Q.    And when you got that half a tag did you happen to see the

21    two of them talking?

22    A.    No.

23    Q.    So you didn't see them together that day?

24    A.    No, I did not.

25    Q.    So if you didn't see them together that day, obviously you

Jacqueline M. Sullivan, RPR
Official Court Reporter

78

1     didn't see anything suspicious yourself watching that day,

2     correct?

3     A.    No.

4     Q.    I am correct?

5     A.    Yes, you're correct.

6     Q.    Let me turn to Bates stamp 63 then, agent.  That would be

7     the next call that you discussed.  Do you have that?

8     A.    Yes.

9     Q.    All right.  Now, in that call Suggs talks about work, and

10    he says he's off then, right?

11    A.    Yes.

12    Q.    All right.  And at that point in time do they meet at the

13    Home Depot?

14    A.    It was shortly after this call, yes.

15    Q.    Shortly after the call.  Now, did you see Mr. Suggs and

16    Lionel Glover meet?

17    A.    I saw Mr. -- I saw Mr. Glover's truck, I saw Mr. Suggs'

18    truck.  I saw Mr. Suggs in his truck.  I then saw him leave.

**Page 74**

2-19-08.txt

19   Q.   I'm sorry.  In whose truck?

20   A.   In his own truck, his Tahoe.

21   Q.   Okay.

22   A.   Parked close to Mr. Glover's pickup truck.

23   Q.   Okay.

24   A.   Then Mr. Suggs began to leave the parking lot and I saw

25   somebody walking, who I later determined to be Lionel Glover,


Jacqueline M. Sullivan, RPR
Official Court Reporter

79


1    walk away from Mr. Suggs' truck.

2    Q.   Okay.  Suffice it to say you didn't even see a conversation

3    take place, right?

4    A.   No, I did not.

5    Q.   And you obviously didn't see any kind of transaction take

6    place, correct?

7    A.   No, I did not.

8    Q.   And you don't know from personal observation where Mr.

9    Suggs went after that meeting?

10   A.   Well, I know later that afternoon he met with our

11   cooperating witness.

12   Q.   From your personal observation do you know where he went

13   right after that?

14   A.   No.  Immediately we followed Mr. Glover.

15   Q.   Right.  So you didn't follow Suggs?

16   A.   Correct.

17   Q.   And you only have video of Mr. Glover on that video

18   surveillance that you played here a moment ago, correct?

19   A.   Correct.

20   Q.   All right.  Let me turn, if we can, to the next phone call,

2-19-08.txt

21    page three, Bates stamp three.  Agent, I want to be clear when I

22    understand what your interpretation of the word "dead" means.

23    You mean, you already testified what you thought it meant.  You

24    agree there's a whole host of other things that it could mean in

25    that context?

Jacqueline M. Sullivan, RPR
Official Court Reporter

80

1    A.    In the context of this call I believe it means what I said

2    it means.

3    Q.    I understand.  But you agree that "dead" could be just I'm

4    beat, I'm dead, I'm tired.  That could be one, right?

5    A.    It could be, yes.

6    Q.    Now, he was talking so we know it's not literal, right?

7    A.    Correct, he's alive.

8    Q.    I think you testified that -- can you point me to -- I

9    mean, let me ask you it a different way.  The use of the term

10   "dead," now, what you're really saying is that's a code word,

11   right?

12   A.    Yes.

13   Q.    Can you point me to any other activation of the 6,500

14   activations in this case where the term "dead" is used as you're

15   using it?

16   A.    I have to research that.  I can't off the top of my head.

17   I don't know that it doesn't exist.

18   Q.    And likewise, you don't know if it does, right?

19   A.    No.  I can recall similar terms that I would put in the

20   same category.

21   Q.    I understand, but in terms of your interpretation of that

2-19-08.txt

22    code word, as you sit here today you can't direct me to any

23    other phone call or use -- where that term is used, correct?

24    A.   No, I cannot.

25    Q.   And I think you said that the term, another term for "dead"

Jacqueline M. Sullivan, RPR
Official Court Reporter

81

1    used in -- you saw used in this case was laying, that is what

2    you saying?

3    A.   Laying, like I'm laying on a call.  I'm laying on him.

4    Q.   Like l-a-y-i-n-g?

5    A.   Correct.

6    Q.   And to you that's a code word for being dead?

7    A.   No.  It's another term for waiting, is what laying is.  If

8    you look --

9    Q.   So waiting is not dead, or laying is waiting?

10   A.   Laying is waiting.  I mean, it is the same as dead.

11   Laying, I'm waiting.  I need to meet with him before I can meet

12   with you.  If you read this call or listen to this call in

13   context that's where it comes from because you have to -- you

14   can't just pull the term "dead" out and stop there.  If you

15   listen to the part that precedes it, it makes sense, my

16   interpretation, I believe.

17   Q.   All right.  But you agree it's subject to different

18   interpretations?

19   A.   I believe it could be, yes.

20   Q.   Of course it is.  Common sense says that, doesn't it?

21   A.   Common sense in a certain, in a different context maybe.

22   In this context I think common sense says that it's consistent

23   with what I have said.

Page 77

2-19-08.txt

24      Q.    For enough.   Common sense from a law enforcement

25      perspective would say that, correct?

                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                    82


1       A.    I don't know that I would limit it to law enforcement.

2       Q.    Let's move to number ten, if you can, special agent.   That

3       was the next one that you listened to.   Now, that is a phone

4       call, and I'm sorry.   It chronologically is page ten.   That's a

5       phone call with Suggs and Johnson, correct?

6       A.    Correct.

7       Q.    All right.   And that's the one in which they talk about a

8       hair dryer, right?

9       A.    Correct.

10      Q.    And you said that you're aware that Ju-Ju doesn't have any

11      hair, he's bald-headed, right?

12      A.    His hair is cut very short or close.

13      Q.    Fair enough.   Now, do you know Ju-Ju's?   Now, Ju-Ju has a

14      son, right?

15      A.    Yes, he does.

16      Q.    And he has a little son with braids in his hair, right?

17      A.    I don't know that.

18      Q.    Do you know whether Ju-Ju's wife has long hair?

19      A.    I'm not aware that he's married, but so I guess the answer

20      is no, I didn't know that.

21      Q.    Now, let's move, if we can, special agent, to page 66, one

22      of the next ones that you talked about.   Now, special agent,

23      this is a call with Ju-Ju, almost eight o'clock in the evening,

24      correct?

                    2-19-08.txt
25    A.    Yes.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                           83



 1    Q.    I have one question on this, and that is, in the fourth
 2    line down Anthony Suggs says I'm laying across the expletive
 3    bed, I thought I heard my phone ringing.  He said he's laying
 4    across the bed.  Now, is that laying, is that like being dead or
 5    is that like being dead from work or is that like being dead
 6    from no drugs or is he really laying across the bed?
 7    A.    In this context I believe he's laying across the bed.
 8    Q.    So that would be the use of laying, so depending on the
 9    context, these words could be code and could not be code, is
10    that fair?
11    A.    Certainly.  Sometimes they are and sometimes they're not.
12    That's part of the purpose to use a code.
13            MR. DONOHUE:  I have nothing else.  Thank you, your
14    Honor.
15            THE COURT:  Anyone else?  Counsel?
16            MR. MARTIN:  Yes, your Honor, please.
17                        CROSS-EXAMINATION
18    BY MR. MARTIN:
19    Q.    Good afternoon, sir.
20    A.    Good afternoon.
21    Q.    You talked a little bit about your background, and if I
22    heard you correctly, you said were you in the organized crime?
23    A.    The squad where I'm currently assigned?
24    Q.    Please.
25    A.    Yes.  It's an organized crime drug squad.

Jacqueline M. Sullivan, RPR
Official Court Reporter

84

1   Q.   Organized crime drug squad.  And I think you also had said
2   earlier in your testimony that one of the things you were trying
3   to do in this investigation was identify the organization, its
4   customers and principal members, right?
5   A.   Yes, correct, to include going to the source of supply as
6   well.
7   Q.   With respect to identifying that organization, once you had
8   done that, then you brought it to the U.S. Attorney's Office for
9   prosecution, right?
10  A.   Well, that's not exactly right because we're working with
11  them as we are going along, so it's not like we do an
12  investigation and then just bring them everything.  They're
13  aware of it as it's occurred.
14  Q.   Okay.  But the investigation surely is developing, this
15  organization, as you go along, right?
16  A.   Yes.  As the investigation continues we identify different
17  parties, more people involved, yes.
18  Q.   All right.  And you also said that you had certain
19  investigative techniques at your disposal in investigating this
20  organization, right?
21  A.   Correct.
22  Q.   And some of those techniques, if I heard you correctly and
23  some tools available to you included cameras?
24  A.   Correct.
25  Q.   Video cameras?

2-19-08.txt

1   A.   Yes, for surveillance, yes.

2   Q.   Would you also be able to use pole cameras in the street?

3   A.   Yes.

4   Q.   You'd also be able to use GPS devices, right?

5   A.   Yes.

6   Q.   In fact, you wired or put audio devices in Mr. Glover's

7   vehicle, that is Lionel Glover, right?

8   A.   Yes, we did.

9   Q.   And you even wire-tapped some phones, right?

10   A.   Yes.

11   Q.   Now, with respect to all of these different investigative

12   techniques that you had at your disposal, would it be fair to

13   say that you have no video surveillance of Mr. Earnest Glover?

14   A.   That's correct.

15   Q.   And in addition to video surveillance, you don't have any

16   tracking devices or didn't have any tracking devices on his

17   vehicle, did you?

18   A.   No, we did not.

19   Q.   But knew that he had a vehicle, right?

20   A.   Yes.

21   Q.   What vehicle was that?

22   A.   Well, there were several vehicles, but he drove a G.M.C.

23   SUV I think for the most part.

24   Q.   And you could have put a GPS device on that, right?

25   A.   If we obtained a court order, yes, we could have.

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-19-08.txt

1    Q.    If you obtained a court order just like you had put one on
2    his brother's car, correct?
3    A.    Yes, that's yes.  His, the device in his brother's car was
4    more a listening device, but it did have GPS capability.
5              THE COURT:  Listening device did have GPS capability?
6              THE WITNESS:  Yes, yes.
7    BY MR. MARTIN:
8    Q.    And you also during your testimony showed some photos of
9    someone approaching an SUV that you said was owned by Mr. Suggs.
10   Do you remember that?
11   A.    Yeah.  A photograph of Mr. Lionel Glover approaching Mr.
12   Suggs' vehicle, yes.
13   Q.    Right.  But you don't have any such photo of Ernest Glover
14   approaching Mr. Suggs' SUV, do you?
15   A.    No.
16   Q.    And we've already established there were no videos, and you
17   also said that you had listened to hundreds of calls.  I think
18   you said thousands, actually; is that correct?
19   A.    Thousands of calls with respect to this particular
20   investigation?
21   Q.    This particular investigation, and for the time being I'm
22   talking about Ernest Glover primarily.  Did you listen to
23   thousands of calls involving him?
24   A.    I don't know how many calls total.  There were thousands of
25   calls in this investigation.  I don't know a total off the top

Jacqueline M. Sullivan, RPR
Official Court Reporter

87

Page 82

2-19-08.txt

1     of my head that involved Ernest Glover.

2     Q.   Well, when I say involved Ernest Glover I'm specifically

3     talking about when Ernest Glover might have been speaking to

4     someone else.  Do you recall what that number was?

5     A.   I don't know the specific number off the top of my head.  I

6     can tell you that he and Mr. Suggs spoke awfully frequently.

7     Q.   He and Mr. Suggs spoke a lot, frequently.  Would it be fair

8     to say that in listening to these phone calls it was established

9     that he and Mr. Suggs were friends?

10    A.   Yes.  They were friends, yes.

11    Q.   Would it be fair to say that in listening to these phone

12    conversations that he and Mr. Suggs discussed work?

13          MR. SCARPELLI:  Objection at this point.  Beyond the

14    scope of direct.

15          THE COURT:  Yes, it is.  You'll have a chance.  I

16    don't mean to cut you off.

17          MR. MARTIN:  Well, it's okay, your Honor.  We'll get

18    to this later.

19          Your Honor, if I could use this for just a second, the

20    Elmo.  I believe 1,400 is published, your Honor.  I believe

21    1,400 is published.

22          THE COURT:  Yes.

23    BY MR. MARTIN:

24    Q.   Agent Bevington, can you see that photo?

25    A.   Yes.

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              88

1     Q.   Would you tell the ladies and gentlemen who this individual

2     is again?

2-19-08.txt

3     A.   That is Cornell Glover.

4     Q.   Would you tell the ladies and gentlemen of the jury how it

5    is you know Cornell Glover?

6     A.   He was working with Mr. Lionel Glover in distributing PCP

7    in D.C.

8     Q.   Thank you very much.  Do you know where Mr. Cornell Glover

9    lived?

10    A.   I know at different times he was staying at 47 Randolph

11   Place Northwest with Mr. Ernest Glover's family.

12    Q.   Do you know how old Mr. Glover is?

13          MR. SCARPELLI:  Your Honor, I'm going to object again

14   with regard to questions about Cornell Glover.

15          THE COURT:  Are you objecting because it's beyond the

16   scope?

17          MR. SCARPELLI:  Correct.

18          THE COURT:  Is it going to be there will be a time

19   later for him to do this?

20          MR. SCARPELLI:  Yes.

21          THE COURT:  Well, I don't know how many -- how many

22   times are you going to testify?

23          MR. MARTIN:  I don't know how many more times he's

24   going to testify, your Honor.  This may be the only shot I have

25   at him regarding this.

Jacqueline M. Sullivan, RPR
Official Court Reporter

89

1          MR. SCARPELLI:  I made representations that this

2   witness will be called more than once.

3          MR. MARTIN:  Your Honor, may we approach just for

2-19-08.txt

4     clarification?  I don't want to argue this in front of the jury.

5                   THE COURT:  Sure.

6                   Excuse us.

7                   (Bench conference as follows):

8                   THE COURT:  Give us a clue how we're doing this.

9                   MR. SCARPELLI:  We're doing it by defendant, so at

10    some point we're going to get to where we're going to have calls

11    with regard to Ernest Glover, and I think that's a more

12    opportune time.

13                   THE COURT:  So really basically we've covered Ju-Ju?

14                   MR. SCARPELLI:  Yes.

15                   THE COURT:  So you'll end up repeating yourself, so I

16    think you ought to wait until the Glover calls come.

17                   MR. SCARPELLI:  And that's also for Mr. Price and

18    for --

19                   THE COURT:  Mr. Lee.

20                   MR. SCARPELLI:  Mr. Lee.

21                   MR. MARTIN:  Okay.

22                   THE COURT:  I didn't understand that.  Who comes after

23    him?

24                   MR. SCARPELLI:  After Bevington I think it's search at

25    4000.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                      90



1                   THE COURT:  Who is that, though?  How many?

2                   MR. HAN:  I'm going to try to do it through one.  I'm

3     going to try to do it through one seizing agent.  If defense

4     counsel makes chain-of-custody arguments I have four other

5     people in the back to call if necessary.

2-19-08.txt

```
 6                THE COURT:  But you've seen the evidence?
 7                MR. HAN:  We have.
 8                THE COURT:  Okay.  Fine.
 9                Well, I think you'll have more than ample opportunity,
10      and we wouldn't want you repeating.  Thank you.
11                (End of bench conference.)
12                THE COURT:  All right.  It's now clear that this
13      witness will be coming back, basically will be testifying about
14      each person separately, so I think, Mr. Martin, you may want to
15      wait and have your opportunity when he comes back.
16                MR. MARTIN:  Yes, ma'am.
17                THE COURT:  Anything for you, Mr. Earnest?
18                MR. EARNEST:  No.
19                THE COURT:  Same thing will apply to you, Mr. Gilbert.
20      You'll have an opportunity when he focuses more.
21                MR. MARTIN:  If that's the case, your Honor, and we
22      are going to have another opportunity, so to speak, to tango
23      with the agent, we'll stop here.
24                THE COURT:  Okay.  We've been told by the government
25      that's going to have him basically focus person by person.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

91

```
 1                MR. EARNEST:  May I have a moment, your Honor?
 2                THE COURT:  Yes.
 3                (There was a pause in the proceedings.)
 4                MR. EARNEST:  Thank you, your Honor.
 5                MR. GILBERT:  I do have a question, your Honor.
 6                THE COURT:  All right.
```

2-19-08.txt
                              CROSS-EXAMINATION

8    BY MR. GILBERT:

9    Q.    Good afternoon, Special Agent Bevington.

10   A.    Good afternoon.

11   Q.    Sir, you made reference in your initial testimony to some

12   training sessions that you had?

13   A.    Yes.

14   Q.    You mentioned training sessions with the U.S. Attorney's

15   Office?

16   A.    Correct.

17   Q.    When were those training sessions?

18   A.    '93, '94, and then in 2003, 2004, with the Department of

19   Justice.

20   Q.    And how long were those training sessions?

21   A.    The one with U.S. Attorney's Office in '93 or '94 was two,

22   three days.  The one from the Department of Justice was a week

23   long.

24   Q.    And both of those covered generally narcotics prosecutions?

25   A.    The first one involved, the U.S. Attorney's Office training


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                92


1    involved narcotics prosecutions, and the second one sponsored by

2    the Department of Justice focused more on money laundering and

3    financial investigations.

4    Q.    Sir, you mentioned the tools available to conduct

5    investigations of this kind, and I believe that Mr. Martin

6    alluded to it, but you had the capability in several different

7    ways to actually physically locate individuals through the

8    global positioning system; is that right?

2-19-08.txt

9   A.   We had a GPS installed in Mr. Suggs' truck, and like I

10  said, the listening device that was in Mr. Lionel Glover's truck

11  also had GPS capability.

12  Q.   And in fact, the pen registers occasionally also had GPS

13  capability, isn't that correct?

14  A.   I believe you have to have a court order.  Now I'm trying

15  to think.  They do have some ability to track with phones.  It's

16  not as precise.

17  Q.   Are Anthony Suggs and Julian Johnson cousins?

18  A.   I don't know.

19  Q.   Let me ask you about two of the calls involving just Julian

20  Johnson, and we have -- do you have the book up there?

21  A.   Yes.

22  Q.   Why don't we deal first of all with Bates number 66, tab

23  51?

24          THE COURT:  Did you get tabs all of a sudden?

25          MR. GILBERT:  No, your Honor, but I've been trying to

                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter
                                                        93


1   write them down as they've been called out.

2          THE COURT:  Okay.  66 tab.

3          MR. GILBERT:  I believe it was 51, and it should be

4   activation 1054.

5   BY MR. GILBERT:

6   Q.   In that conversation Mr. Suggs and Mr. Johnson were talking

7   about 16th Street and 32nd Street; is that right?

8   A.   Yes.  He says 16th Street and 16th Place at different

9   times, Mr. Suggs, that is.

2-19-08.txt

10   Q.   And there's also reference when Mr. Suggs is talking he's

11   talking about southeast?

12   A.   He does say southeast at one point.

13   Q.   What did that mean?

14   A.   Well, southeast would probably be referencing to southeast

15   D.C. when you're talking about streets in D.C.

16   Q.   Well, let me ask you this question.  There in the sentence

17   after he mentions southeast that it used to be at.  He then

18   talks about 16th Street over there, 16th Place.  You know where

19   the store at over there.  Is "store" a code word?

20   A.   I don't think they're talking about a store in this

21   particular conversation.

22   Q.   What are they talking about?

23   A.   They're talking about PCP sales and the need for Mr.

24   Johnson to obtain PCP.

25   Q.   What is the word "store" then?  What is the code

Jacqueline M. Sullivan, RPR
Official Court Reporter

94

1    connotation for "store" in this context?

2    A.   Well, Johnson asked to begin with what are you looking like

3    over there, and then Suggs, to clarify, means what on the store

4    tip.  I would interpret that to mean that Mr. -- he's wanting to

5    clarify that Mr. Johnson is wanting to purchase PCP.

6    Q.   So you think "store" is a code word for PCP in this

7    conversation?

8    A.   Yes, but it's more just he wants to be sure about what

9    they're talking about.  He's trying to clarify that, you know,

10   Mr. Johnson is wanting to know, or is wanting to purchase PCP

11   because Mr. Johnson starts with what you looking like over

2-19-08.txt

12   there, and then Suggs uses the store tip to clarify the do you

13   mean you need PCP.  That's what I believe.

14   Q.   And just out of curiosity, do you know if there's any store

15   on 16th Street Southeast?

16   A.   Well, I think I need a little more.  I need a cross street.

17   I mean, I'm sure at someplace at 16th Street Southeast D.C.

18   there is some kind of store.

19   Q.   All right.  Well, let's look at Bates Stamp No. 3.  I

20   believe you said it's also tab three.  And you were talking

21   about there's a portion in there where Mr. Johnson is asked by

22   Mr. Suggs you just getting in town?  Mr. Johnson says, yeah

23   yeah, I'm just getting in town.  That nigger just ain't got no

24   where.  I want to go heavy but the motherfucker ain't got no

25   where.  I ain't got no storage bin.  Can you explain to us what

Jacqueline M. Sullivan, RPR
Official Court Reporter

95

1   you believe the term "to go heavy" meant?  Tell us what the

2   sentence before that is in reference to, that nigger just ain't

3   got no where?

4   A.   He's saying just haven't got no where.  And then he goes to

5   go heavy, he hasn't got anywhere, he hasn't got a storage bin.

6   Q.   So who is that nigger, if you'll excuse my language, ladies

7   and gentlemen.  It's in the transcript.

8   A.   He's referring to himself.

9   Q.   And he clearly says I want to go heavy?

10   A.   Yes, but he doesn't say this nigger.

11   Q.   He says that nigger, right?  But it's believed that he is

12   nonetheless, even though he uses that term, that he nonetheless

Page 90

2-19-08.txt

13  you believe is referring to himself, if you will, in the third

14  person?

15  A.   Well, there it clarifies it.  He clarifies it because he

16  says I want to go heavy.

17  Q.   Well, that can be talking about two different people,

18  right?

19  A.   Well, not with respect to the I want to go heavy.  I don't

20  believe so.

21  Q.   I'm not asking you about that.  I'm asking you about

22  whether or not you believe he is referring to some other

23  individual when he referred, uses the term that nigger, just

24  ain't got no where?

25  A.   I don't believe so.  I believe he's referring to himself.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              96


 1  Q.   All right.  And a few sentences down Mr. Suggs asks him if

 2  that boy is still calling?

 3  A.   Yes.

 4  Q.   And who is the reference to boy?

 5  A.   I believe he's referring to Andre Stanback.

 6  Q.   Now, Mr. Stanback isn't in this indictment, right?

 7  A.   He's not.

 8  Q.   Was Mr. Stanback a completely different organization?

 9  A.   No, he wasn't.  There are numerous references to him

10  between Mr. Suggs and Mr. Johnson in different phone calls, and

11  I think that's who he's referring to, because you'll see at one

12  point Mr. Suggs said something about not seeing him at work in

13  the morning, and Mr. Stanback also worked at the Department of

14  Public Works.

2-19-08.txt

15    Q.    What other references do we have then?  There are

16    references in the conversations that you've been over with the

17    ladies and gentlemen of the jury that are referring to this

18    other person, this Mr. Stanback?

19    A.    I mean, I think this is the only one we've spoken about so

20    far.

21    Q.    But you are telling us that there are others?

22    A.    Over the course of the wire intercepts, yes, there were

23    other conversations.  They mentioned where they made reference

24    to Mr. Stanback, yes.

25    Q.    And what did they call Mr. Stanback, did he have a

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                97


1    nickname?

2    A.    Quake.

3              THE COURT:  Quake?

4              THE WITNESS:  Quake or Earthquake.  His nickname is

5    Earthquake.  Some people call him Quake.

6              THE COURT:  I wonder why.

7              THE WITNESS:  I don't know.

8              MR. GILBERT:  I don't have any further questions at

9    this time, your Honor.

10              THE COURT:  Anything else for the government?

11              MR. SCARPELLI:  Very briefly, your Honor.

12              THE COURT:  That's good, because we'll break as soon

13    as you're finished.

14                          REDIRECT EXAMINATION

15    BY MR. SCARPELLI:

                              Page 92

2-19-08.txt

16   Q.   Special Agent Bevington, do you recall Mr. Donohue

17   mentioning several names?

18   A.   Yes.

19   Q.   And I just want to give you, I want to start one by one and

20   go through them.  And with respect to Velma Williams, do you

21   know why Velma Williams, there are no calls between Anthony

22   Suggs and Velma Williams?

23   A.   Yes.  Because Ms. Williams was involved in supplying Mr.

24   Lionel Glover with PCP and Mr. Lionel Glover then supplied Mr.

25   Suggs.  There was no need for Mr. Suggs or no ability for Mr.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                98


1    Suggs to communicate directly with Ms. Williams.

2    Q.   And with respect to Ms. Williams, where did Ms. Williams

3    live?

4    A.   She had a home in St. Louis, Missouri.

5    Q.   And let's move to Coolridge Bell.

6    A.   Coolridge Bell was a customer of Mr. Lionel Glover and he

7    lived in New York.

8    Q.   What about Charles Gladden?

9    A.   Charles Gladden is another customer of Mr. Lionel Glover.

10   There are -- they're not direct phone calls between Mr. Gladden

11   and Mr. Suggs.  There are references to Mr. Gladden between Mr.

12   Ernest Glover and Mr. Suggs as well as between Mr. Suggs and Mr.

13   Lionel Glover.

14   Q.   What's Mr. Gladden's nickname?

15   A.   Boon.

16   Q.   Now I want to talk about Henry Brown.  Is there a reason

17   why Henry Brown does not have telephone calls with Anthony

2-19-08.txt

18      Suggs?

19      A.   He worked with Williams transporting the PCP either to D.C.

20      or Atlanta where Mr. Glover then received it, so he was again in

21      the process of supplying Mr. Lionel Glover and didn't have

22      reason to deal directly with Mr. Suggs.

23      Q.   And where did Mr. Henry Brown, where did he reside?

24      A.   Los Angeles, California.

25      Q.   What about Leslie Wood?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              99


1       A.   Leslie Wood was another customer of Mr. Lionel Glover.

2       Q.   And just not to take up too much time, Christian Donaldson?

3       A.   Christian Donaldson was a customer of Mr. Lionel Glover.

4       Q.   And with respect to Diane Holmes, Jerome Hampton, Joe

5       Brown, Ronald Cook, Lena Brown?

6            MR. GILBERT:   That's clearly going to be a compound

7       question.

8            THE COURT:   But I'll see what happens.   It might be

9       efficient.

10      BY MR. SCARPELLI:

11      Q.   John Crumb, all the names I mentioned, were any of them or

12      do you know why they were not intercepted over Mr. Suggs' line?

13      A.   They were either customers of Mr. Glover, Lionel Glover, or

14      involved in the transportation of the PCP to Mr. Lionel Glover.

15           THE COURT:   I don't think you can do it that way.

16      Sustained.   I thought it was one answer only.

17      BY MR. SCARPELLI:

18      Q.   We'll go one by one.   Let's start with Leslie Wood.

2-19-08.txt

19   A.   He was a customer of Mr. Lionel Glover.

20   Q.   What about Christian Donaldson?

21        THE COURT:  You just did that one.

22        MR. SCARPELLI:  I did?

23        THE COURT:  Yes.

24   BY MR. SCARPELLI:

25   Q.   Diane Holmes?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              100


1    A.   Diane Holmes assisted Mr. Glover in transporting drugs to

2    Washington, D.C.  She acted as a mule, if you will, or helped

3    him as far as driving long distances.

4    Q.   And can you give us one of the location that Mr. Lionel

5    Glover and Diane Holmes went to?

6    A.   They went to Atlanta, Georgia.

7    Q.   And Jerome Hampton?

8    A.   Jerome Hampton allowed Mr. Lionel Glover to use his

9    business as a place to have PCP sent via FedEx or U.P.S.

10   Q.   And again, why would Jerome Hampton not have any cause to

11   Anthony Suggs?

12   A.   He wasn't a customer of Mr. Suggs.

13   Q.   And with respect to Joe Brown?

14   A.   Joe Brown was also a customer of Mr. Lionel Glover.

15   Q.   Ronald Cook?

16   A.   Another customer of Mr. Lionel Glover.

17   Q.   What about Lena Brown?

18   A.   Lena Brown was a woman that allowed Mr. Lionel Glover to

19   store PCP in her apartment.

20   Q.   John Franklin Crumb?

2-19-08.txt

21     A.   He was another customer of Mr. Lionel Glover.

22     Q.   So all the names I just mentioned, what role did they play

23     or what did you -- disregard that.

24          With regards to Mr. Suggs, the names I mentioned, were

25     any of those names that we just mentioned customers of Anthony

Jacqueline M. Sullivan, RPR
Official Court Reporter

101

1      Suggs?

2      A.   No.  They were either customers of Lionel Glover or

3      assisting Mr. Glover in either having the PCP transported where

4      he could pick it up or helping him store it or receive it;

5      things like that.

6      Q.   One other question.  With respect to surveillance in this

7      case, how come there's not more surveillance in this case?

8      A.   I mean, we did a lot of surveillance.  As far as getting

9      video and photographs, that depends on lighting and weather

10     conditions and locations.  Some places are easier to conduct

11     surveillance than others.  You know, a parking lot like at Home

12     Depot is easier than a small narrow street where there's a lot

13     of people, so those are the type of things that impact on our

14     ability to actually get video and/or photos.

15          MR. SCARPELLI:  I have nothing further, your Honor.

16          THE COURT:  Okay.  Thank you very much.  You may step

17     down.

18          (Witness excused at about 4:30 p.m.)

19          THE COURT:  I think this is a good place to break.

20     We'll take up the next witness tomorrow morning.

21          Just leave everything.  Don't talk about the case,

Page 96

2-19-08.txt

22    don't do any research.  Put it out of your mind.  Have a good

23    rest.  We'll have breakfast then at 9:00.  Please, not later

24    than 9:30.  Everybody has to be here by 9:30 if you don't like

25    the breakfast.  Otherwise, the breakfast will be available at

Jacqueline M. Sullivan, RPR
Official Court Reporter

102

1     9:00.  Have a good evening.  Thanks very much, ladies and

2     gentlemen.

3              (Jury exits courtroom at about 4:30 p.m.)

4              THE COURT:  Mr. Han, I don't know if you're aware, are

5     we going to have chain of custody problems to the stuff taken

6     out of the house?  That's really Mr. Donohue, I think.  You

7     should discuss it with him and figure out whether we need one or

8     more witnesses.

9              MR. HAN:  We had a meeting and I think my

10    understanding of our agreement is that if we provided a witness

11    who sees the items in place we would not challenge the chain of

12    custody from there till the expert or DEA chemist eventually

13    testifies.

14             THE COURT:  This is just the 10th Street search

15    anyway?

16             MR. DONOHUE:  Yes.

17             THE COURT:  You have what's his name?

18             MR. HAN:  Robert Eathalin.

19             THE COURT:  Then who comes after Robert Eathalin, just

20    so everybody brings the right stuff.

21             MR. HAN:  After 4000 10th Street we plan on going back

22    to John Bevington with conversations.

23             MR. MARTIN:  More wiretap calls regarding the search
                         Page 97

2-19-08.txt

24      warrant at 4000 10th Street that follow.
25              THE COURT:  But we heard those calls today.


                     Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              103


1               MR. HAN:  The ones after the search.
2               THE COURT:  Okay.
3               MR. HAN:  And we will have a 404(b) stipulation for
4      Anthony Suggs.
5               THE COURT:  All right.  That raises the instruction,
6      if I may.  If this applies to you, Mr. Suggs, but it may apply
7      also to Mr. Glover.  Here's the one I gave last time.  We
8      changed the names obviously but I did get it out so you can look
9      at it because I have to give it either just before or right
10     after I guess the government introduces it.  I would assume,
11     other than it's only introduced as to Mr. Suggs or as to Mr.
12     Glover and then we change the names.  It's not admissible as to
13     anybody else, so that you might want to just, you can look at
14     that.  That's what was repeated at the end of the trial.  You
15     can keep that.
16              MR. DONOHUE:  I'm sure it's fine, your Honor.
17              THE COURT:  You can keep it overnight.
18              MR. DONOHUE:  Okay.
19              THE COURT:  Sure.  That's the whole Jones instruction,
20     but I decided I better find something quick.  Okay.  That's why
21     I wanted to know.
22              404(b) for Mr. Suggs, and then where are you going.
23              MR. HAN:  After that we're going to do the chapter on
24     James Parker, which will include a controlled buy from him, the
                          Page 98

2-19-08.txt
wiretap calls, and the search warrant at 9001 Breezewood, and I

Jacqueline M. Sullivan, RPR
Official Court Reporter

104

1    have a show and tell to show the defense attorneys after we
2    break from here.
3            THE COURT:  Okay.  Well, if that instruction doesn't
4    work for us let me -- you don't want it.  Do you want the
5    government to see it?
6            MR. GILBERT:  I apologize.
7            THE COURT:  Just give it back to me tomorrow.  Those
8    were the final instructions, but I had to give 404(b) in the
9    middle as well.  Okay.  Very good.  I think, you know, we'll
10   move much faster than you predicted.
11           MR. SCARPELLI:  I believe so also, your Honor.  I'm
12   trying to.
13           THE COURT:  Thank you.  Have a good evening.
14           Anything further?
15           MR. MARTIN:  Your Honor, just one item I want to bring
16   to the Court's attention regarding Friday.  Mr. Boykin is going
17   to be here Friday and I'm not, with the Court's permission.
18           THE COURT:  It's okay.  I feel as though we should say
19   something to the jury about things like that.  I feel as though
20   we should just say that you can't be here and Mr. Boykin is
21   here, you know, something, just so you don't disappear into thin
22   air on us, so just suggest something and I'll say it.  I just
23   think it's kind of peculiar for somebody not to be here.  If
24   it's okay with Mr. Glover for you not to be here it's okay with
25   me, but I like to say something.  Similarly, I do think we have

2-19-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

105

1    to say something to jury about it's not for them to speculate

2    about why we don't have other people in this case.  They all

3    wonder where is Mr. Lionel Glover, so you'll have to say

4    something at some point.  We can't just leave it out there.  So

5    I suggest the government come up with something.  It's basically

6    to tell them not to speculate about why anybody is in this case

7    or not in this case.  That's not for them to decide.  You need

8    to keep them informed, so if you don't mind, I'd like to say

9    something to them.  As long as it's okay with your client it's

10    okay with me.

11        MR. BOYKIN:  Your Honor, could we discuss it over

12    night with our client and make a recommendation tomorrow?

13        THE COURT:  Yes.

14        The other part is in your timing are you getting to

15    Mr. Bevington then on Friday with respect to Lionel Glover?

16        MR. SCARPELLI:  I don't know how fast we're going to

17    move.

18        MR. BOYKIN:  You mean with respect to Ernest Glover?

19        THE COURT:  Yes.  I mean, that may make some

20    difference about your analysis, but you can talk among

21    yourselves.  All right.

22        MR. SCARPELLI:  Thank you, your Honor.

23        (Proceedings adjourned at about 4:38 p.m.)

24                - - -

25

2-19-08.txt

106

1                              I N D E X

2

3     WITNESSES:                                        PAGE:

4     SPECIAL AGENT JOHN BEVINGTON

5          Direct examination by Mr. Scarpelli          10
           Cross-examination by Mr. Donohue             68
6          Cross-examination by Mr. Martin              83
           Cross-examination by Mr. Gilbert             91
7          Redirect examination by Mr. Scarpelli        97

8

9

10

11

12                          E X H I B I T S

13    Government's
14    Exhibit
      No.              Identification      Marked      Admitted
15
      1208                                                23
16
      WT 7                                                31
17
      WT 9                                                33
18
      1209                                                36
19
      1210                                                36
20
      1211                                                37
21
      1408                                                38
22
      1400-1409                                            39
23
      SV 12                                               50
24

25


                      Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                        107

                           Page 101

2-19-08.txt

1                    CERTIFICATE

2

3

4              I, JACQUELINE M. SULLIVAN, Official Court

5    Reporter, certify that the foregoing pages are a correct

6    transcript from the record of proceedings in the above-entitled

7    matter.

8              _____
                    JACQUELINE M. SULLIVAN
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter