2-20-08.txt

```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3
        UNITED STATES OF AMERICA,    .
4                                    .
                 Plaintiff,          .
5                                    .  CR No. 07-152
            v.                       .
6                                    .
        ANTHONY SUGGS and            .  Washington, D.C.
7       GLENDALE LEE,                .  Wednesday, February 20, 2008
                                     .  At about 1:58 p.m.
8                Defendants.         .
                                     .
9       . . . . . . . . . . . . .    .

10

11              TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                  UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Government:        ANTHONY SCARPELLI, ESQ.
                                   JOHN K. HAN, ESQ.
15                                 U.S. Attorney's Office
                                   555 Fourth Street, NW
16                                 Room 4816
                                   Washington, D.C.  20530
17                                 202-353-1679

18      For the Defendant:        PATRICK M. DONOHUE, ESQ.
        Suggs                     Donohue Law Firm
19                                18 West Street
                                  Annapolis, Maryland  21401
20                                410-280-2023

21      For Defendant:            RON EARNEST, ESQ.
        Lee                       8121 Georgia Avenue, Suite 406
22                                Silver Spring, Maryland  20910
                                  240-401-5277
23

24
        APPEARANCES con't. on next page.
25
```

Jacqueline Sullivan, RPR
Official Court Reporter

2-20-08.txt

```
 1    APPEARANCES, con't.

 2

 3    For Defendant:          RICHARD K. GILBERT, ESQ.
      Price                   P.O. Box 70448
 4                            Washington, D.C.  20024
                              202-898-0857
 5

 6    For Defendant:          ANTHONY D. MARTIN, ESQ.
      Ernest Glover           7841 Belle Point Drive
 7                            Greenbelt, Maryland  20770
                              301-220-3700
 8
      For Defendant:          CURTIS A. BOYKIN, ESQ.
 9    Ernest Glover           1850 M Street, NW
                              Suite 640
10                            Washington, D.C.  20036
                              202-776-0370
11

12

13

14    Court Reporter:              JACQUELINE M. SULLIVAN, RPR
                                   Official Court Reporter
15                                 U.S. Courthouse, Room 6720
                                   333 Constitution Avenue, NW
16                                 Washington, D.C. 20001
                                   202-354-3187
17

18

19
      Proceedings reported by machine shorthand, transcript produced
20    by computer-aided transcription.

21

22

23

24

25
```

Jacqueline Sullivan, RPR
Official Court Reporter

3

2-20-08.txt

1                    P R O C E E D I N G S

2            THE COURT:  Okay.  We have to make inquiry of one of

3    the jurors, the person in the seat, but I suggest we do it

4    towards the end of the day.  She apparently recognizes or knows

5    of your client's wife.

6            MR. MARTIN:  Right.  She's seated there in the red.

7            THE COURT:  Anyways, we know about it.  We'll take it

8    up at the end.  There's no point in doing it now.  Let's get

9    some witnesses.

10           How do you like what I wrote.

11           MR. DONOHUE:  I actually really enjoyed reading it,

12   your Honor.  I did have a few modest suggestions.  That's your

13   unredacted.  This is the proposal that I have, so I'll tell your

14   Honor that I have.

15           THE COURT:  Well, does everybody agree to it?

16           MR. DONOHUE:  No.  I was going to tell the Court.

17   Everything on there is agreed to by the government and defense

18   counsel.  The defendant, except the government does not agree to

19   the line highlighted in blue that reads as charged in count one.

20   I'm sorry.  I gave -- here, use this one.  I highlighted this

21   one as the one so you could read the changes.

22           THE COURT:  Who wants the change in count one?

23           MR. DONOHUE:  I do.

24           THE COURT:  Well, the only problem is I have to agree

25   with the government.  It's a little complicated because they are


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                           4


1    deciding something more than count one.

2            MR. DONOHUE:  Along with the other co-conspirators.
                         Page 3

2-20-08.txt

3        THE COURT:  I'm only defining the job.  Your job is to
4   decide the guilt or innocence of the defendants who are on trial
5   and you should not be concerned about, I can say the legal
6   status of those not on trial.  So as charged in count one, I'm
7   not going to add it.
8        MR. DONOHUE:  I fear if the Court doesn't add it, this
9   is, I mean, all my proposals, everything combined reads I
10  believe to leave the indictment intact, but if you don't review
11  that line I think what the instruction does to a certain extent,
12  it reads out of the indictment the way count one was drafted.  I
13  mean, let's be clear.  Count one is a conspiracy that is defined
14  in the indictment.  It is a conspiracy that allegedly took place
15  over in different jurisdictions with different people.  Now, the
16  Court does want to say --
17       THE COURT:  You're going to run into trouble down the
18  road with that argument because they're going to be told
19  presumably it doesn't matter whether anybody here.  They don't
20  have to prove every little thing in the conspiracy, but the
21  element and the agreement on the joining.  I'll say as charged
22  in the indictment.  I don't like it as charged in count one.  If
23  you want "as charged in the indictment" I'll do that.
24       MR. DONOHUE:  Okay.
25       THE COURT:  All right.  Bring them in.


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                              5


1        MR. HAN:  Your Honor, the next witness is Mr. Norman
2   Mausolf.  He's a PG County chemist.  We're taking him out of
3   turn to accommodate his schedule.  If you could tell the jury
                    Page 4

2-20-08.txt

 4    that I'd appreciate that.

 5         THE COURT:  How would they know we're taking him out

 6    of turn?

 7         MR. HAN:  Because we're going to be talking about

 8    drugs he analyzed that hasn't been seized yet.

 9         THE COURT:  Okay.  It doesn't matter.

10         Good afternoon, ladies and gentlemen.  It's all right.

11    I would like to just give you an instruction I hope that will

12    just clarify something for you, ladies and gentlemen, before we

13    hear from the next witness.  As you know, in count one the

14    indictment charges Anthony Suggs, Ernest Glover, Glendal Earl

15    Lee and Helery Price with conspiracy to distribute and to

16    possess with intent to distribute PCP.  That's count one.  The

17    other people, and you've heard reference to them named in the

18    indictment.  Count one are referred to under the law as what is

19    known as unindictmented co-conspirators but they're not on trial

20    here in this case.  The current legal status of these alleged

21    co-conspirators, and you've heard their names and you'll hear

22    them again, but they're in count one I think that Mr. Donohue

23    mentioned them by name yesterday.  The legal status of these

24    alleged co-conspirators is of no concern to you and you must not

25    speculate or guess as to what their situation is or as to why


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                                  6


 1    they're not part of this trial here.  Your job is to decide the

 2    guilt or innocence of the defendants as charged in the

 3    indictment, and these are the ones who are on trial, and you

 4    should not be concerned about the legal status of any of those

 5    who are not here on trial now.
                    Page 5

2-20-08.txt

6          Okay.  Thank you.  We'll swear the witness.

7          COURTROOM DEPUTY:  Sir, would you please raise your

8    right hand?  Do you solemnly swear that the testimony you should

9    give the Court and the jury in the case now on trial will be the

10   truth, the whole truth and nothing but the truth so help you

11   God?

12         MR. MAUSOLF:  I do.

13       NORMAN MAUSOLF, WITNESS FOR THE GOVERNMENT, SWORN

14                     DIRECT EXAMINATION

15   MR. HAN:

16   Q.   Good afternoon.

17   A.   Good afternoon.

18   Q.   Could you please tell us your name and spell your last name

19   for the record?

20   A.   Norman Mausolf, M-a-u-s-o-l-f.

21   Q.   Where do you work?

22   A.   I work as a chemist for the Prince Georges County police

23   department in their drug analysis laboratory.

24   Q.   And generally speaking what do you do?

25   A.   My work is to analyze drugs that are submitted to us as


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter
                                                        7


1    evidence.

2    Q.   Can you tell us about your educational background?

3    A.   I have a bachelor's degree in chemistry which I received

4    from Hamilton College, which is located in New York state.

5    Q.   And tell us the experience that you've acquired relating to

6    analyzing drugs.

                    Page 6

2-20-08.txt

7     A.   Well, I've worked as a drug chemist for a long time.  I

8     started in this field in the beginning of 1967 when I began with

9     the United States Army criminal investigation laboratory at Fort

10    Gordon, Georgia, as a trainee.  After completing the training

11    there I worked in the Army crime lab for a period of two

12    additional years.  After my work in the Army I worked for three

13    years for the state of Michigan in its crime detection

14    laboratory, also doing drug analysis.  After I left Michigan I

15    came to Washington and I worked for 27 years for the Drug

16    Enforcement Administration in the mid Atlantic regional

17    laboratory, again doing drug analysis, and since December of

18    1999 I have done the same work for the Prince Georges County

19    drug analysis laboratory, so going back to the late 1960s this

20    has been the work that I've been engaged in.

21    Q.   Are you familiar with the term "forensic chemistry"?

22    A.   Yes, I am.

23    Q.   Explain what that means.

24    A.   Forensic chemistry is the use of chemistry to analyze items

25    of evidence, in particular, their chemical composition.


                              Jacqueline M. Sullivan, RPR
                              Official Court Reporter

                                                                  8


1     Q.   Have you been qualified as an expert in forensic chemistry

2     in courts of law?

3     A.   Yes, sir, quite a few times.

4     Q.   Give us a ballpark estimate of how many times.

5     A.   I would say through the years several hundred times.

6     Q.   Has there been any time where you've been rejected as an

7     expert by a court?

8     A.   No.

2-20-08.txt

9        MR. HAN:  Your Honor, at this time this government

10   would proffer or offer Mr. Mausolf as an expert in forensic

11   chemistry.

12        MR. MARTIN:  Mr. Glover has no objection.

13        THE COURT:  Go ahead.  You're entitled to voir dire.

14        MR. GILBERT:  Thank you, your Honor.

15                          VOIR DIRE.

16   BY MR. GILBERT:

17   Q.   Good afternoon, sir.

18   A.   Good afternoon.

19   Q.   Sir, I noticed in your resume that you actually have

20   responsibilities for training new chemists; is that correct?

21   A.   Yes.  I have done that at various times through the years.

22   Q.   In the laboratory where you work now, sir, is your work

23   evaluated by a supervisor that's trained in forensic chemistry?

24   A.   Yes, it is.

25   Q.   All right.  And how frequently are you evaluated in terms

Jacqueline M. Sullivan, RPR
Official Court Reporter

9

1   of your performance?

2   A.   Annually.

3   Q.   And let me also ask, sir, whether or not your lab undergoes

4   proficiency test in forensic chemistry.

5   A.   We do undergo proficiency testing.

6   Q.   What does that consist of?

7   A.   It consists of an uknown sample of a drug material supplied

8   by an outside agency given to the various chemists to analyze to

9   find out its identity.

Page 8

2-20-08.txt

10    Q.   Let me ask you this question:  Is it submitted to you in

11    the context so that you believe that it is an actual case?  In

12    other words, is it a blinded proficiency test, or are you aware

13    that it is a proficiency test that you're performing?

14    A.   It's the latter, sir.

15    Q.   So you are aware that it's a proficiency test?

16    A.   Yes.

17    Q.   And how often are you tested on those, how off often did

18    you personally have those proficiency tests?

19    A.   Those are done twice a year.

20    Q.   Have you had any problems passing the proficiency tests?

21    A.   I've had no particular problems.

22         MR. GILBERT:  Your Honor, I don't have any further

23    voir dire of this witness, and I also would not object to his

24    qualification.

25         THE COURT:  No one else?  Okay.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                              10



1          You will be accepted as an expert.

2          Now, this will apply again probably, ladies and

3     gentlemen, but I'll just tell you the Rules of Evidence

4     ordinarily do not permit witnesses to testify to their opinions

5     and conclusions.  They are limited to relating facts of which

6     they have firsthand knowledge.  An exception to those rules is

7     made for witnesses who qualify as experts.  An expert witness in

8     a particular field is permitted to give his or her opinion in

9     evidence.  Witnesses who by education and experience have become

10    expert in some art, science, profession, or calling may state an

11    opinion as to relevant and material matters in which they

2-20-08.txt

12   profess to be expert and they also may state their reasons for

13   their opinion.  You are not bound by the opinion of an expert.

14   If you should decide that the opinion of an expert witness is

15   not based upon sufficient education and experience, or if you

16   should conclude that the reasons given in support of the opinion

17   are not sound or that the opinion is outweighed by other

18   evidence, you may disregard the opinion in whole or in part.  In

19   other words, you should consider the witness' testimony in

20   connection with the other evidence in the case and give it such

21   weight as in your judgment it is fairly entitled to receive.

22         Now, you also said, Mr. Han, I should just let the

23   jury know that the evidence that the witness is going to be

24   talking about is coming in in subsequent.  We had to take him

25   out of order, so the drugs that he analyzed won't be yet

Jacqueline M. Sullivan, RPR
Official Court Reporter

11

1   available in the courtroom because they're coming through the

2   next witness.

3         MR. HAN:  Later on this afternoon.

4         THE COURT:  All right.  But we're just accommodating

5   the witness' schedule.  So it seems a little out of order but

6   not too bad.  Okay.

7   BY MR. HAN:

8   Q.   I'm showing the witness Government's Exhibit No. 200D5,

9   which has previously been shown to defense counsel.

10         THE COURT:  200D5.  Any objection?  No.  It will be

11   admitted.

12         (Government's Exhibit No. 200D5 was admitted into

                         2-20-08.txt
13            evidence at about 2:11 p.m.)

14            MR. HAN:  I can lay the foundation I think

15            MR. GILBERT:  Yes.  I think that --

16            THE COURT:  Okay fine.  200D5.  Oh, it's a summary

17    chart.  Okay.

18    BY MR. HAN:

19    Q.   Do you see 200D5 in front of you?

20    A.   Yes, I do.

21    Q.   And generally speaking, what is it?

22    A.   This particular page is a summary of the analytical results

23    I got on various items that I examined.

24    Q.   From 9001 Breezewood Terrace, No. 103?

25    A.   That's correct.


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter
                                                                  12


1     Q.   Did you prepare this chart?

2     A.   No, sir.

3     Q.   Have you reviewed it for accuracy?

4     A.   Yes, I have.

5     Q.   Does it accurately reflect your findings in forensic

6     chemistry result of analyzing certain items?

7     A.   Yes, it does.

8             MR. HAN:  Your Honor, the government would move into

9     evidence 200D5 of the summary exhibit.

10            THE COURT:  You've all been able to see the underlying

11    data.  Any objection?  No.  It's admitted.  I don't have hear an

12    objection.  Okay.

13            MR. HAN:  If I could publish to the jury on Elmo,

14    please.
                              Page 11

2-20-08.txt

15          THE COURT:  Let's just give the jury a clue here.

16   Breezewood Terrace relates to a man named James Parker, correct?

17          MR. HAN:  Yes.

18          THE COURT:  You see it says this is the results of the

19   drug analysis from items recovered from 9001 Breezewood Terrace.

20   That's in what town?

21          MR. HAN:  Greenbelt, Maryland, your Honor.

22          THE COURT:  Greenbelt, okay.

23   BY MR. HAN:

24   Q.   On the screen can you read that in front of you?

25   A.   Yes, I can.


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              13


1    Q.   The first column says Government's Exhibit No, and there's

2    a whole bunch of numbers, 200E2, E3, E4.  Your analysis did not

3    include those numbers; is that correct?

4    A.   That's correct.

5    Q.   The second column says PG Police Department number and

6    there's a string of numbers, 2D, 3D, 4D, 5D, etcetera.  Do you

7    see that?

8    A.   Yes, I do.

9    Q.   And what does the PG police department number column refer

10   to?

11   A.   That refers to the exhibit numbers within the particular

12   cases that I analyzed.  It is part of the identification that we

13   use for the evidence that we analyze.

14   Q.   Do those numbers, are those numbers assigned by the police

15   before they get to you?

2-20-08.txt

16    A.    Yes, they are.

17    Q.    The third column says net weight found.  And what does that

18    refer to?

19    A.    That refers to the actual weight of the material that I

20    analyzed in an exhibit without including the weight of any

21    packaging.

22    Q.    So for instance, if you received an exhibit of liquid in a

23    bottle, how would you go about determining the net weight found?

24    A.    I would weigh the bottle first with the liquid in it.  Then

25    would I empty the liquid out into something else, weigh the

Jacqueline M. Sullivan, RPR
Official Court Reporter

14

1    empty bottle, and the difference is the weight of the liquid,

2    which then is the net weight.

3    Q.    So everything under net weight found is the weight of the

4    controlled substance without the packaging?

5    A.    That's correct.

6    Q.    And the fourth column says results of analysis.  And what

7    does that refer to?

8    A.    That's exactly what it says.  That column represents the

9    results that I found when I analyzed the material.

10    Q.    And if we could just go through these.  What was your

11    analysis in regard to weight and result for item 2D?

12    A.    Item 2D I found to weigh 47.75 grams, and it contained

13    phencyclidine, which is commonly referred to as PCP.

14    Q.    3D?

15    A.    Contained residue which is the term that we use for amounts

16    that are too small to weigh in a practical manner, and that

17    contained PCP.

Page 13

2-20-08.txt

18      Q.    4D?

19      A.    Again, residue that contained PCP.

20      Q.    5D?

21      A.    5D weighed 0.755 grams and contained PCP.

22      Q.    6D?

23      A.    6D weighed 0.29 grams and it was marijuana that also was in

24      association that contained, in other words, PCP.

25      Q.    7D?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    15


1       A.    7D was residue that contained PCP.

2       Q.    8D?

3       A.    8D, 0.125 grams that contained PCP.

4       Q.    9D?

5       A.    Residue that contained PCP.

6       Q.    10D?

7       A.    10D was 0.08 grams that contained PCP.

8       Q.    9D?

9       A.    Excuse me.   9D, residue that contained PCP.

10      Q.    10D?

11      A.    0.08 grams that contained PCP.

12      Q.    Then we skip to 12D; is that correct?

13      A.    Yes.

14      Q.    And what was 12D?

15      A.    0.38 grams, and that material contained PCP.

16      Q.    And skipping then, the next one is 14D?

17      A.    The material in 14d weighed 2.77 grams and contained

18      marijuana.

2-20-08.txt

19   Q.   15D?

20   A.   15D were residues that contained PCP.

21   Q.   And tell us about 16D.

22   A.   16D was a cigarette material, and in that case I do not try

23   to empty the plant material out of the cigarette, so in this

24   case it includes the weight of the wrapping, the paper or

25   whatever it is wrapped up in, and so we designate that as a


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                            16


1   gross weight, and so the weight of that was 0.18 grams, and that

2   contained both cocaine and PCP.

3   Q.   Number 17?

4   A.   Number 17, the material there was 218.6 grams in weight,

5   and no controlled substance was detected.

6   Q.   Were you able to determine exactly what substance it was?

7   A.   Just a moment, please.  No, I did not.

8   Q.   Item number 19B?

9   A.   19B weighed 6.12 grams and was marijuana.

10   Q.   20D?

11   A.   Weighed 11.23 grams and it was marijuana.

12   Q.   21D?

13   A.   21D weighed 40.82 grams and was PCP.

14   Q.   22D?

15   A.   22D weighed 0.45 grams and contained marijuana.

16   Q.   23D?

17   A.   23D weighed 385.2 grams and was marijuana.

18   Q.   And last two is 25D?

19   A.   25D again was residue, and that contained PCP.

20   Q.   Last is 26D.

                          Page 15

2-20-08.txt

21    A.   26D weighed 0.12 grams and contained PCP.

22            MR. HAN:  The Court's indulgence.

23            No further questions, your Honor.

24            THE COURT:  Okay.

25                    CROSS-EXAMINATION


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        17


1    BY MR. GILBERT:

2    Q.   Good afternoon, sir.

3    A.   Good afternoon.

4    Q.   Sir, let me ask you a little bit about your methodology in

5    determining whether there is a controlled substance present or

6    not.  Why don't you tell the ladies and gentlemen of the jury

7    just how you go about doing that?  Let's take the liquids first

8    of all, suspected liquid.

9    A.   Yes.  The liquid's at first weighed, as I indicated.  Then

10   a portion of the liquid is taken and put into a solvent and it

11   is injected into an instrument known as a gas liquid

12   chromatograph mass spectromater, which we refer to by the

13   initials GCMS.

14            THE COURT:  Do you need to spell that?

15            THE WITNESS:  Gas, then liquid chromatograph,

16   c-h-r-o-m-a-t-o-g-r-a-p-h, and then mass spectromater, m-a-s-s

17   s-p-e-c-t-r-o-m-a-t-e-r.

18   BY MR. GILBERT:

19   Q.   And when that happens what kind of results do you get, what

20   do they look like?

21   A.   The results that the instrument puts out is a chart which

                        Page 16

2-20-08.txt

22    shows the atomic weights of the various fragments that the

23    molecule breaks down into in the instrument.

24    Q.    All right.  And when you get a chart that shows that,

25    they're depicted as spikes on a graph?

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                               18


1     A.    Yes.

2     Q.    And there is usually a comparable graph below that that you

3     can compare the unknown substance to various known profiles?

4     A.    What we do in our laboratory is actually run a standard

5     sample of the drug, which is done on a different run, and that

6     result shows up on a different page, but we are comparing a

7     known against an unknown.

8     Q.    Well, I'll tell what you.  Let me -- let me show you what's

9     been marked as Defendant Price Exhibit 1 for identification and

10    ask you to take a look at that.

11    A.    Um-hmm.

12    Q.    That's one of the printouts from the GCMS, is it not?

13    A.    That's correct.

14    Q.    And at least for the particular page that the sticker is on

15    there are essentially two graphs, correct?

16    A.    Yes, there are.

17    Q.    And what is the source of the top of the two graphs?

18    A.    The source of the top of the two graphs is from the sample

19    that was being run at the time.

20    Q.    And the bottom one is from?

21    A.    From a library that is contained within the instrument.

22    Q.    So as I understand that, when you look at the individual

23    page of that it wouldn't allow you to compare the profile that's

                              Page 17

2-20-08.txt

24    produced by the GCMS and will allow you to compare that profile

25    with you said something that's in the library of the machine.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    19


1     It's a computer at that point, right?

2     A.   Yes, but you're sort of misunderstanding the process that

3     we use because we are not actually identifying the drug material

4     against the library in the instrument.  We are actually

5     identifying the unknown against a spectrum that has been

6     produced in the instrument that they buy a known sample of the

7     material being tested, in this case, PCP.

8     Q.   And so is that -- well, I guess perhaps you should explain

9     to the ladies and gentlemen of the jury what you mean by a

10    standard.

11    A.   A standard is a known speciman of the drug material being

12    tested.

13    Q.   And so this is something in this particular case, the

14    substance we're talking about is PCP?

15    A.   That's right.

16    Q.   And so you're actually able to obtain something that a

17    laboratory has certified is in fact PCP?

18    A.   That's correct.

19    Q.   And you run that at the same time or the same date at least

20    that you run the other samples through the GCMS; is that

21    correct?

22    A.   That's correct.

23    Q.   And so does that perform sort of a calibration function, if

24    you will?

2-20-08.txt
25     A.    I wouldn't say calibration.  It actually performs an


                          Jacqueline M. Sullivan, RPR
                             Official Court Reporter
                                                                        20



 1     identification function.

 2     Q.    But is the important to do those on the same day?

 3     A.    It's useful because there are sometimes minor variations

 4     from day-to-day in terms of how the instrument works.

 5     Q.    And in this particular case you were given a large number

 6     of items that contained suspected PCP.  Did you run one standard

 7     for all of them?

 8     A.    Yes.

 9     Q.    Let me ask you about that right now.  The printout from the

10     GCMS lists the date and the time that that's run; is that

11     correct?

12     A.    That's right.

13     Q.    And so when I give you, and I hand back to you Defendant's

14     Price's Exhibit 1 for identification, that shows a run through

15     the GCMS of a sample from what you have identified as Exhibit

16     2D; is that correct?

17     A.    3D, sir.

18     Q.    3D.  I'm sorry, I apologize.  And on that one that shows

19     that that was run on the 4th of September?

20     A.    That's correct.

21     Q.    And so the PCP standard that you're comparing that to,

22     should that have also been run on the 4th of September?

23     A.    Yes.

24           MR. GILBERT:  One moment, your Honor.

25     BY MR. GILBERT:

                              Page 19

2-20-08.txt
Jacqueline M. Sullivan, RPR
Official Court Reporter

21

1    Q.   All right, sir, let me show you what's -- I'm sorry.  I
2    need to do this at the microphone.  Let me show you what's been
3    marked as Defendant Price Exhibit 2 for identification.
4    A.   Yes.
5    Q.   And that's a couple of pages.  That is what purports to be
6    the run from the GCMS having to do with the PCP standard,
7    correct?
8    A.   Yes, but this one was run on a different day.  This was
9    from the day before.
10   Q.   All right.  But you see some numbers up there, 83488?
11   A.   Yes, I do.
12   Q.   And you wrote those in, right?
13   A.   Yes.
14   Q.   All right.  And that's because that's in reference to the
15   lab number?
16   A.   Yes, but the lab number consists of a number of different
17   items.
18   Q.   All right.  Well, 3D was analyzed under the lab number
19   83488, correct?
20   A.   Yes, but it was done on a different day.  It was done the
21   next day.
22   Q.   All right.  But that's the standard?  What I've given you
23   as Price Exhibit 2 for identification is the standard that you
24   compare Price Exhibit 1 to, correct?
25   A.   No, I don't believe so, sir, but I don't have my case

2-20-08.txt

1    folder with me with all the different instrument runs.

2    Q.   All right.  Well, what would help you to do that?

3    A.   If I had my case folder with all the, you know, various

4    instrumental runs.

5    Q.   All right.

6    A.   Is your concern the day on which the standard is run?

7    Q.   Well, that standard was run on September 3rd, correct?

8    A.   The particular one you showed me was.

9    Q.   Right.  And the unknown sample that I showed you for 3D was

10   run on September 4th; is that correct?

11   A.   That's right.

12   Q.   And so you were kind enough to provide to the U.S.

13   Attorney's Office your bench notes and laboratory printouts for

14   all of them, the work that you did in this case, right?

15   A.   I believe so.

16   Q.   And do you have those with you?

17   A.   No.

18   Q.   Well, let me put it this way:  Going back then to Defendant

19   Price's Exhibit 2 for identification, which is the printout from

20   the GCMS having to do with the PCP standard, you saw the numbers

21   that I referred to up there, 83488.

22   A.   Yes, indeed.

23   Q.   And you wrote that?

24   A.   Yes.

25   Q.   When you were writing those numbers down what were you

2-20-08.txt

1    writing them down for?
2    A.   As part of the identification 83488 is the overall lab
3    number for a particular number of items, which included, let's
4    see, which included items 1D, 2D, 3D.
5    Q.   So 3D is one of the unknown substances that you were
6    testing under lab number 07, but the key five digits are the
7    83488, correct?
8    A.   Yes, that's right.
9    Q.   All right.  And then you have written in the PCP standard
10   and you have written in those same five numbers?
11   A.   Yes.
12   Q.   That means you compared that standard to the printout or
13   the results from the GCMS having to do with the unknown
14   substance, 3D?
15   A.   Yes.
16   Q.   So that was on a different date, though?
17   A.   Yeah.
18   Q.   All right.  Now, let me ask you before we go back to that a
19   little bit.  I did want to ask you a bit about the measurements.
20   You explained to us how you got a gross measurement that
21   includes the container and then you get sort of a net
22   measurement.  That's the suspected drugs minus the container,
23   correct?
24   A.   Yes.
25   Q.   I believe the term you used in your bench notes is the net

Jacqueline M. Sullivan, RPR
Official Court Reporter

24

Page 22

2-20-08.txt

1    mass?

2    A.    Yeah.

3    Q.    Is that something you do first?

4    A.    Yes, it is.

5    Q.    And so if you have -- now, I believe you told us that with

6    respect to that one item, 16D, that was the one that had the

7    cocaine and the PCP that were on something that looked like a

8    signature?

9    A.    Let me see.  Yes.  A white hand-rolled cigarette butt.

10   Q.    Now, in that particular case you don't separate out, I

11   believe you told us you don't separate out the suspected tabacco

12   or paper, you would just weigh that, correct?

13   A.    Yes, that's right.

14   Q.    So if I looked at your bench notes I would only see a gross

15   mass before analysis and then a gross mass after analysis,

16   correct?

17   A.    Yes, that's right.

18   Q.    There would always be a difference because in order to do

19   your analysis you have to consume at least some portion of the

20   suspected substance, correct?

21   A.    Certainly.

22   Q.    What I did want to ask you about, though, is one that's not

23   on here, but it's on the same lab report, 83488, and that has to

24   do with 1D.  That was something for which no controlled

25   dangerous substance was detected; is that correct?

1    A.    Yes, that's right.

2    Q.    All right.  Now, what I'm interested in is the first thing

2-20-08.txt

 3     that you would have done.  what that was that was a bottle that

 4     had suspected liquid, right?

 5     A.    That's right.

 6     Q.    And so the first thing that you would have done would have

 7     been to weigh it with the bottle and then pour it out and

 8     measure and weigh and measure the bottle; is that correct?

 9     A.    Yes, that's correct.

10     Q.    Did you do?

11     A.    Yes, I did.

12     Q.    All right.  And would that be reflected in your bench

13     notes?

14     A.    Yes, it would.

15     Q.    All right.  Do you have your bench notes in front of you?

16     A.    Yes, I do.

17     Q.    All right.  I'll tell what you.  Let me give you what's

18     been marked as Defendant Price's Exhibit 3 for identification

19     and see if we're talking about the same document.

20     A.    Yes, we are.

21     Q.    All right.  Does that reflect that you weighed the bottle?

22     A.    Yes, it does.

23     Q.    And tell us what we should be looking at to tell us that

24     you've weighed the bottle.  It just has one --

25     A.    Well, okay, let me take a look at this.  In this case the

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                      26


 1     2.07 grams reflects the actual weight of the liquid itself.

 2     Q.    And I guess my concern that I want to pursue is, you in

 3     fact ran the tests including the tests on the GCMS, and there

                                Page 24

2-20-08.txt

4    was no controlled substance even though it was a liquid in a

5    bottle, right?

6    A.    That's correct.

7    Q.    But did you first test the substance, determine that there

8    was no controlled substance, and then go back and fill out the

9    bench notes?

10   A.    Well, I write the notes, you know, as I do the work, but in

11   this case I do the work and then I put down what the results are

12   on my bench notes.

13   Q.    But in this particular case before you wrote the weight of

14   the bottle down you actually performed the analysis; is that

15   correct?

16   A.    No.  I can't do any analysis until I have an initial weight

17   of the liquid.  I have to know how much I start with, so I did

18   that.  In this case looking at it 2.07 grams represents the

19   weight of the liquid itself, and I did not -- and that was done

20   by actually taking the liquid and weighing it in a container,

21   you know, for which I already had the weight, and so the

22   subtraction doesn't show up on here, but the key point is that I

23   have the liquid first and weigh that to see how much I start

24   with.  Then I do the tests and then I have a certain amount of

25   liquid afterwards.  It's a very simple, logical process.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                  27

1    Q.    Well, but why didn't you write the weight of the bottle

2    down in this particular case?  You didn't know going in that

3    there wasn't going to be any PCP, right?

4    A.    I don't have it exactly in my notes, but a plastic GatorAid

5    bottle weighs a rather large amount, you know, has a fairly

                                Page 25

2-20-08.txt

6      large weight, and if it has just a tiny little bit of liquid in

7      it it is easier for me to pour the liquid out and into a smaller

8      container to get a more exact weight of the liquid.  In other

9      words, if I have a bottle, say a quart bottle that has just a

10     tiny few droplets, you know, a small amount of liquid in the

11     bottle, it is a more accurate weighing for me to weigh it in a

12     smaller container whose weight I've already taken into account.

13     Q.   Well, that is what we're talking about here, is this, the

14     tiny few droplets?

15     A.   2.0 grams would be approximately about 2/5 of a teaspoon,

16     so it is a very small amount of liquid.

17     Q.   How big was the GatorAid bottle?

18     A.   I don't have any recording of that and I don't have a

19     picture.  The actual evidence itself would show that.

20           MR. HAN:  Your Honor, I'll object at this point.

21     They're talking about item 1D, which is outside the scope of

22     direct examination.  1D was not part of the summary exhibit.

23           MR. GILBERT:  It goes to protocol, your Honor.

24           THE COURT:  Can you approach, please?  Can I see 1D?

25     Where's the summary exhibit?


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                      28



1            (Bench conference as follows):

2            THE COURT:  Where's 1D?  Are you almost finsihed?

3            MR. GILBERT:  I'm more than halfway done, your Honor,

4      and I'm not going to go in some other areas.

5            THE COURT:  I'm not trying to be thick, but have you

6      made the point?

                              Page 26

2-20-08.txt

7          MR. GILBERT:  I think I'm getting there, but we'll

8     see.  We'll see.

9          THE COURT:  I hope that there's something that you're

10    accomplishing here other than I know you're knowledgeable and

11    he's knowledgeable and we're all going to walk away not the

12    better for it.  Let's move along.

13          (End of bench conference.)

14    BY MR. GILBERT:

15    Q.   All right.  Sir, let me ask you about

16    piperidinocyclohexanecarbonitrile.

17          THE COURT:  If you're going to say words like that

18    you're going to have to spell them.

19          MR. GILBERT:  I've actually given a copy of that to

20    the court reporter already, your Honor.

21    BY MR. GILBERT:

22    Q.   That's a substance called PCC, is it not, sir?

23    A.   That's right.

24    Q.   Tell us what the relationship -- that's all.  I'm going to

25    use those letters from now on.  Tell us about the relationship

Jacqueline M. Sullivan, RPR
Official Court Reporter

29

1     of PCC to PCP.

2     A.   Phencyclidine is made in a two-step process.  A number of

3     chemicals are taken initially and reacted together and they will

4     create a compound that is the PCC, the

5     piperidinocyclohexanecarbonitrile.  In turn, the PCC is then a

6     second reaction converted to PCP.  The PCC is halfway to making

7     phencyclidine.

8     Q.   And the test that you run on the GCMS, can that detect PCC

Page 27

2-20-08.txt

 9   as distinct from PCP?

10   A.   Yes.

11   Q.   Did you detect any PCC in any of the exhibits that you have

12   said detected PCP as well?

13   A.   I'd have to go back and specifically look, but as I

14   remember, yes, there were a number of exhibits that contained

15   PCC as well as PCP.

16   Q.   All right.  And how would you determine which ones those

17   are?  Would they be in your bench notes?

18   A.   Yes, by looking at the specs.

19   Q.   So that would be -- what would we be looking for then, sir?

20   A.   You would look for the attention time, and in particular

21   you would look for the mass spectrum for that particular peak

22   that came out of the JC.

23   Q.   And would that peak, I am going to have to say some of

24   these sylables again, would that be a peak like for

25   piperidinocyclohexanecarbonitrile?

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          30


 1   A.   Yeah.  I do believe that would be the one you're referring

 2   to.

 3   Q.   And so that would tell us the presence of PCC; is that

 4   correct?

 5   A.   Yes.  It would be a very strong indicator of it, yes.  That

 6   would show the presence of it.

 7   Q.   And what is the -- what would we find on your bench notes

 8   that would tell us that it was PCP?

 9   A.   You would find a gas liquid chromatograph peak for the PCP,

                              Page 28

2-20-08.txt

10    which would show how long it took to go through the instrument,

11    and then you would see the mass spectrum that is characteristic

12    of PCP.

13    Q.    And would that be a peak for, it wouldn't be a peak that's

14    labeled phencyclidine, though, correct?

15    A.    No.   The peak that comes out of the gas is not labeled to

16    identify it.   It simply has a time designation.

17    Q.    You're able to compare it, though, to the one in the

18    so-called laboratory in the machine, right?

19    A.    Yes.

20    Q.    And so is what we're looking for something a laboratory

21    that says PCP or would it say something else like piperadine?

22    A.    I don't get your question.   Could you just repeat that,

23    please?

24    Q.    Let me ask you if you have still have Defendant Price's

25    Exhibit 1 for identification up there.

                         Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    31


 1    A.    Yes, I do.

 2    Q.    All right.   Let me ask you with respect to that, do you see

 3    the various printouts from the gas -- I'm going to just use

 4    initials, GCMS?

 5    A.    Yes, yes indeed, sure.

 6    Q.    As we look through those what would it be telling us, which

 7    is the one that tells us there's PCP there?

 8    A.    The peak that comes out at 5.10 minutes and the associated

 9    mass spectrum with it.

10    Q.    Here you go.   It's this one right here and then this is

11    the -- all right.   And so I see, and so on the page that you

2-20-08.txt

12    were indicating to me, which was I believe the third page in the

13    set of four, and you say database, it talks about a database for

14    piperidine one hyphen one phenylcyclohexyl?

15    A.   Yes, that is abbreviated, but that's the term that's used

16    for PCP.

17    Q.   All right.

18         MR. GILBERT:  I'm sure to everyone's delight, your

19    Honor, I have no further questions.

20         THE COURT:  No.  Anything further Mr. Han?  I can't

21    believe you have anything to add.

22         MR. HAN:  One question.

23                   REDIRECT EXAMINATION

24    BY MR. HAN:

25    Q.   Mr. Mausolf, how long have you been doing this stuff?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              32


1          THE COURT:  I don't think that's very scientific,

2     "stuff."

3          MR. HAN:  That's why I called an expert, Judge.

4     BY MR. HAN:

5     Q.   How long have you been doing that stuff?

6     A.   I've been doing drug analysis for approximately forty

7     years.

8     Q.   Can I have the Elmo on, please?

9          Now, in any of the answers you gave to the questions

10    on cross-examination, does that effect the accuracy of summary

11    chart 200D5?

12    A.   No.

2-20-08.txt
13          MR. HAN:  No further questions.

14          THE COURT:  All right.  Thank you.  You may step down.

15          Call your next witness.

16          THE WITNESS:  Thank you, your Honor.

17          MR. HAN:  May the witness be excused, your Honor?

18          THE COURT:  Yes, I think so.

19          MR. GILBERT:  I think there's a legal issue involved

20   in that, your Honor, that I could approach the bench about.

21          THE COURT:  I don't believe there's any problem if you

22   introduce your exhibits in the government case.  I think that's

23   an old rule that I don't believe is -- so it's up to you.  There

24   may be some other issue.

25          MR. GILBERT:  Sure.  Sure.  I'll move those exhibits


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              33


1    in.

2           THE COURT:  Do you have any objection, sir, to the

3    admission of -- what exhibit numbers are they?

4           COURTROOM DEPUTY:  One, two, three.

5           THE COURT:  They're defense.

6           COURTROOM DEPUTY:  Price Exhibits 1, 2, and 3.

7           THE COURT:  Okay.  1, 2 and 3.  Thank you, sir.  Have

8    a good day.  You're excused.

9           COURTROOM DEPUTY:  Do you accept them?

10          THE COURT:  I do.  They're under no objection.

11          (Defendant Price Exhibit Nos. 1-3 were admitted into

12          evidence at about 2:45 p.m.)

13          THE COURT:  Everybody, okay.  We can take another

14   witness?
                              Page 31

2-20-08.txt

15          THE JURY:  Yes.

16          COURTROOM DEPUTY:  Sir, please raise your right hand.

17   Do you solemnly swear that the testimony you should give the

18   Court and the jury in the case now on trial will be the truth,

19   the whole truth and nothing but the truth, so help you God?

20          MR. PARDEE:  I do.

21          COURTROOM DEPUTY:  You may be seated, sir.

22          RYAN PARDEE, WITNESS FOR THE GOVERNMENT, SWORN

23                    DIRECT EXAMINATION

24   BY MR. HAN:

25   Q.   Good afternoon.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          34


1    A.   Good afternoon.

2    Q.   In a loud, clear voice, please tell us your name and spell

3    it for the record.

4    A.   My name is Ryan Pardee, R-y-a-n P-a-r-d-e-e.

5    Q.   Where do you work?

6    A.   I work for the Federal Bureau of Investigation.

7    Q.   What do you do for them?

8    A.   Currently I'm assigned as a special agent to squad CR3.

9    Q.   What does that squad focus on?

10   A.   Squad work, drug crimes and organized crime.

11   Q.   How long have you been an agent with FBI?

12   A.   About five years.

13   Q.   What did you do before becoming an FBI agent?

14   A.   I worked out in the oil fields of Oklahoma.

15   Q.   Doing what?

2-20-08.txt

16    A.    Drilling for oil.

17    Q.    Obviously not very well.

18          Let me direct your attention to an investigation into

19    Anthony Suggs.  Were you part of that investigation?

20    A.    I was.

21    Q.    Did that investigation also include a person by the name of

22    James Parker?

23    A.    It did.

24    Q.    Was what was James Parker's nickname to your knowledge?

25    A.    Yoggie.


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                              35


1     Q.    Did you participate in setting up a controlled buy of Mr.

2     James Parker on January 4th, 2007?

3     A.    I did.

4     Q.    In regard to this particular operation, tell us what a

5     controlled buy is.

6     A.    A controlled purchase would be an instance in which we take

7     somebody who is cooperating with the government, provide them

8     with money that the government gives to them, and then have them

9     purchase narcotics from a particular individual.

10    Q.    In this case did you have someone who could purchase

11    narcotics from James Parker?

12    A.    We did.

13    Q.    Who is that person?

14    A.    That was Eugene McClellan.

15    Q.    Was he an FBI agent?

16    A.    No.

17    Q.    Why was he doing this?

2-20-08.txt

18    A.    Mr. McClellan had previously been arrested and signed a
19    cooperation agreement with the government in which he plead
20    guilty.   In exchange for that he agreed to cooperate and do what
21    the government asked him to do.
22    Q.    Had he been sentenced yet by a judge?
23    A.    No, he had not.
24    Q.    Tell us what is the first step in setting up a controlled
25    buy from James Parker on this date.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          36

1     A.    The first step was to contact Mr. McClellan and have him in
2     turn contact Mr. Parker.
3     Q.    How was that done?
4     A.    Over the telephone.
5     Q.    Approximately how many phone calls were made?
6     A.    Four calls that day between him and Parker.
7     Q.    Did there come a time when you met with Mr. McClellan
8     personally to prepare him for the controlled buy?
9     A.    Yes.
10    Q.    And don't tell me -- well, when you met with him tell me
11    how you prepared him for this controlled buy.
12    A.    I met with Mr. McClellan at a prearranged meeting location.
13    I then searched Mr. McClellan, his person and a vehicle that we
14    had provided for him.
15    Q.    Why did you search the vehicle?
16    A.    I wanted to make certain that the vehicle was free of
17    contraband.
18    Q.    Why is that?

2-20-08.txt

19   A.   During that controlled purchase you have to make sure that

20   the person cooperating with the government isn't buying

21   narcotics from anybody else other than from whom we were

22   directing them to purchase, or you want to make certain they're

23   not bringing extra money to purchase extra narcotics.

24   Q.   Did you find anything unusual in the search of the car?

25   A.   Nothing was found.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                           37


1    Q.   You stated this was an FBI-supplied car?

2    A.   It was.

3    Q.   Did it say FBI on it?

4    A.   No.

5    Q.   Was there any audio or video recording equipment inside the

6    car?

7    A.   There was.

8    Q.   Explain to us -- well, let me ask you about the video

9    equipment.  Was there a camera installed, a video camera?

10   A.   There was.

11   Q.   And what direction was this camera facing?  What would it

12   pick up?

13   A.   The camera was set up so that it would pick up and record

14   audio and video of the front passenger seat area of the vehicle.

15   Q.   Was it recording the video?

16   A.   It was.

17   Q.   Was it recording the audio?

18   A.   It was.

19   Q.   Was there a transmitter in the car?

20   A.   There was also.

                       Page 35

2-20-08.txt

21    Q.    And tell us the difference between a recorder and a

22    transmitter.

23    A.    A recorder would just capture the audio and video on some

24    of medium, such as a videotape, while as a transmitter does not

25    record, in turn repeats whatever the transmitter collects as a

Jacqueline M. Sullivan, RPR
Official Court Reporter

38

1    signal so we can listen to it over our FBI hand-held radio.

2    Q.    So are you listening to what's going on realtime?

3    A.    Yes.

4    Q.    Can you watch video-wise what's going on realtime?

5    A.    No.

6    Q.    Did you give Mr. McClellan any money?

7    A.    I did.

8    Q.    About how much?

9    A.    $3,500.

10    Q.    From that stage and location did Mr. McClellan leave that

11    state and location?

12    A.    He did.

13    Q.    Did you follow him?

14    A.    I did.

15    Q.    Where did you go?

16    A.    I followed Mr. McClellan to the area of 901 Rhode Island

17    Aenue Northeast, Washington, D.C.

18    Q.    Was there at that location?

19    A.    It's a Home Depot parking lot.

20    Q.    I'm showing you what's been marked as Government's Exhibit

21    1000P2 for identification.   Do you recognize that photograph?

**Page 36**

                                    2-20-08.txt
22    A.   I do.

23    Q.   What is it?

24    A.   It's a photograph of the front of Home Depot in the parking

25    lot area.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    39


 1    Q.   Does that fairly and accurately show the Home Depot that

 2    you're referring to?

 3    A.   It does.

 4              MR. HAN:  The government will move 1000P2 into

 5    evidence.

 6              THE COURT:  Any objection?  Okay.  It's admitted.

 7              (Government Exhibit No. 1000P2 was admitted into

 8              evidence at about 2:51 p.m.)

 9    BY MR. HAN:

10    Q.   Was this the photograph taken on January 4, 2007?

11    A.   No, it was not.

12              THE COURT:  What page?

13              COURTROOM DEPUTY:  45, page 45.

14    BY MR. HAN:

15    Q.   Is this the parking lot that you referred to earlier?

16    A.   It is.

17    Q.   And generally speaking, where did Mr. McClellan park his

18    car?

19    A.   That would be toward the right of the photograph in the

20    general area of the lumbar or contractor pick up.

21    Q.   So around the area where my finger is pointed?

22    A.   In that general area, yes.

23    Q.   For the record, that's to the far right side of the
                                 Page 37

2-20-08.txt

24    photograph.

25              What did you see when you were there?


Jacqueline M. Sullivan, RPR
Official Court Reporter

40


1    A.    I was able to observe Mr. McClellan pulling into that

2    parking lot and during a couple brief moments him meeting with

3    another individual.

4    Q.    What did this individual do?

5    A.    The points in time where I was able to see the individual

6    he was located to the driver's side door area.

7    Q.    Did he enter the car?

8    A.    No, he did not.

9    Q.    Could you listen to what was going on through the

10   transmitter?

11   A.    I could.

12   Q.    Did this person who walked up to the door identify himself?

13   A.    He did.

14   Q.    What name did he call himself?

15   A.    Yogi.

16   Q.    Approximately how long was Yogi at the side of the car?

17   A.    Approximately five minues.

18   Q.    What happened then?

19   A.    I later followed Mr. McClellan back to our original

20   prearranged location.

21   Q.    Did he have any drugs to give you?

22   A.    No, he did not.

23   Q.    Did you check to see how much money he had?

24   A.    $3,500.

Page 38

2-20-08.txt
25    Q.   Later that night did Mr. McClellan go to a second location?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                  41



1     A.   He did.

2     Q.   Did you follow him?

3     A.   I did.

4     Q.   And what area did you follow him to?

5     A.   To the area of Jefferson and Georgia Avenue Northwest.

6     Q.   Was there a landmark there that you know of?

7     A.   On that corner there's a McCombo Lounge (ph).

8     Q.   I'm showing you what has been marked for identification as

9     Government's Exhibit 1000.P3.

10              THE COURT:  Any objection?  1000.P3 admitted.

11              (Government Exhibit No. 1000.P3 was admitted into

12              evidence at about 2:53 p.m.)

13              THE COURT:   What quadrant is this?

14    BY MR. HAN:

15    Q.   What quadrant is this, agent?

16    A.   Northwest.

17              THE COURT:   Jefferson and what?

18              THE WITNESS:   Georgia Avenue.

19    BY MR. HAN:

20    Q.   Tell me what happens when you get to this area.

21    A.   I discontinued my following of Mr. McClellan shortly before

22    arriving at this location.

23    Q.   Why did you do that?

24    A.   I felt it was unsafe for Mr. McClellan, continuing to

25    follow him directly to the location.

                              Page 39

2-20-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

42

1    Q.   Were there other agents in place to pick up the

2    surveillance at the McCombo Lounge?

3    A.   There were.

4    Q.   At this location could you hear any conversation over the

5    transmitter?

6    A.   I could.

7    Q.   And whose voices did you hear on that transmission?

8    A.   I heard the voices of Eugene McClellan and James Parker.

9    Q.   I'm showing you what's been marked as Government's Exhibit

10   1000.1.  What is Government's Exhibit 1000.1?

11   A.   That's a CD, compact disk.

12   Q.   Do you know what's on that CD?

13   A.   I do.

14   Q.   What is it?

15   A.   It's a copy of the video that was shot from inside a

16   vehicle that we provided to Mr. McClellan for the controlled

17   purchase.

18   Q.   Does it also contain the audio?

19   A.   It does.

20   Q.   Have you reviewed this CD?

21   A.   I have.

22   Q.   How do you know that?

23   A.   My initials are on the CD.

24   Q.   Does the audio fairly and accurately show what you heard

25   during the transmission in your car?

2-20-08.txt

1    A.    It does.

2          MR. HAN:  The government would move into evidence

3    Government's Exhibit 1000.1.

4          THE COURT:  No objection?  Okay.  All right.  1000.1

5    is admitted.

6          (Government Exhibit No. 1000.1 is admitted into

7          evidence at about 2:55 p.m.)

8    BY MR. HAN:

9    Q.    If we could -- first let me stop you here.  On your video

10   screen you see a date stamp 1/1/93.  Is that accurate?

11   A.    No, it is not.

12   Q.    And there's a timestamp 12:13: a.m.  Is that accurate?

13   A.    No, that is not accurate either.

14   Q.    If we could fast-forward to the counter 1213, and we're

15   going to listen to this from 1213 to 1219.

16          We can play that for the jury, your Honor.

17          (Audio tape played.)

18          THE COURT:  What is the right date?

19          THE WITNESS:  The correct date was January 4th, 2007.

20          THE COURT:  Why does it say 1/1/93?

21          THE WITNESS:  Your Honor, this vehicle in particular

22   every time we start the vehicle the battery is turned off and we

23   had failed to reset the counter, recording device.

24          MR. HAN:  Technical difficulties, your Honor.  We're

25   going to play the video straight from the CD itself.

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-20-08.txt

1    BY MR. HAN:

2    Q.   This first thing that we're going to hear, where is this

3    conversation taking place?

4    A.   The Home Depot parking lot.

5              MR. HAN:  Your Honor, this may be a good time for a

6    break.

7              THE COURT:  That's the same thing as we're having

8    trouble with the machinery.  Are you sure?

9              MR. HAN:  The Court's indulgence.

10             THE COURT:  Once more.

11             (Audio tape played.)

12   BY MR. HAN:

13   Q.   Who just said "what's up with you?  Do you want to get some

14   of that H2O?

15   A.   That was Julian McClellan.

16   Q.   And who was the voice preceding that?

17   A.   That was James Parker.

18             (Audio tape played.)

19   BY MR. HAN:

20   Q.   The next place that Mr. McClellan goes you say is McCombo

21   Lounge?

22   A.   Yes, sir.

23   Q.   If we could advance the counter to 1-41.  At the McCombo

24   Lounge did you have visual contact with Mr. McClellan?

25   A.   No, I did not.

2-20-08.txt

1    Q.   Could you personally see who walked up to him?

2    A.   No, I could not.

3    Q.   During the conversation at the Home Depot you hear Mr.

4    Parker say "I got to make a call."  Do you recall that?

5    A.   Yes.

6    Q.   Did you look at pen register information between Mr. Suggs

7    and Mr. Parker on that day?

8    A.   Yes, I did.

9    Q.   Did it show any activity during this time between the two?

10   A.   It did.

11   Q.   We'll get back to that.

12          (Audio tape played.)

13   BY MR. HAN:

14   Q.   At the very end of that segment you hear Mr. Parker say

15   "glow"?

16   A.   Yes.

17   Q.   What is your understanding of what's going on right there?

18   A.   That would be a conversation over the telephone.

19   Q.   Who was on the phone?

20   A.   Mr. Parker on one end.

21   Q.   But you couldn't see what was going on?

22   A.   No.

23   Q.   That's based on what you heard there?

24   A.   Correct.

25   Q.   Now, I mentioned, I asked you if you looked at pen register

Jacqueline M. Sullivan, RPR
Official Court Reporter

46

1    information between Mr. Parker and Mr. Suggs on this day.  Is

2    there any activity during this time?

Page 43

2-20-08.txt

3    A.   Yes.

4    Q.   We'll get back to that.

5              (Audio tape played.)

6              MR. HAN:  If you could advance it to 145.

7              THE COURT:  This is still the 9th?

8              MR. HAN:  Yes, and 145 is just the counter.  It's not

9    the accurate time.

10             THE COURT:  Yes, I know.  What time of the day are we

11   at now?

12   BY MR. HAN:

13   Q.   What time of the day is this now?

14   A.   It's around seven p.m. as best I recall.

15             (Audio tape played.)

16             MR. HAN:  We're stopping the video at 150/50.

17             THE COURT:  Do you want to take a break?

18             MR. HAN:  No, we're almost done.

19             THE COURT:  We're almost finished?

20             MR. HAN:  Almost.

21             THE COURT:  All right.  Go for it.

22             Everybody okay?

23   BY MR. HAN:

24   Q.   Agent Pardee, after arriving at McCombo's Lounge you said

25   that you didn't have visual contact of Mr. McClellan; is that


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              47



1    correct?

2    A.   Yes.

3    Q.   When is the next time you had visual contact with Mr.

2-20-08.txt

4      McClellan again that night?

5      A.    As Mr. McClellan was departing that area.

6      Q.    In a car?

7      A.    In a car.

8      Q.    Where did you guys go?

9      A.    Follow him back to another staging location.

10     Q.    At the staging location do you retrieve anything from his

11     car?

12     A.    Yes.

13     Q.    What do you retrieve?

14     A.    A Real Lime eight-ounce size bottle.

15     Q.    Showing Government's Exhibit 1000.2A for identification.

16     Do you recognize this exhibit?

17     A.    I do.

18     Q.    What is it?

19     A.    It says the Real Lime juice bottle that we had taken from

20     Mr. McClellan on the 4th of January 2007.

21     Q.    Was there any liquid inside?

22     A.    Yes.

23     Q.    Was there any unusual smell?

24     A.    There was.

25     Q.    What was that unusual smell?

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    48


1      A.    It was a smell consistent with PCP.

2      Q.    Did you submit this sample to the Drug Enforcement Agency

3      for analysis?

4      A.    A sample was submitted, yes.

5      Q.    Was it given a DEA lab number?

2-20-08.txt

 6    A.    It was.

 7    Q.    What is a DEA lab number?

 8    A.    A unique number that the DEA laboratory assigns to every

 9    submission they buy, the DEA or FBI in this case.

10    Q.    Do you recall off the top of your head that DEA lab number?

11    A.    No.

12    Q.    Is it recorded accurately anywhere?

13    A.    It is.

14    Q.    On what?

15    A.    A DEA 7.

16    Q.    I'm showing for identification purposes only Government's

17    Exhibit 1000.3, and just for the record and for identification

18    only, what is 1000.3?

19    A.    It's a DEA 7.

20    Q.    Is the lab number recorded accurately on that piece of

21    paper?

22    A.    It is.

23    Q.    Would you just read it for the record?

24    A.    W 16083.

25          THE COURT:  Are you offering that into evidence?


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              49


 1          MR. HAN:  No.

 2          MR. EARNEST:  Objection.

 3          THE COURT:  He's not offering it.  Sorry.  My mistake.

 4    I meant the package, the thing on the top.  Are you objecting to

 5    2A.

 6          MR. EARNEST:  No, your Honor.

2-20-08.txt

7        THE COURT:  That's the package with the green bottle.

8        MR. HAN:  The green bottle I'm moving into evidence.

9        THE COURT:  That's 1000.2A.  Admitted.

10       (Government Exhibit No. 1000.2A was admitted into

11       evidence at about 3:16 p.m.)

12       MR. HAN:  1000.3 I am not, the piece of paper.

13       THE COURT:  1000.3 is not being offered.

14  BY MR. HAN:

15  Q.   And quickly, we mentioned pen register analysis.  Just

16  briefly what is a pen register?

17  A.   A pen register is a device that the FBI employs to record

18  incoming and outbound phone calls from a particular target

19  telephone number.

20  Q.   Did you look at the pen register analysis on January 4th,

21  2007 between Mr. Suggs' known phones and Mr. Parker's phone?

22  A.   I did.

23       MR. HAN:  I'm showing defense Government's Exhibit

24  1000.6, which is a summary exhibit.

25  BY MR. HAN:


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        50


1   Q.   What is Government's Exhibit 1000.6?

2   A.   It is an event summary for January 4th, 2007.

3        THE COURT:  Wait.  January 4th?

4        THE WITNESS:  Yes.

5        THE COURT:  Okay.  I'm sorry.  That's the date of the

6   tape?

7        THE WITNESS:  Yes, your Honor.

8   BY MR. HAN:

2-20-08.txt

9  Q.   Does this accurately summarize the pen register's

10  information between Mr. Suggs' and Mr. Parker's phones on that

11  day?

12  A.   It does.

13       MR. HAN:  The government will move into evidence No.

14  1000.6 with the exception, I mean, we can -- there's two pieces

15  of data here that is going to be entered through the next

16  witness and I'll publish to the jury after that witness

17  completes the summary chart.

18       THE COURT:  Can you follow what he just said?  Do you

19  know what's being offered?  Just show it to the counsel, please.

20  Apparently there's two pieces.

21       Ladies and gentlemen, we're not sitting Friday morning

22  because one of you are having an important interview, and we'll

23  let you know about the rest of the schedule on Friday tomorrow.

24  Okay?  But I wanted to let you know Friday morning we won't

25  start.  The earliest we can start would be about 1:30 Friday.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              51


1  I'll remind you, don't worry, but I just wanted to give you a

2  heads up while they're conferring here.  Does that make sense?

3  All right.  All right.

4       Then I guess it's admitted subject to there's a couple

5  more pieces of information coming along here.

6       (Government Exhibit No. 1000.6 was admitted into

7       evidence at about 3:18 p.m.)

8  BY MR. HAN:

9  Q.   Just to be clear, this is the pen register off of Mr.

                           Page 48

2-20-08.txt

10   Suggs' phone?

11   A.   Correct.

12        THE COURT:  Everybody understands what a pen register

13   is?  You don't hear the conversation, you don't hear the

14   substance.  It's not like a wiretap.  You just know what the

15   call is.  That's it.

16        MR. HAN:  I have no further questions.

17        THE COURT:  Do we have any questions of this witness?

18        MR. DONOHUE:  I do.

19        THE COURT:  Do you expect it to be a while?

20        MR. DONOHUE:  No.

21        THE COURT:  Okay.  Let's finish him up, then.

22             CROSS-EXAMINATION

23   BY MR. DONOHUE:

24   Q.   Good afternoon, special agent.

25   A.   Good afternoon, sir.


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                         52


1    Q.   Now, special agent, what did the, in terms of the timing of

2    this, you observed Parker and McClellan, that is his name?

3    A.   I'm sorry?

4    Q.   Is that his name, McClellan?

5    A.   McClellan, yes, sir.

6    Q.   You observed the two them at what time at Home Depot?

7    A.   I don't recall specifically.

8    Q.   Can you look at your chart?

9    A.   I don't have a chart in front of me.

10   Q.   Let me approach you with something that might refresh your

11   recollection.
                    Page 49

2-20-08.txt

12    A.    I did not observe them specifically at that time.

13    Q.    All right.  Well, do you know what time they met at Home

14    Depot?

15    A.    On my 302 is written what time we followed the cooperating

16    witness and Mr. McClellan into the parking lot.

17    Q.    Okay.  Do you have that one?

18    A.    No.

19    Q.    So you don't know what time it was then that you were at

20    Home Depot?

21              THE COURT:  If you want to show him the 302, I'm sure

22    the government has it or somebody does, but otherwise he doesn't

23    remember.

24              MR. DONOHUE:  Nobody's got 302.

25              THE COURT:  He does.  Lo and behold.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                  53


1              MR. DONOHUE:  May I approach the witness?

2              THE COURT:  This is not -- we're just showing it to

3    you to see if it refreshes your recollection about the time.

4    It's not going into evidence.

5    BY MR. DONOHUE:

6    Q.    Have you had the opportunity to look at that, special

7    agent?

8    A.    Yes.

9    Q.    Does that refresh your recollection as to what time it was

10    that Mr. Parker met with cooperating witness at Home Depot?

11    A.    Yes.

12    Q.    All right.  What time was that?

                              **Page 50**

2-20-08.txt

13    A.    According to the 302 it's 5:58 p.m.

14    Q.    I'm assuming that the 302 is probably accurate?

15              MR. HAN:  Objection.

16              MR. EARNEST:  Objection.

17              THE COURT:  Do you want to approach?

18              MR. DONOHUE:  Why don't I just ask?

19              MR. HAN:  The last answer was what the 302 said, not

20    his independent recollection.

21              MR. DONOHUE:  Right.  That's my fault.  So let me ask

22    it a different way.

23              THE COURT:  Does looking at that refresh your

24    recollection?

25              THE WITNESS:  As to what I followed the source in


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              54


1     there, yes, but I did not sign off on the observation as to what

2     time Mr. Parker --

3              THE COURT:  Do you know what time you saw him going in

4     there?

5              THE WITNESS:  I didn't see Mr. Parker arrive, is what

6     I'm saying, your Honor.

7              MR. DONOHUE:  All right.

8              THE COURT:  Progress, confusion.

9              MR. DONOHUE:  I'm sorry.  Let's try this.

10             THE COURT:  So you don't know when Parker got there?

11             THE WITNESS:  No, ma'am.

12    BY MR. DONOHUE:

13    Q.    But you started following the cooperating witness at about

14    close to six o'clock from Home Depot, correct?

2-20-08.txt

15     A.    To Home Depot, yes.

16     Q.    Do you recall about what time you followed him away from

17     Home Depot?

18     A.    It would have been a matter of minutes later.

19     Q.    And did you follow him, did you follow Mr. Parker after

20     that?

21     A.    No, I did not.

22     Q.    Do you know where Mr. Parker went in the intervening

23     hour-and-a-half or two hours?

24     A.    No, I do not.

25     Q.    And what did your analysis of Mr. Parker's phone in the pen


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              55


1      register -- did you have a pen register for Mr. Parker's phone?

2      A.    I can't recall.

3      Q.    So you don't know who Mr. Parker might have called in that

4      one-and-a-half-hour or two-hour period also?

5      A.    That's correct.

6      Q.    Correct?

7      A.    Correct.

8      Q.    And you didn't personally see the cooperating witness at

9      McCombo?

10     A.    McCombo Lounge.

11     Q.    Right?

12     A.    Yes, sir.  No, I did not.

13           MR. DONOHUE:  Nothing else.  Thank you, your Honor.

14           MR. MARTIN:  Your Honor, briefly, if I may.

15                        CROSS-EXAMINATION
                            Page 52

2-20-08.txt

16   BY MR. MARTIN:

17   Q.   Good afternoon, Agent Pardee.

18   A.   Good afternoon, sir.

19   Q.   I just have a few questions for you regarding Mr.

20   McClellan.  He was a cooperator, correct?

21   A.   Correct.

22   Q.   And a cooperator is a very important tool that you use

23   during these type of investigations, right?

24   A.   Correct.

25   Q.   And the reason they're important is because you can get up

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              56


1    close and personal, so to speak, with a seller, right?

2    A.   That would be correct.

3    Q.   And many times these cooperators, like in this case, they

4    wear a wire, right?

5    A.   The vehicle was equipped with the recording equipment in

6    this instance.

7    Q.   But in some instances also they wear a wire, right?

8    A.   They could, yes.

9    Q.   And that wasn't done with respect to Mr. Earnest Glover,

10   was it?

11   A.   No, sir.

12        MR. MARTIN:  Thank you.  Nothing further.

13        MR. GILBERT:   In relative terms I will be brief.

14                    CROSS-EXAMINATION

15   BY MR. GILBERT:

16   Q.   Sir, do you know who the Mo was that Mr. Parker or Mr.

17   McClellan were referring to?

                       Page 53

2-20-08.txt

18   A.   No, sir, I do not.

19        THE COURT:  How do you spell it?

20        MR. GILBERT:  I don't know.  I've heard the Mo.

21        THE COURT:  What?

22        MR. GILBERT:  I heard Mo.  I don't know how it's

23   spelled.

24   BY MR. GILBERT:

25   Q.   Who was it that owed who money in the past?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                        57


1    A.   I believe Mr. McClellan was indicating that he owed Mr.

2    Parker money.

3    Q.   You don't know that was before he was working for you, or

4    is that something you didn't know about?

5    A.   That was before he was working for us.

6    Q.   When did he start working for you?

7         MR. HAN:  Objection, your Honor; outside the scope.

8         THE COURT:  Well, in this investigation I'll let him

9    answer.  I don't know if he was doing anything else, but when

10   did he -- no.  Overruled.

11        You can answer that.  Sorry.  When did he, McClellan,

12   start working with the FBI?

13        THE WITNESS:  With the FBI in 2006.

14   BY MR. GILBERT:

15   Q.   Do you remember when in 2006?

16   A.   Not specifically right now, sir, no.

17   Q.   Approximately?

18   A.   I would be doing a disservice to guess.

**Page 54**

2-20-08.txt

19    Q.   When did you start working with him?

20    A.   With Mr. McClellan?  That same time he started working with

21    the FBI.

22    Q.   And you heard references in there to Slim and to Fats.  Do

23    you know who those persons are?

24    A.   It would depend upon what point in time you're talking in

25    the conversation.


Jacqueline M. Sullivan, RPR
Official Court Reporter

58


1    Q.   Okay.  Explain to me your answer then.

2    A.   I don't recall what specific instance you're talking about.

3    Q.   Well, you heard in the conversation at the McCombo Lounge.

4    That's the one where somebody was talking about owing somebody

5    some money.  Do you remember that in the past?

6         THE COURT:  Are you talking about at McCombo's?  Are

7    you talking about what we saw in the screen, which was in the

8    car inside of there?

9         MR. GILBERT:  Yes.

10         THE COURT:  So it wasn't in the lounge.

11         MR. GILBERT:  If I said in the lounge I misspoke.  I

12    should say at the lounge.

13    BY MR. GILBERT:

14    Q.   Maybe it was outside.

15    A.   We saw somebody that has been identified as Mr. Parker

16    sitting in a car outside on the street in a car.

17    Q.   Mr. Parker was the one that got into the car on the video;

18    is that correct?

19    A.   Correct.

20    Q.   And you heard references during that conversation to Slim?

Page 55

2-20-08.txt

21    A.    I do recall what you're talking about now, yes.

22    Q.    Was that a term of address between the two men, or was that

23    in reference to a third party?

24    Q.    I believe that was between the two of them?

25    Q.    Do you know who was Slim then?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                            59


1    A.    I believe Mr. Parker was referring to Mr. McClellan.

2    Q.    And you also heard references to Fats, do you remember

3    hearing that?

4    A.    Yes.  I believe at the beginning of the McCombo Lounge

5    segment I recall.

6    Q.    Was that a form of address between the two men or was that

7    in reference to a third person?

8    A.    Yes.  Mr. Parker was addressing Mr. McClellan.

9    Q.    So Mr. Parker called McClellan Slim and called him Fats?

10    A.    Yes, sir.

11          MR. GILBERT:  No questions, your Honor.

12          THE COURT:  Anything else?

13          MR. MARTIN:  No further questions, your Honor.

14          THE COURT:  Thank you.  Sir, you may step down.

15          (Witness excused at about 3:27 p.m.)

16          THE COURT:  All right, ladies and gentlemen.  We're

17    going to take a 15-minute recess.

18          I'd like to speak to the juror in seat number one

19    after everybody else files out, if you don't mind.  It will just

20    take a second.  It will be about 15 minutes, ladies and

21    gentlemen.

                          Page 56

2-20-08.txt

22                Who's your next witness, Mr. Han?  What's your next

23     witness?

24                MR. HAN:  Our next witness will be John Bevington with

25     some wiretap calls.  Short short.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                      60


1                 THE COURT:  What happened to the search warrant from

2      there?

3                 MR. HAN:  For the wiretap calls will be the search

4      warrant.

5                 THE COURT:  Who's that witness?

6                 MR. HAN:  Colleen Muldoon.

7                 THE COURT:  Good afternoon.  You are juror -- let me

8      just make sure I've got my numbers right, and I want to

9      follow-up something that Ms. Franklin brought to my attention.

10     Let me see.  Juror 1027?

11                JUROR NO. 1027:  Yes.

12                THE COURT:  It came to your attention as were you

13     sitting here that perhaps you knew somebody's spouse; is that

14     correct?

15                JUROR NO. 1027:  Yes.

16                THE COURT:  Am I getting it right?

17                JUROR NO. 1027:  Yes.

18                THE COURT:  Mr. Glover's spouse, whose name is also

19     Sue.

20                JUROR NO. 1027:  Yes.

21                THE COURT:  Do you see her here in the courtroom?

22                JUROR NO. 1027:  Yes.

23                THE COURT:  How do you know her?

2-20-08.txt

24            JUROR NO. 1027:  Her and my daughter went to school

25      together.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          61


 1            THE COURT:  Were they friends?

 2            JUROR NO. 1027:  Yes.

 3            THE COURT:  So did she come to your house on occasion

 4      or what have you?

 5            JUROR NO. 1027:  Yes.  They went to school, yes.

 6            THE COURT:  How long ago was that?

 7            JUROR NO. 1027:  Oh, god.  It's been years.

 8            THE COURT:  Well, do you think, I mean, when you say

 9      "years" I don't know what you're saying.  When?

10            JUROR NO. 1027:  They're in their 40s now.

11            THE COURT:  Twenty years ago?

12            JUROR NO. 1027:  They were in elementary school.

13            THE COURT:  Have you seen Ms. Glover since then?

14            JUROR NO. 1027:  Yes.

15            THE COURT:  You have seen her in what context?

16            JUROR NO. 1027:  Just on the street, you know, passing

17      by.

18            THE COURT:  Do you live anywhere in the same

19      neighborhood nearby or what have you?

20            JUROR NO. 1027:  Yes.

21            THE COURT:  So would you see her, you wouldn't end up

22      in the same social events?

23            JUROR NO. 1027:  Oh, no.

24            THE COURT:  Would you just see her on the street every

                            Page 58

2-20-08.txt
25    once in a while?

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                          62

 1              JUROR NO. 1027:  Yes.
 2              THE COURT:  But your daughter socialized with her in
 3    elementary school?
 4              JUROR NO. 1027:  Yes.
 5              THE COURT:  Now that you realize that there is some
 6    connection I don't know whether or not any of your answers
 7    before would change.  That is, would this in any way affect your
 8    ability to be fair and impartial?
 9              JUROR NO. 1027:  No.
10              THE COURT:  Are you sure?  I mean, the fact she is
11    free to sit here obviously.  It's an open courtroom.  She is not
12    going to testify, but her husband, have you ever met him?
13              JUROR NO. 1027:  No.
14              THE COURT:  Does any of the names of all these Glovers
15    mean anything to you?
16              JUROR NO. 1027:  No.  Because I didn't know her
17    married name was Glover until now.
18              THE COURT:  But do you have any discomfort whatsoever,
19    do you have any?  The fact that you're sitting in that jury box
20    and Ms. Glover is out there as both a spouse and an observer?
21              JUROR NO. 1027:  No.
22              THE COURT:  No?
23              JUROR NO. 1027:  No.
24              THE COURT:  Counsel, is there anything you want to
25    approach and we can follow-up?

                              Page 59

1          MR. MARTIN:  I'd like to ask her a few questions if I
2    may.
3          THE COURT:  That's all right.  We need to explore this
4    so I would appreciate your honesty.
5          MR. MARTIN:  Thank you, your Honor.
6          And good afternoon, ma'am.
7          JUROR NO. 1027:  Good afternoon.
8          MR. MARTIN:  You said that sometimes you see Ms.
9    Glover on the street.  Do you acknowledge her when you see her
10   on the street?
11         JUROR NO. 1027:  We speak.
12         THE COURT:  What, hello?
13         JUROR NO. 1027:  Yes.  Hi, how you doing?
14         THE COURT:  Do you know her family, for instance?
15         JUROR NO. 1027:  Yes, I know her mother and her aunts,
16   yes.
17         THE COURT:  Oh, you do.  How many people?
18         JUROR NO. 1027:  Her cousins and her mother.
19         THE COURT:  And do you socialize with them at all?
20         JUROR NO. 1027:  No.
21         THE COURT:  Do you see them at all?
22         JUROR NO. 1027:  It's been a long while since I've
23   seen them.
24         THE COURT:  Go ahead.
25         MR. MARTIN:  And do you remember the last time you saw

2-20-08.txt

1    Kim Glover?

2              JUROR NO. 1027:  Oh, god.  It's been I ran into her, I

3    think we saw her in the Giant, in the grocery store.

4              MR. MARTIN:  In the grocery store.  And did you say

5    more than hello, did you have a conversation?

6              JUROR NO. 1027:  No, I didn't have a conversation with

7    her, but my daughter did.

8              MR. MARTIN:  Your daughter did?

9              THE COURT:  How long ago was this?

10             JUROR NO. 1027:  It's been months.  It's been months

11   ago.

12             THE COURT:  Months ago.

13             MR. MARTIN:  Well, her honor has asked whether or not

14   you feel that you can be neutral and detached as a result of

15   these contacts you had with Kim Glover, and I think the

16   government is going to be concerned about that.  You can sit

17   here and listen to the evidence and still be fair to both sides?

18             JUROR NO. 1027:  Yes.

19             MR. MARTIN:  And you would try your best to do that?

20             JUROR NO. 1027:  Yes.

21             MR. MARTIN:  I have nothing further, your Honor.

22   Thank you.

23             THE COURT:  Would your daughter in any way have some

24   reason to sort of advocate to you about any of this?  Is she

25   around town?

2-20-08.txt

| 1 | JUROR NO. 1027: Yes. |

1          JUROR NO. 1027:  Yes.

2          THE COURT:  Does she keep in touch with Kim, if you

3    know?

4          JUROR NO. 1027:  No, not really.

5          THE COURT:  Okay.  Is there any ill will between the

6    families?

7          JUROR NO. 1027:  My family and hers?

8          THE COURT:  Yes.

9          JUROR NO. 1027:  No.

10         THE COURT:  I mean, there was just overlap in

11   elementary school and you would pass on street and say hello?

12         JUROR NO. 1027:  Yes.

13         THE COURT:  Mr. Scarpelli?

14         MR. SCARPELLI:  No questions.  Thank you.

15         THE COURT:  Thanks very much.  We'll take a little

16   recess.  I appreciate you bringing this to our attention.  I

17   would prefer you not discuss any of this with any of your fellow

18   jurors, please.

19         JUROR NO. 1027:  All right.

20         THE COURT:  Okay.  A couple of things before we

21   proceed just so I know.  I asked this question before.  Who is

22   testifying as the confidential informants?  Are there any

23   testifying?  Do you still expect them?

24         MR. SCARPELLI:  Yes, your Honor.  Steven Price will be

25   testifying.

Jacqueline M. Sullivan, RPR
Official Court Reporter

66

Page 62

2-20-08.txt

1           THE COURT:  Is that it?

2           MR. SCARPELLI:  Yes.

3           THE COURT:  So the McClellan won't be because today.

4    I came to be somewhat surprised Joy is not testifying.

5           MR. SCARPELLI:  Correct.

6           THE COURT:  So we're down to Steven Price.  Was he

7    involved in an undercover buy?

8           MR. SCARPELLI:  Two with Mr. Suggs.

9           THE COURT:  Thank you.  And are you about to say

10   something regarding her?

11          MR. SCARPELLI:  If you want me to address that issue I

12   will.

13          THE COURT:  Briefly, yes.

14          MR. SCARPELLI:  I think that she should be excused.

15   We have several alternates, and quite frankly if the government

16   knew about this information when we were doing jury selection we

17   would have struck her, and, you know, I think it would have been

18   information that we're entitled to and it's just too close.  I

19   mean, this woman's daughter went to school with one of the

20   defendants' wife who is in the courtroom.

21          THE COURT:  Yes.

22          MR. SCARPELLI:  And we would have used one of our

23   strikes if we would have known that she knew, her daughter knew

24   Kim Glover.

25          THE COURT:  Okay.  Well, Mr. Martin?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                               67


1           MR. MARTIN:  I'd like to respond.  The concern here is

2    whether or not she can be objective.  She assured us that she
                          Page 63

2-20-08.txt

3     could.  She said that she wouldn't be swayed one way or the

4     other, she'd follow your directions, and for that reason, your

5     Honor, I think that we should give her the benefit of the doubt,

6     particularly in light of the fact that she was the one who came

7     forward and she was candid and I think that that says much about

8     her integrity, and for that reason we would ask the Court not to

9     strike her.

10          THE COURT:  Let me just take it under advisement.

11    There is no harm in lettiing her sit.  I don't want to have

12    juror problems, so I'm going to sit on it for a bit, if you

13    don't mind.  Just remind me later.

14          All right.  Do you have your next witness coming as

15    Bevington again?

16          Anything else for the defense?  I take it you all are

17    in agreement with Mr. Martin.

18          MR. DONOHUE:  Yes, your Honor.

19          MR. GILBERT:  Yes.

20          THE COURT:  Something else, Mr. Gilbert?

21          MR. GILBERT:  No, your Honor.  My client and I would

22    just like to use the men's room.

23          THE COURT:  Oh, no.  Let's talk about PCC.

24          MR. GILBERT:  Okay.  Thank you.  We'll be back in ten

25    minutes.

Jacqueline M. Sullivan, RPR
Official Court Reporter

68

1          (Recess taken at about 3:33 p.m.)

2          THE COURT:  Okay.

3          (Back on the record at about 3:45 p.m.)

2-20-08.txt

4          MR. MARTIN:  Your Honor, I don't know if you want to

5     go on the record at this point or if you want to wait until at

6     the end of the day.  You had asked me a question, it was either

7     this morning or yesterday morning, about witnesses who may have

8     appeal interest and may need an attorney.

9          THE COURT:  Yes.

10          MR. MARTIN:  I think I have the answer to that

11    question with respect to at least one of them.

12          THE COURT:  Sure.  I wanted to know go ahead.  We're

13    on the record.

14          MR. MARTIN:  I need to get an investigator anyway

15    because I don't remember the gentleman's name.  May I just step

16    out for a second?

17          THE COURT:  Yes.  This doesn't have to be on the

18    record, Jackie.

19          (Off record discussion had.)

20          THE COURT:  You may have a witness who may need an

21    attorney?

22          MR. MARTIN:  Yes.  Mr. Thomas Crossly unfortunately

23    has left before I could catch him in the hallway.  He's our

24    investigator and he advises me that with respect to the

25    contractor who was doing work on the house, the general

Jacqueline M. Sullivan, RPR
Official Court Reporter

69

1     contractor, his name is Elijah White, and he does have a penal

2     interest based on mine and Mr. Boykin's conversation with Mr.

3     Crossly.  It's pretty clear that he does.

4          THE COURT:  I don't understand what you mean by he has

5     a penal interest.  You're saying he's being paid cash?

2-20-08.txt

6          MR. MARTIN:  He may, during either direct or
7    cross-examination, have to reveal something that makes him
8    subject to prosecution either by the District of Columbia
9    government or the federal government.
10          THE COURT:  IRS-type stuff?
11          MR. MARTIN:  Yes.
12          THE COURT:  Perhaps we can -- his substance of his
13    testimony have anything to do with how he gets paid?  I mean,
14    this one is not going to hang us up.  It's wholly another matter
15    if he has some drug exposure.
16          MR. MARTIN:  No, no, no.  It's not drug exposure.
17          THE COURT:  He is a worker off the books, but he's
18    doing work in Glover's house, and so what's the relevance of his
19    testimony?
20          MR. MARTIN:  Well, the government I suspect is going
21    to mention that Mr. Glover had about $900 in his bedroom on the
22    19th of June 2007, and I suspect the government is going to say
23    that that is payment for the proceeds of the sales, and from the
24    defense perspective there's an explanation for that, and the
25    explanation is he was having work done in his house.  You'll see


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                           70


1    photos of drywall that's been knocked out.  There was work being
2    done in the bathroom, and this man insists on being paid cash
3    only, and that's what the cash was there for.
4          THE COURT:  Okay.  Well, can you think about this
5    before we have to worry about it?  If they declare that they
6    have absolutely no interest in cross-examining him about what he

2-20-08.txt

7    does with the cash, i.e., or whether he pays taxes on it, and

8    out of an abundance of caution you're correct, this may be one

9    where the government says who cares?  Another thing to think

10   about tonight.

11            MR. MARTIN:  Well, that's it.

12            THE COURT:  That's fine.

13            MR. SCARPELLI:  Just one other quick point, getting

14   back to the juror, and I just want you to, I don't know whether

15   I made myself clear, so I want you to understand why I would

16   have struck this woman.

17            One, when this woman goes back to deliberate, and I

18   don't know this, but there's the possibility she may think of

19   the ramifications of if I find Mr. Glover guilty I'm back in

20   that community, my daughter knows Ms. Glover, and I also have

21   another point, which is that we're going to see a search warrant

22   for 47 Randolph Street, which is the home of Kim Glover, and I

23   don't know, I'm not in that position, but I would have struck

24   her for both of those reasons.

25            THE COURT:  I understand.  I've taken it under


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              71


1    advisement.  I'll be able to think more clearly about it when I

2    have a few more discussions about a few other things.

3            Okay.  Get your next witness in and let's bring the

4    jury back.  The weather is starting to -- marshals, have you

5    heard the weather forecast?  You're always better at this than

6    I.  Is it supposed to accumulate a half an inch or a quarter in?

7            MARSHAL:  I don't know, your Honor.

8            THE COURT:  Sir, have a seat.
                            Page 67

2-20-08.txt

 9                (Jury enters courtroom at about 3:58 p.m.)

10                THE COURT:  Thank you, ladies and gentlemen.  Please

11     be seated.

12                Swear the witness.

13                COURTROOM DEPUTY:  Please raise your right hand, sir.

14     Did you solemnly swear that the testimony you should give the

15     Court and the jury in the case now on trial will be the truth,

16     the whole truth and nothing but the truth so help you God?

17                MR. ERVIN:  I do.

18                COURTROOM DEPUTY:  Thank you, sir.  You may be seated.

19                THE WITNESS:  Thank you.

20           TIM ERVIN, WITNESS FOR THE GOVERNMENT, SWORN

21                       DIRECT EXAMINATION

22     BY MR. HAN:

23     Q.   You can be seated.  Oh, you are seated.  I had to say that.

24                THE COURT:  Is this supposed to be a joke?

25     BY MR. HAN:

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    72


 1     Q.   Good afternoon.

 2     A.   Good afternoon.

 3     Q.   Please tell us your name for the record.

 4     A.   Tim Ervin.  My last name is spelled E-r-v-i-n.  My first

 5     name is Tim, T-i-m.

 6     Q.   Where do you work?

 7     A.   I'm a special agent here with the FBI here in Washington.

 8     Q.   How long have you been with the FBI?

 9     A.   Sixteen years.

                               Page 68

2-20-08.txt

10    Q.    On January 4th, 2007 did you assist in a controlled buy

11    operation from a person named James Parker?

12    A.    I did.

13    Q.    What was your role in that operation?

14    A.    My role was to participate in the surveillance during the

15    attempted transaction.

16    Q.    Did your surveillance take you to the Home Depot in

17    Washington, D.C.?

18    A.    Yes, it did.

19    Q.    Ann if I could have the Elmo on, please.  I'm putting on

20    the screen Government's Exhibit 1000.P2, which has already been

21    admitted into evidence.  What are we looking at there?

22                THE COURT:  Home Depot.

23                MR. HAN:  Home Depot.

24                THE COURT:  We've already looked at it.

25    BY MR. HAN:


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    73


1    Q.    Were you at this Home Depot on January 4th, 2007?

2    A.    Yes, I was.

3    Q.    Tell us what happens at 5:52 p.m., what do you see?

4    A.    At 5:52 p.m. I see Mr. Parker walk over to a vehicle in

5    which an FBI informant was seated.  Mr. Parker spoke for a

6    couple minutes to the informant through the driver's side

7    window.  I then saw Mr. Parker return to his vehicle and both

8    Mr. Parker and the informant drove out of the area.

9    Q.    Later that night did you see Mr. Parker again at the

10    McCombo Lounge?

11    A.    Yes, I did, outside of that establishment.

2-20-08.txt

12    Q.   I'm showing you Government's Exhibit 1000.P3.  Did you have

13    visual site of Mr. Eugene McClellan, the cooperating witnesses?

14    A.   Yes, I did.

15    Q.   And where was he?  Was he parked?  Was he inside of a

16    house?

17    A.   He was again in the vehicle, the same vehicle I mentioned

18    earlier, and he was at this intersection which is the

19    intersection of Georgia and Jefferson Street Northwest.  His

20    vehicle -- the McCombo Lounge is at the south east corner of the

21    intersection.  The informant's vehicle was parked at the curb on

22    the northeast side of the intersection.  You can't see that

23    portion of the intersection in this photo.

24    Q.   Would that be to where my finger is at, in that direction?

25    A.   A little further north.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              74


1          MR. HAN:  Your Honor, may the record reflect my finger

2    is on the far left side of the picture?

3          THE COURT:  Okay.  Along Jefferson Street correct, is

4    that south, the south side of Jefferson or the north?  I'm

5    sorry.

6    BY MR. HAN:

7    Q.   Is my finger on the north side of Jefferson Street, north

8    side of Georgia Avenue?

9    A.   Georgia is north/south and Jefferson is east/west.

10          THE COURT:  Is that the west side that his finger is

11    on, or the east?

12          THE WITNESS:  His finger is still at the southeast

                              Page 70

2-20-08.txt

13  corner of the intersection, and the informant's car was actually

14  at the northeast corner.

15  BY MR. HAN:

16  Q.   At 7:21 p.m. tell us what you see.

17  A.   I again see Mr. Parker again approaches the informant's

18  car.  They have a brief discussion.  I then see Mr. Parker

19  walking south down Georgia on the east side of the street and I

20  see him enter a black Tahoe which is parked at the curb on the

21  east side of the street.

22  Q.   Just take a step back.  About how long was Mr. Parker

23  talking at the side of the cooperating witness' car?

24  A.   It was only about a minute.

25  Q.   During that time period did he get in?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              75


1   A.   No, sir.

2   Q.   Then you said he went where from there?

3   A.   He walked south on Georgia staying along the east side of

4   the street until he entered the passenger side of a dark-colored

5   Tahoe which was parked at the curb on the east side of the

6   street.

7   Q.   I'm showing you what's been marked and entered into

8   evidence already as Government's Exhibit No. 1210.  Do you see

9   the vehicle in that picture?

10  A.   Yes, sir.

11  Q.   And how does that vehicle compare to the vehicle that James

12  Parker went into after leaving the vehicle Mr. McClellan's car?

13  A.   It also looks like a dark Tahoe, which is the vehicle

14  description that I gave for that evening.

2-20-08.txt

15    Q.   Were you able to see the license plate of the dark Tahoe at

16    the McCombo's Lounge?

17    A.   Yes, I was.

18    Q.   Do you remember it off the top of your head?

19    A.   No, I don't.

20    Q.   Is there anything that would record it accurately?

21    A.   I had some notes from the evening in which I wrote the

22    plate number down.

23              MR. HAN:   For identification purposes only I'm showing

24    the witness Government's Exhibit 1000.4.

25              THE COURT:   This is just to see if it refreshes his


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                              76


1     recollection.

2               MR. HAN:   Recorded recollection, your Honor.

3               THE COURT:   Well, are you trying to put it into

4     evidence as recorded recollection, or are you refreshing his

5     recollection?   There actually is a difference.

6               MR. HAN:   Recorded recollection, so he will --

7               THE COURT:   You're then offering this into evidence.

8     1004.4.   I don't think it's necessary.   We already know what the

9     license plate is.

10              MR. HAN:   May we approach, your Honor?

11              THE COURT:   Yes.

12              Sorry, ladies and gentlemen.   Excuse me.

13              (Bench conference as follows):

14              THE COURT:   1004, there is an evidentiary issue that

15    you haven't laid the foundation if you want to move that into

2-20-08.txt

16    evidence, but I don't know why you want to.

17         MR. HAN:  My understanding is this, your Honor:  His

18    notes will not bring back his independent recollection of the

19    license plate, it's just too long, but he did record it

20    accurately, so what I intend to do, my understanding is that if

21    I show him the notes he's recorded the license plate, he can

22    read the license plate number and that goes into evidence but

23    the paper does not.  That's my understanding of how it works.

24         THE COURT:  That may be.  He has to establish that he

25    wrote it, it was contemporaneously, etcetera, with seeing it.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              77


 1    Does anyone have any --

 2         MR. GILBERT:  It's only one piece of paper.

 3         THE COURT:  He's not even offering it.  He's only

 4    going to let him read it off the paper.  That's my

 5    understanding.

 6         MR. HAN:  That's my understanding.

 7         THE COURT:  Which I don't have the rule in front of

 8    me, but my recollection, my recollection is that you have to

 9    show that it was contemporaneous and make sure it was accurate

10    and that this is -- what was the other one?

11         MR. GILBERT:  They had a reason to record it

12    accurately.

13         THE COURT:  Yes.  So all he's going to do it get the

14    license plate in.  This is the first time anybody has ever

15    admitted it would refresh his recollection.

16         MR. GILBERT:  We'd rather have that in evidence.  I

17    think I'd rather have that in the evidence.
                         Page 73

2-20-08.txt

18          THE COURT:  He's not offering to put that in, other

19   than reading it off the piece of paper.

20          MR. DONOHUE:  So he's going to look at it?

21          THE COURT:  That's it for the document.  In other

22   words, it will become evidence orally, not by a document.  He's

23   not offering the document itself.  He wants to be able to have

24   him read it.

25          MR. GILBERT:  I don't have a problem with that.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              78


1          THE COURT:  Fine.  I understand that, so I think it's

2   okay.  We're all ready.

3          (Of bench conference.)

4   BY MR. HAN:

5   Q.   When you saw the license plate number of the black truck

6   did you write that down anywhere?

7   A.   Yes, I did.

8   Q.   And where did you write it down?

9   A.   In my notes.

10   Q.   And when you wrote it down did you write it accurately?

11   A.   Yes, sir.

12   Q.   And about how soon or what time frame after looking at the

13   truck did you write these notes?

14   A.   It was my notes were taken contemporaneously with what was

15   occurring before me.

16   Q.   I'm showing you Government's Exhibit 1000.4 for

17   identification purposes only.  Are you able look through and

18   tell me -- well, first tell me the handwriting in that exhibit,

2-20-08.txt

19     what is that handwriting?

20     A.   These are my notes from January 4th, 2007.  This is my

21     handwriting.

22     Q.   Please tell us if you see the license plate that you wrote

23     down.

24     A.   The license plate I wrote down for the dark Tahoe is 865 M

25     as in Mike 412.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                            79



1      Q.   I'm putting on the screen Government's Exhibit 1211, which

2      has already been admitted into evidence.  Can you see the

3      license plate on the screen?

4      A.   It is the same 465 M as in Mike 412.

5      Q.   I'm showing you summary chart labeled 1000.6 and I'm going

6      to refer you to the two red boxes, one box with notation 5:22

7      p.m. and the other red box with a notation 7:21 p.m. and ask if

8      that is accurate according to your testimony.

9      A.   Yes, it is.

10          MR. HAN:  At this time the government would move into

11     evidence summary chart number 1000.6.

12          THE COURT:  This is the pen register?

13          MR. HAN:  Yes.

14          THE COURT:  Any objection?  All right.  1000.6 is

15     admitted.  This is the pen register for Mr. Suggs' cell for that

16     day?

17          MR. HAN:  Yes.

18          (Government Exhibit No. 1000.6 is admitted into

19          evidence at about 4:10 p.m.)

20          THE COURT:  What page again?

2-20-08.txt

21              COURTROOM DEPUTY:  45, Judge.

22              THE COURT:  Thank you.

23    BY MR. HAN:

24    Q.   I'm just going to refer you to the two items that you

25    marked, and I'll explain the rest in closing.  Under 5:52 p.m.,

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    80

1     could you read that notation in there?

2     A.   It says Parker at Home Depot.

3              THE COURT:  I'm sorry.  Is that based on a pen

4     register or that is based on something else?  How could the pen

5     register tell you that?

6              MR. HAN:  The 5:52 in red and 7:21 is based on

7     witness' testimony.  All the other information is pen register

8     information testified to by Agent Pardee earlier.

9              THE COURT:  Okay.

10    BY MR. HAN:

11    Q.   And the 7:21, can you read the notation there?

12    A.   Parker at McCombo's Lounge.

13    Q.   And the other items that you see, the 7:14 Suggs calls

14    Parker, that's not part of your testimony?

15    A.   No, sir.

16              MR. HAN:  No further questions, your Honor.

17              THE COURT:  Can you leave that up on the Elmo?  Let's

18    see it.  Could you bring it down a little so you can see?  Is

19    there more?  This is one day's pen register only, though.  To

20    get it clear, you only picked out the calls between Parker and

21    Suggs, that's what's here, it's not everything?

                              **Page 76**

2-20-08.txt
22          MR. HAN:  That's correct.  This is only pen register

23     information between Suggs and Parker on this day, which are the

24     gray boxes, and the red boxes refers to the agent.

25          THE COURT:  And just one other clarifying question.


                          Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                81


1      Some of them say, it says Suggs calls Parker and sometimes it

2      says Parker calls Suggs.

3          MR. HAN:  I think the testimony was that this

4      information is from Mr. Suggs' pen register.

5          THE COURT:  I haven't seen the underlying data, but it

6      goes both ways, because that's all I'm trying to understand.  In

7      other words, it will be reflected incoming call and outgoing

8      call on the pen register.  The jury needs to know that.

9          MR. DONOHUE:  Yes, but just for Mr. Suggs' phone.

10         THE COURT:  I know that.  But I'm saying that pen

11     register data -- I'm just trying to clarify this for

12     everybody -- reflects an incoming call to number 578-1010 and it

13     will reflect an outgoing call from 578-1010 to another number?

14         MR. DONOHUE:  Correct.

15         THE COURT:  So you're getting both sides of the

16     transaction regardless of who initiates it.

17         MR. HAN:  Yes.

18         THE COURT:  I don't disagree with that.  I just want

19     -- pen register data is different.  Not everybody is familiar

20     with it.  I understand.  And all they're doing is taking the pen

21     register data from Suggs' phone, so if Parker's is making 47

22     other calls it's not going to be on here.  I understand and I

23     think the jury does too, right?  It's only on Mr. Suggs' cells

                                Page 77

2-20-08.txt

24      that the pen register is running.  Okay.

25              MR. GILBERT:  Thank you, your Honor.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              82


1                       CROSS-EXAMINATION

2       BY MR. DONOHUE:

3       Q.   Good afternoon, special agent.

4       A.   Good afternoon, sir.

5       Q.   Now, you don't know, you don't know who was driving the

6       Tahoe, correct?

7       A.   No, sir, I don't.

8       Q.   And you obviously didn't overhear anything that took place

9       in the Tahoe, correct?

10      A.   No, sir, I did not.

11      Q.   You don't know that any transaction took place in that

12      Tahoe, correct?

13      A.   No, sir, I don't.

14      Q.   And could you visually, could you see Parker get out of the

15      Tahoe?

16      A.   Yes.  I could see Parker get out of the Tahoe.  The Tahoe

17      was at the curb.  It drove forward and Parker got out of the

18      Tahoe very close to where the informant's 's car was.  I could

19      see that.

20      Q.   And you agree with me that you don't report in your notes

21      that Parker is carrying anything, correct?

22      A.   That's correct.

23      Q.   Thank you, agent?

24      A.   Yes, sir.

                        Page 78

25          CROSS-EXAMINATION


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

    1    BY MR. MARTIN:

    2    Q.    Good afternoon, agent.

    3    A.    Good afternoon.

    4    Q.    With respect to Mr. Parker and Mr. Ernest Glover you're not

    5    aware of the calls between the two of them, are you?

    6    A.    No, sir.  I don't have any idea if there are or not.  I

    7    don't know.

    8    Q.    You were involved in that investigation, right?

    9    A.    Very small role.

   10    Q.    Did you review any telephone transcript before testifying

   11    here today?

   12    A.    No, sir.

   13          MR. MARTIN:  Nothing further, your Honor.

   14          MR. HAN:  Object, your Honor.

   15          THE COURT:  That's moot.  Sir, all right, thank you,

   16    sir.  You may step down.

   17          THE WITNESS:  Thank you.

   18          THE COURT:  Next witness.

   19          MR. HAN:  Detective Muldoo, your Honor.

   20          THE COURT:  Okay.

   21          COURTROOM DEPUTY:  Ma'am, please raise your right

   22    hand.  Do you solemnly swear that the testimony you should give

   23    the Court and the jury in the case now on trial will be the

   24    truth, the whole truth and nothing but the truth so help you

   25    God?

2-20-08.txt
Jacqueline M. Sullivan, RPR
Official Court Reporter

84

1              MS. MULDOON:  I do.

2              COURTROOM DEPUTY:  You may be seated, ma'am.

3              THE WITNESS:  Thank you.

4         COLLEEN MULDOON, WITNESS FOR THE GOVERNMENT, SWORN

5                       DIRECT EXAMINATION

6    BY MR. HAN:

7    Q.   Good afternoon.

8    A.   Hi.

9    Q.   Can you please tell us your name on spell your name for the

10   record?

11   A.   Corporal Colleen Muldoon, C-o-l-l-e-e-n M-u-l-d-o-o-n.  I'm

12   with the Prince Georges County police department.

13   Q.   What do you for the Prince Georges county police

14   department?

15   A.   At this present time I'm assigned to our major narcotics

16   division.  I've been in our -- I've been in the narcotics

17   division for 17 years now.

18   Q.   How long in total have you been a police officer?

19   A.   Over 19.

20   Q.   Did you take part in a search warrant at 9001 Breezewood

21   Terrace, number 103, Greenbelt, Maryland?

22   A.   Yes, I did, sir.

23   Q.   And that occurred on May 31st, 2007?

24   A.   Yes, sir.

25   Q.   What was your role in the execution of that search warrant?

2-20-08.txt

1    A.    I obtained the affidavit from our states attorneys office

2    in the courthouse and then I was there present during the

3    execution of the search warrant.  I was the one who photographed

4    any of the evidence that was recovered and then I have seized

5    each item of the evidence.

6    Q.    I'm showing you what's been marked for identification

7    purposes as Exhibit P200.1.  And I ask if you recognize that.

8    A.    Yes, sir.  That's a diagram that I did of the apartment of

9    9001 Breezewood Terrace, Apartment 103.

10   Q.    Does it fairly and accurately show the apartment?

11   A.    It's not to scale, but it's basically like a draft.  Yes,

12   it does fairly and accurately show exactly where each of the

13   rooms are, but it's not to scale.

14   Q.    That's 200.P1.

15         COURTROOM DEPUTY:  It's 200.P1?

16         THE COURT:  P says it's a photograph.

17         MR. HAN:  It's a diagram.

18         THE COURT:  Any objection to the diagram 200.P1?

19   Admitted.  We'll change it again.  The index calls it a photo.

20         (Government Exhibit No. 200.P1 was admitted into

21         evidence at about 4:17 p.m.)

22   BY MR. HAN:

23   Q.    On the screen we see the diagram and in the bottom right-

24   hand corner was that labeled -- what type of room was this?

25   A.    That is a bedroom, and that's in my property.  That's where

2-20-08.txt

1    I labeled it as bedroom number one.

2    Q.   Did you find any mail in bedroom number one?

3    A.   Yes, sir.

4    Q.   Who was that mail addressed to?

5    A.   That was James Parker's bedroom, or his mail in there was

6    James Parker.

7    Q.   I'm showing you the top right-hand corner, bedroom number

8    two.  Did you find any mail in that room?

9    A.   Yes, sir.

10   Q.   And who was that addressed to?

11   A.   That was Mark Renfroe.

12   Q.   How many bedrooms in total were in this apartment?

13   A.   There were two bedrooms.

14   Q.   I'm showing you a binder of photographs labeled 200.P2, P3,

15   P4, P5, P6, P7, P8, P9, P10, P11, P12, P13, P14?

16        THE COURT:  Are you going all the way to the end, or

17   are you going to actually --

18        MR. HAN:  P15, 16, 17, 18, 19, 20, 21, 22, 23.

19        THE COURT:  Any objection to P1 through 24?

20        MR. GILBERT:  No, your Honor.

21        THE COURT:  Okay, they're in.  Publish them if you'd

22   like.

23        (Government Exhibit Nos. P1-P23 were admitted into

24         evidence at about 4:19 p.m.)

25   BY MR. HAN:

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-20-08.txt

1    Q.    Showing you Government's Exhibit No. 200.P2, who are we
2    looking at here?
3    A.    That is James Parker.
4    Q.    And what time did you execute the search warrant?
5    A.    We executed the search warrant approximately ten o'clock in
6    the evening, p.m.
7    Q.    Was he present when you executed the search warrant?
8    A.    Yes, sir.
9            THE COURT:  P.m. or a.m.?  P.m.?
10           THE WITNESS:  P.m.  I'm sorry, ma'am.
11   BY MR. HAN:
12   Q.    What are we looking at here?
13           THE COURT:  Baking soda.
14           THE WITNESS:  Next to the baking soda there is two
15   bottles which contained phencyclidine, otherwise known as PCP.
16   Both of those were seized as evidence.
17   Q.    What room was this taken in?
18   A.    These were found in the kitchen.
19   Q.    200.P4, what is this?
20   A.    These items were found just as you see them on a bench in
21   the kitchen, and what you see here is it's a plate that had some
22   residue on it and then these are quarter-ounce bottlecaps, and
23   in the box is quarter-ounce bottles.  They're very small clear
24   bottles.
25   Q.    P5?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        88



1    A.    This is a picture from looking into the freezer, the
2    refrigerator.  These are two bottles that contain residue,
                              Page 83

2-20-08.txt

3    phencyclidine residue inside.

4    Q.   What is this?

5    A.   This is the refrigerator itself with the door opened to

6    give you a different view of the two bottles that were

7    recovered.

8    Q.   That was in the door of the freezer?

9    A.   Yes, sir.

10   Q.   What's P7?

11   A.   This is a tray of a green leafy substance.  It was seized

12   because it was a green leafy substance.  We basically just

13   seized it because it could be used as a matter for someone to --

14   as a medium --

15            MR. MARTIN:  Objection.

16            THE COURT:  I think so.  I'm not ...

17            MR. MARTIN:  Sorry for not standing.  Objection.

18            MR. HAN:  That's fine.  I'll move on, your Honor.

19            THE COURT:  All right.

20   BY MR. HAN:

21   Q.   What was inside the --

22            THE COURT:  Sustained.

23   BY MR. HAN:

24   Q.   Describe.  Don't tell me why you seized it.

25   A.   It was a green leafy substance.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              89



1    Q.   All right.

2            THE COURT:  That in the tin is a green leafy.

3            THE WITNESS:  Yes, ma'am.  It's one on top of the

                              2-20-08.txt
4    other.

5              THE COURT:  What's on the top, though?

6              THE WITNESS:  It's another tin.  It's a smaller tin

7    like a baking tin, and then the bottom one is containing the

8    green leafy substance.

9              THE COURT:  All right.  Okay.  But not the top one?

10             THE WITNESS:  No.  It's just laying on top of the

11   substance.

12             THE COURT:  Okay.

13   BY MR. HAN:

14   Q.   The wooden board above the silver tins, what is that?

15   A.   That's the bench, so that it was like sitting underneath

16   the bench the tin wood, so that's the bench in the kitchen table

17   for the kitchen table, a seating bench.

18   Q.   Could you open that bench?

19   A.   Yes, sir.

20   Q.   What are we looking at here in P8?

21   A.   Once you open up the bench, as you see there is a scale,

22   there is a funnel, and there are some more glass bottles of

23   quarter ounce -- I'm sorry.  Quarter-ounce bottles with the

24   lids.

25   Q.   Is there any mail matter or mail in this bench, do you


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter
                                                                90


1    recall?

2    A.   I think -- no, I don't recall on that one.

3    Q.   Looking at P9, particularly where my pen is pointing at,

4    what are we looking at here?

5    A.   This is a particular picture in the closet in bedroom

2-20-08.txt

6 number one, which is James Parker's closet, and it's a small

7 class bottle found on the closet shelf.

8 Q. Is there any smell coming from this bottle?

9 A. Yes.  It has suspected phencyclidine inside.

10 Q. P.10?

11 A. This is again another glass bottle recovered from

12 underneath the bed in bedroom number one, James Parker's

13 bedroom, and again it did have some green leafy substance and

14 was possible phencyclidine on it.

15 Q. P11?

16 A. This bottle was recovered from on the bed stand next to Mr.

17 James Parker's bedroom, and it has the green leafy substance

18 with suspected PCP.

19 Q. P12?

20 A. The silver -- did you want to point to it?  It was

21 recovered from on top of James Parker's bed in his bedroom.

22 It's a tin foil with suspected PCP residue with on some green

23 leafy substance.

24 Q. P13?

25 A. This board was top of the box was recovered from a bin

Jacqueline M. Sullivan, RPR
Official Court Reporter

91

1 beside the bed in bedroom number one, James Parker's bedroom.

2 It has viles in it with a green leafy substance with suspected

3 PCP as well as some marijuana.

4 Q. How many viles are in this photo?

5 A. In this photo there are three viles.

6 Q. I'm showing you P14.  How does this picture compare with

Page 86

2-20-08.txt

7     the previous picture?

8     A.   It has an additional three extra viles.  You have a half-

9     ounce one, on the half-ounce bottle on the top, and an

10    additional two quarter-ounces.  Those were also recovered within

11    the bin and they were just taken with all of it together that we

12    found all this stuff in one bin.

13    Q.   Can you explain why P13 has three bottles but P14 has six

14    bottles?

15    A.   When the officer pulled this top part of the box out he

16    thought that they might have dropped them as he was moving

17    things around so it was just matter we just put the other ones

18    back in the bench, but they were all found in the same location.

19    Q.   P15?

20    A.   This is a like a cigarette but it was made for like with

21    Tops papers.  You use them for smoking the PCP.  This was found

22    in the kitchen on top of the microwave.

23    Q.   Who is this in P16?

24    A.   This is Mark Renfroe.

25    Q.   Was there any other people besides Mark Renfroe and James

Jacqueline M. Sullivan, RPR
Official Court Reporter

92

1     Parker present in the apartment when you executed the search

2     warrant?

3     A.   Mark Renfroe was walking out of the apartment but James

4     Parker was inside when we executed.

5     Q.   Is there anyone else there?

6     A.   There was another individual leaving with Mark Renfroe.

7     Q.   P17, what room was this picture taken?

8     A.   This is recovered from bedroom number two, Mark Renfroe's

2-20-08.txt

9    bedroom.  It was down by the T.V. set.  It's marijuana seeds and

10   some marijuana in the plastic bag.

11   Q.   And what room is this P18?

12   A.   This is also in bedroom number two, Mark Renfroe's bedroom.

13   You could see the scale, and then in the shoes next to it

14   there's a bluing in the top there and that's where we recovered

15   PCP and cyclidine in the shoe.

16   Q.   P19?

17   A.   This is an Adidas bag which was recovered from underneath

18   the bed in Mark Renfroe's bedroom, bedroom number two, and

19   inside there we recovered marijuana.

20   Q.   P20?

21   A.   And that is the marijuana that was pulled out of that same

22   bag.

23   Q.   P21?

24   A.   This is money that was recovered from bedroom number two,

25   Mark Renfroe's bedroom.  It was hanging in his closet in a suit

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    93


1    jacket.

2    Q.   Do you remember how much that was?

3    A.   I believe it was $2,000.  If I could look at my notes that

4    would be great.

5    Q.   I'm showing you what's been marked for identification

6    purposes only as 200.D2.

7               THE COURT:  This was found in Renfroe's?

8               THE WITNESS:  Yes, ma'am.

9    BY MR. HAN:

2-20-08.txt

10   Q.   What is the 200.D2 that I just handed you?

11   A.   I'm sorry, sir.  This is my report of investigation.

12   Q.   Review your report, and, you know, when you're done just

13   look up.

14   A.   Yes, sir.  It's going to be $2,000.

15   Q.   This is 200.P22.

16   A.   Yes, sir.  This was money that was recovered in Mark

17   Renfroe's bedroom in the closet from one of his jackets, and

18   that total was $1,995.

19   Q.   Finally, 200.P23.

20   A.   Okay.  That A&W rootbeer can was recovered from the kitchen

21   and it's a false compartment.  You just open it up and it's a

22   false compartment that you can hide things in.

23   Q.   Now, were the items that we saw, that we viewed in the

24   photographs, recovered?

25   A.   Yes.

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                          94


1            MR. HAN:  With agreement of defense counsel I'm going

2   to move en mass many, many exhibits.

3            THE COURT:  Tell us the numbers, please.

4            MR. HAN:  Exhibit 200.E2, 200.E3.

5            THE COURT:  Wait a minute.  200.E2, not 12, right?

6            MR. HAN:  2.

7            THE COURT:  2.  I don't know.  You just show them as

8   you're doing it, and that's the end of it unless you have

9   something that you want to say.  I mean, these are now the

10   actual objects that appeared in the pictures, so unless there's

11   some reason, it seems to me just publish them.  Okay.  P2 is the

2-20-08.txt

12    heat-sealed bag.  This came from the kitchen.

13                MR. HAN:  Yes.

14    BY MR. HAN:

15    Q.   I'm handing you 200.E2.  Can you tell us, let me ask, these

16    items that you recovered, were they given a unique number for

17    identification purposes?

18    A.   Yes.  Each item that I recovered, I did give them each an

19    individual number, and the drugs were a D number and this just

20    happened to be 2D.

21    Q.   D for drugs?

22    A.   Yes.

23    Q.   And as I hand these to you just please tell me the item

24    number and the room that they were located.

25    A.   Okay.  This is D2, and this was found in the kitchen above

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                     95

1     the dishwasher in the cabinet.

2                 THE COURT:  That one has been admitted, D2.  What's

3     your next one?  Right?  I assume that all the objects you've

4     seen, and there are no objections going all the way around, so

5     next one.

6     BY MR. HAN:

7     Q.   200.E3, what is that?

8                 THE COURT:  Admitted.

9                 (Government Exhibit No. 200.E3 admitted into evidence

10                at about 4:32 p.m.)

11    BY MR. HAN:

12    Q.   Item number and the location?

2-20-08.txt

13   A.   3D, and this is an item that was recovered in the kitchen

14   above the dishwasher and the cabinet, along with D2.

15   Q.   I'm showing you E4, the item number on the location?

16   A.   E4 is the plate that was recovered, had the PCP residue on

17   it and it was recovered in the kitchen on the bench.

18           THE COURT:  It's admitted, E4.

19           (Government Exhibit No. E4 was admitted into evidence

20           at about 4:33 p.m.)

21   BY MR. HAN:

22   Q.   I'm showing you 200.E5.  The item number and location?

23   A.   D5, D5 is two 16-ounce bottles, jar bottles, that were

24   recovered in the freezer with the phencyclidine residue.  It's

25   wrapped in bundle wrap for protection.


                            Jacqueline M. Sullivan, RPR
                              Official Court Reporter

                                            96


1   Q.   200.E6?

2   A.   This is 6.  This is a quarter-ounce vile with suspected

3   phencyclidine an a green leafy substance, and this was also

4   recovered in the freezer.

5           THE COURT:  6 is in, E6.  That's from the freezer?

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  Okay.

8           (Government Exhibit No. E6 was admitted into

9           evidence at about 4:34 p.m.)

10   BY MR. HAN:

11   Q.   200.E7?

12           THE COURT:  Admitted.

13           (Government Exhibit no. 200.E7 is admitted into

14           evidence at about 4:34 p.m.)

2-20-08.txt

15          THE WITNESS:  D7 is a funnel that was recovered in the

16   kitchen inside the bench.

17   BY MR. HAN:

18   Q.   200E8?

19   A.   D8 is a quarter-ounce vile that was recovered on the -- in

20   bedroom number one, James Parker's bedroom, on the shelf.

21          THE COURT:  8 is admitted.

22          (Government Exhibit No. 200E8 is admitted into

23          evidence at about 4:34 p.m.)

24          THE WITNESS:  D8.

25          THE COURT:  You're saying D8?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              97


 1          THE WITNESS:  D8.

 2          THE COURT:  It's coming in as 200E as in elephant.

 3          MR. HAN:  The Government's Exhibit number is the E

 4   number the D number is the Prince Georges County.

 5          THE COURT:  I understand.

 6          MR. HAN:  Government's Exhibit No. 200E9.

 7          THE COURT:  Admitted.

 8          (Government Exhibit No. 200E9 was admitted into

 9          evidence at about 4:35 p.m.)

10          THE WITNESS:  This is going to be my 9D, and this is a

11   quarter-ounce vile with a green leafy substance in it.  This was

12   recovered under the bed in bedroom number one, in James Parker's

13   room.

14   BY MR. HAN:

15   Q.   200E10?

                          Page 92

2-20-08.txt

16    A.   This is my D10, and this vile is a quarter-ounce vile with

17    the green leafy substance, and it was recovered beside the bed.

18    Q.   200E12?

19    A.   12D is approximately -- oh, I'm sorry.  It's phencyclidine.

20    It's the aluminum foil that was wrapped.  It was recovered on

21    the bed in bedroom number one, James Parker's bedroom.

22              THE COURT:  10, 11 and 12 are in.

23              COURTROOM DEPUTY:  11, he didn't mention 11.

24              THE COURT:  Didn't offer 11.  I'm sorry.

25              MR. HAN:  There is no 11.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              98


1              THE COURT:  I'm sorry.  So it goes from from 10 to 12.

2              (Government Exhibit Nos. 200E 10 and 12 were admitted

3              into evidence at about 4:36 p.m.)

4              THE WITNESS:  This is my D14, and this was recovered

5    in -- this is suspected marijuana.  That was recovered in the

6    bin besides James Parker's bed in bedroom number one.

7              THE COURT:  He didn't mention 13?

8              COURTROOM DEPUTY:  No.

9    BY MR. HAN:

10    Q.   Let me put it on the Elmo so we can follow along perhaps

11    these better.  The summary Exhibit 200.D5 which has already been

12    entered into evidence, E15, 200E15.

13    A.   These were the viles that were recovered, I'm sorry, this

14    is 15D.  These were the items, the viles that were recovered

15    inside the bin besides James Parker's bed in bedroom number one.

16    Q.   200E16?

17    A.   This is the cigarette, the phencyclidine cigarette rolled

                              Page 93

2-20-08.txt

18    that was on top of the microwave in the kitchen.

19    Q.    200E17?

20    A.    This is my D17.  This is the green leafy substance that was

21    recovered in the kitchen underneath the bench.

22    Q.    200E19?

23    A.    This is -- I'm sorry.  This is my 19D, and this was

24    recovered.  This is marijuana that was recovered in Mark

25    Renfroe's bedroom by the television set.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                                99


1    Q.    200E20?

2    A.    I'm sorry.  This is D20.  This is the marijuana seeds that

3    was recovered in Mark Renfroe's bedroom, bedroom number two, by

4    the television set.

5    Q.    200E21?

6    A.    This is the phencyclidine, four ounce, four one-ounce

7    bottles that was recovered in Mark Renfroe's bedroom in the shoe

8    in the closet in bedroom number two.

9    Q.    Do you recall whether it was actual liquid in this bottle?

10    A.    Yes, there was liquid in it.

11    Q.    That was Government's Exhibit E21.  Government's Exhibit

12    E22?

13    A.    Okay.  This is my D22, and it's marijuana that was

14    recovered from Mark Renfroe's bedroom in bedroom number two on

15    the closet shelf.

16    Q.    Government's Exhibit I23?

17    A.    This is my D23.  This is the marijuana that was recovered

18    from underneath Mark Renfroe's bedroom, underneath Mark

                            Page 94

2-20-08.txt

19    Renfroe's bed in his bedroom, bedroom number two.

20    Q.   Government's Exhibit No. E25.

21    A.   This is my D25.  It's green -- it's plastic bags with a

22    green leafy substance in it, and this was recovered in the bench

23    in the kitchen.

24    Q.   Government's Exhibit E26?

25    A.   Okay.  This is my D26.  These are five viles with a green

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                               100


1     leafy substance, and it was recovered in the bench in the

2     kitchen.

3     Q.   Finally, Government's Exhibit E36.

4     A.   Okay.  This is my item number 11P.  This is the A&W

5     rootbeer can that was pictured earlier with the false

6     compartment.

7     Q.   Would you take it out of the bag and show the ladies and

8     gentlemen of the jury how that would work?

9     A.   It just looks like the top.

10             MR. HAN:  No further questions, your Honor.

11             THE COURT:  Do you know how long you might be, Mr.

12    Donohue?

13             MR. DONOHUE:  I have no questions.

14             MR. MARTIN:  Mr. Glover has no questions.

15             MR. GILBERT:  I just have a few.

16             THE COURT:  Okay.  I think we'll finish this witness

17    and that will be the end of the day.

18             Mr. Gilbert?

19                      CROSS-EXAMINATION

20    BY MR. GILBERT:

2-20-08.txt

21    Q.    The money was in Mark Renfroe's bedroom?

22    A.    Yes, sir.

23    Q.    And I understand that the money was, there was $2,000 and

24    then there was another one hundred dollars, I'm sorry, $1,995?

25    A.    And then there was an additional money recovered from Mark

Jacqueline M. Sullivan, RPR
Official Court Reporter

101

1    Renfroe off his person.

2    Q.    How much did he have on his person?

3    A.    Let's see.  $518.

4    Q.    So Mr. Renfroe has $4,500 if you count what's in his

5    bedroom and what's on his person?

6    A.    Approximately, sir.

7    Q.    How much did you take off Mr. Parker?

8    A.    None.

9    Q.    Who was the person with Mr. Renfroe leaving the apartment?

10   A.    I believe his name was Larry Richards.

11          MR. GILBERT:  Thank you.  I don't have any further

12   questions, your Honor.

13          THE COURT:  Anything else?

14          MR. EARNEST:  Nothing, your Honor.

15          JUROR IN SEAT 10:  Can I have the witness just spell

16   her name?

17          THE WITNESS:  Colleen Muldoon, M-u-l-d-o-o-n.

18          THE COURT:  Thank you.  You may step down.  Thank you.

19          (Witness excused at about 4:44 p.m.)

20          THE COURT:  At this time we will, if there's nothing

21   further for counsel, I'm going to excuse the jury at this time.

2-20-08.txt

22          Ladies and gentlemen, tomorrow again we will commence

23    breakfast at 9:00.  9:30.  We will go until about four o'clock

24    so that nobody misses anything, and Friday morning I'll discuss

25    Friday afternoon with you.  You are available Friday afternoon,


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                102


1     that's not a problem, but for Friday morning we'll be off, but

2     we'll remind you about that tomorrow.  Tomorrow at 9:30 at the

3     latest and we'll conclude about about 4:00.  Thank you.  We're

4     moving a lot more efficiently than I expected so don't despair

5          (Jury exits courtroom at about 4:45 p.m.)

6          THE COURT:  Okay.  Tomorrow you let us know what is

7     realistic, and the government has to address Mr. Martin's

8     thought about this witness who may not -- who they want to call.

9     All right.  Anything else before we go off for the afternoon?

10         MR. DONOHUE:  I just want to raise something that I

11    would anticipate is going to come up tomorrow.

12         THE COURT:  Okay.

13         MR. DONOHUE:  I thought perhaps it would be better to

14    raise with the Court now.  There are two, we're talking about

15    two conversations Bates stamped 12 and Bates stamped 15.

16         THE COURT:  12?

17         MR. DONOHUE:  These are phone calls between Mr. Suggs

18    and Ernest Glover.  I have raised the issue with Mr. Scarpelli

19    as we don't believe that either of those two is related to

20    drugs, and this just came to our attention, but they tend to be,

21    I would suggest, very prejudicial.  Perhaps Mr. Scarpelli wants

22    to speak to it.

23         THE COURT:  I'm sorry.  What's the other one?

2-20-08.txt
24             MR. DONOHUE:  15, 12 and 15.  The Bates stamp.
25             THE COURT:  15 goes on for more than --


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                           103


 1             MR. DONOHUE:  Just two pages.
 2             THE COURT:  Can I just look at them a minute?  Do
 3     these have to to with the drugs?
 4             MR. SCARPELLI:  Absolutely.
 5             THE COURT:  What part?  Can't you get out and put, you
 6     know, these asterisks there for the parts that are really
 7     unappealing that have nothing to do with drugs?
 8             MR. SCARPELLI:  Well, your Honor.
 9             THE COURT:  I'm sure Mr. Donohue will work with you
10     just to get some of this extraneous stuff out.  It's not all
11     related to drugs.
12             MR. SCARPELLI:  You know, I had no intention of, if it
13     makes any difference, I had no intention of asking the witness
14     what that term means.  However, this is an important call.
15             THE COURT:  Well, that may be.  It just needs to be
16     edited.  What term are you looking at?  Just refer me to a page.
17             MR. SCARPELLI:  What are you referring to?
18             THE COURT:  You said were you going to ask a witness
19     what that term means.
20             MR. SCARPELLI:  Yes.  Bates stamp 12, the second to
21     last.  I assume that's the concern.
22             THE COURT:  But there's a little more to it than that.
23     But anyways, clean it up.  There's no reason to have -- there's
24     a lot of this.  It has nothing to do with drugs.
                          Page 98

2-20-08.txt
25              MR. SCARPELLI:  I think you're wrong, your Honor.  I

Jacqueline M. Sullivan, RPR
Official Court Reporter

104

1    think you're very wrong.  When he talks about there was no odor

2    to her and he talks about the body part, they're code words.  No

3    odor to that part of the body.  It's code words, so in order to

4    take out that word it's going to take it out of context.

5              I'll also let the Court know that Mr. Mazatelli has

6    told me you just can't just edit out one word.

7              THE COURT:  No, I think there's more than that.

8              MR. MARTIN:  Counsel, I just want the Court to know

9    that Mr. Glover accepts from the motion made by Mr. Suggs, we

10   accept.  We did not join in that.

11             THE COURT:  All right.  I'm not going to get into the

12   line by line.  I wouldn't call it so prejudicial, but at the

13   same time it's in my view --

14             MR. DONOHUE:  It's helpful.

15             THE COURT:  That's not the question as helpful so far

16   I haven't heard too much as helpful.  We can live it with.

17   Overruled then.  Back tomorrow morning.  Thank you.

18             (Proceedings adjourned at about 4:52 p.m.)

19                        - - -

20

21

22

23

24

25

2-20-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

105

1                    I N D E X

2

3   WITNESSES:                                    PAGE:

4   NORMAN MAUSOLF

5       Direct examination by Mr. Han             6
        Cross-examination by Mr. Gilbert          16
6       Redirect examination by Mr. Han           31

7   RYAN PARDEE

8       Direct Examination by Mr. Han             33
        Cross-examination by Mr. Donohue          51
9       Cross-examination by Mr. Martin           55
        Cross-examination by Mr. Gilbert          56
10

11  TIM ERVIN

        Direct Examination by Mr. Han             71
12      Cross-examination by Mr. Donohue          82
        Cross-examination by Mr. Martin           83
13

    COLLEEN MULDOON
14

        Direct Examination by Mr. Han             84
15      Cross-examination by Mr. Gilbert          100

16

17

18

19                   E X H I B I T S

20  Defendant
    Price
21  Exhibit
    No.              Identification         Marked      Admitted
22
    1-3                                                 33
23

24

25

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-20-08.txt

106

| 1 | Government Exhibit | | | |
|---|---|---|---|---|
| 2 | No. | Identification | Marked | Admitted |
| 3 | 200D5 | | | 11 |
| 4 | 1000.P2 | | | 39 |
| 5 | 1000.P3 | | | 41 |
| 6 | 1000.1 | | | 43 |
| 7 | 1000.2A | | | 49 |
| 8 | 1000.6 | | | 51/79 |
| 9 | 200.P1 | | | 85 |
| 10 | P1-P23 | | | 86 |
| 11 | 200.E3 | | | 95 |
| 12 | 200.E4 | | | 95 |
| 13 | 200.E6 | | | 96 |
| 14 | 200.E7 | | | 96 |
| 15 | 200.E8 | | | 96 |
| 16 | 200.E9 | | | 97 |
| 17 | 200.E10 & 12 | | | 98 |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

Jacqueline M. Sullivan, RPR
Official Court Reporter

107

Page 101

2-20-08.txt

1                         CERTIFICATE
2
3
4               I, JACQUELINE M. SULLIVAN, Official Court
5    Reporter, certify that the foregoing pages are a correct
6    transcript from the record of proceedings in the above-entitled
7    matter.
8                    _____
                     JACQUELINE M. SULLIVAN
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter