2-21-08.txt

1

```
 1                        UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3
        UNITED STATES OF AMERICA,      .
 4                Plaintiff,           .
 5                                     .  CR No. 07-152
             v.                        .
 6                                     .
        ANTHONY SUGGS and              .  Washington, D.C.
 7      GLENDALE LEE,                  .  Thursday, February 21, 2008
                                       .  At about 1:58 p.m.
 8                Defendants.          .
                                       .
 9      . . . . . . . . . . . . . .

10

11                   TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                     BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                        UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Government:        ANTHONY SCARPELLI, ESQ.
                                   JOHN K. HAN, ESQ.
15                                 U.S. Attorney's Office
                                   555 Fourth Street, NW
16                                 Room 4816
                                   Washington, D.C.  20530
17                                 202-353-1679

18      For the Defendant:         PATRICK M. DONAHUE, ESQ.
        Suggs                      Donohue Law Firm
19                                 18 West Street
                                   Annapolis, Maryland  21401
20                                 410-280-2023

21      For Defendant:             RON EARNEST, ESQ.
        Lee                        8121 Georgia Avenue, Suite 406
22                                 Silver Spring, Maryland  20910
                                   240-401-5277
23

24
        APPEARANCES con't. on next page.
25
```

Jacqueline Sullivan, RPR
Official Court Reporter

2

2-21-08.txt

```
1       APPEARANCES, con't.

2

3       For Defendant:          RICHARD K. GILBERT, ESQ.
        Price                   P.O. Box 70448
4                               Washington, D.C.  20024
                                202-898-0857
5

6       For Defendant:          ANTHONY D. MARTIN, ESQ.
        Ernest Glover           7841 Belle Point Drive
7                               Greenbelt, Maryland  20770
                                301-220-3700
8
        For Defendant:          CURTIS A. BOYKIN, ESQ.
9       Ernest Glover           1850 M Street, NW
                                Suite 640
10                              Washington, D.C.  20036
                                202-776-0370
11

12

13

14      Court Reporter:              JACQUELINE M. SULLIVAN, RPR
                                     Official Court Reporter
15                                   U.S. Courthouse, Room 6720
                                     333 Constitution Avenue, NW
16                                   Washington, D.C. 20001
                                     202-354-3187
17

18

19
        Proceedings reported by machine shorthand, transcript produced
20      by computer-aided transcription.

21

22

23

24

25
```

Jacqueline Sullivan, RPR
Official Court Reporter

3

```
                              2-21-08.txt
```

1                        P R O C E E D I N G S

2              THE COURT:  I will excuse juror number one, as I've

3     ruled, but I'm not doing it now.

4              MR. SCARPELLI:  We actually have copies of activation

5     186 and activation 1247.  We didn't have a copy for the

6     reporter.

7              THE COURT:  186, okay.  These haven't been handed out

8     to the jury yet anyways.

9              MR. SCARPELLI:  No.

10             THE COURT:  All right.  What time does that juror need

11    to leave?

12             COURTROOM DEPUTY:  At four o'clock would be a better

13    time for her, Judge.

14             THE COURT:  We'll go till four, and at that time, as I

15    said, my law clerk is going to finish listening to the tape.  If

16    we have anything we can take it up on Monday, I guess, and then

17    Mr. Donahue, you have something else to take up at the end?

18             MR. DONAHUE:  Just generally.  Very briefly, Mr.

19    Scarpelli and I haven't -- I think we're going to work out the

20    issues on --

21             THE COURT:  Price.

22             MR. DONAHUE:  And I still have your package from the

23    probation office.  Once we're done --

24             THE COURT:  Fine.

25             MR. DONAHUE:  -- using it I'll get it to you at the

                        Jacqueline Sullivan, RPR
                        Official Court Reporter

                                                                4

1     end.

2              THE COURT:  Fine.  That's fine.
                            Page 3

2-21-08.txt

3          Anything else before we bring in the jury?  Who's your
4     next witness?
5          MR. SCARPELLI:  We're still on Special Agent Bevington
6     for about fifteen, twenty minutes.
7          THE COURT:  If I had just taken an educated guess I
8     could have guessed.
9          MR. GILBERT:  I just want to alert the Court again to
10    an issue that I believe that we're working out, but that it has
11    to do with the pen registers.  Apparently there is another
12    exhibit like they used for Mr. Parker that has to do with Mr.
13    Price and Mr. Suggs and pen register calls, and then in
14    reference to a truck call.  The problem is that we don't
15    actually have that data.  It turns out the pen register data
16    that we had and have had for several months is not the same data
17    that they base this summary chart on.
18         THE COURT:  Well, it's going to be easy, Mr. Gilbert.
19    You can't get it in unless he has the underlying data.  That's
20    the whole point of a summary chart.
21         MR. GILBERT:  I'm just letting the Court know that Ms.
22    Hughes, that's been sort of --
23         THE COURT:  In and out.
24         MR. GILBERT:  -- assisting all of us is working with
25    their technical people to see if we can get that data and then

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                              5


1     try to put it together, because it's a lengthy process.
2          THE COURT:  You have to be able.
3          MR. SCARPELLI:  Your Honor, just so I can go full
                         Page 4

2-21-08.txt

4    circle, that information was provided on October, I want to say

5    around October 21st.  It wasn't in an order done by telephone

6    numbers.  It was done in a different format, and I believe that

7    Special Agent Pardee has brought disks now in a format that may

8    be a little bit easier for them to read.

9            THE COURT:  Okay, that's fine, but don't put it in

10   until he's had the chance to look at the underlying data.

11   That's the necessary prerequisite to a summary chart.  You're

12   not going to Bates stamp these two things, by the way?  186.

13           MR. SCARPELLI:  We'll Bates stamp them.  We just

14   wanted to give you a copy at this point to review.

15           THE COURT:  You're not putting them in until next

16   week?

17           MR. SCARPELLI:  Yes.

18           THE COURT:  All right.  Okay.  Then I think we're

19   ready to get Agent Bevington back on the stand.

20           Agent, what would happen -- I'd never be able to try a

21   case without you testifying in the year '08.

22           THE WITNESS:  Hopefully you will.

23           THE COURT:  He was here for the last case, too.

24           (Jury enters courtroom at about two o'clock p.m.)

25           THE COURT:  Good afternoon, ladies and gentlemen.


                        Jacqueline Sullivan, RPR
                        Official Court Reporter

                                                              6


1            THE JURY:  Good afternoon.

2            THE COURT:  I think we're ready to continue.

3            You're still under oath.

4            THE WITNESS:  Yes.

5            THE COURT:  Did everybody have a good lunch?
                        Page 5

2-21-08.txt

6          THE JURY:  Yes.

7          THE COURT:  Is it very cold out?

8     SPECIAL AGENT JOHN BEVINGTON, WITNESS FOR THE GOVERNMENT,

9                    PREVIOUSLY SWORN

10                 DIRECT EXAMINATION

11   BY MR. SCARPELLI:

12   Q.   Special Agent Bevington, we're going to go to activation

13   1135, which is at tab 55 -- Bates stamp 73, tab 55, Bates stamp

14   73, activation 1135.  Do you recall that activation?

15   A.   Yes, I do.

16   Q.   Can you tell us the date, time, and the speakers?

17   A.   The date is January 22, 2007.  The time is 6:35 p.m., and

18   the speakers are Anthony Suggs and Ernest Glover.

19          (Audio tape played.)

20   BY MR. SCARPELLI:

21   Q.   Special Agent Bevington, I want to take you now to

22   activation 1800, which is tab 67 and Bates stamp 94.  Do you

23   recall that activation?

24   A.   Yes, I do.

25   Q.   Can you tell us the date, time, and the speakers of that

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              7

1    activation?

2    A.   January 20th, 2007, 1:47 p.m., and the speakers are Anthony

3    Suggs and Ernest Glover.

4          (Audio tape played.)

5    BY MR. SCARPELLI:

6    Q.   I want to take your attention to activation 2043, which is

                          Page 6

2-21-08.txt

7    at tab 79, and Bates stamp 96?

8           (Audio tape played.)

9    BY MR. SCARPELLI:

10   Q.   Do you recall that activation?

11   A.   Yes, I do.

12   Q.   Could you tell us who the speakers are as well as the date

13   and time?

14   A.   The date is February 3rd, 2007.  The time is 6:02 p.m., and

15   the speakers are Anthony Suggs and Ernest Glover.

16          (Audio tape played.)

17   BY MR. SCARPELLI:

18   Q.   I want to take your attention to activation 2227, which is

19   at tab 72 and Bates stamp 100.  Tab 72, Bates stamp 100.  Do you

20   recall that activation?

21   A.   Yes.

22   Q.   What's the date, time, and speakers, please?

23   A.   The date is February 5th, 2007.  The time is 2:14 p.m.  The

24   speakers are again Anthony Suggs and Ernest Glover.

25          (Audio tape played.)


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                          8


1    BY MR. SCARPELLI:

2    Q.   Special Agent Bevington, do you recall when Ernest Glover

3    said the word "tray"?

4    A.   Yes.

5    Q.   Do you know is that a code word that you know of?

6    A.   Yes, it is.

7    Q.   And what is it?

8    A.   It's a code word for three, three hundred, three thousand.

2-21-08.txt

9    In this particular context I would say three thousand because he

10   talks about a duce and then a piano.

11   Q.   Can you tell us what a piano is?

12   A.   A piano is a code for a thousand dollars, like a grand

13   piano or a thousand dollars, a grand.

14   Q.   Now I want to go to tab 73.  By Bates stamp I can't see,

15   but it's in tab 73, and it's activation 2545.

16           THE COURT:  102.

17           MR. SCARPELLI:  I'm sorry, your Honor.  That is 102?

18           THE COURT:  Yes.  That is Bates stamp 102.

19   BY MR. SCARPELLI:

20   Q.   Did you recall activation 2545?

21   A.   Yes, I do.

22   Q.   Can you tell us the date, time, and who the speakers are?

23   A.   February 10, 2007, 8:40 p.m.  The speakers are Anthony

24   Suggs and Ernest Glover.

25           (Audio tape played.)


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              9


1    BY MR. SCARPELLI:

2    Q.   I want to take your attention to activation 4377, which is

3    at tab 78 and Bates stamped 109.  Do you recall that activation?

4    A.   Yes, I do.

5    Q.   Can you tell us the date, the time, and the speakers?

6    A.   It is March 10, 2007, 11:16 a.m.  The speakers are Anthony

7    Suggs and an individual known as Joe-Joe.

8    Q.   Now I want to go to activation 4391, which is actually the

9    next tab, 79, Bates stamped 111.  Do you recall that activation?

                            Page 8

2-21-08.txt

10   A.   Yes, I do.

11   Q.   Can you give us the date and time and speakers?

12   A.   March 10, 2007, 3:29 p.m.   The speakers are Anthony Suggs

13   and Ernest Glover.

14   Q.   Approximately how much time has past between activation

15   4391 and 4377?

16   A.   The first one occurred at 11:16 a.m., and the second one

17   occurs at 3:29 p.m., so four hours and fifteen minutes,

18   approximately.

19            (Audio tape played.)

20   Q.   Do you know what Edgewood is?

21   A.   Yes.

22   Q.   What is Edgewood?

23   A.   It's a housing complex in northeast Washington, D.C.

24   Q.   I want to take your attention to truck bug or truck

25   microphone activation 306, which is at tab 119 and Bates stamped


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              10


1   191.  Tab 119, Bates stamp 191.  Do you recall the date, the

2   time, and the speaker --

3            THE COURT:  Wait a second.  Bates stamp?

4            MR. SCARPELLI:  119.  I'm sorry, Bates stamp 191, tab

5   119.

6            JUROR IN SEAT NO. 16:  I don't have that one.

7            THE COURT:  Okay.  What is it, it's 191?  Do you have

8   an extra copy?

9            Are there other tabs that are blank by chance.

10            JUROR IN SEAT NO. 16:  111 was also blank for me.

11            THE COURT:  111 is blank.  We don't have an extra copy

2-21-08.txt

12 of this.  We already played that one.  You didn't have it?

13    JUROR IN SEAT NO. 16:  I didn't have it.

14    THE COURT:  Two people are missing 118, right?

15    JUROR IN SEAT NO. 16:  Two people.

16    MR. DONAHUE:  Well, which one is that?

17    MR. SCARPELLI:  191.

18    THE COURT:  119 Bates stamped.  That's tab 119.  And

19 then you were missing tab 111.  Do you have an extra one?

20    MR. SCARPELLI:  This is a very short call.  It might

21 not be too difficult to follow.

22    THE COURT:  But I'll just have somebody in chambers

23 make Xeroxes.

24    Is there anybody else that knows of something they're

25 missing at the moment?  You got the short book in, okay.

        Jacqueline M. Sullivan, RPR
        Official Court Reporter

                 11

1    Can you make a copy?

2    COURTROOM DEPUTY:  I can.

3    THE COURT:  Do you have the two, one Bates stamped 191

4 and Bates stamp 158?

5    COURTROOM DEPUTY:  I don't have the 158.

6    THE COURT:  Does anyone have a clean copy we can

7 borrow?

8    MR. SCARPELLI:  Mine has a couple lines drawn on it.

9    MR. HAN:  What's the Bates stamp?

10    THE COURT:  158.  So we can just make two copies of

11 each and then the three-hole punch.  All right.  The next call,

12 which is 191, it's very short, but we'll get you something in a

                              2-21-08.txt
13    minute.

14          Anybody else know of anything at the moment that

15    they're missing?  Okay.

16          Thanks, Gwyn.

17          COURTROOM DEPUTY:  Sure.

18          THE COURT:  Go ahead.  You're about to play 191, and I

19    know that a couple of people are missing the transcript.  We'll

20    give it to them in a minute.

21          (Audio tape played.)

22    BY MR. SCARPELLI:

23    Q.   Do you hear the statement that reads "and just got a 16 for

24    fish that moving already"?

25    A.   Yes.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                   12


1     Q.   Do you know what that means?

2     A.   That means that Anthony Suggs got 16 ounces of PCP for

3     Ernest Glover.

4     Q.   What about the part about moving already?

5     A.   It means that they're actually moving, they're selling the

6     drugs, the PCP.  It's moving quickly.

7          MR. SCARPELLI:  That's all I have, your Honor.

8          THE COURT:  Go ahead, Mr. Martin.

9          MR. MARTIN:  Thank you, your Honor.

10                           CROSS-EXAMINATION

11    BY MR. MARTIN:

12    Q.   Good afternoon again, Agent Bevington.

13    A.   Good afternoon, Mr. Martin.

14    Q.   Now, Agent Bevington, we talked a little bit last time

2-21-08.txt

15   about just generally how long you've been with the FBI.  I

16   forgot.

17   A.    Twenty years.

18   Q.    And you've done quite a few cases like this, right?

19   A.    I've done quite a few drug cases, yes.

20   Q.    And let's move directly to these phone conversations, or

21   some of them anyway.

22             MR. MARTIN:  I want to, if I may, your Honor, approach

23   the witness with what's been marked as Ernest Glover Exhibit No.

24   1.  May I, your Honor?

25             THE COURT:  Yes.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                            13


 1             MR. MARTIN:  Thank you, ma'am.

 2             MR. SCARPELLI:  Your Honor, would it about possible to

 3   see that?

 4             THE COURT:  I hope so.

 5             MR. MARTIN:  As you had just played.

 6             THE COURT:  I'm sorry.  Do you want to approach?

 7             MR. SCARPELLI:  Yes.

 8             (Bench conference as follows):

 9             THE COURT:  Can you and Mr. Martin get a little closer

10   to the mike, please?

11             MR. SCARPELLI:  I don't want to delay this.

12             THE COURT:  What are you doing with this?

13             MR. MARTIN:  These are summaries.  These are synopses

14   that Agent Bevington --

15             THE COURT:  These are line sheets.

                         Page 12

2-21-08.txt

16          MR. MARTIN:  Yes, your Honor.

17          THE COURT:  Are you going to put them into evidence?

18          MR. MARTIN:  No, I'm not.

19          THE COURT:  What do you want him to do with it?

20          MR. MARTIN:  I want to show it to him, and in light of

21   the last tape that was played, 706, where there is some

22   suggestion that Lionel Glover is sending drugs to Ernest Glover

23   through Tony Glover, I want to show that that can't be the case

24   because here it says that, and in several places, that Lionel

25   Glover is actually cut fish out.  In other words, he doesn't


                     Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            14


1    want to deal with him.  He doesn't want to have anything to do

2    with him, and I intend to explore that through a series of these

3    line sheets that I believe Agent Bevington has not only looked

4    at but summarized.

5           THE COURT:  What do the line sheets do for you?  Why

6    do you show him the line sheets?  He confesses to be familiar

7    with all of these.

8           MR. MARTIN:  If he doesn't remember.

9           THE COURT:  If he doesn't remember, he's not putting

10   them into evidence.

11          MR. MARTIN:  I'm not putting them into evidence.

12          THE COURT:  But if you're going to show it to him you

13   have to show it to the government first.

14          MR. MARTIN:  Of course.  I know.  And I had made

15   copies for the government.  It was an oversight, your Honor.

16          MR. SCARPELLI:  And I think it might be helpful if we

17   know what the activation number is and what the date is.
                        Page 13

2-21-08.txt

18              MR. MARTIN:  These are line sheets.  I don't know the

19     activation numbers.  I just printed these out from the disks

20     that you gave me.

21              MR. SCARPELLI:  Yes, there should be activation

22     numbers and dates on these.

23              MR. MARTIN:  This is what I got from the government

24     and printed them out.

25              THE COURT:  Just so I understand, where's the


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              15


1      beginning of it?  This is what he's talking about when he's

2      talking about activations, etcetera.  I mean, there must be

3      something that comes.  There's a 35.  Don't you have any way of

4      assessing?  But he's trying to say that -- let me just make

5      sure.

6               MR. MARTIN:  Well, the last --

7               THE COURT:  You were saying that Lionel doesn't want

8      to deal with your client.

9               MR. MARTIN:  Exactly, exactly.

10              THE COURT:  But I didn't think that Lionel Glover

11     dealt with Ernest.  I thought that he dealt with Suggs and Suggs

12     dealt with Ernest.

13              MR. MARTIN:  Well, the last audio that was played,

14     706, suggested that Lionel Glover is sending drugs through Tony

15     Glover to Ernest Glover.

16              THE COURT:  Is that right?  I didn't read it that way.

17              MR. MARTIN:  Well, I guess it could be looked at in

18     different ways, I think.

                        Page 14

2-21-08.txt

19          THE COURT:  Well, maybe, but it says that Suggs just

20   got 16 for Fish, that there is moving ahead, so that's --

21          MR. MARTIN:  I'm sorry, that's true.  That's true.

22          THE COURT:  That's Suggs.

23          MR. MARTIN:  Irrespective of who it might be, the

24   point is Lionel Glover wouldn't be sending drugs to his brother

25   because he thinks his brother is dirty and he thinks his brother


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                                16


1    should clean up his act.

2           MR. DONAHUE:  That's fine.  I don't know that's going

3    to be an issue.  I've heard that on the tapes as we've gone

4    along.  But that doesn't mean that Suggs -- that is in any way

5    going to undercut the government's allegation of conspiracy.

6           MR. MARTIN:  To be cross-examined.

7           THE COURT:  He can't cross-examine him about that.

8    This guy is here; he listened to the tape.  Until he forgets,

9    doesn't remember, or what have you.  And he's not introducing

10   it.

11          MR. MARTIN:  No, and I wasn't going to do that, even

12   though I heard you earlier say even if we introduced exhibits it

13   wouldn't preclude us from making a motion of acquittal.

14          THE COURT:  I don't abide by that rule that, Mr.

15   Gilbert.  You can introduce whatever you want in the

16   government's case and still move, but at the same time you can't

17   show him this.  For what reason you're showing it to him I don't

18   know, but you got to wait and ask for it.

19          MR. MARTIN:  It doesn't matter.

20          THE COURT:  Well, then, give me a copy.

                            Page 15

2-21-08.txt

21          MR. MARTIN:  Which one did you have?

22          THE COURT:  Okay.  But you don't pop it out if you're

23   not going to introduce it until you need it.

24          (End of bench conference.)

25          MR. MARTIN:  Your Honor, just to speed that up so we

Jacqueline M. Sullivan, RPR
Official Court Reporter

17

1    don't run into the same problem again, let me hand the

2    government --

3          THE COURT:  When you turn around I don't think the

4    reporter can pick up what you're saying.

5          MR. MARTIN:  I'm saying, your Honor, I'm saying just

6    so we're not slowed down I'm handing the government a couple of

7    other copies as well.

8          THE COURT:  Fine, but this is not going into evidence

9    anyways.

10          MR. MARTIN:  No, no.  That was not my intent.

11          THE COURT:  So at the moment I don't think there -- I

12   think we're withdrawing Ernest Glover Exhibit 1.  Give it back

13   to him.  I don't know what it's doing.  We're starting afresh

14   there.

15          Gwyn, we don't have an exhibit used yet by Mr. Glover.

16   BY MR. MARTIN:

17   Q.   Well, let me ask you straight out.  Isn't it a fact that

18   Lionel Glover was not dealing with Ernest Glover?

19   A.   Yes.

20   Q.   Okay.  And isn't it a fact that the reason Lionel Glover

21   did not want to deal with Ernest Glover is because Ernest Glover

Page 16

2-21-08.txt

22    has an addiction?

23    A.   That's one of the reasons.

24    Q.   Okay.  And isn't it also a fact that there came a time when

25    Ernest Glover and Lionel Glover were somewhat estranged?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        18


1               THE COURT:  I'm sorry.  Time frame?  Are we talking

2    about during the course of the dates?

3               MR. MARTIN:  The relevant time frame is during the

4    course of this conspiracy.

5    BY MR. MARTIN:

6    Q.   And I understand the relevant time frame for the conspiracy

7    to be sometime between August 2005 and June 2007.  Would you

8    agree with that?

9    A.   Yes.  With respect --

10              THE COURT:  I don't know what you asked.  That's a

11   compound question.

12   BY MR. MARTIN:

13   Q.   Isn't it a fact that the two of them were not talking with

14   each other directly?

15              THE COURT:  During the time frame that you've

16   mentioned?

17   BY MR. MARTIN:

18   Q.   During the relevant time frame, which is August of 2005 to

19   June of 2007.

20   A.   There may have been times within that time period that they

21   may not have been speaking, but during from what I'm aware of

22   from February to June they were speaking about '07, 2007.

23              THE COURT:  That's when your tape is up, that is what
                        Page 17

2-21-08.txt

24     you're telling us?

25              THE WITNESS:  Correct.


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              19


 1    BY MR. MARTIN:

 2    Q.   But during your testimony here for the greater part of this

 3    day you didn't play any transcripts that showed that they were

 4    talking to each other, did you?

 5              THE COURT:  In other words, are you asking him whether

 6    this morning or this afternoon through him we've heard any tapes

 7    between direct conversation?

 8              MR. MARTIN:  Exactly.

 9              MR. SCARPELLI:  Are we talking about between Lionel

10    Glover?

11              MR. MARTIN:  And Ernest Glover.

12              MR. SCARPELLI:  Judge, I think we have to approach on

13    that.

14              MR. DONAHUE:  We do.

15              THE COURT:  Sorry.  Everybody stretch.

16              MR. MARTIN:  I can withdraw the question, your Honor.

17              MR. DONAHUE:  No.

18              THE COURT:  No, no, no, no, no.  I think you better

19    come on up.

20              (Bench conference on the record as follows):

21              THE COURT:  I know, I know.

22              MR. SCARPELLI:  Yes.

23              THE COURT:  What's a problem?  I take it that there

24    are things on the Glover cell.  We didn't allow him to use them,

2-21-08.txt
25      and so I think that I got to strike the question because it

Jacqueline M. Sullivan, RPR
Official Court Reporter

20

1      really suggests something.

2              MR. MARTIN:  Right, right, right.

3              THE COURT:  It opens a door that you don't want to

4      open.

5              MR. MARTIN:  Absolutely, absolutely.

6              MR. GILBERT:  This witness should also know that those

7      were parameters that were off bounds.  He volunteered that.

8              THE COURT:  I don't know what he volunteered.  What do

9      you mean?  What are you saying?  He says there might have been

10     times that they didn't speak, and then he said that they did

11     speak between this period of time on occasion, I guess, and that

12     must be the kind of stuff, but I have to say, it's not fair to

13     the witness to ask him and then say, well, why aren't you

14     obeying the parameters.

15             MR. MARTIN:  Right, right, right.

16             THE COURT:  You've asked him straight out.  The next

17     question will be stricken, but I'm not striking anything else.

18             MR. GILBERT:  But you're striking both the question

19     and the answer?

20             THE COURT:  He hasn't answered it.  No.  It was the

21     next one.  The question that we were at right then was whether

22     or not he played any tapes here, and that question is going to

23     be stricken, and Mr. Martin knows.  Are you asking for something

24     else?

25             MR. GILBERT:  Only that now we've got the existence of

Page 19

2-21-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

21

1    the Glover cell bug hanging over our head in this case, even

2    though none of it's been ruled on.  It's been ruled

3    inadmissible.

4              THE COURT:  To say I ruled inadmissible, so therefore

5    you don't have to file motions to suppress, so that much is

6    true.  He didn't answer the following, and he was asked that

7    during the relevant time period.

8              MR. GILBERT:  Well, my motion would be to allow the

9    answer to stand, that they were speaking in February through

10   June.

11             THE COURT:  That is the answer.

12             MR. GILBERT:  And preclude both sides from probing

13   that any further as to the basis for that answer?

14             THE COURT:  Absolutely, absolutely.  I think that's

15   fine.  Does he know?

16             MR. SCARPELLI:  Well, he knows nondirect examination.

17   That's why I objected, because I was trying to prevent opening

18   the door.

19             THE COURT:  You weren't really objecting, you were

20   just preventing opening the door.

21             MR. GILBERT:  We were on our way up too.

22             MR. MARTIN:  That's why I said I would withdraw it.

23             THE COURT:  We are going to strike the last question

24   as irrelevant and move along from there.  Okay.  Thank you.

25             (End of bench conference.)

2-21-08.txt

```
 1              THE COURT:  Okay.  The last question that was asked is
 2    just stricken and the witness is not going to get to answer it.
 3    Just put it out of your mind.  It's not of any relevance nor
 4    would any answer be of any relevance, so let's go right along
 5    from there and we'll shift gears, if you would.
 6    BY MR. MARTIN:
 7    Q.   Now, earlier transcript 199 was played.  Do you recall
 8    that, agent?
 9    A.   That was the transcript from January 12 where there was
10    some discussion about --
11              THE COURT:  You say 199.  I'm sorry are you doing a
12    Bates stamp?
13              MR. MARTIN:  That's the activation call number,
14    January 12, 2007, activation number 199.  I don't know the --
15              THE COURT:  Can we have a Bates stamp?  Are these
16    chronological?
17              MR. SCARPELLI:  It's 12.
18              THE COURT:  Bates stamp 12?
19              MR. SCARPELLI:  Yes.
20              THE COURT:  Let us try to catch up with you.  At least
21    I'm only able to do it by Bates stamp or tabs.
22              MR. MARTIN:  And I only have an activation number,
23    your Honor.
24              THE COURT:  Oh, well.  Okay.  January 12.  It's Bates
25    stamped 0012, tab 11.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-21-08.txt

```
 1           MR. MARTIN:  Right.
 2    BY MR. MARTIN:
 3    Q.   In any event, the point that I wanted to ask you with
 4    reference to that particular transcript is, you would agree with
 5    me that "broad" is another word for a woman, would you not?
 6    A.   It can be.
 7    Q.   It can be.  And with respect to, again I don't have -- yes,
 8    I do now, with respect to activation number 200, Bates number
 9    0015 --
10           THE COURT:  0015.  We're all trying to keep up with
11    you, Mr. Martin, so give us a minute.  Next tab.  Tab 12.  Tab
12    12, 0015.
13    BY MR. MARTIN:
14    Q.   There is a reference to a woman smelling, an odor that's
15    emanating from a woman.  You would agree that some people have
16    odors, would you not?
17    A.   Yes, that's possible.
18    Q.   And you would also agree that some people have a very
19    distinct odor or smell and other people do not, right?
20    A.   Yes.
21    Q.   Okay.  And it wouldn't be unusual for a man to note if one
22    woman has a smell and another woman does not?
23    A.   It depends on the context.  I guess that's possible.  In
24    this context I don't think that's correct.
25    Q.   But you would agree with me, though, that there can be
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

24

Page 22

2-21-08.txt

1    discussions about women and odors and that would make sense in a

2    particular context?

3    A.    Yes.

4    Q.    All right.  And with respect to activation number 248,

5    which I have as Bates number 0021 --

6              THE COURT:  Okay.

7              MR. MARTIN:  And I don't know the tab number.

8              THE COURT:  Well, it's tab 16, 0021.

9    BY MR. MARTIN:

10   Q.    You would also agree with me that a chick is sometimes a

11   slang word that's used to refer to a woman, would you not?

12   A.    Yes, it can be.

13   Q.    And sisters, you would agree with me, are generally female?

14   A.    Yes.

15   Q.    And it's not unusual to refer to two women in certain

16   contexts as being sisters?

17   A.    No, that's not unusual.

18   Q.    And the same is true of whores, in most contexts when

19   you're talking about people who work the streets or are in the

20   sex trade you're talking again about women?

21   A.    Yes.

22   Q.    Okay.  And so as we go through these so far it is your

23   interpretation that these words mean something different,

24   correct?

25   A.    Yes.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                                    25


1    Q.    Okay.  And moving now to activation number 482, which is

2    Bates number 0031, and I don't know the tab number for that.

2-21-08.txt

3    A.   21, I believe.

4    Q.   There is a reference --

5          THE COURT:  Now, correct me if I'm wrong, has this

6    been played, 482?  Sorry.  Yes?  No.  So if you want to play it

7    that's fine.  I don't know how else to -- they have a

8    transcript, but the tape is the evidence if we're going to have

9    to reconcile exactly what's been played with what's in the book.

10         MR. MARTIN:  We could do that if Mr. Mazatelli would

11    be kind enough to bring that up.

12         THE COURT:  Do you mind?  482?  I assume the

13    government doesn't care about presenting it.  It's in the book.

14    All right.  So tab 21, we're about to play, it is activation

15    482.  Okay.

16         MR. MARTIN:  Correct.

17         THE COURT:  All right.

18         MR. MARTIN:  And actually we don't need the whole

19    thing played.

20         MR. SCARPELLI:  Your Honor, we'd ask the whole call be

21    played.

22         MR. MARTIN:  Well, your Honor, I think the government

23    can do that in redirect if they'd like.

24         THE COURT:  Well, it's only -- it's two pages and I

25    don't think we should chop it up.  If you want to play it you

Jacqueline M. Sullivan, RPR
Official Court Reporter

26

1    play it.  Is this the whole call?  It's not been edited anyways.

2    Is there any problem?  If you're going to do it you're playing

3    the call.

2-21-08.txt

4          MR. MARTIN:  Yes, that's it.

5          THE COURT:   482 activation, January 14th.  It's just a

6     little over a page.

7          MR. MARTIN:  We can start any time you're ready.

8          (Audio tape played.)

9     BY MR. MARTIN:

10     Q.   Now, you saw that portion or you heard that portion of the

11     audio and saw that portion in the transcript where there was a

12     reference to Tony Glover.  Do you remember that?

13     A.   Yes.

14     Q.   And he was chasing some little girl around up town.  Do you

15     remember that?

16     A.   Yes.

17     Q.   Did you ever have occasion to find out who that little girl

18     was?

19     A.   No.  I do not know her name.

20     Q.   But there's no doubt in your mind that in this context

21     that's a woman, right?

22     A.   Correct.

23     Q.   You have no reason to think that that's a discussion about

24     drugs, right?

25     A.   No.  There were other conversations regarding Tony and the

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              27

1     girl.

2     Q.   And you have no reason to believe that that girl was

3     involved in any of the activities you've been testifying about

4     here today, right?

5     A.   Not that I'm aware of.

                              Page 25

2-21-08.txt

6   Q.   Now, transcript 1114, and I'm not sure if you played that

7   one, I think you did, activation number 1114, which is Bates

8   number 0068.  That was a January 22, 2007 --

9            MR. SCARPELLI:  Your Honor, we didn't play that one.

10            THE COURT:  Okay.  If you want to, it's a short call.

11   If you want it to be played I'm sure it can be.  Do you want it

12   to be played?

13            MR. MARTIN:  I do want it to be played.

14            THE COURT:  It's 52, tab 52, 0068.  It will be played

15   then.  Activation 1114.

16            (Audio tape played.)

17   BY MR. MARTIN:

18   Q.   Now, Agent Bevington, with respect to that particular

19   conversation do you see the reference there to clamps at the

20   bottom?

21   A.   Yes.

22   Q.   There's references to clamps at the bottom there.  You

23   don't read that as meaning that there's any reference to drugs

24   there, do you?

25   A.   I don't know what this means, quite honestly.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          28



1   Q.   Okay.  That's a fair answer.

2            And the fact that you don't know what that means in

3   this context, would it be fair to say that there were other

4   instances where there were conversations between Mr. Suggs and

5   Mr. Glover and you weren't sure what they were talking about?

6   A.   I imagine there were times when I didn't know exactly what

                              Page 26

2-21-08.txt

7    they were speaking about about a specific issue, yes.  I think

8    that probably did happen.

9    Q.    But you do know that Mr. Glover works with the Department

10   of Public Works, right?

11   A.    Yes.

12   Q.    And you do know that Mr. Suggs works there as well, right?

13   A.    Correct.

14   Q.    And on many occasions they had conversations about work,

15   correct?

16   A.    Yes, they did have conversations about work.

17   Q.    And you know that they were both driver trucks?

18   A.    I don't know that Mr. Suggs drove a truck.  I know there

19   were conversations about Mr. Glover driving a truck.

20   Q.    And you know that there were conversations about Mr.

21   Glover's truck having problems, right?

22   A.    There was the conversation where it broke down, yes.

23   Q.    Right.  And do you know whether or not there are clamps on

24   trucks?

25   A.    Yes, there are.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                29


1    Q.    Okay.  And so would you concede that Mr. Glover and Mr.

2    Suggs are friends?

3    A.    Yes.

4    Q.    And you would concede that many of their conversations

5    surround either work or social activities?

6    A.    Yes.

7    Q.    And some of those conversations also include women?

8    A.    Yes, they do have conversations about women as well.

2-21-08.txt

```
 9   Q.   And some of those conversations also include work?
10   A.   Yes.
11   Q.   And trucks?
12   A.   Yes.  Yes.
13   Q.   If we could go to -- it's not necessary since you already
14   conceded that.
15        Did you have occasion to be at the house on June 19,
16   2007?
17   A.   No, I did not.
18   Q.   All right.  Well, in any event, let me look here for a
19   second at 4391.  I'm not asking the Court to play it yet, your
20   Honor.
21           THE COURT:  What was the date?
22           THE WITNESS:  I'm looking.  Just a second, your Honor.
23   BY MR. MARTIN:
24   Q.   I'm not sure that I have 391 here.  Well, let me ask you
25   this, Agent Bevington.  Having listened to many conversations
```

```
 1   between Mr. Suggs and Mr. Glover, would it be fair to say that
 2   you've also heard Mr. Glover talking about his house being or
 3   having some repair work done in the house?
 4   A.   I don't recall he and Mr. Suggs talking about it.
 5           MR. MARTIN:  Mr. Mazatelli, I don't know if you have
 6   this one.  I don't have it, but I'm looking for the 4391.  I
 7   believe that that is, I believe that that is Bates number 0111.
 8           THE COURT:  0111.
 9           MR. MARTIN:  Which before he plays that, your Honor,
```

2-21-08.txt
10     could I see if I can find the transcript?

11             THE COURT:  Yes, sure.  It has been played as far as I

12     can tell.  It's activation 4391, tab 79.  It's the one where

13     there's a reference to Joe-Joe.  Is that what you're talking

14     about?

15             MR. MARTIN:  There was a reference to Joe-Joe and in

16     there was a reference also to the house.  I believe it's 4391,

17     your Honor, even though I don't have the transcript here.  Mr.

18     Mazatelli would be kind enough to bring that up.

19             THE COURT:  Yes.  We have heard it once and we have a

20     transcript.  Fine.  Thank you, counsel.

21             MR. MARTIN:  Thank you.

22             (Audio tape played.)

23             MR. SCARPELLI:  I think that you said only a portion

24     is going to be played, and again the government would ask the

25     entire conversation be played.


                        Jacqueline M. Sullivan, RPR
                        Official Court Reporter
                                                                    31


1              THE COURT:  Well, it has been played so it doesn't

2      matter.  I mean, you can just focus him on anything you want

3      without playing it again if you want.  We've heard it, the tape

4      is in evidence, so he can pick and choose what he wants.

5      There's no rule of completeness at this point, but I don't know

6      what the point is of trying to have somebody play one line.

7      That's hard.

8              MR. MARTIN:  Well, it's not one line, your Honor.

9              (Audio tape played.)

10     BY MR. MARTIN:

11     Q.   Now, it's your testimony, I believe, Agent Bevington, that

2-21-08.txt

12    something other than his discussing the renovations in his house

13    are taking place; is that correct?

14    A.    That's correct.

15    Q.    But you've never been in his house, have you?

16    A.    Yes, I have.

17    Q.    You have been in his house?

18    A.    Yes, I have.

19    Q.    Did you see the construction that was taking place on the

20    second floor?

21    A.    I was in his house in April of 1996, and I don't recall.

22    Q.    Were you in his house during the relevant time frame that I

23    had mentioned before, and that is, August 2005 to June 2007?

24    A.    No, I was not.

25    Q.    So you don't know if there was any activity or construction

                          Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                              32

1     taking place in his house at that time?

2     A.    I do believe there were conversations between Ernest Glover

3     and somebody other than Mr. Suggs about some renovations to his

4     home.

5              THE COURT:  So as far as you know there were

6     renovations going on during the '05-'07 period?

7              THE WITNESS:  I believe I overheard conversations

8     regarding renovations or potential renovations.

9              MR. MARTIN:  The Court's indulgence.

10             (There was a pause in the proceedings.)

11             THE COURT:  Is everybody okay?  You know we're ending

12    early today, so if we need a break raise your hand.  Otherwise

2-21-08.txt
13    we'll just stop about fourish.

14         MR. MARTIN:  And since he's only testifying about

15    these audios, that's all the questions that I have for Agent

16    Bevington at this time, your Honor.

17         THE COURT:  Okay.  Anybody else?  Go ahead.

18                    CROSS-EXAMINATION

19    BY MR. GILBERT:

20    Q.   Good afternoon, Special Agent Bevington.

21    A.   Good afternoon.

22    Q.   I guess let's just start with the issue that you brought up

23    with activation two hundred and --

24         THE COURT:  Do you have a Bates stamp?

25    BY MR. GILBERT:


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                            33


 1    Q.   It's after twelve, but my question really about that one is

 2    you told us the time wasn't right?

 3         THE COURT:  I'm sorry.  It would be helpful if we

 4    could just have a number.

 5         MR. GILBERT:  That's fine.  I have 199 is Bates stamp

 6    12, and I don't think I wrote down when 200 started.  We don't

 7    have the tabs.

 8         THE COURT:  I know, I know.

 9         MR. GILBERT:  You've heard that.

10         THE COURT:  But can you help us out here?  He did

11    testify that the time was wrong.

12         MR. SCARPELLI:  In tab 11, Bates stamp 12.

13         THE COURT:  Okay.  Thank you.

14         MR. GILBERT:  No, that's 199, and I had asked about
                          Page 31

2-21-08.txt

15    200.

16              MR. EARNEST:  Bates stamp 15, your Honor.

17              THE COURT:  One second.  If we could catch up with

18    you.  Tab 12, it bears the time of 11:17.

19    BY MR. GILBERT:

20    Q.   And you told us that you believe that was not the correct

21    time?

22    A.   That's correct.

23    Q.   And how would that mistake have happened?

24    A.   When the transcript was transcribed somebody made a mistake

25    on the time.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              34


1     Q.   So this is not a mistake that's coming from your

2     wiretapping equipment, this is you believe a human mistake in

3     typing up the transcript?

4     A.   Right.  These transcripts aren't generated by the machine.

5     They're subsequently typed.

6              THE COURT:  Somebody listens?

7              THE WITNESS:  Somebody listens and types in the time.

8     They type in all the data at the beginning.

9     BY MR. GILBERT:

10    Q.   Do you know what the correct time was?

11    A.   I don't know, but it would be closer to 7:18 p.m. because,

12    like I said, he was on the phone with Ernest Glover, received an

13    incoming call from Mr. Parker, briefly switched to the call with

14    Mr. Parker and then back to the call with Mr. Glover.

15    Q.   All right.  Well, since we're on that transcript, or on

                                Page 32

2-21-08.txt

16    that activation, there is a reference to Zuke.  Do you know who

17    Zuke is?

18    A.   One of Mr. Glover's customers.

19    Q.   Do you have a name?

20    A.   No, I do not.

21    Q.   Does Mr. Zuke appear elsewhere in the wiretap intercepts?

22    A.   I don't believe so.

23         THE COURT:  I'm sorry.  Where are you?

24         MR. GILBERT:  It's about the middle of Bates stamp 15,

25    your Honor.


Jacqueline M. Sullivan, RPR
Official Court Reporter

35


1          THE COURT:  Oh, yes.  You think his name is Mr. Zuke?

2     Okay.

3     BY MR. GILBERT:

4     Q.   Let me go back, if I might, to, let's see, Bates stamp 7,

5     activation 176.

6          THE COURT:  Bates stamp 7, tab 6, activation 175?  I'm

7     sorry.  Which activation are you looking for?

8          MR. GILBERT:  It should be activation 175.

9          THE COURT:  Yes.  Okay.

10         MR. GILBERT:  Did I say 176?  I misspoke.

11         THE COURT:  Tab 6.

12    BY MR. GILBERT:

13    Q.   In that conversation I believe we heard the person that you

14    identified as Ernest Glover saying that he had to make a stop at

15    the Safeway real fast to get some joints?

16    A.   Yes.

17    Q.   Is it your understanding that joint in that context is a

                              Page 33

2-21-08.txt

18    drug, coded drug term?

19    A.    I don't think that that is a drug reference, no.

20    Q.    Because joint can mean a lot of different things, right?

21    A.    Yes.  Joint can mean almost anything.

22    Q.    Let me then direct your attention to -- well, I'm not

23    really -- let me direct your attention, it starts on Bates stamp

24    21, which is, the conversation activation is 248?

25    A.    It's tab 16, I believe.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                36


1               THE COURT:  Correct.

2     BY MR. GILBERT:

3     Q.    My question to you about that is this a conversation, the

4     transcript that was provided to the jury and the Court and the

5     parties ends after a second page; is that correct?

6     A.    Yes.  The conversation was shortened or redacted.

7     Q.    All right.  Isn't it true that later on there is a

8     conversation in which Mr. Suggs and Mr. Glover talk about

9     hooking up about ten o'clock to go get some drinks, correct?

10    A.    I don't recall that right at the moment.  I'd have to hear

11    that.

12    Q.    All right.  And you only have I assume the redacted one?

13              THE COURT:  Well, do you have the transcript?  You

14    want him to just see if it refreshes his recollection?

15              MR. GILBERT:  Sure.

16              THE COURT:  We're not putting it into evidence.  We're

17    now looking at the same call, the redacted portion.  If we can

18    just mark it.

                          Page 34

2-21-08.txt
```
19            MR. GILBERT:  Sure, your Honor.

20            THE COURT:  If it refreshes his recollection, fine.

21    You can just look at it and see if you remember based on that.

22            THE WITNESS:  Okay.

23            MR. SCARPELLI:  Your Honor, may I see the document

24    before he shows it to the witness?

25            MR. GILBERT:  Sure.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

37

```
1              THE COURT:  Yes.

2     BY MR. GILBERT:

3     Q.   Did I put a sticker on it?  No, I didn't.  I filled out the

4     sticker but I didn't put one on there.

5              Sir, I'm going to hand you what's been marked as

6     Defense Exhibit Price's 4, purely for identification purposes at

7     this time.  And I actually have a green sticky on about page

8     three or four, that's what I'm directing your attention to, to

9     see if that refreshes your recollection about that aspect.

10    A.   Yes.

11    Q.   And so there was a period of time in which after discussing

12    perhaps the criminal activity, if that's what the interpretation

13    is, there was a time when they simply talked about getting

14    together that evening just to have some drinks, right?

15    A.   Yes.  Towards the end of the conversation it appears they

16    talked about that.

17    Q.   I have to close my notebook at some later time, I'm afraid.

18    Perhaps I could get the government's assistance with respect to

19    the document that's Bates stamped 23.  I think it's your tab 18,

20    but I'm --
```
**Page 35**

2-21-08.txt

21          THE COURT:  17, I think.

22   BY MR. GILBERT:

23   Q.   I was just trying to estimate, and it is activation 292.

24          THE COURT:  Yes, that was played.

25   BY MR. GILBERT:


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            38


1    Q.   It was played, and I wondered if perhaps the government

2    might indulge me by playing about the first third or so of it.

3          (Audio tape played.)

4    BY MR. GILBERT:

5    Q.   Special Agent Bevington, what I want to address your

6    attention to is the reference in there to his brother, the

7    brother.

8    A.   Yes.

9    Q.   Do you see that?

10   A.   Yes.

11   Q.   This is a situation where Mr. Glover is, Mr. Ernest Glover

12   is talking to Anthony Suggs, and makes reference to a third

13   person and then in turn to a third person's brother; is that

14   correct?

15   A.   That's correct.

16   Q.   And did you understand that to be a reference in this

17   context to Helery Price?

18   A.   No, I did not.

19   Q.   All right.

20   A.   If I might ask again the government's assistance.  It

21   starts on Bates stamp 25.  It's activation 340, 340.  And again

2-21-08.txt

22    if they could just play perhaps the first quarter or so of it.

23    Again, it has to do with the brother issue.  It's tab -- I

24    better not tell you what tab it is because I guess I have those

25    wrong, but the Bates stamp is 25.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    39


1                  THE COURT:  18.

2                  MR. SCARPELLI:  18.

3                  THE COURT:  18, January 13th, correct?

4                  MR. GILBERT:  Yes, your Honor.

5                  (Audio tape played.)

6    BY MR. GILBERT:

7    Q.   And so once again we have a reference to his brother; is

8    that correct?

9    A.   Yes.

10   Q.   And this is a situation where Ernest Glover is referring to

11   someone as a little young nigger, and then refers to that person

12   saying that his brother said he was going to keep his, right?

13   A.   Right.  This is a continuation in the whole saga that

14   started on January 11 with the customer that didn't like the

15   quality.

16   Q.   And the reference to brother in this case is in your

17   opinion not a reference to Helery Price; is that correct?

18   A.   Yes, that's correct.

19   Q.   All right.  I'm going to jump to the activation that starts

20   on page Bates 73.  It's activation 1135.

21                  THE COURT:  Okay.  One second, please.  Tab 55.

22   BY MR. GILBERT:

23   Q.   And I don't know that it will be necessary to play this.

2-21-08.txt

24     Do you recall, sir, that at the end of the conversation -- I got
25     that one right, okay, tab 55 -- at the end of the conversation

                          Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                    40


 1     when Mr. Suggs and Mr. Ernest Glover are talking about that
 2     evening Ernest Glover says there should be two college joints on
 3     tonight?
 4     A.   Yes.
 5     Q.   And that was a reference to two college basketball games?
 6     A.   Yes, I believe that's correct.
 7     Q.   And then let me ask you with respect to the activation that
 8     starts on Bates stamp 102.
 9     A.   Tab 73.
10     Q.   It's activation --
11             THE COURT:  73, yes.
12     BY MR. GILBERT:
13     Q.   2545.  But unfortunately I'm going to ask you about some
14     conversations that occurs, that's not on the transcript that's
15     been provided to the jury.  And do you recall that they were,
16     that Mr. Ernest Glover and Mr. Anthony Suggs were talking again
17     about their activities later that evening and Ernest refers to
18     the fact that Kentucky is going to play Florida?
19     A.   I can't say without having a little bit of context that I
20     specifically recall that.
21             MR. GILBERT:  One moment, your Honor.
22     BY MR. GILBERT:
23     Q.   Let me show you what's been marked as Defendant's Price
24     Exhibit 5.  I need a sticker on it, though.
                              **Page 38**

25     A.    There is a sticker on it.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    41


 1     Q.    There's a green sticky.
 2              THE COURT:  You're asking him if it refreshes his
 3     recollection about Kentucky and who, Florida?
 4              MR. GILBERT:  Yes.
 5     BY MR. GILBERT:
 6     Q.    Does it refresh your recollection that they were talking
 7     about Kentucky playing Florida?
 8     A.    Yes, it does.
 9     Q.    It was your understanding that was a college basketball
10     game?
11     A.    Yes.
12     Q.    Because Kentucky hadn't been to a game a long time in
13     football, right?
14     A.    I don't know.  I thought a couple years ago they had a good
15     team.
16     Q.    Well, not compared to Florida, I'm sure.
17              Let me just ask you, do you also recall, though, that
18     Mr. Glover was then talking in context of the game, talking
19     about some numbers, one and one and one and eighteen?
20     A.    Could I see that again?
21     Q.    Sure.  I stopped reading when I saw the Kentucky.
22     A.    Yes.  It says one and one.  Mr. Ernest Glover is saying
23     that in the transcript.
24              THE COURT:  That's the part we didn't hear, that's
25     what you're saying?

                              Page 39

Jacqueline M. Sullivan, RPR
Official Court Reporter

42

1           MR. GILBERT:  Correct.

2           THE COURT:  One and one.

3    BY MR. GILBERT:

4    Q.   One and one and one and eighteen.  Do you know whether or

5    not he was referring to the point spread?

6    A.   I do not.

7           MR. GILBERT:  Your Honor, I have no further questions

8    of Special Agent Bevington at this time.

9           THE COURT:  Mr. Scarpelli?

10          MR. GILBERT:  And I appreciate the government's

11   cooperation in playing some of those tapes.

12          THE COURT:  Okay.  We're not going back to football I

13   hope.

14          MR. SCARPELLI:  I'm sorry?

15          THE COURT:  We're not going back to who's a better

16   football player.

17          MR. SCARPELLI:  Oh, no.  I have three very simple

18   questions, your Honor.

19          THE COURT:  There is no such thing as simple

20   questions.

21                    REDIRECT EXAMINATION

22   BY MR. SCARPELLI:

23   Q.   Can you tell us, Special Agent Bevington, why activation

24   248 and 2545 were redacted, were shortened?

25   A.   Because there were long periods of conversation that really

2-21-08.txt

43

1    were not relevant here.  They were just idol conversation.

2    Q.    Now I want to go back to activation 292, and I believe the

3    second one was 340.  Do you recall Mr. Gilbert asking you

4    questions about his brother?

5    A.    Yes.

6    Q.    And that's not Brother Price?

7    A.    No, it is not.

8    Q.    And then I want to take your attention to 2083.  Do you

9    recall Ernest Glover and Mr. Suggs talking about Old Brother

10   Price?

11   A.    Yes, I do.

12   Q.    How do you differentiate who his brother is and Brother

13   Price?

14   A.    A lot of it is context, but in the conversations that Mr.

15   Suggs and Mr. Glover were having regarding the customer it was

16   clear he was referring to the one person's brother.  He said the

17   brother, his brother, not just simply the nickname Brother or

18   Brother Price.

19   Q.    With respect to the calls that I played on direct

20   examination, do you believe that part of those conversations Mr.

21   Glover and Mr. Suggs are talking about PCP?

22   A.    Absolutely.

23             MR. SCARPELLI:  Nothing further, your Honor.

24             THE COURT:  Thank you.  You may step down.

25             I'm sorry, Mr. Earnest.  Do you have something on

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

44

                         Page 41

2-21-08.txt

1    that?

2              MR. EARNEST:  Yes.

3                        CROSS-EXAMINATION

4    BY MR. EARNEST:

5    Q.   Good afternoon, Agent Bevington.

6    A.   Good afternoon.

7    Q.   You just said in response to Mr. Scarpelli's question that

8    the reason that the conversation is shortened is because there

9    was a lot of stuff there that just wasn't relevant, it was, as

10   you put it, I think idol conversation.

11   A.   Right.  We were trying to make it more efficient here,

12   quite honestly.

13   Q.   And you do that really throughout your wiretapping

14   activities, right?  When a conversation isn't relevant to

15   anything, if it's mere chat or chatter you remove it, you take

16   it out?

17   A.   Well, when you're talking about the actual live monitoring

18   we will minimize the conversations.  It's not like we have a

19   conversation and then we erase it.  We just do not record when

20   we feel it's necessary to minimize.

21   Q.   Explain minimize.

22   A.   Minimization, we try and protect people's rights when we're

23   listening to these calls, their privacy rights, so when we're

24   listening to conversations that may be between a boyfriend and

25   girlfriend, a parent and a child, or even just two friends, if

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              45

                         Page 42

2-21-08.txt

1    we can tell that it's not drug-related we minimize it, which

2    means that we don't record it and we do not listen.

3    Q.    So the monitor at the time that he or she is listening to

4    the conversation has to make some kind of an assessment this is

5    not drug-related, I'm going to minimize; is that correct?

6    A.    Yes.

7    Q.    And presumably they receive some training in how to do

8    that, how to assess that?

9    A.    Yes.  They have to go through training, and then before any

10   time we do a court-ordered wiretap interception they meet with

11   the Assistance United States Attorneys who go over the rules for

12   minimization with them.

13   Q.    Thank you.

14             THE COURT:  Anything else?

15             MR. SCARPELLI:  Nothing further, your Honor.

16             THE COURT:  I have this feeling we'll see you again.

17             (Witness excused at about 3:16 p.m.)

18             THE COURT:  All right.  Everybody okay?  Does anyone

19   need a short break?  We do.  We'll take about a five-minute

20   recess, please.

21             (Jury exits courtroom at about 3:15 p.m.)

22             (Recess taken at about 3:15 p.m.)

23             THE COURT:  This is the search?

24             MR. SCARPELLI:  No, your Honor.  This is a video.

25             THE COURT:  You've all seen it?  Okay.  What number is


                      Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              46




1    this?

2             MR. SCARPELLI:  The still photo, that's SV 77.
                          Page 43

2-21-08.txt

3            THE COURT:  Okay.  Wait a second.

4            Okay.  We have another witness.  Could you swear the

5     witness?

6            COURTROOM DEPUTY:  Please raise your right hand.  Do

7     you solemnly swear the testimony you should give the Court and

8     the jury in the case now on trial will be the truth, the whole

9     truth and nothing but the truth so help you God?

10            MR. NAUGLE:  I do.

11         STEVEN NAUGLE, WITNESS FOR THE GOVERNMENT, SWORN

12                     DIRECT EXAMINATION

13    BY MR. SCARPELLI:

14    Q.   Good afternoon.

15    A.   Good afternoon.

16    Q.   Can you tell us your first name, last name, and spell your

17    last name for us?

18    A.   Steven Naugle, N-a-u-g-l-e.

19    Q.   Can you tell us where you're employed?

20    A.   I'm employed by the Federal Bureau of Investigations.

21    Q.   In what capacity are you employed in?

22    A.   I'm a special agent with the FBI.

23    Q.   How long have you been with the FBI?

24    A.   It will be ten years this July.

25    Q.   And prior to being employed by the FBI did you have any

                     Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                               47

1     other law enforcement background?

2     A.   Yes, I do.

3     Q.   Can you tell us that?

                          Page 44

2-21-08.txt

4    A.    Yes.  I was a D.C. police officer for ten years.

5    Q.    I want to take your attention back to June 12th, 2007.  Do

6    you recall that day?

7    A.    Yes, I do.

8    Q.    And did you learn information that Lionel Glover and

9    Cornell Tony Glover were going to be meeting in a CVS?

10   A.    Yes, I did.

11   Q.    And what CVS was that?

12   A.    It was a CVS across from Heggerter Mall, which is

13   Blatensburg and Marin area in northwest Washington, D.C.

14   Q.    Once you learned that can you tell us what you did?

15   A.    Yes.  I got into a vehicle and I drove to that area and I

16   parked the vehicle on Mariner Avenue.

17   Q.    When you arrived were you able to see Lionel Glover and/or

18   Cornell Tony Glover?

19   A.    Yes, I was.

20   Q.    So who arrived first, you or them?

21   A.    They were -- when I arrived they were already there.  They

22   both were on the parking lot of the CVS.

23   Q.    Can you tell us what type of vehicle Cornell Tony Glover

24   was driving?

25   A.    Yes.  He was driving a TransAm, Pontiac TransAm.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              48


1    Q.    What about Mr. Lionel Glover?

2    A.    It was a Buick.  I think it was a four-door Buick.

3    Q.    How did you know Mr. Lionel Glover?

4    A.    I recognized him from prior surveillances that we've

5    conducted on Mr. Lionel Glover.

2-21-08.txt

6    Q.    With respect to Cornell Tony Glover, how did you identify

7    him?

8    A.    The same, through prior surveillance, and also I recognized

9    his vehicle.  I seen his vehicle parked out at in front of one

10   of his houses.

11   Q.    And what, if anything, did you use to observe that meeting?

12   A.    I had a video camera and I recorded that meeting with a

13   video camera.

14   Q.    I don't know if I asked what you time approximately did you

15   arrive?

16   A.    I got there approximately around three p.m. that afternoon.

17   Q.    And how long did you observe that meeting between the two

18   of them?

19   A.    It was very short.  Probably approximately five minutes or

20   so.

21   Q.    And as part of this investigation the video with regards to

22   Cornell Glover and Tony Glover meeting, I want to show you

23   what's been marked as Government's Exhibit SV 77.  Do you

24   recognize that item?

25   A.    Yes, I do.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                   49


1    Q.    And what is that?

2    A.    It's a CD, disk.

3    Q.    And what's on the CD?

4    A.    There's some writing and my initials are on here with the

5    date.

6    Q.    What date is that?

Page 46

2-21-08.txt

```
 7    A.    The date that -- February 18th, 2008.
 8              THE COURT:  But it reflects something that was taped
 9    on what day again, 6/12?
10              THE WITNESS:  Yes, your Honor.
11              THE COURT:  June 12.
12              MR. SCARPELLI:  At this time the government would move
13    in SV 77.
14              THE COURT:  No objection?  Okay.  It's admitted.
15              (Government Exhibit No. SV 77 was admitted into
16              evidence at about 3:36 p.m.)
17    BY MR. SCARPELLI:
18    Q.    Let me show you one other item marked as SV 77 and ask you
19    if you recognize this document.
20    A.    Yes, I do.
21    Q.    And how do you recognize that document?
22    A.    I recognize it by the individuals that are in the document.
23    Q.    And what is it?
24    A.    It is a photocopy of a picture of two individuals.
25              THE COURT:  Any objection?  It's part of the video
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

50

```
 1    anyways so it has to go in.  So everybody can see, why don't you
 2    just --
 3              MR. SCARPELLI:  SV 77 the government would move in.
 4              THE COURT:  Yes, it's admitted.  It's a still from a
 5    video.
 6    BY MR. SCARPELLI:
 7    Q.    In looking at SV 77, can you tell us who's wearing the
 8    white T-shirt?
```

Page 47

2-21-08.txt

9   A.   Yes.  Mr. Cornell Glover, Tony.

10   Q.   And to the left of him is an individual with a blue shirt

11   on.  Do you recognize him?

12   A.   Yes, I do.

13   Q.   Who is that?

14   A.   That's Mr. Lionel Glover.

15   Q.   And in that photograph do you see Cornell Tony Glover's

16   automobile?

17   A.   Yes.  It's to the right of Mr. Tony Glover.

18   Q.   The one that you can see the red taillight?

19   A.   That's correct.  It's backed in.  You can see the tail-

20   light, yes.

21        MR. SCARPELLI:  Your Honor, at this time the

22   government will play SV 77 for the jury.

23        THE COURT:  Okay.  How long is it?

24        MR. SCARPELLI:  I should probably ask him.

25   BY MR. SCARPELLI:


Jacqueline M. Sullivan, RPR
Official Court Reporter

51


1   Q.   This clip of the video is approximately how long?

2   A.   This clip, from what I reviewed it's very short.  Maybe ten

3   seconds, twenty seconds.

4        THE COURT:  You mean you taped longer than that, you

5   just selected a portion to show us, or this is the total of your

6   videoing?

7        THE WITNESS:  No.  This was a selection.

8        THE COURT:  All right.  I just wanted to make sure.

9        (Videotape played.)

**Page 48**

2-21-08.txt

10    BY MR. SCARPELLI:

11    Q.   From your vantage point when you were taking that were you

12    able to see what Lionel Glover handed to Cornell Glover?

13    A.   Yes.  It appears to be a plastic soda bottle.

14    Q.   Were you able to tell whether anything was in it?

15    A.   There was liquid inside it, yes.

16         MR. SCARPELLI:  Nothing further.

17         THE COURT:  Any questions?

18              CROSS-EXAMINATION

19    BY MR. GILBERT:

20    Q.   Did you see Tony give anything to Lionel Glover?

21    A.   No, sir.

22    Q.   And it was your impression that the bottle that was passed

23    was plastic?

24    A.   That was my impression, yes.

25    Q.   And was that bottle ever recovered?


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              52


1     A.   Not to my knowledge.

2          MR. GILBERT:  No further questions.

3          THE COURT:  Okay.  You can step down.

4          THE WITNESS:  Thank you.

5          THE COURT:  Go ahead.

6          THE WITNESS:  Thank you.

7          (Witness excused at about 3:40 p.m.)

8          MR. SCARPELLI:  Can I see the still pictures, 77

9     again?

10         MR. HAN:  We call Special Agent Ervin.

11         THE COURT:  Good afternoon.
              Page 49

2-21-08.txt

12          He's been sworn before.

13          COURTROOM DEPUTY:  Right.

14          THE COURT:  You're still under oath, sir.

15      TIM ERVIN, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN

16                      DIRECT EXAMINATION

17  BY MR. HAN:

18  Q.   Would you please tell us name once again for the record?

19  A.   My first name is Tim, T-i-m, my last name is Ervin, spelled

20  E-r-v-i-n.

21  Q.   Did you participate in a search warrant at 47 Randolph

22  Place Northeast in Washington, D.C. on June 19, 2007?

23  A.   Yes, I did.

24  Q.   What was your role in the execution of have search warrant?

25  A.   I was what is called the search team leader.


                        Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                              53


1   Q.   What were your roles as a search team leader?

2   A.   The search team leader is responsible for gathering the

3   other people who will assist in the search, overseeing the

4   entry, and the completion of the search, seizing all the

5   evidence, and processing the items that are seized back at the

6   FBI office and actually submitting them to the folks who

7   maintain the evidence.

8   Q.   With regard to the items that were seized from this search

9   warrant, did you actually personally view them in their original

10  location?

11  A.   Yes.

12          MR. HAN:  The government would like to move in a

2-21-08.txt

13    number of exhibits that have previously been shown to defense

14    counsel, diagrams of photographs.

15              MR. MARTIN:  No objection.

16              THE COURT:  Okay.

17              MR. HAN:  400D8.

18              THE COURT:  400D8.

19              MR. HAN:  400D8, 400D7.

20              THE COURT:  D8 is admitted.  I'm assuming that they've

21    been seen and there is no objection, so they're going in.

22              (Government Exhibit No. 400D8 admitted into evidence

23              at about 3:43 p.m.)

24              MR. HAN:  400D8, 400D7, 400D6.

25              THE COURT:  One second.  400D?


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              54


1              MR. HAN:  D6, D7, D8.

2              THE COURT:  400D6 admitted, D7 and D8.

3              (Government Exhibit Nos. 400D6 and 400D7 admitted into

4              evidence at about 3:43 p.m.)

5              MR. HAN:  400P16, P30.

6              THE COURT:  Wait one second.  P16.  Okay.  P16, 400.30

7    is the next one.

8              MR. HAN:  Yes.  400P30, 400P29.

9              THE COURT:  Admitted.

10              (Government Exhibit No. 400P29 was admitted into

11              evidence at about 3:44 p.m.)

12              MR. HAN:  400P10.

13              THE COURT:  Admitted.

14              (Government Exhibit No. 400P10 admitted into evidence

2-21-08.txt

15          at about 3:44 p.m.)

16          MR. HAN:  400P9, P3.

17          THE COURT:  Admitted.

18          (Government Exhibit No. 400P9 and 400P3 admitted into

19          evidence at about 3:44 p.m.)

20          MR. HAN:  P24, P38, P39, P1, P40.

21          THE COURT:  What are you trying to figure out, if I

22    can keep up with you?  You're jumping around from one to forty.

23    Go ahead.  Next?

24          MR. HAN:  P8.

25          THE COURT:  P8.  Have you ever heard of chronological


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                         55


1    order?

2          MR. HAN:  P41.

3          THE COURT:  P41.

4          MR. HAN:  P18.

5          THE COURT:  P18.

6          MR. HAN:  P42, P12, P13, P4, P5, P6, P7, P43, and P44.

7          THE COURT:  They're all admitted.  Thank you.

8          Got that, Gwyn?

9          (Government Exhibit Nos. P24, P38, P39, P1, P40, P8,

10         P41, P18, P42, P12, P13, P4, P5, P6, P7, P43 and P44

11         admitted into evidence at about 3:45 p.m.)

12         COURTROOM DEPUTY:  I got it, Judge.

13         MR. HAN:  If we can have 400D8 as in dog 8 on the

14    screen, please.

15              (Videotape played.)

                       **Page 52**

                          2-21-08.txt
16    BY MR. HAN:

17    Q.    What are we took looking at here?

18    A.    This is a sketch of the top floor of the residence at 47

19    Randolph Place.

20    Q.    How many floors were there?

21    A.    There are three:  a top floor, a main floor, and a

22    basement.

23    Q.    The top floor is the second floor?

24    A.    Yes, sir.

25    Q.    At the top there is a room labeled Room A.  Could you


                          Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              56


1     please tell us about that room?

2     A.    Room A is a bedroom on the second floor.  That is a bedroom

3     where a driver's license for Ernest Glover was located.

4     Q.    And if you go to the bottom there is a room labeled Room E.

5     Did you associate that room with anybody?  And don't give me the

6     name, just give me the gender and the age.

7     A.    That was a bedroom also on the second floor which I

8     associated with Mr. Glover's son who was 17 years old at the

9     time.

10    Q.    Unless specifically asked, please don't give the name of

11    any juveniles.

12    A.    Okay.

13    Q.    If we go to 400D6.

14          Can you zoom that?

15          On the far left side of your screen there appears to

16    be a Room H that's upsidedown.  Did you see that?

17    A.    Yes.
                          Page 53

2-21-08.txt

18   Q.   And what room was that in the house?

19   A.   That is the kitchen, which is on the main level of the

20   home.

21   Q.   400D7, what is this?

22   A.   That's the basement of the home.

23   Q.   Was this labeled anything?

24   A.   It was labeled Room J, but I don't see the J on this

25   sketch.

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                           57


1    Q.   That was labeled Room J?

2    A.   Yes.

3    Q.   If we can go to the pictures, 400P16.  What are we looking

4    at in this picture?

5    A.   That is Ernest Glover standing in the kitchen of the home.

6    Q.   Other than Mr. Glover were there any other adults?

7    A.   Yes, there were.

8    Q.   And starting with the next oldest adult, you can say this

9    person's name?

10   A.   Mr. Glover's wife, Kim Glover, was also in the home, as was

11   his eldest child.

12   Q.   And the gender of that child?

13   A.   Female.

14   Q.   And was she over eighteen?

15   A.   Yes.

16   Q.   And were there any people below eighteen?

17   A.   There were two children that were below the age of

18   eighteen, one male child and one female, that were also present.

**Page 54**

2-21-08.txt

19   Q.   And what was the relationship between the two juveniles and

20   Mr. Glover?

21   A.   They were also his children.

22   Q.   Other than those five people, was anyone else inside the

23   residence when you executed the search warrant?

24   A.   No.

25   Q.   Let's go to 400P30.  Do you see in the top left-hand corner

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              58


1    there is a taped sign?  What is that sign?

2    A.   It's the letter A.

3    Q.   And what room does that signify on the diagram you just

4    saw?

5    A.   That was the bedroom on the second floor.

6    Q.   400P29, is this room A also?

7    A.   That is Room A.  That's a dresser in Room A.

8    Q.   Was any money recovered from this dresser?

9    A.   Yes.

10   Q.   If you could, with the Court's permission, step down, just

11   point to the big screen where that money was located.

12          (Witness complies.)

13          MR. BOYKIN:  Objection, your Honor.

14          THE COURT:  I can't see anything.  What's he doing?

15   Can you just, Mr. Han, put your pointer on -- can you do it on

16   the Elmo?  Yes, right.  Where did he point?

17          Can everybody read that?  Well, actually it's money.

18   That's not surprising.  It's found where it is, right?

19          THE WITNESS:  What's that?

20          THE COURT:  That's the money you're pointing out.  It

                              Page 55

2-21-08.txt

21    is money.

22              THE WITNESS:  Yes, ma'am.

23              THE COURT:  Does everybody see the money?

24              That's the way you found it when you appeared in that

25    bedroom?


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              59


1              THE WITNESS:  Yes.

2              THE COURT:  All right.

3    BY MR. HAN:

4    Q.   How much money was that?  Was that cash?

5    A.   Yes.  It was cash in the amount of $985.

6              THE COURT:  What denominations?

7              THE WITNESS:  I don't recall, your Honor.

8    BY MR. HAN:

9    Q.   I'm moving the cursor down to the edge of the --

10              THE COURT:  Wait.  Don't talk to the machine.

11    BY MR. HAN:

12    Q.   I'm moving the cursor to the edge of that bureau.  Do you

13    see where it is?

14    A.   Yes.

15    Q.   What is that cursor pointing at?

16    A.   More currency.

17    Q.   What was the state of that currency, was it laid out or

18    folded at that time?

19    A.   It was folded.

20    Q.   If we go to 400P10, zoom in on that.  What are we looking

21    at here?

2-21-08.txt

22    A.    We're looking at a one-dollar bill with a tannish color

23    powder on it, which we suspected to be heroin.

24    Q.    400P2?

25    A.    And there is a black --

Jacqueline M. Sullivan, RPR
Official Court Reporter

60

1     Q.    Tell us what we're looking at here, in particular, the

2     black square underneath the picture of the child.

3     A.    The black square is a digital scale.

4     Q.    Are we still on that bureau?

5     A.    Yes.

6     Q.    400P3.

7           Can you zoom in on that?

8           What are we looking at here?

9     A.    That is a driver's license for Washington, D.C. for Ernest

10    Glover.

11    Q.    Moving to P24, what are we looking at here?

12    A.    That's a photo of Room E.

13    Q.    And who did you associate that room with?

14    A.    Mr. Glover's male son, seventeen years of age.

15    Q.    P38, what is this?

16    A.    That was a shoe box which was found in Room E, and the

17    items in there are suspected small quantities of marijuana, a

18    lot of stems and a lot of packaging material, and just debris.

19    Q.    P39, what are we looking at in this closeup?

20    A.    Those are what are commonly called zips.  They're small

21    plastic bags with a ziplock top, which can be used to hold

22    narcotics.

23    Q.    And in what room was this found?

Page 57

2-21-08.txt

24   A.   That's also Room E.

25   Q.   P1, what are we looking at here?

Jacqueline M. Sullivan, RPR
Official Court Reporter

61

1    A.   We're looking at a container, a Tupperwear-type large

2    container, with two bags of suspected marijuana, and then right

3    next to that you'll see the little blue bags which bear the

4    little apple on them, and those are more of the zip-type baggies

5    that I spoke of a moment ago.

6    Q.   What room number is this?

7    A.   Room E.

8    Q.   400P40, please.  What is this?

9    A.   That also is Room E.  That's a shotgun which actually has

10   been altered along the barrel and along the stock of the weapon.

11   Q.   What do you mean, that it's been altered along the stock of

12   the barrel?

13   A.   Well, a shotgun that you would purchase at a sporting goods

14   store or whatnot would normally have a much longer barrel than

15   the one that you see here and then it also would have what's

16   called a stock of the weapon, which is usually it would have

17   been in this case a wooden piece that was quite lengthy.  You

18   can see where the gray tape is.  Normally what you would see if

19   you were to buy this weapon in a store is you would see

20   something very similar to the wood grip, that that would be a

21   stock, a lengthy piece of wood or imitation wood which would

22   lengthen the weapon on the back, and also I don't know if you

23   can tell or not from this photo, but there is, if you were to

24   get a better look at the end of the barrel you would see it's

Page 58

25      somewhat serrated from being cut.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                    62


 1      Q.    400P8?

 2      A.    That is also Room E, and that is what I believe to be a

 3      piece of the barrel of that shotgun which was cut off.

 4      Q.    400P41?

 5      A.    That was a bag in Room E which contained numerous shotgun

 6      shells.

 7      Q.    400P18, what room is this?

 8      A.    That's the kitchen of the home, which I earlier described

 9      as Room H.

10      Q.    400P42, what are we looking at here?

11      A.    That's a plate with numerous little zip baggies on it.  One

12      of the baggies --

13      Q.    Let me stop you there.  I'm going up one section.  All

14      right.  On the screen you see a blowup.  Do you see that?

15      A.    Yes, sir.

16      Q.    There's a ziplock in the top left-hand corner of the plate

17      as we're looking at it.  Do you see that?

18      A.    I do.

19      Q.    Was anything in that zip?

20      A.    That contained a substance which we suspected to be heroin.

21                 MR. MARTIN:  Objection.

22                 THE COURT:  I'm sorry?

23                 MR. MARTIN:  Objection.

24                 THE COURT:  Okay.  Do you want to approach?

25                 MR. MARTIN:  No, your Honor.  602.

                                Page 59

2-21-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

63

1           THE COURT:  Well, are you going to introduce any

2    further evidence?

3           MR. HAN:  No.

4           THE COURT:  No?  Then the objection is sustained, and

5    it will be stricken.  The answer whether it's suspected or not

6    doesn't tell us anything.

7    BY MR. HAN:

8    Q.   Was that zip in the top left-hand corner with the material

9    in it seized?

10   A.   Yes.

11          THE COURT:  I'm sorry.  When you say the top left-hand

12   corner I'm not sure what you mean.  Can you cursor?

13   BY MR. HAN:

14   Q.   Can you see the cursor?

15          THE COURT:  Yes.  Okay.

16          MR. EARNEST:  Objection; relevance.

17          THE COURT:  Well, now I'm not sure.  Do you want to

18   approach?

19          MR. EARNEST:  Sure.

20          (Bench conference on the record as follows):

21          MR. HAN:  We had an agreement, Judge.

22          THE COURT:  Did you ever have any of this tested?

23          MR. HAN:  We did.  Not the dollar bill, but that

24   turned out to be --

25          THE COURT:  This is admissible.  I think simply we

2-21-08.txt

1    ought to be saying this is admissible only against your client.
2    Somebody is suggesting that there's heroin, but you want it in.
3    I don't know.
4            MR. EARNEST:  I think what happened is a knee-jerk
5    reaction, I would suspect.  It's been tested.
6            THE COURT:  Some of it has.
7            MR. HAN:  This has been tested.
8            THE COURT:  When you say "this" I don't know what
9    you're pointing to except for me.
10           MR. HAN:  The zip with the two substances has been
11    tested and determined to be heroin.  The dollar bill that
12    contained the powder has not been tested.
13           MR. MARTIN:  I thought the dollar bill was tested.
14           THE COURT:  What dollar bill?
15           MR. MARTIN:  On the dresser.
16           THE COURT:  Testing for what?
17           MR. HAN:  We're not trying to make a big deal out of
18    it, we're not trying to emphasize it, we're just trying to front
19    it.
20           THE COURT:  He doesn't care.
21           MR. EARNEST:  My objection is --
22           THE COURT:  Your objection is overruled except that.
23           MR. EARNEST:  Your Honor, my only objection was that
24    it being seized does not, because the prosecutor asked as a
25    follow-up question was it seized.  Well, that's proof that it

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-21-08.txt

1    wasn't.

2              THE COURT:  You're objecting to that, not what it was?

3              MR. EARNEST:  Exactly.

4              MR. HAN:  We can move on.

5              THE COURT:  What?

6              Has it come up that any of this stuff is heroin yet?

7              MR. HAN:  That is heroin on your screen.

8              MR. EARNEST:  But it hasn't come up in the case, your

9    Honor.

10             MR. HAN:  No, and I don't intend it to.

11             THE COURT:  You don't?

12             MR. HAN:  No.

13             THE COURT:  So why did you ask?  Didn't you ask him

14   what it was and he said suspected.

15             MR. MARTIN:  He said suspected.

16             THE COURT:  And I sustained that.

17             MR. HAN:  We can move on.  I don't want to make a big

18   deal about it.

19             THE COURT:  He may bring it out.  We now know that

20   some of it's been tested.  If it comes out I won't strike this

21   not being admitted against anybody except for Mr. Glover.

22             Don't talk to him.  You can't.

23             MR. MARTIN:  I will withdraw my objection if the

24   witness knows that it was tested.

25             THE COURT:  It's still hearsay.  We don't care.


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter
                                                                    66


                            Page 62

2-21-08.txt

1           MR. MARTIN:  But at that point I don't care.

2           THE COURT:  Do you want to bring it out?

3           MR. HAN:  I don't want to bring it out.

4           THE COURT:  Fine.  Then you can bring it out.

5           MR. DONAHUE:  I want to renew my motion to sever.  If

6      we didn't have Mr. Glover in here we wouldn't have heroin and we

7      wouldn't have firearms and we wouldn't have shotguns but we

8      wouldn't have all these other things that are coming in.

9      There's no violence in this case, but the jury is looking at

10     these weapons in a whole different light now.

11          THE COURT:  But I think that I'm not declaring

12     severance and I'm not declaring a mistrial.  I'm waiting for

13     some request.  Go ahead.

14          MR. GILBERT:  I'm going to request that you instruct

15     the jury that the guns are also only admitted against Mr.

16     Glover.

17          THE COURT:  I'm happy to.  They're all coming in

18     relevant to him.

19          MR. GILBERT:  I appreciate that.

20          THE COURT:  And the same is for any other substance

21     that is not PCP.  Okay.  Thank you.

22          How much more on direct?

23          MR. HAN:  I can finish in about ten minutes.  I can

24     finish full direct.

25          THE COURT:  I'll ask.  Okay.  Thanks.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              67



1           (End of bench conference.)

2           THE COURT:  All right.  One, the prosecutor says he
                              Page 63

2-21-08.txt

3      can finish the direct in ten minutes.  Is that too late for you?

4      Second of all, I just want to say there's a lot of evidence

5      coming in now that it was found at Randolph, Northeast.  There

6      is evidence of suspected or drugs, firearms.  These things are

7      being admitted solely -- you've heard this instruction before --

8      against Mr. Glover.  They have nothing to do with the other

9      defendants in this case.  There is no suggestion here that

10     anybody in this case, other defendants, had anything to do with

11     firearms or other drugs, etcetera, etcetera, so this is a PCP

12     case, but what they seized at this residence is relevant as to

13     Mr. Glover only.

14             Proceed.  I gave you ten minutes.  That's it.

15     BY MR. HAN:

16     Q.   400P12, what room is this?

17     A.   That's the basement, Room J.

18     Q.   400P13?

19     A.   That is also the basement, Room J.

20     Q.   And if you look in the wooden closet there appears to be

21     two shoe boxes.  Do you see that?

22     A.   Yes, I do.

23     Q.   And what color are those shoe boxes?

24     A.   One is orange and one is green.

25     Q.   Was this photo taken before those shoe boxes were searched?

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              68


1      A.   Yes.

2      Q.   400P4, what is this?

3      A.   That's a photo, closer-up photo of the shoe boxes after

2-21-08.txt
```
 4    someone has looked in them.

 5    Q.    And do you know the size of that shoe box?

 6    A.    Both shoe boxes have the size nine-and-a-half.

 7    Q.    Do you know the shoe size of Mr. Ernest Glover?

 8    A.    No, I don't.

 9    Q.    400P5, what is this?

10    A.    What you're seeing here is a look inside the two shoe

11    boxes.  What you can see in the orange shoe box on the left is

12    several small glass bottles, and what you can see in the shoe

13    box on the right you can probably just make it out.  There's a

14    bottle which has a purple label on it.

15    Q.    400P6?

16    A.    Okay.

17    Q.    What is this?

18    A.    That's another photo of the same two shoe boxes from a

19    different perspective but with the tops completely off.  It

20    gives you a better view of the rows of bottles which are inside

21    that box, and again you can see the purple label of the bottle

22    in the other box.

23          MR. HAN:  If I can get a close-up of the red shoe

24    boxes.

25    BY MR. HAN:
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

69

```
 1    Q.    I'm showing you what's been marked for identification as

 2    Government Exhibit 400E6.

 3          THE COURT:  I'm sorry.  Four hundred what?

 4          MR. HAN:  E6.

 5          THE COURT:  I assume there's no objection.  It's
```

2-21-08.txt

6    admitted, E6.

7            (Government Exhibit No. 400E6 was admitted into

8            evidence at about 4:05 p.m.)

9    BY MR. HAN:

10   Q.    What is that exhibit?

11   A.    This is the cardboard box and the bottles, the small glass

12   bottles which you see in this photo.

13   Q.    Approximately how many of those glass bottles are there?

14   A.    Well, as I count the rows it's eight wide by six deep, so I

15   believe that would make 48 bottles.

16   Q.    I'm showing you what's been marked for identification as

17   Government's Exhibit 400E4.

18            THE COURT:  These have all been shown to counsel, and

19   there's been no objection, so E4 is in.

20            (Government Exhibit No. 400E4 was admitted into

21            evidence at about 4:06 p.m.)

22   BY MR. HAN:

23   Q.    What is that?

24   A.    These are also items which were seized from the orange shoe

25   box.  The large item here that I'm showing you is what the

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                            70


1    yellow handle is like a turkey baster and you can see the yellow

2    handle, just the edge of it, there in the box.  These other two

3    items with the black rubber handles are kind of like

4    eye-droppers almost, and you can see one of those if you look on

5    top of the box where you see the glass bottles.

6    Q.    I'm showing you Government's Exhibit 400E1.

                              **Page 66**

2-21-08.txt

7    A.   This is the bottle which you can just see the label of and

8    the green shoe box that's got the purple label.  It's a Dole

9    product.  This item was seized because, based on my experience,

10   it had the smell of PCP.

11   Q.   Was there actual liquid in that bottle when you found it?

12   A.   Yes.

13          THE COURT:  What's the Exhibit No.?

14          COURTROOM DEPUTY:  400E1.

15          THE COURT:  E1, okay.  Thank you.

16   BY MR. HAN:

17   Q.   I'm showing you Government's Exhibit 400E8.  Let's go back

18   to the wire.

19   A.   These are tops, bottle tops, black in color, which fit on

20   top of the glass bottle that you see, and I believe these were

21   seized primarily from the orange shoe box, but they were

22   cummatively seized from both shoe boxes.

23   Q.   I'm showing you --

24          THE COURT:  Do you know the numbers?

25   BY MR. HAN:


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              71



1    Q.   -- Exhibit 400E12?

2          THE COURT:  E12, and what's the other one?

3          MR. HAN:  And 400E11.

4          THE COURT:  They're admitted.

5          (Government Exhibit Nos. 400E11 and 400E12 were

6          admitted into evidence at about 4:09 p.m.)

7          THE WITNESS:  These are the empty shoe boxes which

8    were seized on this date during this search in the basement.
                        Page 67

2-21-08.txt

```
 9    BY MR. HAN:
10    Q.   The plastic juice bottle that you mentioned earlier, did it
11    have a peculiar door?
12    A.   Yes.
13              THE COURT:  It's late in the day.
14              THE WITNESS:  Based on my experience it bore the odor
15    of PCP.
16    BY MR. HAN:
17    Q.   If we go to 400P7, what is this?
18    A.   These are two vanilla extract bottles.  The black, the item
19    with the black handle is another turkey baster-type of item, and
20    then you see two funnels which of course are white.  These items
21    are seized from a little shelf as you go down the stairs into
22    the basement.  The vanilla extract bottles when they were opened
23    both also, based on my experience, bore the smell of PCP.
24    Q.   Did they have liquid in it?
25    A.   Yes.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

72

```
 1    Q.   I'm showing you 400E13.  What is this?
 2    A.   These are the two vanilla extract bottles and the two boxes
 3    of vanilla extract that you see in this photo.
 4              THE COURT:  That's E13.  Okay.
 5    BY MR. HAN:
 6    Q.   400P43, what is that?
 7    A.   That is Room J.  That is a rifle and a shotgun that were
 8    leaning against the wall in Room J in the basement.
 9    Q.   400P44?
```

2-21-08.txt

10    A.    That is different types of ammunition which is located in

11    close proximity to the two weapons you saw in the earlier photo,

12    also in Room J in the basement.

13    Q.    And the small boxes you said were the ammunition?

14    A.    Yes.

15              MR. HAN:  No further questions, your Honor.

16              THE COURT:  Okay.  Well, I think this is a perfect

17    time to break.  Thank you very much.

18              Ladies and gentlemen, I'd like to, if the juror in

19    seat one could stay for one minute, please.  Thank you.  You're

20    excused.  Ladies and gentlemen, we will resume at nine o'clock

21    for breakfast on Monday morning.  You are not to discuss this

22    case with anyone over the course of the weekend.  We have three

23    days off.  I hope you have a very nice weekend.  Leave

24    everything underneath.  Don't listen to the news.  Don't talk to

25    anybody.  Don't do any research.  No Internet research.  You

                          Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                              73


1     remember everything I've told you, right?

2               THE JURY:  Yes.

3               THE COURT:  Thank you.  Have a nice weekend.  See you

4     on Monday morning.  Breakfast is at nine.  We'll start promptly

5     at 9:30.  We're doing very well.

6               Counsel, I need everybody to stay put for a minute,

7     please.

8               Thank you, everybody.  Have a good weekend.

9               (Jury exits courtroom at about 4:10 p.m.)

10              THE COURT:  Please be seated.

11              This is juror 1027.  After much sole-searching, I have

2-21-08.txt

12    decided that because of the amount of evidence coming in

13    regarding the Glover family I am going to excuse you at this

14    time.  I think that you've been a very kind juror.  I appreciate

15    your service.  I for one just think that it is appropriate not

16    to have, even if it's your daughter or you live close by, I just

17    feel somewhat uncomfortable given the testimony, so you're free

18    to go at this time.  You should check out.

19            Is the jury office still open?

20            COURTROOM DEPUTY:  Yes, they are.

21            THE COURT:  Thank you very much.  It was very nice to

22    have met you.  If you give Ms. Franklin your notes they'll be

23    destroyed immediately.  And have a very nice weekend.  I'd

24    appreciate you not discussing this.  I'll explain to the jurors

25    that I excused you, but I don't want you to go into reasons why.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                        74


1            Anything else before we thank this juror?  Okay.  Have

2     a good weekend.

3            JUROR NO. 1027:  You too.

4            THE COURT:  Okay.  We have one other matter to take up

5     before you go.  Go ahead.

6            MR. MARTIN:  It's very quick, your Honor.  I jumped up

7     when I heard the word "suspected" not thinking about what he was

8     testifying about, and of course it goes to part of our theory of

9     defense that Mr. Glover, amongst other things, is an addict.

10    You sustained the objection, you didn't strike the answer, as I

11    recall, so if you haven't stricken the answer ...

12            THE COURT:  Well, but the answer is suspected.  All

                          Page 70

2-21-08.txt

13    right.  I'm sure the government will agree that whatever was

14    tested was tested.  They'll agree with you it's heroin, and I'll

15    say it's only admissible as to Mr. Glover and that will get it

16    over.  I don't see that --

17          MR. MARTIN:  I don't want you to strike the answer.

18    That's the point.

19          THE COURT:  I understand, but all it's going to be is

20    suspected.  If you and the government want to have a brief

21    stipulation I'll tell them that it only applies to you, your

22    client, okay?

23          MR. MARTIN:  I think that's what everybody here really

24    wants, though.

25          THE COURT:  All right.  You had some of the stuff

Jacqueline M. Sullivan, RPR
Official Court Reporter

75

1    tested so all you have to do is come up with some small

2    stipulation and then he doesn't sort of have to beat around the

3    bush with some person who's got it secondhand really -- that's

4    objectionable -- out of this witness' mouth.

5          Can I see what you, out of an abundance of caution at

6    my request or at the request of I think Mr. Donahue my law clerk

7    listened to the tape and was somewhat concerned about a few

8    kinds of statements that are not in the redacted one.  One,

9    there are two things that could be, or one thing that could be

10    about Mr. Suggs but we weren't a hundred percent sure.  I

11    haven't listened to it, but I have no doubt that my clerk erred

12    on the side of being inclusive.  At line 4550 she thought there

13    was some discussion about Suggs.  They asked who he's with, and

14    they might have asked something about a car, so it appeared that

2-21-08.txt

15    they might be asking Price about Mr. Suggs.  It's not a hundred

16    percent clear.  But it comes up at line 4550.

17           And then there's a couple of times where the

18    government agents suggest that a cooperation agreement will help

19    you.  Once again I'm erring on the side of caution.  Things like

20    we can't authorize anything but we have the U.S. Attorney's, but

21    we are the initial contact.  You are helping yourself.  You want

22    to help yourself?  Hopefully it will work out for you.  If you

23    say the right things you might be out by tomorrow.  That's

24    really, it goes right in there under Giglio.  I'm looking at

25    this myself for the first time.  There is at some point

Jacqueline M. Sullivan, RPR
Official Court Reporter

76

1    explanation of a cooperating agreement.  They give you point for

2    the assistance provided.  There's nothing I haven't seen them

3    take care of before, meaning the AUSAs.  These lines are 1143,

4    1800, 2828, 3300, and 5300.  So I've just basically summarized,

5    but I think you might reconsider your tape.

6           Have you returned the tape?

7           MS. KALB:  Yes, but I haven't finished.

8           THE COURT:  You haven't finished listening?

9           MS. KALB:  No.  This is the first 54 minutes.

10          THE COURT:  That's right.  There may be more.  How

11    long does the thing last?  That's right.  We had to give back

12    the machine to him so could play the exhibits.  54 minutes.

13          MR. SCARPELLI:  An hour and 41 minutes, your Honor.

14          THE COURT:  An hour and 41 minutes?  Okay.  Well, we

15    have a little ways to go, but we'll know by Monday, but you get

2-21-08.txt

16   the drift.  "If you say the right things you may be out by

17   tomorrow" is pretty -- we're not parsing words here.  Okay.

18         Anything else before we break until Monday?  We're

19   going to take a shot at working on the jury instructions next

20   week, and the way I understand it, just so I get the lineup for

21   Monday, the prosecution, I guess since Mr. Price may be coming

22   on rather quickly, right?  Monday?

23         MR. SCARPELLI:  Yes.  I believe he'll come on Monday.

24   There are a couple witnesses before him.

25         THE COURT:  You don't think that they'll finish the


Jacqueline M. Sullivan, RPR
Official Court Reporter

77


1    cross-examination.  I mean, I just didn't think we can convey, I

2    think, if you don't mind, we'll send by e-mail tomorrow any

3    other further lines that we consider fall in the category of

4    things that ought to be given to them, and then I think you

5    better figure out a way to get it to them.

6          MR. DONAHUE:  I'm happy to try.  The difficulty is the

7    median in which that they use, because I haven't been able to

8    open any of the disks.

9          MR. SCARPELLI:  Is there a start time and a stop time

10   or just a start time?

11         MS. KALB:  Just a start time at the moment.  I can do

12   more.  I just ran out of time.

13         THE COURT:  If you don't mind I would give this to the

14   government, these are my notes, not my notes, my law clerk who

15   listened for 45 minutes and wrote down this.  There aren't start

16   times, but I basically said what I just summarized these things.

17   There's one, 4550 is the question of whether they're actually

2-21-08.txt

18    talking about Suggs; therefore, that comes in as Jennings, but

19    the other, there's one, two, three, four, five things that make

20    reference to cooperation agreements are good things kind of.  So

21    here's this.  No.  This is for him because he's going to -- he

22    may or may not agree with us so far, and then we'll do another

23    one to finish off the last hour tomorrow, and then they'll have

24    to, I don't know the answer technologically.  We have to sit

25    here.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                78


 1              MR. DONAHUE:  I still have a V.C.R. at home.  I know

 2    how to work that.

 3              THE COURT:  Good.  It's like the tape that somebody

 4    has an answering machine.  I know the feeling.  Well, you're

 5    going to have to figure out a way that Mr. Donahue can hear.

 6              Have you heard the seven minutes at least?

 7              MR. DONAHUE:  I heard part of the seven minutes, and

 8    then I couldn't get it to replay.

 9              THE COURT:  See, can you make an arrangement so he can

10    hear some of this tomorrow?

11              MR. SCARPELLI:  Sure.

12              THE COURT:  Because we need their computer ourselves.

13    This afternoon we couldn't do it ourselves, so call him up and

14    err on the side of giving it to him.  Don't lose that piece of

15    paper, though, because we may need it for various reasons.  All

16    right.  Then I will assume that you will meet with the

17    government tomorrow.

18              MR. DONAHUE:  I will.

2-21-08.txt

19        THE COURT:  Have you worked that out?

20        MR. DONAHUE:  No, but what I would ask the Court to

21  do, I was going to return this in its entirety Mr. Scarpelli.  I

22  want to look at it, and I was going to suggest that we be

23  allowed to have a copy of just the report.

24        THE COURT:  No.  You hold on to it.  I hold you

25  responsible for not losing it.  I don't want that kind of stuff


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            79


1   floating around.  It's only for your eyes or counsel's eyes or

2   the government counsel.  That's it.  I don't want that.  Just

3   return it to me when you're finished.

4         Is there anything else that we need to address, except

5   that we're going to borrow your computer?

6         MR. GILBERT:  Thursday afternoon any Jencks that we've

7   not already been provided for witnesses who would be expected

8   next week.

9         THE COURT:  Jencks?   There's a yes-or-no answer to

10  this.

11        MR. HAN:  There may be two or three pages of Jencks

12  regarding surveillance.  I don't have it with me today.  I can

13  provide it either tomorrow or first thing Monday.

14        THE COURT:  No, tomorrow, tomorrow, tomorrow.  Our

15  deal is Thursday, so what do you mean, three or four pages of

16  surveillance?  How is that Jencks?

17        MR. SCARPELLI:  We are going to have the agent testify

18  about some surveillance.  He wrote some notes about the

19  surveillance.

20        THE COURT:  Oh, okay.  Which agent, and when is he

                        Page 75

2-21-08.txt

21    going to testify?

22         MR. HAN:  Agent Bevington probably Monday.  We're a

23    lot further advanced in our schedules then we planned.

24         THE COURT:  Can you get this to him tomorrow?  Just

25    fax it, or can you e-mail it to all these people?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              80


1          MR. HAN:  I can scan an e-mail to them.

2          MR. DONAHUE:  PDF.

3          THE COURT:  That's it for Jencks.  Leave him a

4     voicemail.

5          Anything further?  Thank you for reminding me.  I

6     suspect that by Thursday you'll see the end of the government's

7     case, and at that point you're going to have to tell us who your

8     witnesses are, the date of birth if we don't already have them,

9     whether you're calling anybody in, experts, and whether your

10    defendants are going to testify.  They all remember I've told

11    them what their rights are.  If they want to testify they can go

12    right ahead; if they don't they don't.

13         Are you doing another 404(b)?

14         MR. SCARPELLI:  Yes, your Honor.

15         THE COURT:  All right.  When will that be?

16         MR. SCARPELLI:  That will be when we're done

17    cross-examining Special Agent Erving.

18         THE COURT:  Soon.  I need that instruction again.

19    Thank you very much.  Thanks again.

20         (Proceedings adjourned at about 4:23 p.m.)

21                         - - -

2-21-08.txt
22

23

24

25


Jacqueline M. Sullivan, RPR
Official Court Reporter

81


1                          I N D E X

2

3    WITNESSES:                                        PAGE:

4    SPECIAL AGENT JOHN BEVINGTON

5         Direct examination by Mr. Scarpelli             6
          Cross-examination by Mr. Martin               12
6         Cross-examination by Mr. Gilbert              32
          Redirect examination by Mr. Scarpelli         42
7         Cross-examination by Mr. Earnest              44

8    STEVEN NAUGLE

9         Direct Examination by Mr. Scarpelli          46
          Cross-examination by Mr. Gilbert             51
10
     TIM ERVIN
11
          Direct Examination by Mr. Han               52
12

13
                          E X H I B I T S
14
     Defendant
15   Exhibit
     No.            Identification        Marked      Admitted
16
     None.
17

18   Government
     Exhibit
19   No.            Identification        Marked      Admitted

20   77                                                45

21   400D8                                             53

22   400D6                                             54
     & 400D7
23
                          Page 77

```
                              2-21-08.txt
          400P29                                                    54
24

25        EXHIBITS con't. on next page.


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                   82
```

| | Government Exhibit No. | Identification | Marked | Admitted |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| | 400P10 | | | 54 |
| 4 | | | | |
| | 400P9 & 400P3 | | | 54 |
| 5 | | | | |
| | P24, P38, P39, | | | 55 |
| 6 | P1, P40, P8, | | | |
| | P41, P18, P42, | | | |
| 7 | P12, P13, P4, | | | |
| | P5, P6, P7, | | | |
| 8 | P43, P44 | | | |
| 9 | 400E6 | | | 69 |
| 10 | 400E4 | | | 69 |
| 11 | 400E11 & 400E12 | | | 71 |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

2-21-08.txt
25

Jacqueline M. Sullivan, RPR
Official Court Reporter

83

1                              CERTIFICATE

2

3

4                I, JACQUELINE M. SULLIVAN, Official Court

5     Reporter, certify that the foregoing pages are a correct

6     transcript from the record of proceedings in the above-entitled

7     matter.

8                        _____
                         JACQUELINE M. SULLIVAN
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2-21-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter