2-25-08.txt

1

```
 1                      UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3
        UNITED STATES OF AMERICA,       .
 4                                      .
                  Plaintiff,            .
 5                                      . CR No. 07-152
           v.                           .
 6                                      .
        ANTHONY SUGGS and               . Washington, D.C.
 7      GLENDALE LEE,                    . Monday, February 25, 2008
                                        . At about 2:01 p.m.
 8                Defendants.           .
                                        .
 9      . . . . . . . . . . . . .       .

10

11                  TRANSCRIPT OF JURY TRIAL – AFTERNOON SESSION
                    BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                      UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Government:        ANTHONY SCARPELLI, ESQ.
                                   JOHN K. HAN, ESQ.
15                                 U.S. Attorney's Office
                                   555 Fourth Street, NW
16                                 Room 4816
                                   Washington, D.C.  20530
17                                 202-353-1679

18      For the Defendant:        PATRICK M. DONAHUE, ESQ.
        Suggs                      Donohue Law Firm
19                                 18 West Street
                                   Annapolis, Maryland  21401
20                                 410-280-2023

21      For Defendant:            RON EARNEST, ESQ.
        Lee                        8121 Georgia Avenue, Suite 406
22                                 Silver Spring, Maryland  20910
                                   240-401-5277
23

24
        APPEARANCES con't. on next page.
25
```

Jacqueline Sullivan, RPR
Official Court Reporter

2

2-25-08.txt

```
 1      APPEARANCES, con't.

 2

 3      For Defendant:          RICHARD K. GILBERT, ESQ.
        Price                   P.O. Box 70448
 4                              Washington, D.C.   20024
                                202-898-0857
 5

 6      For Defendant:          ANTHONY D. MARTIN, ESQ.
        Ernest Glover           7841 Belle Point Drive
 7                              Greenbelt, Maryland  20770
                                301-220-3700
 8
        For Defendant:          CURTIS A. BOYKIN, ESQ.
 9      Ernest Glover           1850 M Street, NW
                                Suite 640
10                              Washington, D.C.   20036
                                202-776-0370
11

12

13

14      Court Reporter:             JACQUELINE M. SULLIVAN, RPR
                                    Official Court Reporter
15                                  U.S. Courthouse, Room 6720
                                    333 Constitution Avenue, NW
16                                  Washington, D.C. 20001
                                    202-354-3187
17

18

19
        Proceedings reported by machine shorthand, transcript produced
20      by computer-aided transcription.

21

22

23

24

25
```

Jacqueline Sullivan, RPR
Official Court Reporter

3

2-25-08.txt
1                    P R O C E E D I N G S
2              COURTROOM DEPUTY:  This Honorable Court is again in
3    session.  Please be seated and come to order.
4              (Jury enters courtroom at about 2:00 p.m.)
5              THE COURT:  Good afternoon, ladies and gentlemen.  All
6    set, ready to go?
7              Mr. Donahue, are you going first?
8              MR. DONAHUE:  Yes.
9              THE COURT:  Okay.
10    MONIQUE BRILLHART, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN
11                         CROSS-EXAMINATION
12    BY MR. DONAHUE:
13    Q.    Good afternoon, Ms. Brillhart.
14    A.    Good afternoon.
15    Q.    Ms. Brillhart, I'm going to put on the overhead a, if we
16    can get to it, the lab number.
17              THE COURT:  It's in evidence, I assume.
18              COURTROOM DEPUTY:  I need the Exhibit No.
19              MR. DONAHUE:  Yes.  It is Exhibit No. 1503.
20              THE COURT:  This is the hardest one to read.  I don't
21    know.
22    BY MR. DONAHUE:
23    Q.    I'll try to direct your attention quickly.  You testified
24    that you tested three orange buckets, correct?
25    A.    Correct.


                        Jacqueline M. Sullivan, RPR
                         Official Court Reporter
                                                                4



1    Q.    And I'm going to put on the overhead Exhibit 100.P34,
2    already in evidence, and Ms. Brillhart, I'm going to ask you to
                              Page 3

2-25-08.txt

3    take a look at this exhibit, if you would.  Those appear to be

4    the buckets, correct?

5    A.    Correct.

6    Q.    All right.  Now, can you tell me from your notes whether

7    those buckets came to you stacked three deep like that?

8    A.    I recall when I received the evidence at the laboratory I

9    remember seeing the buckets stacked just like the photograph.

10   Q.    Can you tell me which of those three -- is that your notes,

11   or that's not something you would have noted, you just recall

12   that?

13   A.    Correct.

14   Q.    And do your notes reflect anything, do you know, in that

15   regard?

16   A.    In regard to them being stacked?

17   Q.    Right.

18   A.    No, they do not.

19   Q.    And can you tell me as you sit here today do you recall

20   which, I mean, you've testified that one of these buckets had a

21   latent print, correct?

22   A.    That's correct.

23   Q.    And can you tell me which of those three as they were

24   stacked has that latent print?

25   A.    No.  I cannot, because -- well, let me back up.

Jacqueline M. Sullivan, RPR
Official Court Reporter

5

1         When I received the evidence, as I stated earlier, our

2    evidence control unit will inventory all of the evidence, and I

3    believe these buckets went to another unit within the

2-25-08.txt

4   laboratory, so they were itemized and inventoried by them as

5   well.  Just looking at this photograph I can't recall which Q

6   was, you know, which Q in regards to that, but I remember when I

7   received it it was already given a Q number.  I remember that

8   being written on the actual item.

9   Q.   The Q numbers were not on there when you first got them; is

10  that right?

11  A.   No, they were.

12  Q.   They weren't?

13  A.   Yes.

14  Q.   And so we don't know as they were stacked which bucket had

15  a latent print on it, correct?

16  A.   I just recall that the latent print was developed on Q277.

17  Q.   Right.  But we don't know looking at that which Q277 is,

18  correct?

19  A.   From that photograph I can't recall which bucket in that

20  stack was Q277.

21  Q.   From your memory?

22  A.   Correct.

23  Q.   Can you tell me from either your memory or your notes what

24  finger the latent print reflected?

25  A.   As which finger on the hand?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              6


1   Q.   Right.

2   A.   The finger that was identified on Q277 was the right thumb

3   of Anthony Suggs.

4   Q.   Thank you.  That's all I have on the bucket.

5            Let me ask you, you also tested, I think, is it, as is
                            Page 5

2-25-08.txt

6     clear from again 1503.1, fourteen glass bottles, correct?

7     A.    That's correct.

8     Q.    And there are no latent prints on those glass bottles?

9     A.    That's correct.

10    Q.    Let me show you in sequence two exhibits.  One is 100.P61.

11    Now, you tested in total how many bottles?

12    A.    In this portion of the examination, because I had such a

13    large number of items, this portion of the processing was

14    performed by another latent print examiner.  However, I did

15    inventory these item identifiers before disbursing them to other

16    examiners to process for me.  So this portion of the testing was

17    processed by another examiner.

18    Q.    On those seven reflected in 100.P61, correct?

19    A.    That's correct.

20    Q.    And is that true as well for 100.P62?

21    A.    That's correct.

22    Q.    And in both of those tests you can confirm for me there

23    were no latent prints developed or arrived or found on any of

24    those items; is that correct?

25    A.    That's correct.


                           Jacqueline M. Sullivan, RPR
                             Official Court Reporter

                                                              7



1              MR. DONAHUE:  I have nothing else, your Honor.  Thank

2     you.

3              THE COURT:  Mr. Martin?

4                         CROSS-EXAMINATION

5     BY MR. MARTIN:

6     Q.    Good afternoon.

                           Page 6

2-25-08.txt

7    A.    Good afternoon.

8    Q.    Agent Brillhart?

9    A.    Forensic examiner Monique Brillhart.

10   Q.    Is it okay if I say Ms. Brillhart then?

11   A.    Oh, that's fine.

12   Q.    Good afternoon to you, ma'am.  I'm going to be asking you

13   questions that are specifically related to lab number 09092003.

14   That's 09092003.

15   A.    Do you mean 0709?

16   Q.    You're right.  07092003.  I wasn't trying to trick you.  I

17   don't see as well as I might.

18         And specifically you had testified that there were a

19   number of items that you had examined, and I lost track.  At one

20   point I heard you say 78, and at another time I heard you say a

21   much larger number, so how many items did you examine related to

22   this case?  Let's start with that.

23   A.    In total related to this entire case, because there were

24   various submissions that were submitted to the laboratory, in

25   total, over four hundred items in the entire case.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              8


1    Q.    And with respect to this particular lab number, the

2    309092003, do you know how many items you actually examined?

3    Would your summary sheet tell you that?

4    A.    Yes, the summary sheet does say.

5         MR. MARTIN:  Mr. Mazatelli, I think I'm looking for

6    either 1503.2 or 1503.1.

7    BY MR. MARTIN:

8    Q.    Would it help if I showed you the summary sheet?
                           Page 7

2-25-08.txt

 9   A.   Yes.

10        MR. MARTIN:  With the Court's permission.

11   BY MR. MARTIN:

12   Q.   I'm showing you what's been marked Government Exhibit No.

13   1503.1.  Does that assist in you knowing how many items you

14   examined related to the lab number that I referenced earlier?

15   A.   Yes, it does.

16   Q.   Okay.  And could you tell us how many items there were?

17   A.   How many items I examined, or how many items submitted to

18   the laboratory?

19   Q.   How many were submitted to the laboratory?  Let's start

20   with that.

21   A.   In regards to how many were submitted to the laboratory, I

22   would have to actually add up the items that were not examined

23   to the items that were examined, so to start off, the items that

24   were examined were 383 items, and there were quite a few items

25   that were not examined because they were actually needed for a

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                                 9


 1   later time, according to my understanding from the field office.

 2   Q.   383 items that were submitted.  And how many did you

 3   actually examine?

 4   A.   The 383 items were the items that I actually processed and

 5   examined.  However, the number is much larger for the actual

 6   items that were received.

 7   Q.   I see.

 8        THE COURT:  You mean because some of the ones received

 9   you were told they were not priority ones?

                            Page 8

2-25-08.txt

10          THE WITNESS:  That's correct.

11          THE COURT:  So there were more than 383 received, but

12   examined, the universe was 383?

13          THE WITNESS:  That's correct.

14   BY MR. MARTIN:

15   Q.   And you said the Q numbers were assigned even before it

16   came to the lab, right?

17   A.   No.  When a contributor sends evidence into the laboratory

18   the evidence control unit at the FBI laboratory assigns a Q

19   number designation, which is how these Q numbers were derived.

20   Q.   When we're talking about Q numbers, they're alphanumeric,

21   that they precede with the letter Q and then it's followed by a

22   series of numbers, right?

23   A.   That's correct.

24   Q.   So when the jury is looking at it they'll know that those

25   are the Q numbers that we're talking.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              10


1    A.   That's correct.

2    Q.   And were you given known prints at the time that these

3    items to examine were given to you, were you given known prints

4    at the same time, right?

5    A.   I was provided with names of individuals with FBI number,

6    which is a designator as far as fingerprints on file with the

7    FBI's fingerprint files.  I was provided names to compare to

8    various items of evidence.

9    Q.   That is a yes?

10   A.   Well, I wasn't actually -- no fingerprint cards were

11   actually submitted to me at the laboratory.  I was provided

                    Page 9

2-25-08.txt

12    names to look into the FBI files to pull known /TP-PLS, which I

13    then compared to any latent prints.

14    Q.   So you had a set of known prints then, correct?

15    A.   Yes, that's correct.

16    Q.   And you were looking to match those known prints to the

17    items that were submitted to you for examination, correct?

18    A.   That's correct.

19    Q.   And you also said that even after you did your testing

20    there was a verification process, right?

21    A.   In the event that any latent print was identified, that

22    latent print was then verified by another certified examiner.

23    Q.   So the answer again is yes?

24    A.   Yes.

25    Q.   Thank you.  You talked also a little bit about the

Jacqueline M. Sullivan, RPR
Official Court Reporter

11

1    different surfaces and that it was easier sometimes to find

2    prints on one type of surface as opposed to another.  Do you

3    recall that testimony?

4    A.   Yes, I do.

5    Q.   And I think if I heard you correctly you said that with

6    respect to paper items it was easier to find prints; is that

7    correct?

8    A.   Normally, yes.

9    Q.   Normally.  And when we talk about paper items, that would

10    include cardboard, correct?

11    A.   Yes, that's correct.

12    Q.   All right.  Now, if a cardboard box then is kept in a cool,

2-25-08.txt

13    dry place, you shouldn't have too much trouble getting a print

14    off of it, correct?

15    A.    It depends on the situation.  As I stated earlier, there's

16    various factors involved with that, including a person who

17    actually touches the item, whether or not they produce enough

18    perspiration to leave a latent print.

19    Q.    Assuming they did have enough perspiration to leave a

20    latent print and it was in a cool, dry place, you'd be able to

21    get a latent print off of that, right?

22    A.    That's correct.

23    Q.    I have here in front of me Government's Exhibit, it's

24    number 400E12 and 400E11, and I'm just holding them up.  Do you

25    recognize these boxes, ma'am?

Jacqueline M. Sullivan, RPR
Official Court Reporter

12

1     A.    Yes, I do.

2     Q.    Do you recall whether you had an opportunity to examine any

3     items that were in these boxes?

4     A.    Yes, I did.

5     Q.    You did.

6           MR. MARTIN:  Your Honor, may I approach?

7           THE COURT:  Sure.

8     BY MR. MARTIN:

9     Q.    I'm approaching the witness first with Government's Exhibit

10    No. 400E12.  Would you be so kind to open that up, ma'am?

11    A.    Sure.

12    Q.    Just take a look in there.  Do you recognize the items that

13    are contained in that box?

14    A.    Yes, I do.

Page 11

2-25-08.txt

15   Q.   You do.  And I noticed that there is like a black substance

16   on that, like a powder or something.  Do you see that?

17   A.   Yes, I do.

18   Q.   What is that?

19   A.   The black substance is fingerprint powder from processing

20   in the laboratory.  Items like this, like a nonporous item, is

21   powdered towards the end of our processing.

22   Q.   So did you put that powder on those bottles?

23   A.   These bottles that are contained within this box were

24   processed by another examiner who helped me work on this case.

25   Q.   But that was done at your lab?

Jacqueline M. Sullivan, RPR
Official Court Reporter

13

1   A.   Yes, it was.

2   Q.   Now I want to show you what's been marked as Government's

3   Exhibit 400E11.  And for the record, again, this is a shoe box

4   that has the size number nine-and-a-half on it.  It's black

5   apparently on four sides.

6   A.   I recognize it.

7   Q.   Do you recognize that, ma'am?

8   A.   Yes, I do.

9   Q.   Do you recall whether or not you examined anything that was

10   in that box?

11   A.   This box was processed by yet another examiner who helped

12   me work on this case.

13   Q.   So you didn't actually test the item or examine the item

14   that was in there?

15   A.   That's correct.

2-25-08.txt

16   Q.   And so you didn't verify it either?

17   A.   Well, this box was processed by another examiner in the

18   laboratory, but any latent prints that were developed, I am the

19   only examiner that performed those comparisons in this case, so

20   although other examiners helped me physically process in the

21   laboratory, I did all of the comparisons that were developed.

22   Q.   Well, if you were to look at your summary, could you tell

23   us if that box is Q403 or if that box is Q411?

24   A.   This box is Q403.  It has my initials, and also it has

25   "Q403" written on the top of the box.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              14


1    Q.   And even though it has your initials, you're telling us you

2    didn't test anything that was in that, right?

3    A.   Correct, I did not process anything within this box.

4         THE COURT:  But someone else did, right?  But someone

5    else did?

6    BY MR. MARTIN:

7    Q.   But someone else did.

8         But you did test or examine the box for fingerprints,

9    the box itself?

10   A.   I'm the examiner that performed the comparisons to the

11   known print of the individual named for comparison.  Although I

12   did not physically use chemicals to process this item, another

13   examiner assisted me in doing that portion.

14   Q.   And the other examiner who did that, that is assisted you,

15   made a determination that Ernest Milton Glover's fingerprints

16   were not on that box, correct?

17   A.   No, that is not correct.  When the fingerprints were

                            Page 13

2-25-08.txt

18    developed on this box they were then photographed.  Those

19    photographs were then given to me and I am the only examiner

20    that performed comparisons to Cornell Glover and Ernest Glover

21    in this case.

22    Q.   And you didn't find Ernest Milton Glover's fingerprints on

23    that box, did you?

24    A.   No, I did not.

25    Q.   All right.  And I failed to ask you the same question with

Jacqueline M. Sullivan, RPR
Official Court Reporter

15

1    respect to this box, and I'm approaching you again with

2    Government's Exhibit 400.E12.  Again, same description, black

3    and four sides with a size number nine-and-a-half on the face.

4    Would you examine that, ma'am, and tell me if your initials

5    appear in that box?

6    A.   Yes, they do.

7    Q.   And with respect to that box, either you or anyone who

8    works in your lab found Ernest Milton Glover's fingerprints on

9    that box, did they?

10    A.   No, they did not.

11    Q.   And just to amuse me, would you be so kind to open up

12    Government's Exhibit No. 400E11, please?  Would you describe for

13    the ladies and gentlemen of the jury what it is you're looking

14    at?

15    A.   This appears to be a Dole Sparkler's flavored juice drink

16    bottle.

17    Q.   Did you examine that for prints?

18    A.   No, I did not.

Page 14

2-25-08.txt

19    Q.    Did anyone in your lab examine that for prints?

20    A.    It doesn't appear so.  If this were examined in my

21    laboratory the FBI would have been given a Q number and there's

22    no Q number listed on this bag.

23    Q.    Now, this particular box that you're looking at now with

24    the bottle that you just took out, what's the Q number on that?

25    Is that Q411 or is that Q412, just for clarification?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        16


1     A.    It says Q403.

2     Q.    Q403.  All right.  Thank you, ma'am.

3              THE COURT:  How do you determine what's printed, what

4     is examined for prints, say, in the box?

5              THE WITNESS:  I'm sorry?

6              THE COURT:  Who decides what gets examined for prints,

7     say, to the contents of have box?

8              THE WITNESS:  Well, the contributor would request an

9     item to be examined for latent prints.

10             THE COURT:  So that bag that we just looked at, I

11    don't recall the number, you would have done it if requested,

12    but were you not requested?

13             THE WITNESS:  Correct.

14    BY MR. MARTIN:

15    Q.    Now, with respect to -- let's move on.  It was also a box

16    that you examined with a plastic wrap that was Q412.  Do you

17    remember that, do you see that?

18    A.    Yes, I do remember this.

19    Q.    Did you examine that?

20    A.    No.  Another examiner examined this particular item.
                              Page 15

2-25-08.txt

21    Q.    But there was no indication from that examiner that Ernest

22    Milton Glover's prints were on that, was there?

23    A.    That's correct.

24    Q.    And with respect to Q475, the dropper packaging, do you see

25    that?

Jacqueline M. Sullivan, RPR
Official Court Reporter

17

1     A.    Yes.

2     Q.    Ernest Milton Glover's prints were not found on that

3     either, were they?

4     A.    No, they were not.

5     Q.    In fact, Cornell Glover's prints were found on that,

6     correct?

7     A.    That's correct.

8     Q.    And with respect to the dropper that was found in the

9     packaging that is listed here at Q475, would it be correct to

10    say that Ernest Milton Glover's prints were not found on that

11    either?

12    A.    That's correct.

13    Q.    But it's not clear in looking at this summary that I have

14    whether Cornell Glover's prints were found on that.  Would you

15    be able to tell?

16    A.    On Q475?

17    Q.    Yes, ma'am.  What I've done is I've broken it down with

18    respect to the dropper packaging.  I asked you whether his

19    prints were there, and I think you answered in the affirmative.

20    Now I'm asking you whether Cornell Glover's prints were found on

21    the dropper that was contained in the bag.

Page 16

2-25-08.txt

22    A.    Q475, which was the dropper packaging for the fingerprint

23    that was developed on the dropper packaging, was identified to

24    Cornell Glover, but on Q476, which was the actual dropper, there

25    were no latent prints of value developed on the actual dropper.


                        Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                                    18



 1    Q.    And Q500 was a plastic bag, correct?

 2    A.    That is correct.

 3    Q.    And on that plastic bag again Ernest Milton Glover's prints

 4    were not found; is that correct?

 5    A.    That is correct.

 6    Q.    But Cornell Glover's prints were found, right?

 7    A.    Correct.

 8    Q.    Then in Q585 we have a shot shell box?

 9    A.    Correct.

10    Q.    Is that an ammunition box?

11    A.    Yes, it is.

12    Q.    Is that for like a shotgun?

13    A.    Yes.

14    Q.    And again, Ernest Milton Glover's prints were not found on

15    that, were they?

16    A.    Correct.

17    Q.    And then with respect to Q847, we have a second shot shell

18    box, correct?

19    A.    That's correct.

20    Q.    And again, ma'am, Ernest Milton Glover's prints were not

21    found on that, were they?

22    A.    No, they were not.

23    Q.    You also, you were shown an orange bucket.  You don't know

2-25-08.txt

24     whether that orange bucket came from 47 Randolph Place, do you?

25     A.   No, I do not.


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                    19


1      Q.   And you have no reason to believe it came from 47 Randolph,

2      do you?

3      A.   No, I do not.

4                MR. MARTIN:  If I might just have a moment, your

5      Honor.

6                     (There was a pause in the proceedings.)

7                Mr. Glover has no more questions.  Thank you, ma'am.

8                THE WITNESS:  You're welcome.

9                MR. EARNEST:  If I may have a moment, your Honor.

10                         CROSS-EXAMINATION

11     BY MR. EARNEST:

12     Q.   Good afternoon, ma'am.

13     A.   Good afternoon.

14     Q.   I have some general questions.  Actually all I have is two

15     or three general questions to test my common sense.  My common

16     sense tells me that if somebody is in an area for an extended

17     period of time, comes and goes from that area, that he or she

18     would be more likely to leave fingerprints behind in that area,

19     is that true?

20     A.   I would say it depends on so many factors that I described

21     earlier:  the environment, whether a person is able to leave

22     latent prints behind.

23     Q.   But my question to you is, taking all of those factors and

24     leaving them aside controlling for them, in other words, assume

                              Page 18

25        the same weather, the same humidity, the same permeability or

Jacqueline M. Sullivan, RPR
Official Court Reporter

20

1         porosity of the surfaces, would it be more likely for somebody

2         who is in an area repeatedly to leave fingerprints than

3         otherwise?

4         A.    I would say that's a fair assessment.

5         Q.    And the other question that I have is, because I just can't

6         remember, I heard somebody testify about this a long time ago,

7         what's the relationship of dampness to leaving or not leaving

8         fingerprints, again assuming the same level of perspiration?

9         A.    Well, dampness have an effect of a latent print that's left

10        behind by creating condensation on a latent print, almost

11        possibly damaging a latent print that would be left behind.

12        Q.    So for example, if there were a latent print on a plastic

13        bag and that plastic bag were placed inside another plastic bag,

14        the latent print if there were one would more likely to be

15        preserved; is that right?

16        A.    No.  It would actually -- it would stand more of a chance

17        to be destroyed because of the friction involved between one

18        plastic bag rubbing against another plastic bag would allow for

19        a latent print to be rubbed off.

20        Q.    And you've mentioned several times that perhaps some people

21        don't leave fingerprints at all because they don't perspire.  Is

22        that a common problem?

23        A.    No.  I wouldn't say that.  I wouldn't say it's common or

24        uncommon.  Just generally speaking some people sweat more than

25        others, and people that would sweat more or apply more lotion to

Jacqueline M. Sullivan, RPR
Official Court Reporter

21

1    their hands would be more apt to leave a latent print behind

2    rather than someone who doesn't sweat as much.

3    Q.   And in your training and experience, does it happen that

4    some people simply don't leave fingerprints because they don't

5    perspire enough?

6    A.   Yes, yes.

7           MR. EARNEST:  Thank you.

8           THE COURT:  Anything further?

9           MR. SCARPELLI:  Nothing further.  Thank you very much.

10          THE COURT:  Sir, I'm sorry.

11                  CROSS-EXAMINATION

12   BY MR. GILBERT:

13   Q.   Good afternoon, Ms. Brillhart.

14   A.   Good afternoon.

15   Q.   Ma'am, I have just handed you what has been marked as

16   Government's Exhibit 1503.2, which are your bench notes for the

17   lab number 07092003, correct?

18   A.   That's correct.

19   Q.   That's the lab number, that has the two-page summary?

20   A.   That's correct.

21   Q.   That's the bulk of the items that you examined came on that

22   lab report?

23   A.   Correct.

24   Q.   Let me ask you some questions about that lab report, and

25   particularly in reference to your case notes.  Your case notes

2-25-08.txt

1    are numbered, you have at the bottom page one whatever and then

2    you indicate at least that there are 42 pages of bench notes in

3    this case?

4    A.    That's correct.

5    Q.    Which would be partially the result of a large number of

6    items that you were required, you and your colleagues were

7    required to process?

8    A.    Correct.

9    Q.    Let me ask you if you might turn to your first page so you

10    shouldn't have to turn, I suppose.  Your page one, I noticed at

11    the top there is a general label that it's the Federal Bureau of

12    Investigation latent print operations unit laboratory case notes

13    continued.  Is it continued from anything?

14    A.    No.  No, it is not.

15    Q.    All right.  Well, why that page then?  Why indicate that

16    there is something that it was continued from?

17    A.    When the other examiner who assisted me in this case

18    created this page of notes, the "continued" at the top of this

19    blank case note page must have still been in her template so

20    therefore it was not deleted prior to creating this first page

21    of case notes.

22    Q.    The case notes that we have in front of us certainly for

23    the first ten pages or so are primarily typed, correct?

24    A.    Correct.

25    Q.    Are they typed on to a computer?

2-25-08.txt

1    A.    Yes, they are.

2    Q.    Do you write things down?

3    A.    Yes, I do.

4    Q.    So there would be handwritten notes as well?

5    A.    As I'm in the laboratory processing items myself and other

6    examiners, we actually hand write our notes because we don't

7    have access to a computer over on the laboratory side, so we

8    will hand write our notes, and then when we get back to our desk

9    we actually type up a hard copy of our notes.

10   Q.    And do you keep the handwritten notes?

11   A.    No, I do not.

12   Q.    Is that because it's the practice of the FBI laboratory not

13   to keep the contemporaneous notes?

14   A.    As I transfer the handwritten notes to a typed format, this

15   is considered keeping contemporaneous bench notes.

16   Q.    For example, I believe that you told us that the reason

17   that page one of these notes starts with a "continued" sheet is

18   because it was actually prepared by another examiner; is that

19   right?

20   A.    Correct.  This page was prepared by another examiner.

21   Q.    All right.  And so when we see a reference to the e-mail,

22   the first entry in your notes here is 10/11, 2007, and it makes

23   reference to an e-mail from Special Agent Pardee dated 10/30/07;

24   is that correct?

25   A.    That's correct.

Jacqueline M. Sullivan, RPR
Official Court Reporter

24

Page 22

2-25-08.txt

1  Q.   Now, who got that e-mail?

2  A.   I received that e-mail.

3  Q.   And so why would you not have started the bench notes in

4  this case?

5  A.   In this case because there were numerous examiners

6  assisting me to process and I was essentially supervising all of

7  the processing actions that went along.  I instructed the

8  examiners who were assisting me to ensure that their first entry

9  into their case notes referred to this e-mail, and the reason

10 why I did that is because this e-mail instructed me how to

11 process all the items for this case.

12 Q.   Then it talks about which items are to be processed and not

13 processed, correct?

14 A.   That is correct.

15 Q.   And who actually entered that, was that something that your

16 colleague wrote in?

17 A.   You mean the italicized print?

18 Q.   Yes.

19 A.   The italicized print was a collaboration between myself and

20 the examiner processing this case, along with speaking with

21 Special Agent Pardee in regards to all the glass files that are

22 referred to in this, these case notes.

23 Q.   So in fact so the ladies and gentlemen know what we're

24 talking about, this is an item that talks about the box that has

25 all of the viles in it, the small viles, right?


Jacqueline M. Sullivan, RPR
Official Court Reporter

25


1  A.   That is correct.

2  Q.   And that was Q112, I mean Q411.  I'm sorry.

2-25-08.txt

3    A.   Correct.

4    Q.   And a decision was made to take about fifteen of them out

5    and process them individually?

6    A.   That is correct.

7    Q.   And then so those received Q numbers?

8    A.   Correct.

9    Q.   But I thought you told us the Q numbers came before you got

10   them.

11   A.   Correct.  All these Q numbers were designated, their

12   specific Q number in our evidence control unit.  When I received

13   this case and I examined Q419, which was a cardboard box with

14   plastic wrap and it had many viles inside, this box looked as

15   though it were cut open and that access was granted to

16   particular viles right in the front.  At that point I decided to

17   process just those items because they appeared to be handled,

18   whereas all the other items in the box appeared to be new and

19   not used, so all of these viles were given Q number designations

20   prior to me receiving them, but the processing decision was

21   based on my communication with the special agent in this case.

22   Q.   Well, so are you saying that somebody took out each of

23   those viles and gave them Q numbers and then put them back in

24   the box?

25   A.   What I'm saying is, when the box came in to our evidence


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              26


1    control unit there were 52 glass viles in this box.  All of

2    those viles were given a Q number.  They were not handwritten on

3    that particular Q number.  I did that when I received it into my

                             Page 24

2-25-08.txt
4    unit in the laboratory.

5    Q.   Well, for example, the remaining viles, Q428 through 464,

6    which were not processed, they were not processed really, were

7    they?

8    A.   They were just processed within the box as is, so the box

9    that contained the remaining viles that appeared to be new were

10   just processed as is.

11   Q.   Well, so that means you left the viles in the box?

12   A.   That is correct.

13   Q.   So how could you tell if there were any fingerprints on the

14   viles?

15   A.   Well, the viles were inside the box that appeared new were

16   not to be pulled out to be processed individually.  They were

17   just processed as is, so essentially the remainder of the viles

18   were left inside the box.  The outside of the box was processed.

19   Q.   I'm having trouble with the verb "to process."  What does

20   it mean to process an item?

21   A.   When I speak about processing I'm referring to when I go

22   into the laboratory and I go through the different steps of

23   visual examination, laser examination, superglue fuming,

24   superglue dye and fingerprints powder.

25   Q.   And so you did not do, though, any of those steps with the

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                            27

1    glass viles that you left inside the box?

2    A.   That is correct.

3    Q.   So they were not processed?

4    A.   They were not taken out separately and processed, no.

5    Q.   Is there a caveat to my answer when I said so they were not
                          Page 25

2-25-08.txt

```
6    processed?  Am I misunderstanding something when you continue to

7    say they were not processed outside the box?  They weren't

8    really processed in the box, were they?

9    A.   No.  Essentially no, they were not, because all these

10   viles, when they appeared to be brand new, so based on that

11   there was -- it appeared to me there was no reason to take these

12   viles out separately one by one when they appeared to be brand

13   new and not handled and not used.

14   Q.   But that wasn't also a decision that you made consulting

15   with the special agent who was in charge of the case, correct?

16   A.   That is correct.

17   Q.   So did you have a phone conversation with Special Agent

18   Pardee about that?

19   A.   Correct.  I would have had a phone conversation or an

20   e-mail communication.

21   Q.   Would that be referenced --

22   A.   Yes.

23   Q.   -- in your bench notes?

24   A.   It would be referenced in a communication log that I keep

25   with my case.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

28

```
1    Q.   I see.  Was that provided to us?

2            THE COURT:  How would she know?

3    BY MR. GILBERT:

4    Q.   Well, you have the bench notes in in front of you?

5    A.   Yes, I do.

6    Q.   Is the communication log there?
```

2-25-08.txt

7    A.   The communication log is not part of the bench notes.

8    Q.   Do you recall today whether that was a decision that was

9    made before or after you received the e-mail from Special Agent

10   Pardee on October 4th?

11   A.   I would have to refer to the actual e-mail, but I'm sure

12   when I actually opened that evidence and saw all of these viles

13   appeared to be brand new I would have consulted at that point

14   had I had a question about what to process and what not to

15   process.

16   Q.   Because you had another situation in one of the other labs

17   where you had a bunch of little plastic bags inside a large

18   plastic bag, correct?

19   A.   That is correct.

20   Q.   It didn't appear that they had been opened so it seemed no

21   point to you to fingerprint the small ones inside?

22   A.   That is correct.

23   Q.   But that also would have been something that you would have

24   discussed with the special agent?

25   A.   Absolutely.

Jacqueline M. Sullivan, RPR
Official Court Reporter

29

1    Q.   Do you recall if you got more than one e-mail from him?

2    A.   I was in constant communication with the special agent in

3    this case coordinating my actions and processing the results

4    up-to-date and also preparation for trial.

5    Q.   And that sort of constant communication would be reflected

6    in something known as a communication log?

7    A.   That is correct.

8    Q.   All right.  Well, let me then ask you about, I want to talk

2-25-08.txt

9    to you about 403, Q403.  It's a box on which you found a number

10   of fingerprints.  And if we want to know what happened to 403 we

11   have to look through your bench notes until we see the first

12   reference to 403; is that correct?

13   A.    That is correct.

14   Q.    And that would be at page seven of your bench notes?

15   A.    Yes, that's correct.

16   Q.    All right.  And what that shows, there was an Examiner

17   Chillins?

18   A.    That is correct.

19   Q.    And it was Examiner Chillins that was looking at this item,

20   right?

21   A.    Correct.

22   Q.    And the notation is that it was sent to photo, correct?

23   A.    Yes.

24   Q.    And that means that you wanted to have an opportunity to

25   have what he or she wanted to have an opportunity to what they

Jacqueline M. Sullivan, RPR
Official Court Reporter

30

1    believe they observed captured permanently, or is that something

2    he would, he or she would -- actually, what gender is Chillins?

3    A.    She.

4    Q.    Ms. Chillins, if it says "sent to photo," that's because

5    Ms. Chillins thinks that she's seen something there, correct?

6    A.    That is correct.

7    Q.    Would she have sent it to photo if she saw it and it's the

8    photo people that take the picture, or does she have the ability

9    to photograph it if it's clear enough for her purposes?

Page 28

2-25-08.txt

10  A.   No.  At the FBI laboratory we have a separate photography

11  unit which actually captures all latent prints that we will

12  develop on the items.

13  Q.   So if we turn to the next page then, page eight of your

14  bench notes, it would appear that on October 25th -- I should go

15  back and see.  It's October 16th that Q403 was first sent to

16  photo, correct?  That would be on page 57.  I know I'm jumping

17  around.  I'll come back.

18  A.   Yes, that's correct.

19  Q.   But then on page eight it indicates that on October 25th it

20  was resubmitted to photo; is that correct?

21  A.   Yes, that's correct.

22  Q.   Is that because there was a problem with the photo?

23  A.   What happened --

24  Q.   Or do you know?

25  A.   Yes, I know.  In this instance the latent, some of the

1  latent prints that were captured by our photography unit, Ms.

2  Chillins felt as though they could be captured better, that the

3  photos that she received could be of better quality, so she

4  resubmitted the item to the photography unit in order to capture

5  those latent prints.

6  Q.   And then on November 5th there is another notation, also by

7  Ms. Chillins, about process capital R capital A capital M, exam

8  U-V-L-A-S.  And what does that refer to?

9  A.   This refers to one of the last processes that we use on a

10  nonporous item.  RAM is a fluorescent dye that's been applied to

11  an item.  These are all different dyes that are used in order to

2-25-08.txt

12    adhere to a superglue print.  After you adhere RAM to an item
13    you have to visualize it using the ultraviolet light or a laser
14    light in order to visualize the latent print.
15    Q.    All right.  But then the notation is that it's then sent to
16    photo?
17    A.    That is correct.
18    Q.    So can we infer that after going through this additional
19    step Ms. Chillins saw additional reasons to have it
20    photographed?
21    A.    That is correct.  In our processing sequence if I process
22    an item superglue, for example, and I send that item to our
23    photography unit to capture latent prints, I then continue
24    processing and then I would move on to the RAM process.  If I
25    see latent prints that I already developed or new latent prints

Jacqueline M. Sullivan, RPR
Official Court Reporter

32

1    that I see, I will have them captured by our photography unit.
2    Q.    All right.  And then just to track, 403, there is an entry
3    that on November 14th of 2007 Ms. Chillins then processed it
4    with the gray and the black powder, correct?
5    A.    That is correct.
6    Q.    At that time no additional latents were of value or found
7    so it was not sent to the photograph, right?
8    A.    That's correct.
9    Q.    And then when we want to decide what the -- what
10    comparisons were actually made, we would have to turn further in
11    your bench notes; is that correct?
12    A.    That is correct.

2-25-08.txt

13    Q.    And at least with respect to 403, if we turn to page

14    eleven, that's where we start talking about the actual

15    examinations; is that correct?

16    A.    Do you mean the actual comparisons?

17    Q.    Yes.  Yes.  I'm sorry.  The actual comparisons.

18    A.    Actually on page ten that's where the comparisons begin.

19    Q.    Right, but the first mention at 403 is at the top of page

20    eleven, correct?

21    A.    That is correct.

22    Q.    And so that shows that on November 1st five latent prints

23    of value were developed and on the shoe box; is that correct?

24    A.    That is correct.

25    Q.    So by that time you had found at least five of them, and

                        Jacqueline M. Sullivan, RPR
                            Official Court Reporter
                                                                    33


1     were you the one that made the comparison; is that correct?

2     A.    That is correct.

3     Q.    And you're the one that found that all five of them matched

4     that of Cornell Glover?

5     A.    That is correct.

6     Q.    And so then it's on November 19th that two more latent

7     fingerprints are developed, and those are also from Cornell

8     Glover, correct?

9     A.    That is correct.

10    Q.    And that would have been after the RAM process, correct?

11    A.    Correct.

12    Q.    And in fact, the notation there in parentheses, RAM, after

13    Q403 on 11/19/07, that indicates that is the process that were

14    you using, right?

2-25-08.txt

15      A.    Yes, that's correct.

16      Q.    And then it indicates that on 11/28 yet another latent

17      print of value was developed on Q403, correct?

18      A.    Correct.

19      Q.    What happened between November 19th and November 28th?

20      A.    What do you mean?

21      Q.    Well, nothing happened to process 403 between the 19th of

22      November and the 28th of November, did they?

23      A.    Well, actually this portion of the notes are actually my

24      notes and I was the examiner conducting all the comparisons in

25      this case, so the documentation listed there, it says

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    34


1       examination is continuing, that is referring to comparisons.

2       That's referring to actually looking at the latent print in the

3       photograph.

4       Q.    So the term "latent print developed" is not what's

5       happening, the latent print is already there and it's just being

6       compared, that is what we should understand "developed" to mean

7       in this context?

8       A.    Correct.  In this instance in my notes when I say, for

9       example, one latent fingerprint of value developed on Q403, what

10      I'm doing there is I'm claiming that latent print, and what I

11      mean by that is I'm saying this latent print is of value for

12      identification purposes, and then after that notation I am

13      listing my result as to who I compared it to, what my result

14      was.

15      Q.    Well, I want to talk then about, it's ACE-V system that

2-25-08.txt

16    they all use?

17    A.    It's the ACE-V methodology.

18    Q.    ACE-V?

19    A.    Yes.

20    Q.    But the ACE is A-C-E and that stands for the analysis,

21    comparison, and evaluation?

22    A.    That's correct.

23    Q.    Do you not do that analysis all at once?

24    A.    The analysis portion is conducted on a latent print that is

25    deemed of value, so at the point where I determine that a latent

Jacqueline M. Sullivan, RPR
Official Court Reporter

35

1    is of value for identification purposes I look at that latent

2    print, I evaluate all the information in that latent print, and

3    that is done separately.

4    Q.    All right.  So did you do that with -- let me make this a

5    little simpler.  Five of the prints on 403 were developed as a

6    result of the original examination and then photography,

7    correct?

8    A.    That is correct.

9    Q.    And then the other five were developed as a result of using

10    the florescent dies, the RAM process?

11    A.    I'm just going to refer to my notes.

12    Q.    Sure, sure.

13    A.    According to my notes, there were six fingerprints that

14    were developed with superglue on Q403, and there were four

15    fingerprints that were developed RAM.

16    Q.    All right.  And so let me then go to page, back up to the

17    top of page eleven when you say five latent fingerprints of

Page 33

2-25-08.txt

18   value were developed.  This is your first entry on November 1st,

19   2007, your first entry with respect to this item.  So there's

20   five latent prints there.  Am I misunderstanding something in

21   your notes?

22   A.   No.

23   Q.   All right.  So where did the sixth come from?

24   A.   On the next page, on page 12, under 11/28/07 there are two

25   fingerprints that are claimed there on Q403.  One fingerprint

Jacqueline M. Sullivan, RPR
Official Court Reporter

36

1    was developed superglue and the other fingerprint was developed

2    RAM.

3    Q.   All right.  And so I'm having trouble understanding the

4    chronology of when these occurred.  I understand that because

5    you go through the sequences of -- methods of developing latent

6    prints, which are not always visible to the eye, right?

7    A.   Correct.

8    Q.   I mean, the Sherlock Holmes with the magnifying glass

9    wouldn't find a lot of latent prints, right?

10   A.   I don't know about that.  I'm not sure.

11   Q.   So you found some latent prints out of the gate, so to

12   speak, before you had to apply the florescent dyes, right?

13   A.   I'm not sure I understand your question.

14   Q.   Ms. Chillins found some latent prints before she had to

15   process it with the RAM, am I correct?

16   A.   Yes, you're correct.

17   Q.   All right.  And do we know which ones or how many of those

18   she found?

Page 34

2-25-08.txt

19    A.    On Q403?

20    Q.    Yes.

21    A.    If you look on page 12 there's chart, and it's like a

22    little summary that I inverted into my notes.

23    Q.    Sure.

24    A.    The third box down, it says ten fingerprints on Q403.

25    Q.    Yes.


                         Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                  37


1    A.    There were six fingerprints that were developed super glue.

2    That's SGF, and four fingerprints RAM.

3    Q.    So from that summary box we can refer back to the fact that

4    six of them were identified prior to having to use the RAM

5    technique?

6    A.    I would have to actually look at my notes here as far as

7    dates what was processed, when.  You know, as each examiner

8    helped me process this case, if they developed photographs they

9    gave those photographs to me so that I could begin doing my

10   comparisons.

11   Q.    Well, that's fine, and certainly it would be fair for you

12   to do that.  Let me see if I can phrase the question this way,

13   though.  Once you've been given a latent print, would you be

14   given first of all at least of off an individual item like 403,

15   you've been given 403 as one particular item of interest because

16   you in fact were finding latent prints of value on 403.  All

17   right.  Are you given all of those that are developed at one

18   time?

19   A.    All of the photographs?

20   Q.    Yes.
                         Page 35

2-25-08.txt

21    A.    I'm given, I was given those photographs as they were

22    developed.

23    Q.    And so we can assume, leaving aside having to send it back

24    to the photo, that before the RAM testing was done there were

25    six prints that had been developed?

Jacqueline M. Sullivan, RPR
Official Court Reporter

38

1    A.    Before the RAM testing was done there were six prints that

2    were developed, correct.  They were developed superglue.

3    Q.    Were you given all of those prints at the same time?

4    A.    I don't recall.

5    Q.    Is there any reason why you would not be given them all at

6    the same time?

7    A.    No, there is not.

8    Q.    Because you start the next process, the comparison process,

9    and is that the process that is split up, so some of it is done

10   on November 1st and then some of it is done on November 19th,

11   and some of it done on November 28th?

12   A.    Based on my notes, yes, because, you know, when you compare

13   latent prints you can't put a timetable on how long it takes you

14   to analyze and compare a latent print, so these entries in my

15   notes are reflecting when I performed various comparisons on

16   different dates because there were so many latent prints, you

17   know, just in this particular case, and, you know, items that I

18   was coordinating, processing, so there are various dates as to

19   when I did my comparisons.

20   Q.    Well, I guess I'm a little confused as to why you wouldn't

21   make all of the comparisons off one item at the same time.

Page 36

2-25-08.txt

22   A.    There is really no reason for that.  For example, on Q403

23   there were numerous photographs that were given to me that were

24   captured by our photography unit.  On each of those photographs

25   I have to evaluate that photograph.  I'm looking for any latent

Jacqueline M. Sullivan, RPR
Official Court Reporter

39

1    prints that are present.  Then I'm determining whether or not

2    there are latent prints of value, or I'm taking into account the

3    clarity of the latent print, the quantity of the information.

4    At that point let's say I determine that a latent print is of

5    value, then I will further evaluate that latent print, claim the

6    latent print, and then perform my comparisons to a known

7    individual.  This is a very time-consuming process, so it takes

8    a long time to actually perform this.

9    Q.    And so what I'm understanding is that we should not assume

10   that you would process all of the latent prints from a single

11   item at the same time?

12         MR. SCARPELLI:  Objection, your Honor.  I think we've

13   exhausted this issue.

14         THE COURT:  Well, I'll let her answer it, but can you

15   answer that?  I think you explained the answer.

16         THE WITNESS:  Essentially just because I developed

17   eight fingerprints on one item doesn't mean that I'm going to

18   compare all of those latent prints in one day.  It may take me

19   various days.

20   BY MR. GILBERT:

21   Q.    Very well.  Let me ask you then just one final area about

22   this.  And that is the verification process.  I believe you told

23   us that if you make an identification it is verified; is that

2-25-08.txt

24      correct?

25      A.   That is correct.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    40


1       Q.   And that verification process, is that done by you going to

2       a fellow examiner and saying I've made this identification, will

3       you see if you agree with it?

4       A.   No.   That's not how it takes place.   What happens is I make

5       an identification, I document this in my bench notes.   I will

6       then provide that information to my supervisor who then

7       determines who will verify that latent print and then provide

8       that paperwork to that examiner to verify the identification

9       that I've made.

10      Q.   All right.   And the only thing that's verified are

11      identifications, correct?

12      A.   That is correct.

13      Q.   And what is the difference between verification and a blind

14      verification?

15      A.   Verifications occur with every identification, so if I

16      identify an individual, every identification is verified.   Now,

17      a blind verification comes into play when there is a single

18      conclusion, so, for example, if I develop a latent print, one

19      latent print on one item and I identify an individual and there

20      are no other latent prints that I have identified to that

21      individual that is blind-verified, so first I will identify this

22      print.   It will be verified and then blind-verified, and with

23      that being said, if I have one nonidentification, say, I develop

24      one print in a case and it was nonidentified, one print, that

                              Page 38

2-25-08.txt
25      print will be blind-verified.  It is not verified because there

Jacqueline M. Sullivan, RPR
Official Court Reporter

41

1      was not an identification.

2      Q.   What does it mean to blind-verify?

3      A.   Blind verification refers to another examiner who has no

4      idea as to my conclusion, so, for example, if I identify an

5      individual and a particular finger, for example, the right

6      thumb, so I identify the right thumb of a particular individual,

7      the blinded verifier has no idea what person or what finger I

8      have identified.  They are provided a latent print, the

9      photograph of the latent print, and the known card of the

10     individual without any of my case documentation.

11     Q.   All right.  But you told us that when you made these

12     comparisons and virtually every case you were given several

13     known cards or several sets of known prints that you could read

14     the database and compare them to items when you evaluated them;

15     is that correct?

16     A.   I missed that last part.

17     Q.   I'm sorry.  That was perhaps too complicated.

18            I believe that you told us in going through your

19     summary chart I believe that you told us with respect to each

20     item that you say you recovered an identifiable print from that

21     you were actually given at least several names to compare that

22     to; is that correct?

23     A.   I was given names in regards to the particular Q number, so

24     my communication with the special agent in this case, he

25     instructed me who to compare to particular items that were

Page 39

Jacqueline M. Sullivan, RPR
Official Court Reporter

42

1     submitted to the laboratory.

2     Q.   All right.  But in each case you were given several names

3     to compare it to, correct?

4     A.   That is correct.

5     Q.   So with it simply being verified the person who is, quote,

6     simply verifying is actually given the fingerprint and given the

7     particular known print that you think matches and just asked if

8     they reached the same conclusion, right?

9     A.   That is correct with verification, yes.

10    Q.   Blinded verification, are think given just the card, you've

11    made the identification, or are they given all of the known

12    prints that you make the identification, that you considered

13    before you made the identification?

14    A.   That is up to the supervisor who actually provides that to

15    another examiner.  That's not my decision to do.

16    Q.   And so is other than the fact that you have written or

17    somebody has written that there were ten blind-verified results

18    here which would match the ten identifications in this whole lab

19    thing now, right?

20    A.   I don't believe there were ten blinded-verifications in the

21    whole case.

22    Q.   Well, I'm only referring to this lab number that ends in

23    0307.

24    A.   Okay.

25    Q.   I mean, on page eleven it shows that there is a notation

2-25-08.txt

43

1    there about verified identifications, and then there's one that

2    says ten blind-verified on 11/20/07 by, it looks like, Michelle

3    Resnick; is that correct?

4    A.   What that actually says there is, is a one, and then there

5    is a symbol, which it means identification.

6    Q.   All right.

7    A.   So that means one identification was blind-verified on

8    11/20/07 by Michelle Resnick.

9    Q.   Which one was that then?

10   A.   In this instance on Q277 Anthony Suggs was identify to the

11   orange bucket, and because there was one identification to

12   Anthony Suggs it was verified as well as blind-verified.

13   Q.   I see.  And if you've identified Cornell Glover time and

14   time again, that needs to be verified but not blind-verified; is

15   that correct?

16   A.   That is correct.

17   Q.   All right.

18            MR. GILBERT:  No further questions, your Honor.

19            MR. EARNEST:  I'm sorry.  Just one or two.

20                         CROSS-EXAMINATION

21   BY MR. EARNEST:

22   Q.   Do you know how many items you processed from the basement

23   of New Hampshire, 3536 New Hampshire Avenue?

24   A.   I'm not sure about that designation.  I would have to know

25   a lab number.

Jacqueline M. Sullivan, RPR
Official Court Reporter

44

2-25-08.txt

1    Q.   Do we have a lab number?  There is an exhibit that

2    summarize's this?  I know you can't provide it?

3              MR. SCARPELLI:  May we approach, your Honor?

4              THE COURT:  Yes.

5              (Bench conference as follows):

6              MR. SCARPELLI:  They're not broken up by,

7    unfortunately they didn't send them based on --

8              THE COURT:  Well, you must have some way, you have

9    380-something.  This is not irrelevant.

10             MR. SCARPELLI:  You're asking me in front of the jury.

11   The witness said she doesn't know and I can't testify so we'll

12   have to try --

13             THE COURT:  You can tell them and we can have a little

14   stipulation.  The 383, do you know how many came out of that

15   address?

16             MR. SCARPELLI:  Well, I know that the --

17             MR. EARNEST:  It doesn't have to be an exact number.

18             MR. SCARPELLI:  I know there is 22 viles that were

19   sent -- well, 21 of them were sent.  One was sent to trace, at

20   least I don't know.  There was close to 20 viles that were sent.

21             THE COURT:  Anything else?  Do we know?  I mean, this

22   testimony, she's the best expert to ever come out of the FBI if

23   you ask me by far on this subject first time out, they ought to

24   bring her back, but the fact of the matter is that what's of

25   interest is how you break it up by location.

2-25-08.txt

1          MR. SCARPELLI:  What I talked about with Mr. Martin

2    over the lunch hour was possibly getting a stipulation.

3          THE COURT:  Fine.  Do it.

4          MR. SCARPELLI:  With a G number.

5          THE COURT:  Whatever way you do it.

6          MR. EARNEST:  We can work out a stipulation.

7          THE COURT:  I think it's important to have some sense

8    of what came from where both in terms of numbers and kinds of

9    items.  I mean, the way it stands at this moment, other than the

10   fact we know there's a lot of stuff that with Cornell Glover,

11   it's very hard to figure out whether any of this is terribly

12   relevant to anybody in particular.

13         MR. SCARPELLI:  We'll work out a stipulation.

14         THE COURT:  Okay.  So you're going to get the number

15   of items.  Do you want anything else in this stipulation per

16   location, X number of items were examined that came from here?

17   Is there anything else that we want?

18         MR. SCARPELLI:  What I propose to do is take the

19   summary chart and just then list where each item was taken from.

20         THE COURT:  Fine, whatever you want to do.  She

21   doesn't know the answer then.

22         Do you have any other questions?

23         MR. EARNEST:  No, your Honor.

24         (End of bench conference.)

25         THE COURT:  Anything further from the government?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              46



1          MR. SCARPELLI:  No, your Honor.

2          THE COURT:  We're going to try to provide the
                          Page 43

2-25-08.txt

3    information that was just asked about that apparently the

4    witness doesn't know, that is, of all the 383 items exactly

5    where they came from or at least number-wise where they came

6    from, but that's not available to this witness.  The parties

7    will try to work that out, is my understanding.

8           Anything else for the government?

9           MR. SCARPELLI:  Not with this witness, your Honor.

10          THE COURT:  Thank you.  We appreciate it.  You can

11   give back those exhibits to the government.  You're excused.

12          (Witness excused at about 3:05 p.m.)

13          THE COURT:  I guess this is a good time to take a

14   break.

15          Who's next, please?

16          MR. HAN:  Agent Bevington, your Honor.

17          THE COURT:  What do you know?  When all else fails,

18   here comes Agent Bevington.

19          We'll take a break.

20          (Recess taken at about 3:05 p.m.)

21          (Back on the record at about 3:20 p.m.)

22          COURTROOM DEPUTY:  All rise.

23          THE COURT:  Are you ready to bring in the jury?

24          MR. HAN:  Your Honor, there's one more transcript we

25   need to put in the book.  That's 604.

Jacqueline M. Sullivan, RPR
Official Court Reporter

47

1          THE COURT:  I'm sorry, what are you saying?  We had

2   the one that everybody agreed to, which were tabbed 132 and 133.

3   They're new.  Do you have something else now?

**Page 44**

2-25-08.txt

 4            MR. HAN:  Truck bug 604, the transcript has been

 5     approved by the Court and it's been redacted.  It goes under tab

 6     117, which is left potentially blank.

 7            THE COURT:  117.  You mean 117 was blank?  Can you

 8     give it to counsel so they know what you're talking about?

 9            MR. HAN:  They already have it.

10            THE COURT:  Have you given them the 117?

11            MR. HAN:  They should have it.  Truck bug 604.

12            MR. GILBERT:  It's been through a lot of iterations,

13     your Honor.

14            THE COURT:  Yes, I know, so I don't know which one

15     you've got either.  Can you give them copies, please?  Do you

16     have an extra?

17            MR. MAZETELLI:  I believe they already have it.

18            THE COURT:  One minute, please.  One minute, please.

19     One minute, please.  When you say you already have it, I don't

20     have it so why should they have it?

21            MR. MAZETELLI:  I believe I gave it to everybody

22     already.  I thought I gave you a copy too, your Honor.

23            THE COURT:  When?

24            MR. MAZETELLI:  Bates stamp 180.

25            THE COURT:  180.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                48



 1            MR. MARTIN:  Let me look at it and I'll tell you.

 2            MR. DONAHUE:  I have one.  I have it.

 3            MR. MAZETELLI:  Mr. Donahue has it.

 4            THE COURT:  I do not.  If I have it it's someplace

 5     else, someplace that I don't know about.  Can I have a copy?

2-25-08.txt

6            MR. MAZETELLI:  Yes, your Honor.  Sorry.

7            THE COURT:  180 from the truck bug 640.  This is

8    one -- I probably do have it.  This is an edited, this is one I

9    made them edit.  Okay?  You got it?

10           MR. GILBERT:  I don't have one with the Bates stamp.

11           THE COURT:  Well, it's 604, and it goes for

12   seven-and-a-half pages, but here you can look at this one just

13   so you can see whether it coincides with what you do have.

14           MR. GILBERT:  That's fine, your Honor.

15           MR. SCARPELLI:  Do you want to switch?  I'll give you

16   a Bates-stamped one and you can give me one that's not Bates

17   stamped.

18           THE COURT:  Pretty soon they'll be giving you tabs

19   too.

20           MR. MAZETELLI:  I might have one extra too.

21           THE COURT:  All right.  I believe I don't have it in

22   front of me.  The way to check to see what it was before, I

23   mean, this is what -- I assume you've done it consistently with

24   my ruling.

25           MR. HAN:  I assume so too, your Honor.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              49




1            THE COURT:  180.  All right.  I mean, I can go and

2    recreate it because I have a file somewhere of how I ruled.  I

3    can't remember whether it was objectionable.

4            MR. HAN:  Your Honor, we're not going to play that

5    activation during this series of calls.  It will be later on in

6    the case.  There's at least this set of calls and the search

2-25-08.txt

7    warrant before we get to truck bug 604.

8          THE COURT:  Well, I'd ask that if you see any problems

9    with 604 let me know.  All right.  Then we're ready to proceed?

10   Well, then don't hand it out yet, okay?

11         MR. HAN:  We won't.

12         THE COURT:  We're about to hand out the last two tabs,

13   correct, which I have as tabs 132 and 133.  It's Bates stamp

14   starts 218 through 220 something.  Okay?

15         MR. HAN:  Yes.

16         THE COURT:  All right.  That's fine.  Okay again.

17         (Jury enters courtroom at about 3:24 p.m.)

18         THE COURT:  Okay.  Good afternoon, ladies and

19   gentlemen.

20         THE JURY:  Good afternoon.

21         THE COURT:  In case you don't recall, this is Agent

22   Bevington.

23         You're still under oath.

24         THE WITNESS:  Thank you.

25         MR. HAN:  With the Court's permission, if we could


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                           50


1    pass out the last two editions to the transcript book, tab 132,

2    which is activation 186, and tab 133, which is activation 1247.

3    Both go at the very end of the binder.

4          THE COURT:  Right.  Just stick this at the end, tail

5    end.  We've added two tapes for you, ladies and gentlemen.

6    Before the end of the case we will take out any tapes that

7    haven't been played and you will have a book that coincides

8    strictly with that.
                            Page 47

2-25-08.txt

```
 9            Everybody get the two extra tabs?  In your book it's
10     going to be 132, 133.
11            Are we ready to go?
12       SPECIAL AGENT JOHN BEVINGTON, WITNESS FOR THE GOVERNMENT,
13                        PREVIOUSLY SWORN
14                      DIRECT EXAMINATION
15     BY MR. HAN:
16     Q.   Can you please state your name again for the record?
17     A.   John Bevington.
18            THE COURT:  You got to be kidding.
19            MR. HAN:  Just for the record, your Honor.
20     BY MR. HAN:
21     Q.   If I could direct your attention to activation 446 and ask
22     you to tell us the name, date, and participants of that phone
23     call.
24     A.   Could you repeat that, please?
25            THE COURT:  Tab 447 or activation.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

51

```
 1            Can you give us a tab or Bates stamp, please?
 2     BY MR. HAN:
 3     Q.   Tab 20, Bates stamp 29, and can you tell us the date, time,
 4     and participants of that phone call?
 5     A.   The date is January 14th, 2007.  The time is 6:47 p.m., the
 6     speakers are Anthony Suggs and Glendale Lee.
 7     Q.   You previously talked about how you knew it was Anthony
 8     Suggs' voice on the line.  Can you please tell us how you know
 9     this is Glendale Lee's voice on this line?
```

**Page 48**

2-25-08.txt
10          THE COURT:  One minute, please.

11          Everybody with us?

12          JUROR IN SEAT NO. 3:  No.

13          THE COURT:  Bates stamp 0029, tab 20.  This is

14    activation 446, January 12.  One second, please.

15          Anybody want us to holdup anymore?  Everybody okay?

16    Thank you.

17    BY MR. HAN:

18    Q.   How do you know this is Glendale Lee on this line?

19    A.   Mr. Lee consistently used the telephone that was subscribed

20    to in his name and during the course of the court-ordered

21    wiretap interceptions.  There were different times where Mr.

22    Suggs referred to him as Glen and ultimately was arrested at New

23    Hampshire Avenue, 3536 New Hampshire Avenue, Northwest, which is

24    from the phone intercepts where we believed him to be living.

25    Q.   Have you seen a Sprint telephone bill subscribed to by


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                            52


1     Glendale Lee?

2     A.   Yes, I have.

3     Q.   How does the number on that bill coincide with the numbers

4     that he either calls to or from in this series of calls?

5     A.   It's the same number.

6          MR. HAN:  Would you play that call, please?

7          (Audio tape played.)

8     BY MR. HAN:

9     Q.   In the first part of that conversation there's a reference

10    to grandma downstairs.  What are they referring to there?

11    A.   The downstairs, well, the grandma is Anthony Suggs'
                       Page 49

2-25-08.txt

12    grandmother, and the downstairs is the basement at 3536 New

13    Hampshire Avenue, Northwest, Washington.

14    Q.    Go to tab 23, which is activation 546, Bates number 35.

15    Tell us the date and time and people in this call.

16    A.    January 15th, 2007, 3:34 p.m.   The speakers are again

17    Anthony Suggs and Glendale Lee.

18              (Audio tape played.)

19    BY MR. HAN:

20    Q.    Referring you now to tab 35, which is activation 649, Bates

21    stamp 48, tell us the date, time, and people in this call.

22    A.    The date is January 16th, 2007.   The time is 10:43 p.m.,

23    the speakers are Anthony Suggs and Glendale Lee.

24              (Audio tape played.)

25    BY MR. HAN:


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    53


1     Q.    Referring you to tab 37, which is activation 727, Bates

2     stamp 5050, tell us the date and time and participants of that

3     phone call.

4     A.    January 17th, 2007, 10:43 p.m.   The participants are

5     Anthony Suggs and Glendale Lee.

6              (Audio tape played.)

7     BY MR. HAN:

8     Q.    Directing you to tab 56, which is activation 1163, Bates

9     stamp 0077, tell us the date, time, and participants of that

10    call.

11    A.    January 22nd, 2007, 8:49 p.m., and the speakers are Anthony

12    Suggs and Glendale Lee.

2-25-08.txt

13          MR. EARNEST:  Excuse me, your Honor.  I'm having

14     trouble.

15          MR. HAN:  0077.

16          MR. EARNEST:  All right.  Go ahead.

17          (Audio tape played.)

18     BY MR. HAN:

19     Q.   Let's go to tab 57, activation 1179, Bates stamp 78.  Give

20     us the date, time, and participants of that phone call.

21     A.   This is again January 22nd, 2007, 9:29 p.m., and the

22     speakers are Anthony Suggs and Glendale Lee.

23     Q.   How much time has past between the previous call, 1163, and

24     this current call, 1179?

25     A.   Just 50 minutes.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                  54


 1          (Audio tape played.)

 2     BY MR. HAN:

 3     Q.   Turn to the next tab, 58, activation 1182, Bates stamp

 4     0079, and tell us the date, time, and participants of that call.

 5     A.   Again January 22nd, 2007, 9:39 p.m., and the participants

 6     are again Anthony Suggs and Glendale Lee.

 7     Q.   How much time past between that call, 1182, and the

 8     previous one, 1179?

 9     A.   Ten minutes.

10          (Audio tape played.)

11     BY MR. HAN:

12     Q.   In that last series of calls there was a reference to

13     Tacoma Station.  Do you recall that?

14     A.   Yes, I do.

2-25-08.txt

15    Q.   To your knowledge what is Tacoma Station?

16    A.   Tacoma Station is a club in northwest Washington close to

17    the line with Tacoma, Maryland.

18    Q.   If we could turn to tab 133, which is activation 1247,

19    Bates stamp 0220, the very last tab.

20         MR. EARNEST:   Again, what was the Bates number,

21    please, sir?

22         MR. HAN:   0220.

23    BY MR. HAN:

24    Q.   And can you give me the date, time, and activation of this

25    call?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              55


1     A.   This is January 23rd, 2007.   The time is 5:29 p.m., and the

2     participants are Anthony Suggs and Julian Johnson.

3     Q.   Now, this, even though these participants are Julian

4     Johnson and Anthony Suggs, do they refer --

5          THE COURT:   This is the one we just passed out to the

6     jury a few moments ago.

7     BY MR. HAN:

8     Q.   Who do they talk about in this call primarily?

9     A.   In at least part of this Glendale Lee.

10         THE COURT:   Got it, Mr. Earnest?

11         MR. EARNEST:   Yes.   Thank you.

12         MR. HAN:   Please play that call, please.

13         (Audio tape played.)

14    BY MR. HAN:

15    Q.   At the bottom of Bates stamp 0222 there is some reference

                    Page 52

2-25-08.txt

16     to Big John being in Suggs' business and if they snatch him up

17     something is going to happen.  Do you see those parts of the

18     conversation?

19     A.    Yes.

20     Q.    What's going on in that part of the conversation?

21     A.    Mr. Suggs is concerned that Glendale Lee is telling John

22     everything that they're doing, and if John is arrested for

23     something he will testify against them.

24              THE COURT:  Who is John?

25              THE WITNESS:  He's an associate of theirs.  I don't

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                 56

1      know his full name.

2      BY MR. HAN:

3      Q.    Let's go now to tab 59, which is activation 1262, Bates

4      stamp 0080.

5              THE COURT:  0080?

6              MR. HAN:  Actually, let me go back for a second.

7      BY MR. HAN:

8      Q.    Going back to the call we just played, activation 1247,

9      which was tab 133, how does the date and time of that call

10     relate to the three calls we played previously about Tacoma

11     Station?

12     A.    This is the following afternoon.

13     Q.    Now let's go to tab 59, activation 1262, Bates 0080, and

14     tell us the date, time, and participants of that call.

15     A.    The date is January 23rd, 2007.  The time is 6:35 p.m.

16     this is actually a voicemail message left by Glendale Lee.

17              (Audio tape played.)

2-25-08.txt

18    BY MR. HAN:

19    Q.   Let's go now to tab 60, which is activation 1283, Bates

20    stamp 0081, and tell us the date, time, and participants of this

21    call.

22    A.   The date is January 23rd, 2007.  The time is 7:21 p.m., and

23    the participants are Anthony Suggs and Glendale Lee.

24              THE COURT:  Bates number again, please?

25              MR. HAN:  0081.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter
                                                                    57


1              (Audio tape played.)

2    BY MR. HAN:

3    Q.   Please turn to the next tab, tab 61, which is activation

4    1301, Bates stamp 0082, and tell us the date, time, and people

5    in this call.

6    A.   January 23rd, 2007, 9:41 p.m., and the speakers are Anthony

7    Suggs and Glendale Lee.

8              (Audio tape played.)

9    BY MR. HAN:

10   Q.   Mr. Suggs makes a reference, I'm still laying.  What does

11   that refer to?

12   A.   It means that he's still waiting on his source of supply.

13   Q.   Let's go to the next tab, tab 62, which is activation 1345,

14   page 0083, and tell us the date, time, and participants of that

15   call.

16   A.   January 24th, 2007, 2:45 p.m.  The speakers are Anthony

17   Suggs and Glendale Lee.

18              (Audio tape played.)

**Page 54**

                              2-25-08.txt
19    BY MR. HAN:

20    Q.   Let's go to tab 97, which is activation 6104, page 0135,

21    and tell us the date, time, and participants of that call.

22    A.   April 1st, 2007 is the date.  8:47 p.m. is the time, and

23    the speakers are Glendale Lee and Anthony Suggs.

24              (Audio tape played.)

25              MR. HAN:  The Court's indulgence.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              58


 1    BY MR. HAN:

 2    Q.   What was the date of that call?

 3    A.   April 1st, 2007.

 4    Q.   When did you stop the wiretap on Anthony Suggs' phone?

 5    A.   April 7th, 2007.

 6              MR. HAN:  The Court's indulgence.

 7              No further questions.  I'll pass the witness.

 8              THE COURT:  That was 135, right?

 9              THE WITNESS:  Yes, your Honor.  0135.

10              THE COURT:  Okay.  Thank you.

11              MR. DONAHUE:  Pass.

12              THE COURT:  Mr. Earnest?

13                    CROSS-EXAMINATION

14    BY MR. EARNEST:

15    Q.   Good afternoon, Agent Bevington.

16    A.   Good afternoon, Mr. Earnest.

17    Q.   Agent Bevington, the other day you defined for us

18    minimization.  Remember?

19    A.   Yes.

20    Q.   And correct me if I'm wrong, but you basically said that
                              Page 55

2-25-08.txt

21    when you get permission to wiretap somebody's phone you go to

22    the phone company, the phone company then responds, you set up

23    your equipment, and as the wiretap proceeds there's an agent

24    always listening to these wire-tapped calls; is that right?

25    A.   It's not always an agent, but there's always, whenever

Jacqueline M. Sullivan, RPR
Official Court Reporter

59

1     we're monitoring, there's somebody listening.  It's not a

2     situation where you just turn it on and let it run.

3     Q.   So there's a person acting on behalf of the agency to

4     listen?

5     A.   Correct.

6     Q.   And if that person listening to a conversation that

7     according to their instructions and training doesn't seem to be

8     part of any criminal activity, then they turn off the monitor,

9     they don't listen to the conversation?

10    A.   Yes, they minimize it and stop recording and stop

11    listening.

12    Q.   And then sometimes if it's a long conversation they'll tune

13    in again to see if the conversation subject has changed?

14    A.   Correct.  That's what we call spot-checking long

15    conversations, because the topic could have changed or the

16    speakers may have changed.

17    Q.   Now, in this case, I believe you said this when you first

18    testified, how many -- well, we talked about this business of

19    activations, and I think there were 6,400 activations; is that

20    right?

21    A.   Yes.  Between 6,400 and 6,500.

**Page 56**

2-25-08.txt

22   Q.   And 64 or 65 hundred activations means basically that the

23   phone receiver gets listed, that's what an activation is, right?

24   So in other words, it could be that it's just a click and that's

25   the end of it, that's an activation; is that correct?

Jacqueline M. Sullivan, RPR
Official Court Reporter

60

1    A.   If Mr. Suggs, so to speak, clicked his phone, yes.  If

2    somebody was calling in to him they would actually have had to

3    dial the number, and then as we discussed previously, because of

4    the way the information comes into our office or sometimes most

5    of the time incoming calls are counted twice or registered two

6    activations.

7    Q.   Okay.  And do you have any sense of how many phone calls

8    were actually recorded in this case?

9    A.   No, I don't.  That would be something I'd have to research.

10   Q.   Do you have any sense of how many calls were minimized?

11   A.   Not off the top of my head, no.

12   Q.   Would it be fair to say that -- you said not off the top of

13   your head.  All right.  Maybe we can come back to that.

14       Let me direct your attention to activation 446, Bates

15   page 29.  And I don't think we need to play it again, but in

16   this conversation Mr. Suggs says that he's running over to

17   grandma's to drop some Depends off.  Do you know what Depends

18   references?

19   A.   Yes.  Adult diapers.

20   Q.   Right, exactly, and grandma doesn't live at grandma's

21   house, is that fair to say?

22   A.   Yes.  That is correct.

23   Q.   And from your investigation who does, besides Glendale Lee

Page 57

2-25-08.txt

24      who is in the basement, who does live at that house?

25              THE COURT:  On New Hampshire, you mean?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          61


1       BY MR. EARNEST:

2       Q.    Yes.  I'm sorry, that's the house on 3536 New Hampshire

3       Avenue where Glendale Lee was renting the basement.  Who else

4       lived at the house?

5       A.    Patricia Hill lived at the house, her sister, who I don't

6       recall her name, and I believe one of their daughters, Ashley,

7       and another I believe another gentleman named JR also lived at

8       the house.

9               THE COURT:  What's grandma's name?

10              THE WITNESS:  I don't know her name, I don't believe.

11              THE COURT:  So she's not Patricia Hill?

12              THE WITNESS:  No, she's not.  Patricia Hill is the

13      aunt, the grandmother's daughter.

14      BY MR. EARNEST:

15      Q.    Agent Bevington, this New Hampshire house, when did you

16      identify it as Mr. Suggs' grandmother's house?  Let me withdraw

17      that question.  When did that investigation begin,

18      approximately?

19      A.    Sometime in 2005.

20      Q.    And in relation to that, to the year 2005, approximately

21      when did the house on New Hampshire Avenue become of interest to

22      your investigation?

23      A.    I don't know exactly when it became of interest in the

24      investigation.  I know I became aware it I believe sometime in

                          Page 58

2-25-08.txt

25    2006.

Jacqueline M. Sullivan, RPR
Official Court Reporter

62

1    Q.   Could you tell us some of the things that happened in 2006

2    that made you aware of this house?

3    A.   It was at that point that I became involved in the

4    investigation and began conducting surveillance and became

5    familiar with that address.

6    Q.   And in 2006 was that a place where Mr. Suggs met with

7    people sometimes?

8    A.   Yes.

9    Q.   And was there, you said there were surveillance of the

10   house.  Was there videotape taken at the house?

11            MR. DONAHUE:  Object.  Can we approach?

12            (Bench conference as follows):

13            MR. DONAHUE:  I'm going to object and I'm going to

14   move to sever if Mr. Earnest is going to become the third

15   prosecutor in the courtroom.  Mr. Suggs has a right to sever out

16   at this point.  This is not information that would come in

17   normally.

18            MR. EARNEST:  Well, your Honor, I would like to

19   establish, and I think it is a fact I should be able to prove

20   without too much difficulty, that Mr. Lee did not have anything

21   like exclusive control of that basement.  People came and went

22   from that house, including from the basement repeatedly much

23   earlier than when he started to live there, and when he started

24   to live in the basement they continued to come and go.

25            THE COURT:  Well, there are people other than Suggs?

Page 59

2-25-08.txt
Jacqueline M. Sullivan, RPR
Official Court Reporter

63


1          MR. EARNEST:  Yes.

2          THE COURT:  I don't see how that's so -- it's his

3     mother's place, I guess, or grandmother's.

4          MR. DONAHUE:  His grandmother's, but all the questions

5     so far we are now at from Bevington was there surveillance of

6     Mr. Suggs at the house.

7          MR. EARNEST:  I'll change the direction.  I'll change

8     the direction.

9          THE COURT:  Fine.  Motion is denied.

10          (End of bench conference.)

11    BY MR. EARNEST:

12    Q.   Agent Bevington, because of your interest in the house and

13    because you've listened to all of the wiretapped conversations

14    in this case, do you know whether people congregated, or isn't

15    it true that people in fact congregated at that New Hampshire

16    house often on the weekends?

17    A.   I would say that's correct.

18    Q.   This was sort of not only sort of extended family and

19    friends of the extended family, would that be fair to say?

20    A.   Yes, I think that's right.

21    Q.   And they would party there?

22    A.   I believe so.

23          MR. EARNEST:  If I could just have a moment, your

24    Honor.

25          THE COURT:  Okay.

2-25-08.txt

1    BY MR. EARNEST:

2    Q.   Now, Agent Bevington, Mr. Lee moved in to the basement of

3    the house to live or to sleep there in February of '07; is that

4    your best understanding?

5    A.   I believe it was prior to that.

6    Q.   When according to you -- when is it your --

7    A.   I'm not exactly sure when he moved in, but I know when we

8    began listening to the calls in January of '07.  It appeared

9    that he was living there.

10   Q.   So it seemed to you that as early as January of '07 he was

11   already in the basement?

12   A.   Yes.

13   Q.   And do you know from those conversations that he paid rent

14   or at least he agreed to pay rent?

15   A.   I don't know that from the conversations that we

16   intercepted.

17   Q.   Did you know it from some other aspect of the

18   investigation?

19   A.   Yes.

20   Q.   Now, turning to this business of grandma's house, we've

21   established that grandma didn't live there.  It was used on the

22   weekends.  Do you know if Mr. Suggs ever expressed any complaint

23   about grandma's house being used in this way?

24   A.   Yes, I believe he did express frustration sometimes with

25   the number of people that were coming in and out and some of the

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-25-08.txt

1   people that were coming in and out, yes.

2   Q.   And in fact, on one occasion did he complain that it was

3   maybe cousins of his were storing a Moped in the basement?

4   A.   There was some conversation regarding what I believe was a

5   stolen Moped or mini bike or something like that, yes.

6   Q.   All right.  Agent Bevington, I'm going to turn now my

7   attention to these wiretap conversations.  Again, we spoke about

8   the one where Mr. Suggs says that he's on his way to grandma's

9   to drop off some Depends.  And then in activation 546, page 35,

10  there is a brief conversation, Mr. Lee says a two, one for Doc

11  and one more for me?

12  A.   Correct.

13  Q.   Do you know who Doc is?

14  A.   No, I do not.

15  Q.   Was there any surveillance on Mr. Suggs or Mr. Lee

16  immediately before this conversation?

17  A.   I know we followed Mr. Suggs at some point on January 15th,

18  but I don't recall it at that particular time.  I know we did

19  see him or see his vehicle at least up at the New Hampshire

20  Avenue address that day.

21  Q.   And you were not able to identify any person referred to as

22  Doc or nicknamed Doc?

23  A.   No.

24  Q.   All right.  On page 48, activation 649, there is an

25  exchange where Mr. Suggs says I'm leaving a play.  I'm coming up

Jacqueline M. Sullivan, RPR
Official Court Reporter

66

Page 62

2-25-08.txt

1    13th Street leaving the play.  Do you know from your

2    investigation what the play refers to?

3    A.    Yes.  I believe he was leaving What Goes on in the Dark.

4            THE COURT:  Dark?

5            THE WITNESS:  Dark, like Tyler Perry.  I think that's

6    the name of it.

7            THE COURT:  I'm sorry?

8            THE WITNESS:  He and his girlfriend attended a play,

9    your Honor, and I believe it was called What Goes on in the

10   Dark.

11           THE COURT:  Okay.

12   BY MR. EARNEST:

13   Q.    When he says I'm coming up 13th Street you interpret that

14   to mean that he's coming up 13th Street?

15   A.    Correct.

16   Q.    Activation 727 on page 50 I imagine that the phrase that

17   might indicate to you suspicion activity is already I'm up, I'm

18   up, grandma, I need you to bring one too.  Is that it?

19   A.    Yes.

20   Q.    And activation, referring to activation 1179, page 78, Mr.

21   Lee apparently is up at Tacoma Station listening to a comedy

22   routine of some kind and Mr. Suggs asks him do you want me to

23   ride up there, and Lee says, yeah, if you want to; is that

24   correct?

25   A.    Yes.  There was another conversation that preceded this one


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                            67



1    I believe on that day and, yes, ultimately he asked if Mr. Lee

2    wanted him to come to Tacoma Station.

2-25-08.txt

3   Q.   The previous conversation, that's activation 1163, page 77,

4   and it's about an hour and ten minutes before, and Mr. Lee says

5   something to the effect of I need to get one.  That is the

6   conversation you're referring to, the immediate previous one?

7   A.   Yes, correct.

8   Q.   So he says I need to get one and then about an hour and ten

9   minutes later Mr. Suggs says, you know, would you like me to

10  come up there, and Mr. Lee says, sure, if you want to, right?

11  A.   Yes.

12  Q.   Activation 1262, page 80, Mr. Lee says he needs a couple of

13  tickets, one for a girl and another for himself, yes?

14  A.   Yes.

15  Q.   And then it's not my intent to review every single one of

16  these conversations with you, you've already done that with the

17  prosecutor, but if we could turn to activation 1247, page 220,

18  that's the conversation where Mr. Suggs seems extremely upset

19  with Mr. Lee, and basically speaking to Mr. Johnson, Ju-Ju.  He

20  changes the subject.  They were talking about something or other

21  and he changes the subject and he basically tells Ju-Ju how he's

22  had to have some kind of confrontation with Mr. Lee because Mr.

23  Lee is running around partying all the time and not taking care

24  of his responsibilities; is that right?

25  A.   The partying was part of it.  It appears that he was also

Jacqueline M. Sullivan, RPR
Official Court Reporter

68

1   concerned about money that he's owed, and Mr. Lee telling other

2   people about their criminal activity, and a concern that that's

3   going to, if somebody gets arrested, then he will tell on them.

Page 64

2-25-08.txt

4    Q.   In fact, it says, now it has a little phrase there where he

5    says, he called me up to Tacoma Station thinking a motherfucker

6    coming with a bag.  Do you know that, you know?

7    A.   Yes.

8    Q.   If you go to the following page, it says still getting

9    bags?

10   A.   Yes.

11   Q.   And your understanding is that that's a reference to drugs?

12   A.   Correct.

13        MR. EARNEST:  The Court's indulgence.

14   BY MR. EARNEST:

15   Q.   Now, Mr. Lee was arrested in the basement of 3536 New

16   Hampshire Avenue, right?

17   A.   Yes, that's correct.

18   Q.   And hidden in that basement behind some drywall --

19        MR. HAN:  Objection, your Honor.

20        THE COURT:  Because he doesn't know about the search.

21        MR. HAN:  Essentially.

22        THE COURT:  Can you wait until the next person knows

23   about it?

24        You were not involved in the search at New Hampshire

25   Avenue, were you?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              69


1         THE WITNESS:  No, your Honor.

2         MR. MARTIN:  Your Honor, may I be excused, please?

3         THE COURT:  Do you need to take a break?  Yes, sure.

4         Okay, sustained.

5         Go ahead.

2-25-08.txt

6      BY MR. EARNEST:

7      Q.   Well, after this business at New Hampshire Avenue was on

8      March 27th; is that right?

9      A.   I'm not sure what you're referring to.

10     Q.   I'm referring to the arrest of Mr. Lee.  He was arrested

11     on -- no, I'm sorry.  I take that back.  I mean the search of

12     Mr. Suggs' house.  That was on March 27th?

13     A.   Yes, but it was not at New Hampshire Avenue.

14     Q.   Right, exactly.  It was 10th Street?

15     A.   4000 10th Street.

16     Q.   Now, immediately when that happened did your investigation

17     reveal any communication to Mr. Lee that that had happened?

18     A.   Not that I recall.

19     Q.   And let me ask you some general questions about your

20     investigation.  In your knowledge of this investigation do you

21     have any direct evidence of sales made by Glendale Lee?

22     A.   Direct evidence of sales?  We have the phone calls that

23     indicate that he had customers.

24     Q.   Were you able to identify any of his customers?

25     A.   No.

Jacqueline M. Sullivan, RPR
Official Court Reporter

70

1      Q.   Could you identify any specific sale to a particular

2      customer, for example, do you know what he sold to Doc and for

3      how much?

4      A.   No.

5      Q.   Do you have any conversations, did you pick up any

6      conversations that he might have had by any means that he might

2-25-08.txt

7   have had with alleged customers of his?

8   A.   Mr. Lee, we're talking about?

9   Q.   Mr. Lee.

10   A.   No.

11   Q.   And as a trained and experienced agent, you know that

12   people who traffic in drugs frequently -- this has come up in

13   this case -- keep records and bank statements and receipts,

14   notes, ledgers, bank records, money orders, and they tend to

15   keep them available close to them; is that right?

16   A.   I would say that different people keep some different

17   records.  My experience in these kind of investigations, you

18   don't necessarily see a lot of bank records.  You sometimes may

19   see written notes with respect to who owes how much and things

20   like that.

21   Q.   And did you find anything like that or that you're aware

22   of?  I realize there are other agents involved in this

23   investigation, but are you aware of any such papers involving

24   Mr. Lee?

25   A.   No, I'm not.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                71


1   Q.   Now, you pointed us to conversations that you believe

2   involved Mr. Lee and Mr. Suggs talking about getting a supply of

3   drugs for Mr. Lee presumably to sell?

4   A.   Correct.

5   Q.   Do you have any evidence that Mr. Lee coordinated his

6   activities with anybody else other than Mr. Suggs and presumably

7   his customers?

8   A.   From the phone calls I would say they appear to be between
                            Page 67

2-25-08.txt

9   Mr. Suggs and Mr. Lee and then Mr. Lee makes multiple references

10   to having people waiting or somebody that needs something.

11   Q.   So you don't have, there is no evidence in this case that

12   you know of that involves Mr. Lee traveling out of state, for

13   example, or transporting anything, or hiding something for

14   somebody or laundering money, anything of that nature?

15   A.   Not that I know of.

16            MR. EARNEST:  If I could have a moment, your Honor.  I

17   just want to talk with my client.

18            (There was a pause in the proceedings.)

19            MR. EARNEST:  Thank you, Agent Bevington.  That's all

20   I have.

21            THE WITNESS:  Thank you.

22            MR. DONAHUE:  Briefly, your Honor.

23                         CROSS-EXAMINATION

24   BY MR. DONAHUE:

25   Q.   Good afternoon, agent.


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                  72


1   A.   Good afternoon.

2   Q.   Agent, turn to Bates stamp 29.  I think that's the first

3   one that you testified about and played.  I just wanted to be

4   clear on what your position is.  Is it your position that when

5   Mr. Suggs is talking about Depends that you're recognizing those

6   are Depends, this is not a drug conversation, correct?

7   A.   That part of the conversation is not related to drugs, no.

8   Q.   So you recognize that his grandmother lived out in

9   Maryland?

2-25-08.txt

10   A.   Yes, I was aware of that from the phone calls.

11   Q.   You don't have any dispute that he was at grandma's house

12   picking up Depends to take them to Maryland?

13   A.   Absolutely not.

14          MR. DONAHUE:   That's all I have.  Thank you.

15          THE COURT:   Anything else?

16                  REDIRECT EXAMINATION

17   BY MR. HAN:

18   Q.   Talk about that activation 446, Bates stamp 29, which

19   defense counsel for Mr. Suggs just referred you to about the

20   depends to grandma's.  You said that doesn't relate to drugs as

21   you believe; is that correct?

22   A.   That's correct.

23   Q.   What is the importance of this phone call for the purposes

24   of investigation?

25   A.   When Mr. Suggs asked Mr. Lee what's up, are you ready to

                   Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              73


1   rock and roll, and then Mr. Lee indicates that he just got up

2   and he wasn't ready yet.

3   Q.   Turning your attention to tab 35, activation 649, Bates

4   stamp 0048, this is the activation where defense counsel for Mr.

5   Lee asked you about 13th Street.  Do you see that?

6   A.   Yes.

7   Q.   If you go down about halfway there is a reference by Mr.

8   Suggs why, what's wrong, what he need?  Do you see that?

9   A.   Yes, I do.

10   Q.   And then right below that is another reference, it's

11   labeled Suggs.  It says I got a little dude man.  We're trying
                        Page 69

2-25-08.txt

12    to do.  Do you know what I'm saying, but he counting, he

13    counting his scratch.  Did you see that?

14    A.    Yes, I do.

15    Q.    Is that supposed to be Mr. Suggs or Mr. Lee?

16    A.    No, that should be Mr. Lee.

17              MR. HAN:  No further questions, your Honor.

18              THE COURT:  The one that starts "I do."

19              THE WITNESS:  Yes, that's correct.

20              THE COURT:  Which tab is it?

21              MR. HAN:  35.

22              THE COURT:  0048, there is an error in voice, and it's

23    Lee that says, Couz, I got a little dude man.  Okay.

24              MR. HAN:  No further questions, your Honor.

25              THE COURT:  Thanks.  You may step down.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              74



1              (Witness excused at about 4:17 p.m.)

2              THE COURT:  Okay.  Why don't you start -- nothing

3    else?  Go ahead.  Call your next witness.  We'll go for a little

4    while.

5              MR. SCARPELLI:  Your Honor, I'm just going to step out

6    for a minute.  I have to get the next witness.

7              THE COURT:  That's fine.  Who is the next witness?

8              MR. SCARPELLI:  He's Special Agent Jeffrey Rice.

9              THE COURT:  We'll start.  We won't finish him today.

10             Everybody okay?

11             JUROR IN SEAT NO. 15:  Can we stand up for a minute?

12             THE COURT:  Sure.  You can stand up any time you want.

                         Page 70

2-25-08.txt
13          (Pause in the proceedings.)

14          THE COURT:  Anybody want water?

15          COURTROOM DEPUTY:  Sir, please raise your right hand.

16   Do you solemnly swear that the testimony you should give the

17   Court and the jury in the case now on trial will be the truth,

18   the whole truth and nothing but the truth so help you God?

19          SPECIAL AGENT RICE:  I do.

20          COURTROOM DEPUTY:  You may take the stand, sir.

21    SPECIAL AGENT RICHARD RICE, WITNESS FOR THE GOVERNMENT, SWORN

22                    DIRECT EXAMINATION

23   BY MR. SCARPELLI:

24   Q.   Good afternoon.

25   A.   Good afternoon.


                   Jacqueline M. Sullivan, RPR
                   Official Court Reporter
                                                          75


1    Q.   Can you please state your first name, last name, and spell

2    them for us?

3    A.   Richard Rice, R-i-c-h-a-r-d, R-i-c-e.

4    Q.   Did you also go by Jeff?

5    A.   Jeffrey is a middle name.

6    Q.   Can you tell us where you're employed?

7    A.   Federal Bureau of Investigation.

8    Q.   What capacity are you employed there?

9    A.   Special agent.

10   Q.   How long have you been employed with the FBI?

11   A.   Approximately four years.

12   Q.   I want to take your attention to June 19, 2007.  Do you

13   recall that day?

14   A.   Yes, I do.

2-25-08.txt

15   Q.   Were you asked to assist in an investigation with respect

16   to arresting Glendale Lee?

17   A.   Yes.

18   Q.   Based on what occurred on June 19th, 2007, did you prepare

19   what's called a 302?

20   A.   Yes, I did.

21   Q.   And what is a 302?

22   A.   That's a summary of the investigation or the actions that I

23   took that day.

24   Q.   I'm going to show you what's been marked as Government's

25   Exhibit 400D1 and ask you if you recognize that item.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              76


1    A.   Yes.  I recognize it.

2    Q.   And what is it?

3    A.   It is a copy of the 302 that I wrote for this case.

4    Q.   If at any point I ask you a question and you need to refer

5    to your 302 just let us know, okay?

6    A.   Okay.

7    Q.   So on June 19th, 2007 you were asked to assist in the

8    arrest of Glendale Lee.  Where did you go?

9    A.   It was on New Hampshire Avenue in D.C.  I'd have to look at

10   the paper for the exact numbers.

11   Q.   Okay.

12   A.   Okay.  It was 3536 New Hampshire Avenue in northwest D.C.

13   Q.   Do you remember approximately what time you arrived at 3536

14   New Hampshire Avenue on June 19th, 2007?

15   A.   It was approximately five minutes after six a.m. that

                         Page 72

                                    2-25-08.txt
16    morning.

17    Q.    You were obviously with other officers; is that correct?

18    A.    Yes.

19    Q.    And explain to us what you did when you approached a front

20    door to 3536 New Hampshire Avenue?

21    A.    I knocked on the door and announced myself to the residents

22    inside.

23    Q.    And who, if anybody, came to the door?

24    A.    Ms. Patricia Hill answered the door, along with a male,

25    Allen Washington.


                            Jacqueline M. Sullivan, RPR
                              Official Court Reporter

                                                                    77


1     Q.    They both identified themselves?

2     A.    Yes, they did.

3     Q.    What did you tell Ms. Hill when she answered the door?

4     A.    I asked Ms. Hill who lives at the residence.

5     Q.    And did you learn from the conversation with Ms. Hill that

6     Mr. Glendale Lee was residing in the basement?

7     A.    Yes, I did.

8     Q.    Were you permitted to enter 3536 New Hampshire Avenue?

9     A.    Yes.  Mrs. Hill allowed me and the other agents to enter

10    the address.

11    Q.    Where did you go once you entered?

12    A.    Once she told us that Mr. Lee was residing downstairs

13    that's where we went.  We went downstairs into the basement.

14    Q.    And when you went down to the basement who if anybody did

15    you see down there?

16    A.    Just Mr. Glendale Lee.

17    Q.    Can you tell us in what state he was in when you arrived in
                                    Page 73

2-25-08.txt

18    the basement?

19    A.    It was early in the morning and he seemed to be -- he was

20    lying in a bed and he seemed to be awakening.  As we approached

21    downstairs the steps were kind of -- our feet were probably loud

22    and seemed to wake him up as we went down.

23    Q.    I'm going to show you four photographs and ask you if you

24    recognize these photographs.  The first one I'm going to show

25    you has been marked Government's Exhibit 300P3.  Do you

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              78


1     recognize that photograph?

2     A.    Yes.  That is the front to the residence on New Hampshire

3     Avenue, the front door.

4                THE COURT:  Any objection?

5                MR. EARNEST:  No, your Honor.

6                THE COURT:  All right.  That's admitted.  That's P3.

7     Go ahead.

8                (Government Exhibit No. 300P3 was admitted into

9                evidence at about 4:24 p.m.)

10    BY MR. SCARPELLI:

11    Q.    The next one is 300P10.  Do you recognize that photograph?

12    A.    Yes.  After entering the residence that was a hallway

13    immediately in front of me.

14                THE COURT:  No objection?

15                MR. GILBERT:  No.

16                THE COURT:  It's admitted.

17                (Government Exhibit No. 300P10 was admitted into

18                evidence at about 4:24 p.m.)

Page 74

2-25-08.txt

19   BY MR. SCARPELLI:

20   Q.   Let me show you what's been marked as Government's Exhibit

21   P14 and ask you if you recognize that photograph.

22   A.   That is the room where Mr. Lee was residing.

23          THE COURT:  Any objection?  Okay.  And your last one

24   is?  Is that it?

25          (Government Exhibit No. 300P14 was admitted into

Jacqueline M. Sullivan, RPR
Official Court Reporter

79

1          evidence at about 4:25 p.m.)

2          MR. SCARPELLI:  Yes.

3          THE COURT:  That's three.  Did I miss something?

4          MR. SCARPELLI:  I'm going to hold off on the fourth

5    one, your Honor.

6          THE COURT:  Okay.

7          MR. SCARPELLI:  Can we publish Government's Exhibit

8    300P3?

9    BY MR. SCARPELLI:

10   Q.   Can you very, very briefly tell us what we're looking at?

11   A.   That is from the sidewalk in front of residence.  That is

12   where that picture was taken from.

13   Q.   So is the front door to 3536 New Hampshire Avenue, the door

14   opened?

15   A.   Yes, it is.

16          THE COURT:  When you say door -- oh, I see the storm

17   door is opened or something, under the awning there.  Okay.  I'm

18   sorry.

19          What quadrant?

20          THE WITNESS:  Northwest.

Page 75

2-25-08.txt

21    BY MR. SCARPELLI:

22    Q.   Can we go to Government's Exhibit 300P10?  Can you tell us

23    what we're looking at in Government's Exhibit 300P10?

24    A.   That's the hallway that's directly in front of you when you

25    walk into the front door of the residence.

Jacqueline M. Sullivan, RPR
Official Court Reporter

80

1     Q.   I'm going to zoom in on a part of this photograph and I'm

2     going to ask you.  Do you see the piece of paper that's depicted

3     on the wall?

4     A.   Yes.

5     Q.   And what is that?

6     A.   That is a room marker.

7     Q.   And what room is marked?

8     A.   Room D.

9     Q.   And can you tell us from that photograph in what direction

10    you would go in order to get into the basement?

11    A.   You would actually, right before you would get to that sign

12    that says Room D, you would make an immediate right and it would

13    be like a really sharp U-turn and the stairs are right there to

14    the right going downstairs.

15    Q.   Was there a door, a doorway or a door on to the entrance to

16    the basement?

17    A.   Yes, there was.

18    Q.   And let's go to the last photograph, which was Government's

19    Exhibit 300P14.  Can you explain to us what we are looking at

20    here?

21    A.   If you were to walk down the steps that were leading to the

Page 76

2-25-08.txt

22   basement this is the initial view that you would have of the

23   downstairs when you first walk down to the bottom of the steps.

24   Q.   Can you step down and show us on the screen where Lee was

25   in bed when you said he was sort of awaking when you came down

Jacqueline M. Sullivan, RPR
Official Court Reporter

81

1    there?

2    A.   Yes.  You'll see right here that there's --

3    Q.   Can you step back so we all can see?

4    A.   You see right here that there's a sofa and it's got like a

5    fold-up type bed to it, there was a mattress on top of that and

6    that was actually a bed.

7           THE COURT:  The right side there?

8           THE WITNESS:  On the right side of the photograph.

9           THE COURT:  Underneath some coats, right?

10          THE WITNESS:  That's correct.  The coats are hanging

11   above it from the ceiling.

12   BY MR. SCARPELLI:

13   Q.   So the sofa bed is partially closed.  Was that how it was

14   or did you or any other officers do that when you entered?

15   A.   We did that in our search of the place.

16   Q.   Can you show us where the mattress is that was on top of

17   that?

18   A.   The mattress you can see right here in the photograph at

19   the bottom of the picture right here.

20   Q.   And one last question with regard to that photograph.  The

21   part of the sofa bed that's partially closed, there are some

22   items on top of it.  I mean, I think it's obvious, but were

23   those items on top of there previously?

Page 77

2-25-08.txt

24    A.    No, they were not.

25    Q.    You can resume your seat.


                            Jacqueline M. Sullivan, RPR
                                 Official Court Reporter

                                                                    82


 1    A.    Okay.

 2    Q.    Now, when you went down the basement and you came in

 3    contact with Mr. Lee, at some point did you obtain consent to

 4    search the basement from Mr. Lee?

 5    A.    Yes.

 6    Q.    300D5.

 7                THE COURT:  Any objection?

 8                MR. EARNEST:  No.

 9                THE COURT:  All right.  That will be admitted, 300D5.

10                (Government Exhibit No. 300D5 admitted into evidence

11                at about 4:29 p.m.)

12    BY MR. SCARPELLI:

13    Q.    I'm going to show you what's been marked as Government's

14    Exhibit 300D5 and ask you what is that document that you've just

15    been handed.

16    A.    That is a consent to search document.

17    Q.    And whose signatures appear on that?

18    A.    The signature of Glendale Lee to the right of the date and

19    another special agent that was with me that day.

20    Q.    I'm also going to show you what has been marked as

21    Government's Exhibit 300D4?

22                THE COURT:  Any objection to that?

23                MR. EARNEST:  No, your Honor.

24                THE COURT:  D4 is in.

                                 Page 78

```
                              2-25-08.txt
25                (Government Exhibit No. 300D4 admitted into evidence
```

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

83

```
 1            at about 4:29 p.m.)
 2   BY MR. SCARPELLI:
 3   Q.    Do you have recognize this item?
 4   A.    Yes.
 5   Q.    And what is that item?
 6   A.    That is also a consent to search document.
 7   Q.    And who signed that document?
 8   A.    That was signed by Patricia Hill and another special agent
 9   that was with me that day.
10   Q.    Which consent to search was signed first?
11   A.    The consent to search signed by Mr. Lee was first.
12   Q.    After obtaining permission to search the basement area did
13   you in fact search the basement area?
14   A.    Yes.
15   Q.    And I want to specifically focus your attention to a bucket
16   that was found next to the desk in the basement.  Do you recall
17   that?
18   A.    Yes, I do.
19   Q.    We're going to go back to Government's Exhibit 314.  I'm
20   going to ask you to step down again and show us where the desk
21   is and where the bucket was found.
22   A.    The desk is right here.  You can see a T.V. here.  The desk
23   is right here to the left side of the photograph, and the bucket
24   is immediately beside the desk on the right side of it.
25   Q.    It's not in the photograph, though?
```

2-25-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

84

1    A.   Not in the photograph.  Because of the angle of the shot it
2    was too hard to get.
3    Q.   You can resume your seat.
4            THE COURT:  So we don't see the desk in the picture
5    either, or can you see that?
6            THE WITNESS:  You can see the desk in the picture.
7            THE COURT:  It's behind the T.V., in other words?
8            THE WITNESS:  It's right to the right of it.  They're
9    both a black color.
10           THE COURT:  Facing the T.V. it's to the right, but the
11   bucket is not visible --
12           THE WITNESS:  That's correct, your Honor.
13           THE COURT:  -- in this picture.
14   BY MR. SCARPELLI:
15   Q.   Just so we're clear, the desk is the object that has what
16   appears to be sort of a hygiene product on it, some sort of Soft
17   Soap or shampoo?
18   A.   That's correct.
19   Q.   And can you just point that out for us so we can see that
20   in the photograph?
21   A.   Yes.  Here's the hygiene product.
22           MR. EARNEST:  We can't see that.
23           THE COURT:  And I can't describe it for the record,
24   so, I mean, there is a white container there somewhere.
25           MR. SCARPELLI:  I am going to have a sticky put on the

2-25-08.txt

85

1    photograph and I'm going to have him --
2                THE COURT:  Just put it on the Elmo and point to it.
3    You know, Mr. Scarpelli, it's clear where he's going.
4    BY MR. SCARPELLI:
5    Q.   Special Agent Rice, what I'm pointing to right over here,
6    is this the desk?
7    A.   That is correct.
8    Q.   And the bucket was to the right of that desk if you were
9    facing it?
10   A.   That's correct.
11   Q.   Okay.  Now, were you present when that bucket was examined
12   by either you or other law enforcement officers?
13   A.   Yes, I was.
14   Q.   And what do you recall finding anything in that bucket?
15   A.   In that bucket was a black sac almost like a canvas-type
16   sac.  It wasn't plastic, and inside of that sac were various
17   plastic bags which contained small glass viles.
18   Q.   320 hundred to and 321.  Let me show you what's been marked
19   as Government's Exhibit 300P20 and P21.  Do you recognize those
20   photographs?
21   A.   Yes, I do.
22   Q.   And what's depicted in those photographs?
23   A.   The bucket and the black sac or canvas-type bag.
24               MR. SCARPELLI:  Your Honor, at this time the
25   government would move into evidence Government's Exhibit 300P20

2-25-08.txt

1    and P21.

2              THE COURT:  Any objection?

3              MR. EARNEST:  No.

4              THE COURT:  All right, go ahead.  20 and 21 can be

5    published.  That's what number?

6              MR. SCARPELLI:  That's Government's Exhibit No. P20.

7    BY MR. SCARPELLI:

8    Q.    And looking at the bucket, is the black bag that you talked

9    about, is that to the left of the white object sticking out of

10   the bucket?

11   A.    Yes, it is.

12   Q.    Can we have P21.  And what are we looking at in P21?

13   A.    That is the inside of the bucket which contains the black

14   bag.

15             THE COURT:  What's the white object, do you know?

16             THE WITNESS:  It's a clothes hanger.

17             THE COURT:  With what?

18             THE WITNESS:  With the white paper like you get from

19   the cleaners.

20             THE COURT:  Okay.

21   BY MR. SCARPELLI:

22   Q.    I'm also going to show you what's been marked as

23   Government's Exhibit 300D7.  Based on your search, did you

24   prepare a seizure list?

25   A.    Yes.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

2-25-08.txt
1   Q.   And that's what's in front of you?

2   A.   That is correct.

3   Q.   If you need to refer to that when I'm questioning, just let

4   us know you're looking at it, okay?

5   A.   Okay.

6   Q.   Now, in looking into the bucket did you also look into the

7   black sac?

8   A.   Yes.

9   Q.   And what did you find in there?

10  A.   Inside the black sac was various plastic bags that were

11  white and black in color.  Inside those plastic bags there were

12  two plastic bags that were wrapped in a clear plastic bag which

13  contained three small viles with caps.

14  Q.   Let me stop you there.  Let me show you what's been marked

15  as Government's Exhibit P44 and P45.  Do you recognize those

16  photographs?

17  A.   Yes, I do.

18       MR. SCARPELLI:  Your Honor, the government will

19  introduce Government's Exhibit 300P44 and P45.

20       THE COURT:  No objection?  They'll be admitted.

21  300P44 and 45.  Okay.

22       (Government Exhibit Nos. 300P44 and 300P45 admitted

23       into evidence at about 4:36 p.m.)

24       MR. SCARPELLI:  Will you publish those?

25       THE COURT:  And Mr. Scarpelli, when you have a

Jacqueline M. Sullivan, RPR
Official Court Reporter

88

1   convenient time let's take a break.  It's quite hot in here

2   frankly.  Any time that's convenient.
Page 83

2-25-08.txt

3              344 and 45.  Okay.

4      BY MR. SCARPELLI:

5      Q.   What are we looking at in this photograph, P44?

6      A.   This is a photograph of the three small viles with the

7      black plastic caps inside of a clear plastic baggie.

8      Q.   Can you show us P45?  And what is this photograph?

9      A.   These are the viles and the caps outside of the bag.

10              MR. SCARPELLI:  This might be a good place to stop.

11              THE COURT:  I think so.  It's a little too hot in

12     here.

13              Ladies and gentlemen, as I told you last week, we're

14     moving along a lot faster than I ever predicted so I'm not

15     concerned if we let us break for the evening.

16              Do not discuss the case.

17              We'll be back tomorrow for breakfast and we'll start

18     at 9:30.  Just leave your notebooks under your chair, and have a

19     good evening, and tomorrow morning start at no later than 9:30.

20     Thanks very much.

21              (Jury exits courtroom at about 4:35 p.m.)

22              THE COURT:  I predict Agent Bevington will be back

23     tomorrow.

24              MR. SCARPELLI:  More than once.

25              THE COURT:  More than once.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              89



1              MR. SCARPELLI:  More than once.

2              THE COURT:  Thank you.  Have a good evening.

3              Can I have counsel's attention for a few moments?

                          Page 84

2-25-08.txt

 4                  Thank you, sir.  You may step down.

 5                  THE WITNESS:  Thank you, ma'am.

 6                  THE COURT:  Have a good evening.

 7                  (Witness excused at about 4:38 p.m.)

 8                  THE COURT:  Okay.  Time-wise just so everybody can

 9       plan this, I suppose will be finished within an hour, right,

10       tops?

11                  MR. SCARPELLI:  I'm ten minutes.

12                  THE COURT:  And then from after that we have, what,

13       Bevington on the tapes with Mr. Lee?

14                  MR. SCARPELLI:  We have a very short witness.

15                  THE COURT:  Of Mr. Price.  I'm sorry, go ahead.  We

16       have a short what?

17                  MR. HAN:  We'll finish up with the search warrant at

18       3536 tomorrow.  Then we'll go --

19                  MR. BOYKIN:  I'm sorry.  I didn't hear.

20                  MR. HAN:  We'll finish with --

21                  THE COURT:  We'll finish with him tomorrow morning

22       first thing.

23                  MR. HAN:  Then we'll have Agent Naugle who collected

24       some mail from that residence at a later date.

25                  THE COURT:  What's the relevance of that have since we

                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              90


 1       all know he lived in the basement?

 2                  MR. HAN:  To prove that he lived in the basement.

 3                  THE COURT:  It's uncontested, isn't it?

 4                  MR. EARNEST:  It's uncontested.

 5                  THE COURT:  You're not going to argue for a minute
                              Page 85

2-25-08.txt

6    that he didn't live there, are you?

7              MR. EARNEST:  I am not.  I wish I could.

8              MR. HAN:  We might be able to take that off.

9              THE COURT:  Please.  It's cumulative.  All right.  By

10   Agent Naugle.  Thank you.

11             MR. HAN:  We have a trace evidence expert.

12             THE COURT:  Does that have to do with what we're

13   looking at now?

14             MR. HAN:  Yes.  There were some trace PCP found from

15   some of those viles.

16             THE COURT:  Okay.

17             MR. HAN:  And after that we'll play the set of Helery

18   Price calls.  We will present another witness that talks about

19   the arrests and seizure of a phone from Mr. Helery Price when he

20   was arrested.

21             THE COURT:  I don't know why that can't be stipulated

22   to anyways, but all it is is to show that the number of his

23   phone that he had when he was arrested is the same number that

24   appears in this book.

25             MR. GILBERT:  They want more than that, your Honor.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter
                                                          91



1              THE COURT:  Let him have it then.  Phone.  Price

2    calls.  Yes.  The trace expert I don't suppose is going to be

3    very long.

4              MR. HAN:  The direct won't be very long.

5              THE COURT:  All right.

6              MR. HAN:  The DEA chemist.  Then we have the arrest of

2-25-08.txt

7    Mr. Suggs and the seizure of money and phones from him.

8              THE COURT:  Okay.

9              MR. HAN:  And then lastly we'll talk about the

10   evidence that we found in the phones, that the numbers match up

11   in the phones.

12             THE COURT:  Okay.  And this may or may not be a

13   stipulation regarding heroin, I just want you to keep your eye

14   on this.  If Mr. Martin still wants it it's not a problem, I

15   don't think.

16             MR. MARTIN:  It's not.

17             THE COURT:  Stipulation regarding the quantity of

18   items or the type of items that came from each case.  So if

19   people can work on that.  This case will be over from the

20   government's point of view no later than Wednesday morning.

21             Are any of you prepared to start on Wednesday

22   afternoon?

23             MR. MARTIN:  I don't want the Court to rely on this,

24   so I better not say it, but we expect to hear from Mr. Crossly

25   today and I'll have an answer for the Court tomorrow morning in


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              92


1    that regard as to whether or not we can start before Mr. Suggs

2    puts on his case if Mr. Donahue needs some more time.

3              THE COURT:  Well, you better figure this out fairly

4    quickly.  I mean, we can take anybody out of order.

5              What about you, Mr. Earnest, do you have any witnesses

6    you're intending to call?

7              MR. EARNEST:  Yes.  I have two or three witnesses.

8    They are friendly witnesses, so if I make a phone call this
                        Page 87

2-25-08.txt

9    evening I might be able to get them in here without too much

10   ado.

11          THE COURT:  Wednesday then.  But will you give the

12   government their names and date of birth, any reverse Jencks,

13   etcetera?  They need that.

14          MR. EARNEST:  Yes, your Honor, if I must.

15          THE COURT:  We don't want to holdup on that stuff.

16          Mr. Gilbert, do you have anything you're expecting to

17   put on?

18          MR. GILBERT:  The answer to that is since Mr. Steven

19   Price is not going to testify I don't believe we will have any

20   live witnesses.  We may have some tapes that they don't have.

21          THE COURT:  That's fine.

22          MR. GILBERT:  We'll see how that plays out.

23          THE COURT:  Well, then, you have nothing to give them

24   in terms of reverse Jencks or anything like that?

25          MR. GILBERT:  That's correct, your Honor.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter
                                                                    93



1           THE COURT:  All right.  Video or any kind of date of

2    birth information.

3           Has there been any witness who testified that had a

4    criminal record?  I don't think so.  I'm just trying to keep my

5    eye on the instructions.

6           Mr. Martin, I'm sorry, you're going to tell me

7    tomorrow morning.  How many witnesses might you have if you do?

8           MR. MARTIN:  It looks like it's going to be no more

9    than three.  That's tops, your Honor, and one of those three

2-25-08.txt

10    witnesses it looks like we're going to call Special Agent Ervin

11    back very, very briefly, and I didn't serve him with a subpoena

12    today.

13         THE COURT:  Is that a problem?  Can you bring Ervin

14    over here on Wednesday?  One is the contractor.  Hopefully Mr.

15    Diamond and Mr. Scarpelli have seen the light of day so I don't

16    have to rule on this issue, but who's the third, Max the dancer?

17         MR. MARTIN:  Amanda Sommers, but we're in conference

18    right now as to whether or not we still need Amanda.

19         THE COURT:  That's fine, but you might want the

20    contractor.

21         MR. MARTIN:  Yes.

22         THE COURT:  Well, the government, I'll hear you on

23    that's not now, tomorrow.  I just think the idea of

24    cross-examining him, what he does with his tax returns is just

25    really beyond the pail for what he's being offered for.  You can


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            94


1    go last if you need the time.

2         MR. DONAHUE:  I do.  My issues are like more to

3    experts than lay witnesses, your Honor.

4         THE COURT:  I know.  Well, okay.  When will you know

5    if you're going to have experts?

6         MR. DONAHUE:  Probably by tomorrow.

7         THE COURT:  All right.  By Wednesday I'll have you

8    draft sort of jury instructions.  I can see this case going to

9    the jury next week.  We'll have to take up your objections to

10    the jury instructions, but you'll have them over the weekend for

11    sure.  You don't have to just verify my understanding of the

2-25-08.txt

12    law.  When it comes to PCP it's not like crack cocaine that the

13    jury has to make findings of quantities, if you don't find this

14    you go down to the lower one.  You better double-check me on

15    that.  There's no Apprendi issue that raises quantities.

16            MR. GILBERT:  Sure.

17            THE COURT:  Well, then, you better not rely on Mr.

18    O'Malley's instructions because he didn't give me that.  If you

19    want, you come up with a verdict form, will you, and tell me

20    what your quantities are?  You're sure?

21            MR. GILBERT:  Yes.  The quantities kick in the various

22    mandatory sentences for the defendants.

23            THE COURT:  Fine.

24            MR. GILBERT:  So, yes, no.

25            THE COURT:  That's a pretty important thing, and your


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              95


1     instructions didn't have anything about that.

2            MR. HAN:  I have one that we used with Judge Lamberth

3     in a PCP case.

4            THE COURT:  Can you fax it to me today?

5            MR. HAN:  Will do.

6            THE COURT:  Thank you.  Fax it, and give me a proposed

7     verdict form by tomorrow.  All right.  The same kind of

8     quantities under five, more than five to whatever?  How could

9     you have not done that?  Okay.  It wasn't in the government's

10    proposed instructions, that's what I'm telling you.

11            MR. GILBERT:  Just for my information, the

12    instructions that we're operating off of, are these the

2-25-08.txt

13    instructions that Mr. O'Malley sent you several months ago?

14          THE COURT:  We're operating on my set of instructions,

15    but I looked at his for the substantive instructions figuring

16    they must know the law, that's their job.  I've not had a PCP

17    case.  I've had plenty of crack cocaine cases, so when he didn't

18    give me gradations I decided I better double-check with the

19    experts out here, so the substantive instructions, I kindly wish

20    you'd get them to us tonight by e-mail and cc them as well,

21    please.

22          MR. GILBERT:  We'd be perfectly willing to send it to

23    the jury with a detectable amount.  Then we don't have to worry

24    about these findings.

25          THE COURT:  I understand that.  I'm sure you would.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              96


1     The government is going to do a verdict form and give me tonight

2     the gradations that are appropriate under the law.  I thought

3     there was something different about PCP.

4           (Proceedings adjourned at about 4:46 p.m.)

5                         - - -

6

7

8

9

10

11

12

13

14
                          Page 91

2-25-08.txt

15

16

17

18

19

20

21

22

23

24

25

Jacqueline M. Sullivan, RPR
Official Court Reporter

97

1                              I N D E X

2

3    WITNESSES:                                      PAGE:

4    FORENSIC EXAMINER MONIQUE BRILLHART

5        Cross-examination by Mr. Donahue            3
         Cross-examination by Mr. Martin             7
6        Cross-examination by Mr. Earnest            19
         Cross-examination by Mr. Gilbert            21
7        Cross-examination by Mr. Earnest            43

8    SPECIAL AGENT JOHN BEVINGTON

9        Direct Examination by Mr. Han               50
         Cross-examination by Mr. Donahue            71
10
     SPECIAL AGENT RICHARD PRICE

11
         Direct Examination by Mr. Scarpelli         74
12

13                            E X H I B I T S

14
     Defendant
15   Exhibit
     No.              Identification         Marked      Admitted

Page 92

2-25-08.txt

16      None.

17

18      Government
        Exhibit
19      No.              Identification           Marked        Admitted

20      300P3                                                     78

21      300P10                                                    78

22      300P14                                                    78

23      300D5                                                     82

24

25      EXHIBITS con't. on next page.


                        Jacqueline M. Sullivan, RPR
                         Official Court Reporter

                                                                 98


1       Government
        Exhibit
2       No.              Identification           Marked        Admitted

3
        300D4                                                     82
4
        300P44 and 300P45                                         87
5

6

7

8

9

10

11

12

13

14

15

16

17

2-25-08.txt

```
18
19
20
21
22
23
24
25
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

99

```
1                    CERTIFICATE

2

3

4              I, JACQUELINE M. SULLIVAN, Official Court

5   Reporter, certify that the foregoing pages are a correct

6   transcript from the record of proceedings in the above-entitled

7   matter.

8              _____
                JACQUELINE M. SULLIVAN
9

10

11

12

13

14

15

16

17

18
```

Page 94

2-25-08.txt
19
20
21
22
23
24
25


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter