2-26-08.txt

1                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3
     UNITED STATES OF AMERICA,      .
4                                   .
              Plaintiff,            .
5                                   .  CR No. 07-152
         v.                         .
6                                   .
     ANTHONY SUGGS and              .  Washington, D.C.
7    GLENDALE LEE,                  .  Tuesday, February 26, 2008
                                    .  At about 1:55 p.m.
8              Defendants.          .
                                    .
9    . . . . . . . . . . . . .      .

10

11            TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
               BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                  UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:        ANTHONY SCARPELLI, ESQ.
                                JOHN K. HAN, ESQ.
15                              U.S. Attorney's Office
                                555 Fourth Street, NW
16                              Room 4816
                                Washington, D.C.  20530
17                              202-353-1679

18   For the Defendant:        PATRICK M. DONAHUE, ESQ.
     Suggs                      Donohue Law Firm
19                              18 West Street
                                Annapolis, Maryland  21401
20                              410-280-2023

21   For Defendant:            RON EARNEST, ESQ.
     Lee                        8121 Georgia Avenue, Suite 406
22                              Silver Spring, Maryland  20910
                                240-401-5277
23

24
     APPEARANCES con't. on next page.
25

                          Jacqueline Sullivan, RPR
                          Official Court Reporter

2-26-08.txt

```
1    APPEARANCES, con't.

2

3    For Defendant:          RICHARD K. GILBERT, ESQ.
     Price                   P.O. Box 70448
4                            Washington, D.C.  20024
                             202-898-0857
5

6    For Defendant:          ANTHONY D. MARTIN, ESQ.
     Ernest Glover           7841 Belle Point Drive
7                            Greenbelt, Maryland  20770
                             301-220-3700
8
     For Defendant:          CURTIS A. BOYKIN, ESQ.
9    Ernest Glover           1850 M Street, NW
                             Suite 640
10                           Washington, D.C.  20036
                             202-776-0370
11

12

13

14   Court Reporter:             JACQUELINE M. SULLIVAN, RPR
                                 Official Court Reporter
15                               U.S. Courthouse, Room 6720
                                 333 Constitution Avenue, NW
16                               Washington, D.C. 20001
                                 202-354-3187
17

18

19
     Proceedings reported by machine shorthand, transcript produced
20   by computer-aided transcription.

21

22

23

24

25


                         Jacqueline Sullivan, RPR
                         Official Court Reporter
                                                                  3
```

2-26-08.txt
 1                    P R O C E E D I N G S
 2          COURTROOM DEPUTY:  All rise.  This Honorable Court is
 3     again in session.  Please be seated and come to order.
 4          THE COURT:  Okay.  Counsel, have we worked out
 5     anything on the summary?  Are we still having problems?  We
 6     don't have problems?  Are we going to be able to use this that
 7     was given to me before lunch?
 8          MR. GILBERT:  Your Honor, it's our belief that almost
 9     virtually all of those numbers are incorrect.
10          THE COURT:  Incorrect?
11          MR. GILBERT:  Yes.  We are basing that at looking at
12     the reports given to us by the government from this chemist and
13     then the quantities listed on that summary chart, so my request
14     and my recommendation is that we hear from the chemist, you can
15     keep a copy of that in front of you, and if the numbers somehow
16     match up then we can sort of talk about that at the end of
17     direct or even cross-examination, but we do not see from the
18     reports that have been given to us, we would note that
19     apparently we have just been given a report of this chemist who
20     redid a report, and it was in January of this year, in other
21     words, about a month ago.  I can't recall getting it.  The
22     government believes they sent it to us, but we got it and it's
23     very similar, a few differences to the report that we were given
24     that was dated back in May of 2007, but none of that has the,
25     neither report, neither the May 2007 or the January 2008 report

                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                                4

 1     reflect anything like the quantities in that summary chart.
 2               THE COURT:  Well, does the government have the
                              Page 3

2-26-08.txt

3      underlying documentation?

4              MR. SCARPELLI:  Judge, I gave you a very clear example

5      before we broke for lunch on how she came up with these numbers,

6      and I think first with regards to the numbers being all wrong,

7      that's --

8              THE COURT:  In any case, though, it seems to me I

9      don't have the ability now at this late date to sit here and

10     figure it out.  So if you want to go forward with her --

11             MR. SCARPELLI:  Maybe I can clarify it for you.  The

12     reports, the actual lab reports, what the chemist does is she,

13     for instance, there is 8,800 milliliters of PCP from 4000 10th

14     Street.  She concludes how much total volume there is and then

15     she gives it back to the FBI agent who submitted it, minus a

16     sample, so that's why the numbers in the report reflect the

17     samples, not the entire content, and --

18             THE COURT:  All I'm saying is that I suppose, I mean,

19     you can do one of two things.  You can introduce this, and then

20     cross-examine on the report and it goes in -- let me look at the

21     rules -- or else you put in the underlying data and she

22     testifies.  Is it 900?

23             MR. SCARPELLI:  1000.6, is it?

24             THE COURT:  Let's see.  All right.  I don't know what

25     happens when you don't agree, other than you have the right of

Jacqueline Sullivan, RPR
Official Court Reporter

5

1      cross-examination.  You've had the ability to look at the

2      underlying data you said doesn't jive.  She'll come on and

3      explain why it does, and then you have the right to cross-

Page 4

2-26-08.txt

4   examine and introduce whatever you want.  Is that not your

5   understanding of the Rules of Evidence?

6              MR. GILBERT:  No, no.  I agree.

7              THE COURT:  Okay.

8              MR. GILBERT:  I was responding merely to the Court's

9   question as to whether we had agreed on the summary chart, and

10  we have not.

11             THE COURT:  Fine.  Well, you can have it introduced.

12  It will be introduced over objection, and the question is do you

13  object to the chart?  And I suppose the question that I have to

14  face is when you introduce it whether she -- I'm thinking out

15  loud.  I should not think out loud.  What happens when she

16  introduces it, what are you going to do?

17             MR. GILBERT:  My view is they should not introduce it

18  until after she has testified and established the data that's on

19  the summary chart.  In other words, she testifies, but it seems

20  to me she should testify about all four of the lab numbers, and

21  then if her testimony -- and I agree that there is a separate

22  issue about cross-examination, if her testimony on direct

23  examination arrives at those figures, you know, then it may

24  still be over objection, but it seems to me the Court is in a

25  stronger position to say, all right, well, I'm going to let the

Jacqueline Sullivan, RPR
Official Court Reporter

6

1   government, I'm going to admit this subject to objection or

2   subject to cross-examination.

3              MR. SCARPELLI:  I don't think that's the way it should

4   go.  I think what should happen is when she's on the stand I can

5   introduce the summary chart to her and I can ask her did you

2-26-08.txt

6      prepare it, are these numbers accurate.  Then it should come in

7      because she's going to explain the charts.

8              MR. GILBERT:  Excuse me, your Honor.  The summary

9      charts don't come in unless they're agreed upon.  The summary

10     charts come in after the testimony has come in.

11             THE COURT:  I think, though, in order to me to admit

12     the chart, you'll have to establish how she came up with these

13     numbers given the state of affairs, so I would not suggest that

14     you can show it to her, but I don't think that until I

15     understand given all the objections here, and I think you have

16     to establish how she arrived at this before we actually put it

17     into evidence.

18             MR. SCARPELLI:  I thought that I showed you an example

19     before lunch on how she came up with the volume seized, how she

20     came up with the density, and then how she came up with the

21     mixture and substance of PCP.

22             THE COURT:  That's what you said, but she has to come

23     on and say these things.

24             MR. SCARPELLI:  But she prepared the chart.

25             THE COURT:  Yes, but I think you have to explain the


                         Jacqueline Sullivan, RPR
                         Official Court Reporter

                                                              7


1      numbers because we have some disagreements here.  They will be

2      able to -- you can't just pop in the chart without her

3      establishing how she arrived at these and what the bases are,

4      and then she's going to be subject to cross, but I would think

5      that you would like to run some of this cross because apparently

6      there's some discrepancy.

2-26-08.txt

 7          MR. SCARPELLI:  She's going to explain it all.

 8          THE COURT:  I know.  But I'm saying have her explain

 9    it before you put the chart into evidence so that we understand

10    the foundation for the chart, because usually the parties have

11    had the chance to look at it and they don't disagree with it and

12    now they do, so I have to be satisfied that at least this isn't

13    coming out of whole cloth.  I know you tell me, but she has to

14    tell us.  It can't be that complicated, frankly.  They're just

15    apparently she's had other reports.  That's what's going to

16    confuse things.

17          Do I have any question about notes?  Anything else I

18    have to take up before?

19          What time is the jury coming back, quarter past?

20          I misspoke.  Today we don't have to end early, it's

21    tomorrow.  I'm sorry about that.

22          MR. DONAHUE:  I understand that there are no

23    communications at all, e-mail communication notes or otherwise.

24          THE COURT:  If there aren't there aren't.

25          MR. SCARPELLI:  One other thing.


                    Jacqueline Sullivan, RPR
                     Official Court Reporter

                                                              8


 1          THE COURT:  The benefit of the chart is you don't have

 2    to put in all the underlying data that she's used, but I think

 3    given the circumstances we're going to have enough so that we're

 4    not, not the underlying data be introduced, per se, but enough

 5    of the explanation, and if she has to refer to her notes, fine,

 6    so that we know that these figures have some relationship to

 7    what was going on here.  Okay.

 8          MR. SCARPELLI:  I have one other issue, your Honor.
                           Page 7

2-26-08.txt

9   And that's with regards to the bulk PCP from 4000 10th Street.

10   What I proposed to do is I don't want to introduce it, but I

11   wanted to have it marked and I want to show it to the jury, the

12   three large containers, and then I'm going to walk it back out

13   of the courtroom so that 2.3 gallons of PCP is not just sitting

14   here.

15        THE COURT:  We don't want it to sit here.  But why

16   won't you introduce it?  You can introduce it and then walk it

17   right out of here.  I don't understand why you would just use

18   it.  I mean, how could you be using that as demonstrative

19   evidence so to speak?

20        MR. SCARPELLI:  Then I'll introduce it.

21        THE COURT:  Mr. Donahue?  I mean, he doesn't keep --

22   all evidence doesn't sit in the courtroom forever and ever.  We

23   never allowed them to discard it.  He has it, and I see

24   absolutely no reason why he can't introduce it as an exhibit as

25   long as somebody is going to --

Jacqueline Sullivan, RPR
Official Court Reporter

9

1        MR. DONAHUE:  I mean, I can't think of an objection as

2   to why it can't be admitted into evidence given the allegations,

3   but I do think it's very prejudicial when the government, you

4   know, puts on gloves, stays away from it, dances around.  It

5   implies to the jury that they're carrying some kind of explosive

6   and --

7        THE COURT:  What are we looking at?  I don't have the

8   foggiest.  Can I see the picture?

9        MR. SCARPELLI:  You see the hanger on the left.

Page 8

2-26-08.txt

10          THE COURT:  How many are there?

11          MR. SCARPELLI:  There are three.  Two I would say

12   roughly two-thirds full and one is a lot less full.

13          THE COURT:  And this is what was analyzed and

14   produced, these figures on 7.7?

15          MR. SCARPELLI:  Just 4000 10th Street.

16          THE COURT:  I know, but that is what you're talking

17   about?

18          MR. SCARPELLI:  Yes.

19          THE COURT:  Is the equivalent of 7.7 kilograms.

20          MR. SCARPELLI:  There's more.

21          THE COURT:  I mean, well, you told me there were more

22   insofar as there's two more containers.

23          MR. SCARPELLI:  Right.

24          THE COURT:  Is that what's approximately 7.7?

25          MR. SCARPELLI:  Yes.


                        Jacqueline Sullivan, RPR
                         Official Court Reporter

                                                              10



1          THE COURT:  Really?  You don't suggest that he

2   shouldn't wear the white gloves, do you?  Overruled.  All right.

3   That's fine.  You can mark it, though, as exhibits.  It's going

4   into evidence and then it's going to leave here.  We had it here

5   before.  I don't remember it being offensively anything.  I

6   don't want you to just mark it and then not introduce it.  Any

7   objection to the introduction other than Mr. Donahue's.

8          MR. GILBERT:  Who is going to introduce it?

9          THE COURT:  The government.  I know now you're saying

10   now he's bringing up what the -- who's the seizing person?

11          MR. SCARPELLI:  Well, I mean, if it's the chain of
                              Page 9

2-26-08.txt

12    custody which is the issue, we're going to have to put on two or

13    three witnesses.

14         THE COURT:  Well, I don't see how you can get around

15    that.

16         MR. SCARPELLI:  Well, I mean --

17         THE COURT:  The problem --

18         MR. SCARPELLI:  When I first made this statement I

19    assumed the chain of custody was not an issue, but if it is --

20         THE COURT:  I'm sure it isn't, but the fact of the

21    matter, I don't know why it is, but I'm not sure I can just say

22    ignore it.  That's the problem.

23         MR. GILBERT:  Well, for example, I don't have that

24    picture in front of me, but if the chemist is going to say I

25    ordered these chemicals into these containers and then, okay,


                         Jacqueline Sullivan, RPR
                         Official Court Reporter

                                                                11


1     that's fine, but if what we're talking about is that it's

2     been -- she poured it into one container and then it went

3     someplace else and now it's getting poured into something

4     different.

5          MR. SCARPELLI:  No.  It was poured into those

6     containers in front of Special Agent Naugle, who then took it

7     back to sample.

8          THE COURT:  Is this the sample, these tubes, those

9     test tubes, those are the sample?

10         MR. SCARPELLI:  No.  What's in the test tube was the

11    full amount that was inside those Everfresh bottles.

12         THE COURT:  I'm sorry.  How many Everfresh bottles

2-26-08.txt

13      would you be putting in?

14              MR. SCARPELLI:  There was seven.

15              THE COURT:  Seven?

16              MR. SCARPELLI:  Seven, I believe.

17              THE COURT:  And that this was in the cooler down-

18      stairs and the other places, right?

19              MR. SCARPELLI:  Too coolers and the attic.

20              THE COURT:  And you want to take the Everfresh bottles

21      with the PCP in it?

22              MR. SCARPELLI:  No, no, no, no, no.  I just want to

23      show the bulk, introduce the bulk PCP, so the jury sees the

24      bulk.

25              THE COURT:  And what kind of form is that?


                         Jacqueline Sullivan, RPR
                         Official Court Reporter

                                                              12


1               MR. SCARPELLI:  It's in that large container.

2               THE COURT:  Two or three of those?

3               MR. SCARPELLI:  Right.

4               THE COURT:  So you're saying that he can't do it

5       through the chemist, the chain of custody?

6               MR. GILBERT:  Your Honor --

7               THE COURT:  Is that your problem, chain of custody?

8               MR. GILBERT:  If the chemist is going to say I poured

9       it into the containers that the government wants to bring into

10      evidence, I don't have a problem with that.

11              THE COURT:  How did it get -- well, it was in the

12      containers, then the chemist took some out.

13              MR. GILBERT:  Right.

14              THE COURT:  I don't know what the chemist, didn't she

                              Page 11

2-26-08.txt

15    put things back in the containers?

16              MR. SCARPELLI:  Which containers?

17              THE COURT:  How did it get into these big containers?

18              MR. SCARPELLI:  She --

19              THE COURT:  The big container, there's sort of a

20    plastic bottle with a blue top.  Those are what you're seeking

21    to introduce?

22              MR. SCARPELLI:  Yes.  She's taking it from the

23    Everfresh bottles putting it into a cylinder to measure it and

24    at some point she's taking her sample out.  I don't know at what

25    point, but then she pours the cylinder into the large jug, is my

Jacqueline Sullivan, RPR
Official Court Reporter

13

1    understanding.

2              THE COURT:  The large jugs weren't seized from 10th

3    Street then?

4              MR. SCARPELLI:  No, no.

5              THE COURT:  Fine.  They don't have to get a chain of

6    custody back to 10th Street.  He's only seeking to bring in the

7    jugs.

8              MR. GILBERT:  I agree.  As I understand the proffer

9    the chemist is the one that poured it into the jugs.  If so, I

10    don't have a problem.

11              THE COURT:  I get that.

12              MR. SCARPELLI:  That's my understanding, and then in

13    the laboratory she then gave it to Special Agent Naugle to take

14    back because they don't want two-and-a-half gallons of PCP

15    sitting in the laboratory.

Page 12

2-26-08.txt
16          THE COURT:  I don't understand Mr. Gilbert to be

17   complaining that we don't have Mr. Naugle here anyways.

18          MR. GILBERT:  That's correct.

19          THE COURT:  All he's saying is he wants the chemist to

20   say I took what was given to me from these Everfresh bottles.

21   After I did what I was going to do I took most of the stuff

22   minus the sample and put it in these containers, and here comes

23   Mr. Scarpelli with the containers and is wearing gloves, right,

24   and as to the objection, so he is not objecting to that if

25   they're coming with the testimony of the chemist about


                         Jacqueline Sullivan, RPR
                          Official Court Reporter

                                                              14


1    containers with the blue tops.  It's not a problem, there's no

2    objection.  The only objection I've overruled is Mr. Donahue's.

3          MR. SCARPELLI:  I can't see that photo clearly, but

4    I'm not sure that that's the blue top or if she put a different

5    top on to seal it.  Is that a funnel or is that a top?

6          THE COURT:  Oh, I don't know.  It looks like a top.

7          MR. SCARPELLI:  Anyway, it has a white top on it.

8    That's what it was sealed with.

9          THE COURT:  This may be a funnel to pour it back in.

10   That's fine.  You can bring him, but they're going to have to

11   give them an Exhibit No.

12          MR. SCARPELLI:  They have a number.

13          THE COURT:  They have them already?

14          MR. SCARPELLI:  They have had exhibit numbers.

15          THE COURT:  What numbers are they?

16          MR. SCARPELLI:  1200E20, 21, and 22.

17          THE COURT:  Okay.  They'll be admitted over the only
                              Page 13

2-26-08.txt

18    objection I've heard.  They'll be admitted subject to the

19    chemist being able to say how did the substance get in the

20    bottles, the 20, 21, 22.  And they will not stay in the

21    courtroom.  I don't know whether they're ever going to ask for

22    this stuff.

23              Gwyn?

24              COURTROOM DEPUTY:  Yes.

25              THE COURT:  Is there anything else we have to take


                         Jacqueline Sullivan, RPR
                         Official Court Reporter
                                                              15



 1    before we get the chemist?

 2              COURTROOM DEPUTY:  No.

 3              MR. HAN:  Just a reminder, there's one less transcript

 4    that we need to give the jury to put in their binders, which is

 5    truck bug 604.

 6              THE COURT:  Okay.  Are you giving it a tab number?

 7              MR. HAN:  There should be a blank tab 117 in

 8    everybody's exhibit binder.

 9              THE COURT:  Okay.  Do I have any objections to this?

10    This is what I ruled on before.

11              MR. HAN:  Yes.

12              THE COURT:  That was part of the original one, and

13    you've now edited, as we read.

14              MR. HAN:  Yes.

15              THE COURT:  All right.  Well, 604, is there anything?

16              MR. MARTIN:  Your Honor, may I have a look at that,

17    please?

18              THE COURT:  Yes, sure.

                              Page 14

2-26-08.txt

19          Anyone else?  Mr. Donahue, we've gone over this

20     before.

21          MR. DONAHUE:  Yes.

22          THE COURT:  No objection?

23          MR. DONAHUE:  None other than what we talked about

24     long ago.  I mean, I'm not asking you to revisit prior rulings.

25          THE COURT:  Okay.  That had to do with sort of a


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                        16


1      factual recitation issue.  That's all I recall.  All right.

2               Could you give these back, Gwyn?

3          MR. GILBERT:  I do have a matter, and that is, we have

4      ample quantity of bench notes from this chemist that's been

5      provided to us, but as I said, we were provided with a report

6      that appears to have been generated at the end of January, last

7      month, and I guess I would ask if there is underlying

8      documentation for that report.  In other words --

9          THE COURT:  Other notes by the chemist?

10         MR. GILBERT:  Correct.

11         THE COURT:  That's a fair question.

12         MR. SCARPELLI:  Judge, I believe she submitted

13     everything.  If you look at the document we're talking about,

14     essentially the only thing changed on this report is when she

15     first tested it.  The amount of actual drug she listed at 221.4.

16     On 1/22/08 in her amended report it's 22.1.

17         THE COURT:  Okay.

18         MR. SCARPELLI:  My understanding is that the decimal

19     point was in the wrong spot, but I can check and see.

20         THE COURT:  The question is, does she have the
                         Page 15

2-26-08.txt

21    underlying documentation that relates to any report so we don't

22    have to spend our time worrying about Jencks stuff.

23          MR. SCARPELLI:  I believe she gave all the bench

24    notes, but I will check.

25          THE COURT:  Just double-check.  Take that with you so

Jacqueline Sullivan, RPR
Official Court Reporter

17

1    she can see.

2          MR. SCARPELLI:  She knows what I'm talking about, your

3    Honor, which she had which I didn't have, but I'll make a copy

4    for defense counsel and for myself.  What she did was she just

5    took the original bench notes and under the area marked 11,

6    "Amount of Pure Drug," she crossed out 221.4 and made it 22.1

7    grams, and then on page two of three she corrected her numbers

8    to reflect 22.142 grams, so I can cake a copy of this for

9    defense counsel and myself and provide it to them.

10          THE COURT:  That's fine.  Go ahead.  Can we do it

11    here?  Where is he going to copy it?

12          MR. SCARPELLI:  The bench notes.

13          THE COURT:  Where?

14          MR. SCARPELLI:  I'm going to give it to Special Agent

15    Bevington who is going to do it downstairs.

16          THE COURT:  Okay.  Well, the jury is here.

17          MR. SCARPELLI:  Your Honor, unless there's a closer

18    copy machine.

19          THE COURT:  We'll do it.  Where would he be doing it?

20          MR. SCARPELLI:  Downstairs.

21          THE COURT:  Is it front and back you have to do?

Page 16

2-26-08.txt

22          MR. SCARPELLI:  Yes.

23          THE COURT:  All right.  Do you mind?  Okay.  I think

24  we're pretty much -- well, we'll get these notes first.

25          Is the chemist the first witness?


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                        18


1           MR. SCARPELLI:  Yes, your Honor.

2           THE COURT:  Mr. Earnest, you're going to have some

3   witnesses available tomorrow?

4           MR. EARNEST:  I spoke to my investigator last night.

5   They won't be available.

6           THE COURT:  When will they be available?

7           MR. EARNEST:  Monday.

8           THE COURT:  I'm not going to ...

9           MR. DONAHUE:  May I speak to the issue, your Honor?  I

10  think I can say for all defense counsel we're kind of scrambling

11  given the change in our schedules, just to be able to -- I mean,

12  as of last week at the end of the week we were making

13  arrangements to begin the defense case on Monday first thing,

14  and at least from myself I think that's really the only

15  reasonable time I can have it, for just lay things too.  I mean,

16  we're getting transcripts together and so forth, but given the

17  fact that the case has moved so very quickly, unexpectedly

18  quickly, I'd ask the Court to consider sticking with the

19  schedule that we talked about last Thursday, which is defense

20  case starts on Monday.  What we may lose is Thursday really.

21          THE COURT:  All right.  You don't even know yet

22  whether you have anything.  Let's hear it.  You predict what?

23          MR. DONAHUE:  I don't have, I don't have my answer.  I
                    Page 17

2-26-08.txt

24      have my fingerprint person doing their analysis tomorrow.  I

25      have a drug chemist that I'm going to be speaking with after

Jacqueline Sullivan, RPR
Official Court Reporter

19

1       today's proceedings, but they're out of state.

2               THE COURT:  So these two people would be available

3       Monday if they're going to testify at all?

4               MR. DONAHUE:  They will be available early in the week

5       if they're going to testify at all.

6               THE COURT:  But you have no idea?  In all honesty

7       you're sitting here telling me you don't have any idea whether

8       they're going to testify?

9               MR. DONAHUE:  I don't.

10              THE COURT:  And you don't have anything else?

11              MR. DONAHUE:  Other than I'm trying to get transcripts

12      together for certain phone calls that were not played that we

13      think should be played and perhaps one lay witness, but I'm not

14      confident about that, but it would be a half hour.

15              THE COURT:  Al right.

16              Mr. Gilbert, let's hear what we've got.  What do you

17      have?

18              MR. GILBERT:  Your Honor, I don't, I mean, I don't

19      anticipate calling any witnesses at this point now.  If Price is

20      called in rebuttal for some reason then we may have some

21      rebuttal for Steve Price.

22              THE COURT:  The tentative answer is you have nobody.

23              Mr. Donahue, you're going to know when?  First of all,

24      they have to have notice of the expert.

Page 18

25              MR. DONAHUE:  I understand, and I talked to Mr.


                    Jacqueline Sullivan, RPR
                    Official Court Reporter
                                                              20



 1    Scarpelli about the fingerprint person.  We're using their

 2    originals to have the analysis done.  I should know if it works.

 3    Hopefully it's going to happen tonight and I'll know.  It might

 4    not happen until Thursday.  I'm not going to know until sometime

 5    tomorrow about the chemist.

 6              THE COURT:  Mr. Earnest, who again are you thinking

 7    about?

 8              MR. EARNEST:  Your Honor, I am going to call Mr. Lee's

 9    fiance or girlfriend and somebody from his work.  He worked at

10    Carabou Coffee, so his boss, his supervisor, Mr. Eric Melton,

11    and then finally an old childhood friend of his, Marquez

12    Clifford, and those are the three.  They won't be very long.  It

13    will be brief, but unfortunately I couldn't get them to be

14    available.

15              THE COURT:  They will be available Monday morning?

16              MR. EARNEST:  Yes, your Honor.

17              THE COURT:  And what precisely, give us just a little

18    bit of a clue what they have to add here.

19              MR. EARNEST:  Well, your Honor, I would like to

20    establish through -- well, through Mr. Marquez Clifford I'd like

21    to establish some of Mr. Lee's movements, some of what was

22    happening up at Tacoma Station that may explain some of the

23    conversations which the government alleges are incriminating.

24    Through his girlfriend I'd like to establish that he very often

25    was not in fact sleeping in that basement, that he was with her,

                    Page 19

Jacqueline Sullivan, RPR
Official Court Reporter

21

1    and also that he never had any kind of flash money, he often

2    depended on her to pay for their Cokes and so forth, and Mr.

3    Eric Melton I think will testify that he very often or very

4    often worked double shifts so that he was occupied for most of

5    the week.  He wasn't running around selling drugs.  So that's

6    the evidence.

7            THE COURT:  Okay.  And then the last, we're back to

8    you, Mr. Martin, and I guess we can resolve this one last

9    question.  You'll have a contractor, is he still on board?

10           MR. MARTIN:  We actually have a stipulation as to what

11   his testimony would have been.

12           THE COURT:  Fine.

13           MR. MARTIN:  And I think that's going to satisfy or

14   evade anyway a possible Fifth Amendment problem.  We also have a

15   stipulation regarding the work that was being done in the

16   bathroom, so Exhibit 20, which I did not admit or move into

17   evidence, I think the government is not going to contest my

18   moving that into evidence.  It's a photo of the bathroom with

19   the knocked-out drywall.

20           THE COURT:  Exhibit 20 means your exhibit or theirs?

21           MR. MARTIN:  Glover Exhibit 20.  Exactly.

22           THE COURT:  Okay.  And you -- I'm sorry.

23           MR. MARTIN:  Sorry, ma'am.

24           THE COURT:  Did you use that already once?

25           MR. MARTIN:  I used it but I didn't move it into

2-26-08.txt

1    evidence because I wasn't sure of this MJOA thing.  I'm still
2    nervous about that.
3            THE COURT:  No, I don't follow that rule.  I think
4    that's obsolete, but anyways.  Then what?
5            MR. MARTIN:  And then we also have a stipulation
6    regarding the heroin in the kitchen, so that again obviates the
7    need to call anybody with respect to that, and then finally
8    there was an issue with respect to the trace heroin that was
9    found on the dollar bill on the nightstand and I had hoped that
10   Special Agent Ervin had field tested that.  He has not so we
11   can't get a stipulation on that and in fact we can't get a
12   witness to testify to that, so I think --
13           THE COURT:  That's it?
14           MR. MARTIN:  I think that's it, but before I say that
15   let me check with my client and make sure there's nothing else,
16   I may be missing something.
17           THE COURT:  Okay.  Do we have a witness in the
18   courtroom?
19           MR. SCARPELLI:  Yes.
20           MR. MARTIN:  There is one other potential witness,
21   your Honor.  We may be able to work something out with the
22   government.  It is a government employee, so, you know, I don't
23   think it's going to be a problem if we do have to call her, and
24   her testimony would be very limited, and it would be to the fact
25   that Mr. Glover has had a heroin addiction for several years,

Jacqueline Sullivan, RPR
Official Court Reporter

2-26-08.txt

1    and the government is not --

2              THE COURT:  Who's going to be able to testify to that?

3              MR. MARTIN:  His probation officer while he was on

4    supervised release.  He was in a program.

5              THE COURT:  Fine.  So any witnesses who are going to

6    testify for the defense at this moment will be on Monday, but

7    I'm not going to delay it beyond that.

8              MR. MARTIN:  No.

9              THE COURT:  I'm not worried about you.  I'm really

10   speaking to Mr. Donahue.

11             MR. DONAHUE:  We're doing the best we can.  We've

12   moved from prospective witnesses in April to late March to early

13   March and now to late February and we're scrambling.  I

14   anticipate that I will have everything I need consistent with

15   what the Court directed us to do last Thursday and I'm hopeful.

16   The Court knows I'll tell the Court if I'm having problems.  I'm

17   hopeful that I have it together.

18             THE COURT:  Well, I just want to give the jury some

19   sort of prospective schedule.

20             All right.  Let's bring in the jury and then the

21   chemist will testify.

22             (Jury enters courtroom at about 2:33 p.m.)

23             THE COURT:  Okay.  Call your next witness.

24             MR. SCARPELLI:  Your Honor, the government calls

25   Connie Klinkam.


                        Jacqueline Sullivan, RPR
                        Official Court Reporter
                                                                24


                              Page 22

2-26-08.txt
1          COURTROOM DEPUTY:  Ma'am, please raise your right

2     hand.  Do you solemnly swear that the testimony you should give

3     the Court and the jury in the case now on trial will be the

4     truth, the whole truth and nothing but the truth so help you

5     God?

6          MS. KLINKAM:  I do.

7          COURTROOM DEPUTY:  You may take the stand, ma'am.

8          CONNIE KLINKAM, WITNESS FOR THE GOVERNMENT, SWORN

9                    DIRECT EXAMINATION

10    BY MR. SCARPELLI:

11    Q.    Good afternoon.

12    A.    Good afternoon.

13    Q.    Could you please state your first name, last name, and

14    spell them for us?

15    A.    My name is Connie Klinkam, C-o-n-n-i-e K-l-i-n-k-a-m.

16    Q.    Can you tell us where you're employed?

17    A.    I work for the Drug Enforcement Administration.

18    Q.    In what capacity?

19    A.    I'm a forensic chemist.

20    Q.    What's a forensic chemist?

21    A.    As a forensic chemist I analyze evidence for the presence

22    or absence of a controlled substance.

23    Q.    Can you tell us how long you've been a forensic chemist?

24    A.    It will be eight years in March.

25    Q.    Can you give us the benefit of your educational background?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              25



1     A.    I have two bachelor's degrees, one in molecular biology and

2     biochemistry, the other in microbiology, and I have a master's
                              Page 23

2-26-08.txt

3    degree in forensic science.

4    Q.   When did you get the master's degree?

5    A.   May 2007.

6    Q.   Can you tell us your training and experience with regards

7    to your position?

8    A.   With the position there is an intensive on-the-job training

9    program not less than six months as well as ongoing training,

10   clandestine laboratory certification, as well as instrumental

11   training.

12   Q.   Can you tell us what a controlled substance is?

13   A.   A controlled substance is something that has been

14   legislated by Congress to be controlled illegal for use.

15   Q.   How many times have you analyzed controlled substances?

16   A.   I have analyzed evidence more than 3,800 times.

17   Q.   What about PCP?

18   A.   Approximately two hundred times or more.

19   Q.   Have you been qualified as an expert before?

20   A.   Yes, I have.

21   Q.   And approximately how many times have you been qualified as

22   a forensic chemist?

23   A.   Approximately 24.

24   Q.   And have you ever been qualified as an expert in United

25   States District Court for the District of Columbia?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                          26


1    A.   Yes.

2    Q.   How many times would that be?

3    A.   Approximately five.

                    Page 24

2-26-08.txt

4      MR. SCARPELLI:  Your Honor, at this time the

5  government would offer Ms. Connie Klinkam as an expert in

6  forensic chemistry.

7      THE COURT:  Okay.  Mr. Gilbert?

8              VOIR DIRE

9  BY MR. GILBERT:

10  Q.   Good afternoon, Ms. Klinkam.

11  A.   Good afternoon.

12  Q.   Ms. Klinkam, I'm going to hand you what's been marked as

13  Defendant Price Exhibit 10 for identification.  That's your

14  resume, is it not?

15  A.   My curriculum vitae, that is correct.

16  Q.   All right.  But you do you have a more current C.V. than

17  that one?

18  A.   The only difference may be that the master's, it would be

19  already received.

20  Q.   All right.  Because that says "anticipated graduation,"

21  correct?

22  A.   Yes, but it is post May 2007, so it was received in May

23  2007.

24  Q.   There's not a new C.V. out?

25  A.   No, sir.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                           27


1  Q.   All right.  Well, then, let me ask you some questions.

2  First of all, let me ask you a little bit about those bachelor's

3  of science.  Those were during the years 1991 to 1996 at the

4  University of Idaho, correct?

5  A.   That is correct.

                        Page 25

2-26-08.txt

6   Q.   And so are we talking about you essentially went to college

7   twice or you simply got two degrees?

8   A.   I received two degrees.

9   Q.   And how did that work exactly, how many courses did you

10   have to take to get the two degrees together?

11   A.   Sir, I don't know the exact number of courses, but I know

12   that I fulfilled the requirements for the two degrees to be

13   received.

14   Q.   And the two degrees, that is because there's different

15   specialties?

16   A.   Yes.

17   Q.   I mean, you didn't have to take French twice, for example,

18   or something like that, right?

19       THE COURT:  Why would you take French for a science

20   degree?

21       MR. GILBERT:  Well, I suppose today Spanish.

22       THE COURT:  That doesn't answer my question.  She got

23   degrees in science.

24       What were your bachelor's in again.

25       THE WITNESS:  One is in microbiology the other is in


Jacqueline M. Sullivan, RPR
Official Court Reporter

28


1   molecular biology and biochemistry.

2   BY MR. GILBERT:

3   Q.   And you got your master's in forensic science from the

4   University of Florida; is that correct?

5   A.   That is correct.

6   Q.   And you attended from 2005 to 2007?

**Page 26**

2-26-08.txt

7    A.   That is correct.

8    Q.   All right.  And were you online?

9    A.   It was primarily online, but there was some on campus.

10   Q.   When did you actually have to be on campus?

11   A.   It was in April 2007.

12   Q.   For how long?

13   A.   Three days.

14   Q.   All right.  Let me ask you, you say that you have been

15   qualified as an expert also in the United States District Court

16   of California?

17   A.   Yes, sir.

18   Q.   Which district?

19   A.   The district that governs Riverside, California.

20   Q.   You don't know if that's the Southern District, Middle

21   District, Central District?

22   A.   I'm not sure.

23   Q.   How many times did you testify in Riverside?

24   A.   Twice.

25   Q.   And your resume indicates that you testified, you qualified

Jacqueline M. Sullivan, RPR
Official Court Reporter

29

1    as an expert witness here in this court, and you said that was

2    about five times?

3    A.   That is correct.

4    Q.   Where are the other courts that you've been qualified as an

5    expert witness?

6    A.   I have been qualified in the District Court of Maryland,

7    District Court of Western Virginia, as well as United States

8    Superior Court here in D.C.

Page 27

2-26-08.txt

9   Q.   District of Columbia Superior Court?

10   A.   District of Columbia.

11   Q.   When you said Western Virginia do you mean the United

12   States District Court for West Virginia or do you mean the

13   Western District of Virginia?

14   A.   The Western District of Virginia, sir.

15   Q.   That's in Roanoke?

16   A.   I did not testify in Roanoke.

17   Q.   All right.  Now, your training program I believe you said

18   was about seven months long, your basic forensic chemist

19   training program?

20   A.   Excuse me.  I'm trying to do the math.  I believe it was

21   seven to eight months, yes.

22   Q.   So March 2000 to November 2000?

23   A.   Okay.

24   Q.   Is that correct?

25   A.   Correct.

Jacqueline M. Sullivan, RPR
Official Court Reporter

30

1   Q.   And that was there at the Southwest Laboratory, that's in

2   California, right?

3   A.   That is correct.

4   Q.   And tell us a little bit about that training?  Was it just

5   on-the-job training?

6   A.   Before a forensic chemist can analyze evidence they have to

7   undergo training, so in the sense that it's on the job in your

8   location where you are employed, yes, it's on the job.  Am I

9   analyzing evidence, am I producing output during that time?  No.

Page 28

2-26-08.txt

10    It's a training period in which the chemist learns instrumental

11    techniques, instrumental theory, and what is necessary to do the

12    job.

13    Q.    But during those eight months in 2000 you also went away

14    for some training, correct?

15    A.    That is correct.

16    Q.    Basic forensic science school?

17    A.    Correct.

18    Q.    And that was at Quantico?

19    A.    Yes, sir.

20    Q.    And how long was that course?

21    A.    Five weeks.

22    Q.    And what did that course cover?

23    A.    That is the basic forensic science school that is pursuant

24    on the Drug Enforcement Administration for all new chemists to

25    attend to learn DEA policy, DEA procedures, introduce them to

Jacqueline M. Sullivan, RPR
Official Court Reporter

31

1     the agency.

2     Q.    And that's something you would have to complete before you

3     would be considered a forensic chemist?

4     A.    Before you're allowed to analyze evidence, yes.

5     Q.    All right.  And then there's another a course that you went

6     to the month before; is that correct?

7     A.    Correct.

8     Q.    Basic clandestine laboratory investigation and safety?

9     A.    Yes.

10    Q.    And how long was that course?

11    A.    That was one week.

2-26-08.txt

12   Q.   Any other training that you've had since May of 2007?

13   A.   I've attended various instrumental training programs.

14   Q.   And so that just teaches you how to work the equipment,

15   right?

16   A.   Essentially, yes, it teaches maintenance, routine

17   procedures, method validation, method development for the

18   instruments that you were using.

19   Q.   When you say "method validation" what do you mean?

20   A.   Method validation?  Before a method is used for quanitation

21   it is tested to show that it is consistent and is applicable for

22   the process.

23   Q.   When you say "before a method is used" what do you mean?

24   A.   The method is defined as certain parameters that the

25   instrument is placed in.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              32


1    Q.   I'm sorry.  Certain parameters?

2    A.   Parameters.

3    Q.   That the instrument is placed in?

4    A.   Yes.  Are placed on to the instrument when you use it.

5    Q.   And so that's unique to each instrument?

6    A.   Each instrument has different parameters, that is correct.

7    Q.   And you mention maintenance.  Are you responsible for

8    maintaining the laboratory equipment that you use?

9    A.   Some of them, yes.

10   Q.   What are you responsible for maintaining?

11   A.   I am the instrument monitor for the gas chromautograph,

12   coupled with the detector, the nuclear magnetic resonance

                              Page 30

2-26-08.txt

13    imaging, as well as the liquid chromautograph.

14    Q.   Those are various type of instruments at your lab?

15    A.   Correct.

16    Q.   You are the person that's responsible for all of those

17    instruments in the laboratory?

18    A.   I am one of the people that are responsible for keeping

19    them operational.

20    Q.   All right.  Any other training that you've had since the

21    resume that's in front of you now?

22    A.   No, sir.

23    Q.   All right.  Well, let me ask you a little bit about

24    proficiency.  Do you get proficiency tests at the DEA?

25    A.   Yes, sir.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              33


1    Q.   And how often do you get them?

2    A.   There are three different types of proficiency tests.  Each

3    chemist performs at least two per year.

4    Q.   Why don't you take us for the first type?  What's the first

5    type that you're talking about?

6    A.   As I stated, there are two types.  One is an internal

7    proficiency test and another is an external proficiency test and

8    the other one is external at the agency proficiency test.

9    Q.   External to the agency?

10    A.   Correct.

11    Q.   All right.  Well, let's stop a minute.  The internal

12    proficiency test?

13    A.   Yes.

14    Q.   How is that administered?

2-26-08.txt

15  A.  The internal proficiency test, each chemist performs an

16  analysis of an exhibit that was generated within the laboratory.

17  Q.  All right.  Are you told that this is a test?

18  A.  Yes.

19  Q.  And what are the standards for grading the proficiency

20  test?

21  A.  The results must correspond with the original analysis.

22  Q.  And like how complex are the substances that you're

23  required to evaluate?

24  A.  It depends on the substance that is pulled.

25  Q.  All right.  So you have taken how many of those tests?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              34


1   A.  One per year.

2   Q.  I thought you had to take each of them twice per year.

3   A.  No.  As I stated, they're different kinds.  I have had one

4   internal proficiency test per year.

5   Q.  And is there a numeric figure that you have to achieve,

6   like 70 percent, 80 percent, 90 percent, a hundred percent,

7   before you're viewed as passing the proficiency test?

8   A.  The proficiency test is either right or wrong.

9   Q.  So it's just one item that you're required to analyze?

10  A.  You're required to analyze one exhibit, and it is either

11  correct or it is not correct.

12  Q.  Let's talk about the external proficiency then.  Because

13  the internal is administered by people that you work with,

14  right?

15  A.  Correct.

                            Page 32

2-26-08.txt

16   Q.   Let's talk about the external.  I believe there are two

17   kinds of external proficiency tests, right?

18   A.   Yes.

19   Q.   Let's talk about the first kind.  One of them is external

20   outside the agency, so what does external within the agency

21   mean?

22   A.   There are eight field laboratories within the system so

23   each laboratory generates its own proficiency test that is then

24   sent to all the other laboratories and analyzed.

25   Q.   So there is eight of them floating around?

Jacqueline M. Sullivan, RPR
Official Court Reporter

35

1   A.   There is eight -- I don't understand the question.  There

2   is eight per month generated.  Each laboratory has a certain

3   requirement to generate them.

4   Q.   All right.  How often do you take an external proficiency

5   exam?

6   A.   Once per year.

7   Q.   All right.  And so the eight labs, what does that mean?

8   You're not getting them from eight different laboratories,

9   right?

10   A.   Mine is only from one laboratory for that year.

11   Q.   When that comes to you are you aware that that's a test?

12   A.   Yes, sir.

13   Q.   Is there just one item you're required to analyze?

14   A.   There's one exhibit.  There may be multiple components of

15   that exhibit.

16   Q.   Like how many components to the exhibit?

17   A.   As many that are in the sample that is pulled.

2-26-08.txt

18    Q.    The last one that you did, how many components to it?

19    A.    I don't recall.

20    Q.    Is it more than three?

21    A.    I don't recall.

22    Q.    How long ago was that?

23    A.    I don't recall.

24    Q.    You don't recall your last external proficiency test?

25    A.    No, sir, I do not.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                              36


1     Q.    Did you pass it?

2     A.    Certainly I did.

3     Q.    And would that be written and recorded somewhere?

4     A.    I would imagine so.

5     Q.    But you don't know that?

6     A.    I'm not in charge of the proficiency program.

7     Q.    But it governs your ability to practice as a forensic

8     chemist in the laboratory, right?

9     A.    Yes.

10    Q.    Are you briefed on the results?

11    A.    If the results are outside of tolerance I would be briefed.

12    Q.    By "outside of tolerance" you mean you failed?

13    A.    Correct.

14    Q.    All right.  Then I believe you said that there is yet

15    another kind of proficiency test.  There is an external to the

16    agency test?

17    A.    That is correct.

18    Q.    And how many times do you have to do that?

                            Page 34

2-26-08.txt

19    A.    It is not a question of how many times I have to do this.

20    This is testing of the laboratory, so there's one per year, and

21    the chemist in the laboratory analyzes it.

22    Q.    One chemist.  How many chemists are in your laboratory?

23    A.    We are slotted for thirty chemists.

24    Q.    How many of them are actually there?

25    A.    I don't have the accurate number today.


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            37



1     Q.    So one chemist steps up to the plate and takes the external

2     agency proficiency test?

3     A.    Correct.

4     Q.    Who gets to pick that chemist?

5     A.    Management.

6     Q.    And where does that test come from?

7     A.    It's an external company that provides them for

8     certification.

9            THE COURT:  Are they testing just the competency of

10    that one person, or are they doing something that is testing the

11    seizures used by the whole lab?

12           THE WITNESS:  This particular one is to test

13    procedures used by the laboratory.

14           THE COURT:  So it's not the same as looking at what

15    one person is doing vis-a-vis one specimen?

16           THE WITNESS:  Right.

17    BY MR. GILBERT:

18    Q.    Actually I don't understand that answer.  Then tell me, if

19    there's only one chemist, what it is they're testing.

20    A.    This is external, so the lab is accredited at this time, so
                              Page 35

2-26-08.txt

21   it is tested to show that the procedures of the laboratory

22   adhere to accreditation.

23            THE COURT:  How they store things, how they document

24   things, what is documented?

25            THE WITNESS:  How they store things, how they document

Jacqueline M. Sullivan, RPR
Official Court Reporter

38

1    things, that the results expected are obtained.

2    BY MR. GILBERT:

3    Q.   All right.  Well, we can break that down a little bit

4    because part of it has to do with whether or not you followed

5    procedures in storing inventory and evidence, right?

6    A.   Correct.

7    Q.   Part of it has to do with whether or not you filled out

8    your paperwork correctly, right?

9    A.   Correct.

10   Q.   And then part of it has to do with whether or not you get

11   the chemistry right, correct?

12   A.   Correct.

13   Q.   So what you're saying is for this external test one chemist

14   is selected to do the actual chemistry to see if you get the

15   right result?

16   A.   Correct.

17   Q.   But you had to do one of those?

18   A.   Yes.

19   Q.   When did you do yours?

20   A.   It was before I moved to this area.  It was in California.

21   I can't tell you what the date was.

Page 36

2-26-08.txt

22   Q.   So you have to just take two proficiency tests per year

23   then, correct?

24   A.   Correct.

25   Q.   One is internal from the people that you work with?


Jacqueline M. Sullivan, RPR
Official Court Reporter

39


1    A.   Correct.

2    Q.   And then one is external, meaning it's prepared by one of

3    the other laboratories and sent to your laboratory?

4    A.   Correct.

5         MR. GILBERT:  Your Honor, I don't have any further

6    questions of Ms. Klinkam at this time.  I don't object.

7         THE COURT:  No objection, all right.  Then the witness

8    will be accepted as an expert in forensic chemistry.

9    BY MR. SCARPELLI:

10   Q.   Just so we're clear, the two proficiency tests that you

11   spoke about, you passed both of those?

12   A.   Consistently every year.

13   Q.   Now I want to go to how evidence is received at your

14   laboratory.  Can you explain to us how an item is received at

15   your laboratory?

16   A.   An item is received from the law enforcement entity,

17   whatever agency that may be, and is presented to the laboratory,

18   submitted into the vault, assigned a unique identifier, and then

19   assigned to an analyst to analyze.

20   Q.   And where is your laboratory?

21   A.   Our laboratory is located in Largo, Maryland.

22   Q.   And when you say that each item that's submitted has a

23   unique number, what is the purpose of that?

2-26-08.txt

24    A.   The reason we have unique identifiers associated with it,

25    which is also called a lab number.

                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                   40


 1              THE COURT:  I think you have to slow down a little

 2    bit.

 3              THE WITNESS:  It's assigned a unique identifier which

 4    is also called a lab number, the lab number is assigned to the

 5    piece of evidence and any report generated for that evidence, so

 6    that they all can be married together and you know that this

 7    report goes with this piece of evidence.

 8    BY MR. SCARPELLI:

 9    Q.   In your daily work have you come across and analyzed items

10    that you determined were PCP?

11    A.   Yes, sir.

12    Q.   And do you know the chemical make up of PCP or how PCP is

13    made?  How is that?

14    A.   Yes, I do know how PCP is made.

15    Q.   I'm going to show you what's been marked as Government's

16    Exhibit 1605 and ask you if you recognize that document.

17    A.   Yes, I do.

18    Q.   And what is that document?

19    A.   This document outlines the manufacture of PCP.

20              MR. SCARPELLI:  Your Honor, at this time the

21    government is going to move Government's Exhibit 1605 into

22    evidence and publish it to the jury.

23              THE COURT:  Any objection?

24              MR. GILBERT:  Subject to cross-examination.

                              Page 38

2-26-08.txt
25        THE COURT:  All right.  1605 can be published.  1605

Jacqueline M. Sullivan, RPR
Official Court Reporter

41

1     is admitted.

2              (Government Exhibit No. 1605 admitted into evidence at

3              about 2:56 p.m.)

4     BY MR. SCARPELLI:

5     Q.   It's a little difficult to see.  That's why we're going to

6     have Ms. Klinkam explain it to us.

7              THE COURT:  Not in too much detail, okay?

8     BY MR. SCARPELLI:

9     Q.   Can you explain to us very briefly how PCP is made?

10    A.   PCP is made by taking two substances and mixing them

11    together.  You take piperidine mixed with cyanide and water.

12             THE COURT:  You have to remember that all us don't

13    know these words.

14             You take two substances and mix them together.  What

15    are the substances again?

16             THE WITNESS:  What we end up with is we're going to

17    mix PCC with phenylmagnesium bromide.  If you look at the far

18    right you see the top says PCC and the middle one is

19    phenylmagnesium bromide.  We're going to mix those two together

20    and the find product is going to make PCP.  The other steps are

21    just used to make those other two products.

22    BY MR. SCARPELLI:

23    Q.   I was going to have you pronounce the items on the left,

24    but I guess we'll just leave that.

25             Can you tell us, do you understand how a chemical

2-26-08.txt

1    becomes PCC versus PCP?

2    A.    PCC is an intermediate product, as you can see, in the

3    process.  The items in the left are mixed together to create

4    PCC.  PCC is mixed with phenylmagnesium bromide to generate PCP,

5    so PCC is an enter immediate product to create PCC, but PCC is a

6    controlled product in itself.

7    Q.    Are there times where you've tested PCP and you've had both

8    PCP and PCC in the sample?

9    A.    It is very common to find PCC in a PCP sample.

10   Q.    How in simple terms how would you wind up with PCC and PCP?

11   A.    As I stated, you take the PCC, you add the phenylmagnesium

12   bromide to it, you mix them together and get PCP.  As with any

13   reaction, any chemical reaction, not every molecule is going to

14   mix together to make PCP.  You're going to have some PCP, PCC

15   left over that just didn't react for whatever reasons.  Maybe it

16   was an excess of the other product, it wasn't mixed long enough,

17   for whatever reason you're going to have a little bit left over.

18   That's very common to have a little bit left over.

19   Q.    Now I want to go to when you receive an item, and let's

20   specifically talk about if you received an item to be analyzed

21   as to whether or not it's PCP.  Take us step-by-step, slowly, on

22   how the process works, how your examination works?

23   A.    We receive an exhibit that's purported to contain PCP.  If

24   it is an exhibit that is larger than one ounce, so it's larger

25   than one ounce, and one ounce is about 28 mils, receive larger

2-26-08.txt

1    one ounce, the law enforcement entity will bring it in to the

2    laboratory, we will take a sampling from that, a one-ounce

3    sample from that, and return the rest of it to that law

4    enforcement agency.  That one-ounce sample will be submitted to

5    the laboratory for analysis, assigned the unique identifier like

6    we talked about before, and then analyzed, that sample of the

7    larger bulk.

8    Q.   And so when the item first comes in and it's larger than an

9    ounce, are one of the chemists called to the area where the item

10    has come in so that you can take that one ounce and return it to

11    the law enforcement?  How does that work?

12    A.   We do offer the services of going to the site where it's

13    seized from, but I believe in this particular case the law

14    enforcement entity brought it to the laboratory and it was done

15    at that location.

16    Q.   Now, once you've received the one-ounce sample, am I

17    correct that the rest of the substance is returned to the law

18    enforcement who brought it there?

19    A.   That's correct.

20    Q.   Take us through what you do with the one-ounce sample that

21    you have.

22    A.   The law enforcement entity submits it for analysis, it's

23    assigned it's unique identifier.  It is assigned to me, it's

24    proposed for analysis.  I go to the vault where it is stored in

25    a secure location, pick it up, and proceed with my analysis.

2-26-08.txt

1   The very first thing when I get my heat seal is I make sure that
2   the unique identifier is correct with the paperwork that is
3   accompanying it, that all seals are intact and untampered, and
4   then I will proceed with my analysis, and the first thing I
5   would do is obtain a gross weight.
6   Q.   Let me just take a step back real quick.  Let's assume
7   instead of you're going to take your one-ounce sample and return
8   the bulk back to a law enforcement officer, let's assume you
9   have 14 different containers that have more than one ounce.
10  What would you do, would you just take one one-ounce sample or
11  how would that work?
12  A.   It's very important that we would show that each one of
13  those containers contained PCP, so I would take a one-ounce
14  sample from each container.
15  Q.   Let's go back to your gross weight now.  How do you
16  determine the gross weight?
17  A.   The gross weight is the weight of the exhibit as I receive
18  it.  These are generally in a plastic pouch that is heat-sealed
19  on either side.  We refer to them as a heat seal evidence
20  envelope, and I would take that, place it on a balance, and that
21  right there is my gross weight.
22  Q.   That's with the container and everything?
23  A.   The container and everything.
24  Q.   Now, what is the next step in your process after you've
25  determined the gross weight?

Jacqueline M. Sullivan, RPR
Official Court Reporter

45

Page 42

2-26-08.txt

1    A.    After I determine and record the gross weight, I would open

2    the heat seal, marking it with the unique identifier and my

3    initials and date, remove the contents, document the contents,

4    and then proceed with my analysis.

5    Q.    And where would you document the contents?

6    A.    I document the contents as well as all the results of my

7    analysis are documented on my chemist work sheet, which is also

8    referred to as bench notes.

9    Q.    Once you've documented that on your bench notes what's the

10   next step?

11   A.    Upon opening it and recording the contents of the heat seal

12   I would determine a net weight or how much sample is in there.

13   The net weight is what is the weight of the controlled substance

14   or a purported controlled substance minus any packaging.

15   Q.    I got to go back to the beginning again.  I'm sorry.

16        You said that you have the gross weight.  Do you also

17   determine the gross weight of the entire object when it first

18   came in before you took your one-ounce samples?

19   A.    No.  It is documented that it came in, and I would take a

20   measurement of how much, in this case we're looking at PCP, so I

21   would take a documentation of how much PCP was there when it was

22   submitted for the sampling, but I did not take a gross weight at

23   that time because it's not submitted for analysis yet.

24   Q.    So just so I'm clear, let's go back to my hypothetical.  If

25   you had 14 bottles that had fluid in them, would you then

Jacqueline M. Sullivan, RPR
Official Court Reporter

46

1    measure the volume or how many ounces or milliliters are in each

2    bottle before you gave it back to the law enforcement entity?
Page 43

2-26-08.txt

3    A.    I would take the volume measurement, which would be how

4    much is in each bottle, I would determine the volume prior to

5    taking the samples.  I would then determine the volume, take the

6    samples, and then return what I did not retain for samples to

7    the law enforcement entity.

8              THE COURT:  The volume, now you're talking about the

9    contents of the bottles?

10             THE WITNESS:  The contents, the liquid volume of the

11   bottles.

12   BY MR. SCARPELLI:

13   Q.    And how do you do that?

14   A.    By pouring, simply pouring the liquid into a graduated

15   cylinder, which is just a tall cylinder-shaped glasswear which

16   has markings on the side.

17   Q.    And then do you note that in your bench notes?

18   A.    Yes.

19   Q.    Let's go back to your analysis, so now we're up to I think

20   you said net weight.

21   A.    Correct.

22   Q.    And how do you determine the net weight?

23   A.    The net weight for a liquid is often determined by

24   weighing.  You have to remember, the net weight that I have is

25   the amount submitted.  It is not the total amount seized, it's

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              47


1    the amount that was submitted for analysis, so I would take the

2    one-ounce vile that I have, weigh it, weigh another vile that's

3    the same, identical to it, weigh it, so then I have a

                              Page 44

2-26-08.txt

4    difference, so I know how much the liquid inside weighs, and

5    then I would also take one mil of the liquid, you know,

6    scientifically accurately measured out, one mil, weigh that one

7    mil so I know how much one mil of the liquid is, and then I

8    could, using math, determine how much, how many mils are there.

9    Q.    At this point do you calculate how many grams per

10   milliliter are in the item or is that after you've tested the

11   item?

12   A.    The grams per milliliter, which is the density of the

13   liquid, is calculated, like I stated, by weighing the one mil.

14   The one milliliter weight is the grams per milliliter.  That's

15   the density.

16   Q.    Do you note that in your bench notes?

17   A.    Yes.  All calculations are noted in my bench notes.

18   Q.    Now take us briefly and slowly through the process of what

19   you do with the liquid to determine whether or not it's PCP.

20   A.    In this case we're going to say that, like he has been

21   saying, there's 14 individual bottles, so I have 14 one-ounce

22   samples.  From each one of those 14 samples I will take a small

23   amount and perform two tests.  One is a confirmatory test

24   confirming the presence of the PCP, and the secondary test is

25   the presumptive test also showing the presence of the likelihood


                          Jacqueline M. Sullivan, RPR
                             Official Court Reporter

                                                                    48


1    of PCP.  In this manner we have confirmed that each one of those

2    bottles contains PCP, and then a portion of each one of those

3    bottles is combined to conform a composit or a, you know, a

4    mixture of all the bottles is formed, and then on that mixture a

5    quanitative analysis is determined.

2-26-08.txt

6    Q.   And why do you mix all 14 viles together?

7    A.   Because they're one exhibit in an attempt to not do a

8    quanitation on all 14.

9    Q.   And you said that you do a confirmatory test.  Can you

10   explain very briefly what that is?

11   A.   The confirmatory test used in this case is a gas

12   chromautograph coupled with a mass spectrometer.

13           THE COURT:  Can you spell that?

14           THE WITNESS:  Gas chromautograph, g-a-s, second word,

15   c-h-r-o-m-a-u-t-o-g-r-a-p-h, and mass spectrometer, m-a-s-s.

16   Spectrometer is s-p-e-c-t-r-o-m-e-t-e-r.

17           Essentially what this does is it separates out the

18   components in a mixture and then positively identifies each one

19   of those components based on their mass ratios.

20   BY MR. SCARPELLI:

21   Q.   And then you said there's a second test which is a

22   presumptive test?

23   A.   A presumptive test that is done in this, again, it's just a

24   second test to confirm the other results, and this is just

25   simply a gas chromautogaph.  It does not have a mass

Jacqueline M. Sullivan, RPR
Official Court Reporter

49

1    spectrometer connected to it, and you would then get a retention

2    time match with a standard for PCP.  It's just a secondary test.

3    Q.   When you're doing this test are you also able to determine

4    how much PCC or whether an item is PCC as you're testing it?

5    A.   Yes.  The mass spectrometer will identify any controlled

6    substance or any noncontrolled substance for that matter so the

2-26-08.txt

7   mass spectrometer would determine PCC and PCP.

8   Q.   Once you have the results what do you do with them?

9   A.   The results are recorded on my bench notes and a report is

10  created and submitted for review.

11  Q.   And then once you've totally completed your examination

12  what is done with the samples?

13  A.   The samples are returned to their original container,

14  placed back into the original heat seal.  It is sealed with my

15  seal and signature, and returned to the vault for safe-keeping,

16  in which then if it's a nonDEA law enforcement entity they come

17  and pick it up and then they store it following their

18  procedures.

19  Q.   Let's go to this specific case.  With regards to this --

20  once you had your results with respect to this case, did you

21  prepare what you characterized as a summary chart?

22  A.   In this particular case a summary chart was generated.

23  Q.   We'll talk a little bit more about that in a minute.

24       I want to go to this specific case, and particularly I

25  want to go to laboratory number W16400.  Do you recall doing an

Jacqueline M. Sullivan, RPR
Official Court Reporter

50

1   examination with regards to PCP with that laboratory number?

2   A.   Yes, sir, I do.

3   Q.   And did you prepare bench notes as well as a report with

4   respect to what was analyzed in W16400?

5   A.   Yes, sir.

6        THE COURT:  Mr. Scarpelli, we're going to take a short

7   recess for ten minutes at this time.

8        All right, ladies and gentlemen.

Page 47

2-26-08.txt

9            (Jury exits courtroom at about 3:08 p.m.)

10            MR. MARTIN:  Your Honor, if I have one of these fits

11    again can I just step out without having to come up here and

12    asking you?

13            THE COURT:  Sure, as long as it's okay with your

14    client.

15            DEFENDANT GLOVER:  That's fine.

16            THE COURT:  Okay.

17            (Recess taken at about 3:08 p.m.)

18            (Jury enters courtroom at about 3:28 p.m.)

19    BY MR. SCARPELLI:

20    Q.   I think when we stopped I was going to show you what's been

21    marked as Government's Exhibit 1600.1.  I'm also going to show

22    you what's been marked as Government's Exhibit 1604.

23            THE COURT:  1604 or 16.  Yes, 1604?

24    BY MR. SCARPELLI:

25    Q.   1600.1 and 1604.  Can you tell us, let's go to 1604 first.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                              51



1     What is that?

2     A.   1604 is a summary drug report that was prepared in this

3     case.

4     Q.   Let's go to 1600.1.  What is that?

5     A.   1600.1 is a copy of the report that I generated.

6     Q.   with regards to w16400?

7     A.   That is correct.

8     Q.   Let's start first with what was submitted to you under

9     w16400?

                            Page 48

2-26-08.txt

10  A.   May I refer to my notes?

11  Q.   Sure.

12  A.   For W16400, on April 18th, 2007, six heat seals were

13  presented containing 13 bottles containing a yellow liquid.

14  These were separated or samples were taken from each of these as

15  we discussed previously for submission for analysis, one ounce

16  from each of the 13, and those 13 samples were submitted for

17  analysis and that is what I analyzed.

18  Q.   Was there also another bottle that was submitted?

19  A.   There was another bottle.  There was a total of 14 bottles

20  but only 13 contained liquid.

21  Q.   Did you note that in your bench notes?

22  A.   Yes, I did.

23  Q.   And once you received the 13 bottles that contained the

24  liquid what did you do with them?

25  A.   As I stated previously, if there is a sample of PCP


Jacqueline M. Sullivan, RPR
Official Court Reporter

52


1  presented that has larger than one ounce in volume a sample is

2  taken, a one-ounce sample is taken from each of the 13 bottles

3  and submitted for analysis.

4  Q.   And you did that in this case?

5  A.   That is correct.

6  Q.   And did you take a series or you or someone at the DEA

7  laboratory take a photograph, a series of photographs depicting

8  each step in that process with regards to taking the sample?

9  A.   On April 18th, 2007, when the samples were taken

10  photographs were taken to document the sample as it was

11  received.

Page 49

2-26-08.txt

12    Q.   Let's start with Government's Exhibit 1600.2.  Do you

13    recognize that item?

14    A.   Yes, I do.

15    Q.   And what is that item?

16    A.   This is a photo that I took on April 18th, 2007.  As I

17    previously stated, there were six heat seals submitted.  This is

18    the contents of heat seal one of six.

19         MR. SCARPELLI:  Your Honor, I'm going to do three

20    photos at a time.

21    BY MR. SCARPELLI:

22    Q.   I'm going to show you what's been marked as 1600.3 and ask

23    you if you recognize that photograph.

24    A.   That is also a photo that I took on the same day.  It is a

25    photo depicting the volume of the liquid in the bottle for heat

Jacqueline M. Sullivan, RPR
Official Court Reporter

53

1    seal one of six.

2         MR. SCARPELLI:  Your Honor, I misspoke.  I'm going to

3    publish or move into evidence 1600.2 and 1600.3 and publish them

4    to the jury.

5         THE COURT:  Any objection?

6         MR. DONAHUE:  No.

7         THE COURT:  Good.  The two photos are in.

8         (Government Exhibit Nos. 1600.2 and 1600.3 admitted

9         into evidence at about 3:33 p.m.)

10    BY MR. SCARPELLI:

11    Q.   And again, this is Government's Exhibit 1600.2, and very

12    briefly, what are we looking at?

Page 50

2-26-08.txt

13    A.    We are looking at an Everfresh cranberry bottle containing

14    a yellow liquid.

15    Q.    Let's move to 1600.3.  What are we looking at in 1600.3?

16    A.    This is the same bottle as in the previous picture,

17    although it has been emptied into a graduated cylinder as I

18    described previously to determine the volume.

19    Q.    And you do that in milliliters?

20    A.    That is correct.

21    Q.    Now I'm going to show what has been marked Government's

22    Exhibit 1604, excuse me, 1600.4, 1600.5, and 1600.6.  Take a

23    look at those.

24    A.    These are pictures that were taken of heat seal number two

25    of six.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              54



1         MR. SCARPELLI:  Your Honor, at this time the

2    government would move into evidence Government's 1600.4, point

3    5, and point 6, and publish to the jury.

4         THE COURT:  No objection?  4, 5 and 6.

5         (Government Exhibit Nos. 1600.4, 1600.5, and 1600.6

6         admitted into evidence at about 3:35 p.m.)

7         MR. GILBERT:  I only have two.

8    BY MR. SCARPELLI:

9    Q.    So what are we looking at in 1600.4?

10   A.    This picture is a picture of 2 Everfresh cranberry bottles

11   containing yellow liquid.  This picture is a picture of the

12   empty cranberry bottles, cranberry juice bottles, with the two

13   graduated cylinders on either side depicting the volume.

14   Q.    What about the large jug with the blue, what looks like a

                                Page 51

2-26-08.txt

15    funnel on top of that.  What is that for?

16    A.   As I stated, we take a one-ounce sample from each bottle or

17    each container that was presented, so after the one-ounce sample

18    is presented, glass is very breakable, as you know, and PCP is

19    very dangerous, and the ether that it is packaged in is very

20    dangerous, so it is put into another container to be returned to

21    the law enforcement entity for destruction or whatever they

22    choose to do with it.

23    Q.   Let's go to 1600.6.  And again, what are we looking at?

24    A.   1600.6 is simply the same two bottles, the same two

25    graduated cylinders in the previous picture with the one-ounce

Jacqueline M. Sullivan, RPR
Official Court Reporter

55

1    samples next to them depicting the samples that were removed

2    from each one.

3    Q.   Let's look at Government's Exhibit 1600.7, point 8, and

4    point 9.

5    A.   These pictures are pictures of the contents of heat seal

6    number three of six.

7         MR. SCARPELLI:  Your Honor, the government would move

8    into evidence Government's Exhibit 1600.7, 8 and 9.

9         THE COURT:  7, 8 and 9, no objection?  They'll be

10    admitted.

11         (Government Exhibit Nos. 1600.7, 1600.8, and 1600.9

12         admitted into evidence at about 3:37 p.m.)

13    BY MR. SCARPELLI:

14    Q.   Again what we looking at?

15    A.   This picture is the picture of the contents of the heat

Page 52

2-26-08.txt

16    seal number three of six.  Again it's two glass bottles

17    containing yellow liquid.

18    Q.   What are we looking at in 1600.8?

19    A.   The same two glass bottles from the previous picture

20    emptying in the graduated cylinder.  This is the third picture.

21    Q.   Point 9?

22    A.   This is the third picture of the series.  It is the empty

23    bottles with the liquid with the samples that were removed.

24    Q.   Let's go to 1600.10, 11 and 12.

25    A.   These pictures are pictures of the contents of heat seal

Jacqueline M. Sullivan, RPR
Official Court Reporter

56

1    four of six.

2            MR. SCARPELLI:  Your Honor, the government would move

3    into evidence Government's Exhibit 1600.10, 1600.11, and 1600.12

4    and publish them to the jury.

5            THE COURT:  Admitted.  That's through 12?

6            MR. SCARPELLI:  Yes, 10 through 12.

7            (Government Exhibit Nos. 1600.10, 1600.11, and 1600.12

8            admitted into evidence at about 3:38 p.m.)

9    BY MR. SCARPELLI:

10    Q.   What are we looking at in 1600.10?

11    A.   1600.10 is two juice bottles, glass juice bottles,

12    containing a yellow liquid.

13    Q.   Let's go to 1600.11.

14    A.   1600.12 is the same juice bottles emptying into graduated

15    cylinder to identify the contents.

16    Q.   And 1600.12.

17    A.   1600.12 is the same bottles with the graduated cylinders

2-26-08.txt

18    and the samples removed.

19    Q.    And just for clarity, the smaller white bottles next to the

20    sample, what purpose do they serve?

21    A.    The smaller white bottles are plastic outer bottles.  You

22    see next to the small white bottles are little glass viles.

23    That is the actual sample that is pulled for analysis.  That

24    glass vile is put into an outer plastic vile to protect it.

25    Q.    We're almost there.  Now we have 1600.13, 14, and 15.  Tell

Jacqueline M. Sullivan, RPR
Official Court Reporter

57

1    us what is depicted in there.

2    A.    In these pictures are pictures of the contents of heat seal

3    five of six.

4           MR. SCARPELLI:  Your Honor, the government would move

5    into evidence 1600.13, 14, and 15, and publish them to the jury.

6           THE COURT:  No objection.  They'll be in.  13, 14 and

7    15.

8           (Government Exhibit Nos. 1600.13, 1600.14, and 1600.15

9           admitted into evidence at about 3:39 p.m.)

10    BY MR. SCARPELLI:

11    Q.    Again, what are we looking at in Government's Exhibit

12    1600.13?

13    A.    This picture is a picture of four glass bottles containing

14    a yellow liquid.

15    Q.    14?

16    A.    This is a picture of the same glass bottles containing the

17    yellow liquid emptied into graduated cylinders.

18    Q.    Finally, 15?

**Page 54**

2-26-08.txt

19   A.   This is the same four glass bottles with the graduated

20   cylinders behind them and documentation of the samples that have

21   been removed.

22   Q.   Let us look at Government's Exhibit 1600.16, 17, and 18.

23   A.   16, 17 and 18 are pictures of the contents of heat seal six

24   of six.

25            MR. SCARPELLI:   And the government would move into


                      Jacqueline M. Sullivan, RPR
                         Official Court Reporter

                                                                58


1    evidence Government's Exhibit 1600.16, 17, and 18.

2             THE COURT:   Admitted.

3             (Government Exhibit Nos. 1600.16, 1600.17, and 1600.18

4             admitted into evidence at about 3:40 p.m.)

5    BY MR. SCARPELLI:

6    Q.   What are we looking at in Government's Exhibit 1600.16?

7    A.   This is the contents of heat seal six of six, three Real

8    Lemon bottles.  It's hard to tell, but only two of them contain

9    a liquid.

10   Q.   And which one does not contain liquid?

11   A.   I believe it is the one on the far right.

12   Q.   Let me show you what's been marked as Government's Exhibit

13   1600.16.  I want you to look at that.

14   A.   Yes.  That one is empty.  That one on the far right is

15   empty.

16   Q.   And once you emptied all these bottles into those larger

17   containers did you give them back to Special Agent Naugle?

18   A.   Yes.  Once the samples were removed, the remainder of the

19   liquid was returned to the law enforcement agency.

20   Q.   Now what I want to ask you is if you can tell us 1 through

2-26-08.txt

21   13, how many milliliters were in each bottle.

22   A.   May I refer to my notes?

23            THE COURT:  We're talking now the net?

24            MR. SCARPELLI:  Total volume of liquid.

25            THE COURT:  In the six bottles?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              59


 1            MR. SCARPELLI:  No, your Honor.  13.

 2            THE WITNESS:  Are you asking for the total volume in

 3   all 13, or would you like individuals results for each 13?

 4   BY MR. SCARPELLI:

 5   Q.   Let's go one by one, and if you can add them up at the end

 6   that would be great.

 7   A.   Heat seal one of six contained one bottle containing 910

 8   mils of liquid.  Heat seal number two of six contained two

 9   bottles, one containing 910 mils of liquid, the other containing

10   915 mils of liquid.  Heat seal number three of six contained two

11   bottles -- excuse me.  Two bottles of liquid, one containing 910

12   mils of liquid, the other containing 940 mils of liquid.  Heat

13   seal number four of six contained two bottles, one containing

14   950 mils of liquid, the other containing 930 mils of liquid.

15   Heat seal number five of six contained four glass bottles, one

16   containing 480 mils, one containing 460 mils, one containing 470

17   mils, and the fourth containing 485 mils.  The final heat seal

18   contained three bottles.  One of them was empty and one of them

19   contained 190 mils, and the other one contained 250 mils.  The

20   total volume for each of these, the total of all 13 bottles that

21   contained liquid is 880 milliliters of yellow liquid.

                            Page 56

2-26-08.txt

22    Q.   Eight hundred?

23    A.   Excuse me.  8,800.

24    Q.   8,800 milliliters?

25    A.   That is correct.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                    60



1     Q.   I'll show you what's been marked as Government's Exhibit

2     1600.A1 and ask you if you recognize that document.

3     A.   Yes, I do.

4     Q.   And what is that?

5     A.   This is exhibit -- this is page three of three of my bench

6     notes in this particular exhibit.

7     Q.   And on that page three of three of your bench notes did you

8     total up the full amount of liquid in milliliters in regards to

9     all 13 of those bottles?

10    A.   Yes, I did, but there is an error on this sheet.

11    Q.   What did you put down?

12    A.   I wrote down 7,890 milliliters.

13    Q.   And why do you say there's an error?

14    A.   Because when you actually add up the numbers it's 8,800.

15    Q.   Now, looking at this document do you know why you did not

16    come up with the figure 8,800?

17    A.   The result, the cause of the error is that heat seal one of

18    six is written a little to the left of all the other numbers.

19    When I added up all of the numbers I only added up twelve of the

20    bottles and missed the first one.  It just slipped.

21         MR. SCARPELLI:  Your Honor, the government would move

22    into evidence Government's Exhibit 1600.1A and publish it to the

23    jury.

                              Page 57

2-26-08.txt

24          THE COURT:  16, what is it?

25          MR. SCARPELLI:  1600.1A.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        61


 1          THE COURT:  You're just putting a subpart 1A, right?

 2          MR. SCARPELLI:  Yes.

 3          THE COURT:  Any objection to 1A?

 4          MR. DONAHUE:  No, your Honor.

 5          THE COURT:  Okay.  1A is admitted.  That's page three

 6   of?

 7          MR. SCARPELLI:  Page three of her bench notes.

 8          THE COURT:  Okay.

 9          (Government Exhibit No. 1600.1A admitted into evidence

10          at about 3:46 p.m.)

11   BY MR. SCARPELLI:

12   Q.   I'm going to point to what I believe you're talking about,

13   and tell me if that's correct.  Is that the number that you

14   missed when adding up --

15   A.   That is correct.

16   Q.   So when we look at the bottom, you have 7,890.  If you add

17   910 that equals 8,800; is that correct?

18   A.   That's correct.

19   Q.   Now, you tested the samples, the 13 samples; is that

20   correct?

21   A.   Yes.

22   Q.   And what were your results?

23   A.   I found that each contained PCP and PCC.

24   Q.   Were you also able to determine the density or, in other

                            **Page 58**

2-26-08.txt
25     words, the grams per milliliter for that quantity of PCP?


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              62



 1     A.   Yes, I was.

 2     Q.   And what was that?

 3     A.   I would need to refer to my notes for that number.

 4     Q.   Do you need the page that I took from you?

 5     A.   No.  I need page two of three.

 6          The density for this exhibit, W16400, is 0.8849 grams

 7     per mil.

 8     Q.   And how were you able to figure out that figure, if it's

 9     not too complicated?

10     A.   I measured out one mil of liquid and I weighed it.

11     Q.   And your results with respect to all 13 of those samples,

12     was what item or what liquid did you come to the result, what

13     was it?

14          THE COURT:  I'm sorry.

15          MR. SCARPELLI:  I'll rephrase.

16     BY MR. SCARPELLI:

17     Q.   The liquid that you tested in all 13 samples, what was the

18     result of that liquid?

19     A.   Each sample contained PCP and PCC.

20     Q.   And with respect to W16400, 8,800 milliliters, did you

21     figure out how many gallons that is?

22     A.   By using a converse, yes.

23     Q.   And what was it?

24     A.   8,800 milliliters is equal to 2.3 gallons.

25     Q.   And did you determine the total mixture and substance of

Jacqueline M. Sullivan, RPR
Official Court Reporter

1    PCP that was submitted to you within W16400?

2    A.   I determined the total mixture and substance of the amount

3    seized, and that was 7,787.1 grams of liquid.

4    Q.   Which equates to 7.7 kilograms?

5    A.   That is correct.

6    Q.   How did you come to that number?

7    A.   By multiplying the total amount seized, which is the 8,800,

8    by the density of the liquid.  How much the liquid weighs per

9    mil determines how many grams of liquid is there.

10   Q.   One other item and I think we're ready to move on, you

11   prepared a report with regards to your results; is that correct?

12   A.   Yes.

13   Q.   That report, the initial report was done on January -- I'm

14   sorry.  The initial report was done on April 26, 2007; is that

15   correct?

16   A.   That is correct.

17   Q.   And at some point in reviewing that report did you find an

18   error?

19   A.   Yes, I did.

20   Q.   And what was the error?

21   A.   On the original report it was reported out as containing

22   221.4 grams of PCP submitted for analysis when in fact the

23   decimal needs to be moved over to the left.  It's 22.1 grams of

24   PCP of the amount of actual drug submitted for analysis.

25   Q.   And did you amend your report?

2-26-08.txt

1   A.   I created an amended report documenting the correct value.

2   Q.   And when did you document that?

3   A.   January 22nd of 2008.

4        THE COURT:  I'm sorry.  The 21.1 grams refers to the

5   actual drug submitted, so when you take an ounce from each of

6   the various places that's what you're talking about, or

7   something else?

8        THE WITNESS:  The 22.1 grams refers to the amount of

9   PCP in the sample that was submitted for analysis.  Not the

10   total volume seized, but of the 13 samples that I took each

11   of -- there's 22.1 submitted.

12        MR. SCARPELLI:  Your Honor, I might be able to clear

13   this up if you give me a minute.

14        THE COURT:  I mean, I'm not focusing on the difference

15   between 21.4 and 22.1.  I'm just trying to understand what the

16   22.1 represents.  Say it again slowly.

17        THE WITNESS:  I quanatated or determined how much of

18   that liquid is PCP and I obtained an amount.  Then I determined

19   of the liquid that was presented to me using that quanatation

20   value that I determined how much of that is -- that's the amount

21   of controlled substance in there.

22        THE COURT:  So are you saying that -- is that a

23   proportion of the total is PCP?  In other words, there are other

24   liquids, is what you're telling us, there are other liquids in

25   there besides the PCP and that is sort of the strength of it.

2-26-08.txt

1        THE WITNESS:  There's only one liquid, and of that
2   liquid a certain amount of it is PCP.
3        THE COURT:  Right.  So is there a variation in
4   strength so to speak?  I mean, there couldn't be anything as a
5   hundred percent PCP because you have to mix it with other
6   things, right?
7        THE WITNESS:  Correct.  Especially this is diluted in
8   a liquid.
9        THE COURT:  Are you okay on this?  Have I confused
10  everybody?
11       MR. GILBERT:  There's always cross, your Honor.
12       THE COURT:  I'm just trying to understand what it
13  means.  I figure if I understand it maybe I just will, but if I
14  don't maybe I just don't.  I know some of you probably do
15  understand this.  Okay.
16  BY MR. SCARPELLI:
17  Q.   Let's do this.  Let's look at Government's Exhibit 1600.1
18  and 1600.1A2.  Do you recognize those two documents?
19  A.   Yes.  This is the original report and the amended report.
20       MR. SCARPELLI:  Your Honor, at this time the
21  government would move into evidence Government's Exhibits 1600.1
22  and 1600.1A2.
23       THE COURT:  1600.1, is that the -- I thought we
24  already put in.
25       MR. SCARPELLI:  That's the front page of her bench

Jacqueline M. Sullivan, RPR
Official Court Reporter

66

Page 62

2-26-08.txt
```
 1    notes and her report.
 2            THE COURT:  And 1A2.  You want to approach?
 3            MR. GILBERT:  Yes, I think so.
 4            THE COURT:  Do you want to see it?
 5            MR. GILBERT:  Yes.
 6            THE COURT:  Okay.  Sorry.
 7            (Bench conference as follow):
 8            MR. GILBERT:  I thought 1601 was the bench notes.
 9            THE COURT:  I thought so too, and 1A was page three of
10    the bench notes.  Is this page one of the bench notes?
11            MR. SCARPELLI:  Yes.  It's actually the report.
12            MR. GILBERT:  That's the report?
13            MR. SCARPELLI:  I put everything together, so if you
14    want me to what I can do is pick put 1600.1 on the bench notes
15    numbered as 1601.A3 if that makes it clear.
16            THE COURT:  Why would that make anything clear?  1A is
17    page three of the bench notes.  That's all I know, is 1A is page
18    three of the bench notes.  That's in evidence.  What are you
19    offering?
20            MR. SCARPELLI:  The two reports.  The two reports.
21            THE COURT:  Well, one is --
22            MR. SCARPELLI:  This was the first page that was on
23    the full document.
24            THE COURT:  Is that page one of 1600.1?
25            MR. SCARPELLI:  Yes.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

67

```
 1            MR. GILBERT:  I disagree with the characterization.  I
 2    think the lab report is a one-page document that says one of
```
Page 63

2-26-08.txt

3      one.  The bench notes that start later when it separated the

4      bench notes are not part of the lab report.  The lab report is

5      the final conclusion that the chemist reaches.

6              THE COURT:  You have marked exhibits, you know.  Each

7      of the exhibits are as confusing as the reports.  1600.1 are

8      bench notes, and we've introduced 1A as being page three of a

9      three-page document.

10             MR. SCARPELLI:  This is what we can do.  I can take

11     this off, put it on the bench notes, so 1600.1 is the bench

12     notes, and then I'll mark this report as 1600.A13.

13             THE COURT:  Why do we have 1600?  You want to call it

14     1600.1A13?  Can I make a suggestion?  Why don't you just call

15     these are the reports, they relate to the bench notes, I

16     understand that, but why don't you just call it 1600.19 and 20

17     and they're the report and don't worry about it?

18             MR. SCARPELLI:  Okay.

19             THE COURT:  So we're going to call 1600.19 and

20     1600.20.  One is a January report, is that what it means?

21             MR. SCARPELLI:  Right.

22             THE COURT:  January '07 report, that's 20.

23             MR. SCARPELLI:  Okay.

24             MR. GILBERT:  January '08 report.

25             THE COURT:  I'm sorry, January '08.  And the other one

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              68


1      is April '07?

2              MR. SCARPELLI:  Yes.

3              THE COURT:  And they're one page each?

                            Page 64

2-26-08.txt

4                    MR. SCARPELLI:  Yes.

5                    THE COURT:  Okay.  I am having some difficulty because

6       I've never dealt with PCP compared to crack.  You know, they

7       always say that something is, the 37 percent.

8                    MR. SCARPELLI:  Right.  I'm going to get to that.

9                    THE COURT:  You are?

10                   MR. SCARPELLI:  I think I can explain it.

11                   THE COURT:  But in terms of what we're dealing with

12      for purposes of to make sure we understand at the end of the day

13      you're measuring kilograms as total weight, net weight, and not

14      getting worried about the strength.  This is sort of comparable

15      to the crack strength notion?  No.  You're looking at me like

16      I'm really --

17                   MR. SCARPELLI:  No, no, no, no.  It's a mixture of

18      substance of PCP.

19                   THE COURT:  Right.  What is the significance of the

20      22.104, whichever the case may be?  Grams, what is that telling

21      us?  Why are we hearing about it, since it's a mixture that

22      includes --

23                   MR. SCARPELLI:  Because my understanding is they also

24      find out the amount of actual in there.

25                   THE COURT:  That is what the 22.4 is?


                            Jacqueline M. Sullivan, RPR
                              Official Court Reporter
                                                                    69


1                    MR. SCARPELLI:  Yes.

2                    THE COURT:  What actual drug are you talking about?

3                    MR. SCARPELLI:  PCP.

4                    THE COURT:  But with PCP if you look at it, we had a

5       chart there before, remember, so what's the other remaining

2-26-08.txt

 6      grams?

 7              MR. SCARPELLI:  Some other substance, some other

 8      liquid that's mixed with it.

 9              THE COURT:  Okay.  Is this the way they cut stuff in

10      order to make it go farther?

11              MR. SCARPELLI:  I never made PCP, but I think that's

12      what it is.

13              MR. GILBERT:  In some of the truck calls Mr. Glover is

14      talking about stretching the PCP by adding other liquids

15      presumably.  I think it's ether is the most common one, to

16      whatever he gets, and the PCP itself is suspended in ether.  I

17      mean, one of the difficulties is that the chemical molecules

18      that make up PCP are actually part of a larger liquid.

19              THE COURT:  Okay.  All right.  We now know what we're

20      doing.  The report from April and January 1600.19 and 1600.20.

21              Do you have that, Gwyn?

22              COURTROOM DEPUTY:  No.

23              THE COURT:  He'll tell you in a minute.

24              Okay.  We have a 1600.19 and 1600.20, Gwyn.  19 is an

25      April '07 report, is that fair?


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    70


 1              MR. SCARPELLI:  Yes.

 2              THE COURT:  And 1600.20 is the amended January '08

 3      report.

 4              MR. SCARPELLI:  Right.

 5              THE COURT:  Any objection to these?  I assume you're

 6      about to offer them.

                              Page 66

2-26-08.txt

7          MR. DONAHUE:  No, your Honor.

8          THE COURT:  Okay.  They'll be admitted.

9          (Government Exhibit Nos. 1600.19 and 1600.20 admitted

10          into evidence at about 3:58 p.m.)

11    BY MR. SCARPELLI:

12    Q.    I'm going to show you 1600.19.  Hopefully you can explain

13    to us a little better what your results are.  Let's start to the

14    left.  The Exhibit No, where does the Exhibit No. come from?

15    A.    The Exhibit No. is the Exhibit No. that's assigned by the

16    law enforcement agency when they submit it.

17    Q.    And in the active drug ingredient, in parentheses it says

18    established or common name.  Can you explain to us what is

19    written there?

20    A.    This is the substance that was identified in the exhibit.

21    In this case there is phencyclidine, otherwise known as PCP, and

22    one piperidinocyclohexanecarbonitrile, otherwise known as PCC.

23          THE COURT:  Instead of spelling that word can you just

24    provide it?

25          So the 16400 refers now to what we've been talking

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              71

1     about.  Okay.

2     BY MR. SCARPELLI:

3     Q.    So in other words, your results, there was PCP and PCC in

4     the liquid?

5     A.    That is correct.

6     Q.    And what does "calculated as base" mean?

7     A.    When I determined the purity of the exhibit I used it

8     assuming that it was just PCP and didn't have any other assault
                          Page 67

2-26-08.txt

9    forms.

10   Q.   I'm going to move on a little bit to the left.  What does

11   the gross weight, I mean, it's 10,040 grams.  It appears less

12   than your 8,800 milliliters; is that correct?

13   A.   It's 1,040 grams, and as I stated, it is the weight of the

14   exhibit that as submitted, so this doesn't include the 8,800

15   milliliters.  This is simply the one-ounce samples from each of

16   the 13.  That's what the 1,040 grams is.  As I checked it out I

17   weight it.  That's how much it weighed.

18            THE COURT:  I'm sorry.  It's the total of the one-

19   ounce samples from 13 bottles?

20            THE WITNESS:  Yes.

21            THE COURT:  Or total of.

22            THE WITNESS:  With this packaging and the liquid and

23   the heat seal.

24            MR. SCARPELLI:  Okay, Judge.

25            THE COURT:  Are you giving me a quiz?  Don't you dare.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                72


1    BY MR. SCARPELLI:

2    Q.   Let's move on to net weight.

3            THE COURT:  You're not supposed to be asking me

4    questions.

5            THE WITNESS:  The net weight is the volume and weight

6    of the liquid of the 13 samples.  Again, this is not all that

7    was seized.  This is just what was submitted for analysis.

8    BY MR. SCARPELLI:

9    Q.   And you have in it two separate forms, milliliters and

2-26-08.txt

10    grams?

11    A.    Correct.

12    Q.    Let's move on to concentration or purity.  80.4 milligrams

13    per milliliter, what does that mean?

14    A.    I determined the substance to contain 80. milligrams per

15    milliliter of PCP, so that means for every milliliter of sample,

16    80.4 milligrams of that is PCP.

17    Q.    And below that it has plus or minus 8.5 milligrams per

18    milliliter, and then an asterisk.  What does that mean?

19    A.    That is an uncertainty value.  No scientific measurement is

20    one hundred percent right on.  They're still debating the weight

21    of a gram to certain decimal places, so this value is plus or

22    minus 8.5.  The true value is plus or minus 8.5 milligrams per

23    mil.

24    Q.    Is that an error rate?

25    A.    It is not an error.  It's just a documentation of the

                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              73

1     uncertainty value of that number.

2     Q.    And if you were to subtract 8.5 milligrams per milliliter

3     do we still have PCP?

4     A.    There is still PCP.

5     Q.    And then let's move on to the actual or the amount of

6     actual drug, 221.4 grams, correct?

7     A.    That is what it states.

8     Q.    That's the number that is incorrect?

9     A.    That is correct.

10              THE COURT:  The right number again should be?

11              THE WITNESS:  22.1 grams.

                    Page 69

2-26-08.txt

12    BY MR. SCARPELLI:

13    Q.    What does "the amount of actual drug" mean?

14    A.    The actual drug again is the amount of PCP, the amount of

15    grams of PCP submitted for analysis.  Of the 13 one-ounce

16    samples, 22.1 grams is PCP.

17    Q.    And finally, what's the reserve weight?

18    A.    That is the amount of sample left after I have completed my

19    analysis.

20    Q.    Now I'm going to show what's been marked as Government's

21    Exhibit 1600.20.  Now, under amount of actual drug there is a

22    different number, correct?

23    A.    Correct.

24    Q.    And that's the number you were discussing that was

25    incorrect in your first report?

Jacqueline M. Sullivan, RPR
Official Court Reporter

74

1    A.    That's correct.

2    Q.    Does changing that number affect your results in any way?

3    A.    It does not affect that the sample contained PCP and PCC.

4    It only changes the amount of PCP that was submitted for

5    analysis.

6    Q.    So in other words, within the 1,040 grams the sample

7    instead of two --

8            MR. GILBERT:  It's almost certainly a leading

9    question.

10           THE COURT:  Yes.

11    BY MR. SCARPELLI:

12    Q.    Tell us with respect to the 1,040 grams how does an actual

Page 70

2-26-08.txt

13    drug change.

14    A.    The 1,040 grams is a gross weight.  A better representation

15    would be to use the net weight.  Of the 243.7 grams of liquid,

16    22.1 grams is PCP.

17    Q.    What did you do --

18              THE COURT:  Say that once again.  Out of the net

19    weight, 243.7 grams, out of that 22.1 grams, okay, is PCP?

20              THE WITNESS:  That is correct.

21              THE COURT:  It keeps coming back, so what's the rest?

22              THE WITNESS:  It's analogous to putting a tablespoon

23    of sugar into water, you mix it up and the sugar disappears.

24    It's not one hundred percent sugar.  Let's say we put 22.1 grams

25    of sugar into a volume of water, it's water, it's whatever else

Jacqueline M. Sullivan, RPR
Official Court Reporter

75

1    you may put in there.  You can put salt in there too.

2              THE COURT:  I know.  But is there some -- the

3    remainder here, is it known what it is?

4              THE WITNESS:  Well, there is also found, PCC was found

5    in this sample, so that's going to be a portion of it, and also

6    the weight of the liquid that it's suspended in is another

7    portion.

8    BY MR. SCARPELLI:

9    Q.    So you don't test for whether it's ether or nail polish

10    remover or anything else?

11    A.    I did not determine the solvent in this case.

12              THE COURT:  The what?

13              THE WITNESS:  Solvent.

14              THE COURT:  Solvent.  Okay.  So what you are saying is

2-26-08.txt

15     that certain portions is PCP, some of the rest could be PCC,

16     some could be this, quote, solvent, whatever is being used

17     there, that's all were trying to get at, what is it, but we

18     don't know, okay.  Is that correct, we don't know?  Some of you

19     have probably taken chemistry.  We don't have a chemical

20     analysis of the nonPCP components of the mixture?

21               THE WITNESS:  Despite the fact that we do know there's

22     PCC.

23               THE COURT:  That's one component.

24               THE WITNESS:  Yes, but there are probably other

25     components that were not identified.


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                  76



1                    THE COURT:  Okay.

2      BY MR. SCARPELLI:

3      Q.   Can you tell us the difference between a mixture and

4      substance of PCP and actual PCP?

5      A.   The both are actual PCP because they both contain PCP.

6      Just for example, in my sugar water example you put sugar into

7      water, you still have sugar, it's just suspended in the water.

8      It's a substance containing sugar.  This is a substance

9      containing PCP.

10     Q.   Obviously the sugar itself or the actual PCP?

11               MR. GILBERT:  Leading.

12     BY MR. SCARPELLI:

13     Q.   What does that have added to it?

14               THE COURT:  No.  Overruled.

15               THE WITNESS:  What does the PCP have added to it?

                              Page 72

2-26-08.txt

16    BY MR. SCARPELLI:

17    Q.   You have actual PCP.  What if anything is added to it?

18    A.   I don't know.

19    Q.   Is there anything added to it?

20    A.   I don't know.

21    Q.   Let's move on.  What did you do with the bulk?

22          THE COURT:  The bulk?

23    BY MR. SCARPELLI:

24    Q.   The bulk of the PCP.

25          THE COURT:  The stuff that wasn't tested.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                        77


1     BY MR. SCARPELLI:

2     Q.   Yes.

3     A.   The stuff that was not tested on April 18th, 2007 when I

4     separated the samples, I returned the rest of that, which is a

5     significant amount of liquid, to the FBI for their destruction

6     or storage purposes.

7     Q.   Let's go to an easy one.  Did you also receive an item

8     under W16686?

9     A.   Yes.

10    Q.   And you prepared bench notes with regards to that item

11    also?

12    A.   Bench notes as well as a report.

13    Q.   I'm showing you what's been marked as Government's Exhibit

14    1602.1.  Do you recognize that item?

15    A.   Yes, I do.  I recognize it as a report and the bench notes

16    generated for W16686.

17    Q.   Tell us what you received with regards to Government's
                            Page 73

2-26-08.txt

18    Exhibit or under DA lab number W16696.

19    A.   W16696 was a box containing a metal can containing paper

20    and two vanilla extract boxes with glass bottles.  One of these

21    bottles contained residue and the other one contained a brown

22    liquid.

23    Q.   And did you go through the same process you did with

24    W16400?

25    A.   I did, with the exception of this was a small volume so a

Jacqueline M. Sullivan, RPR
Official Court Reporter

78

1    sample was not taken and a one-ounce sample was not taken for

2    analysis.  This was only six milliliters, so the whole thing was

3    submitted for analysis.

4    Q.   I'm going to show you what's been marked as Government's

5    Exhibit 1602.2.

6              THE COURT:  1602.2, correct?

7              MR. SCARPELLI:  Yes.

8    BY MR. SCARPELLI:

9    Q.   I'll show you what's been marked as Government's Exhibit

10   1602.2 and ask you if you recognize that item.

11   A.   Yes, I do.  I recognize this as the photo that was taken of

12   W16686 upon analysis.

13             MR. SCARPELLI:  The government would move into

14   evidence Government's Exhibit 1602.2 and publish it to the jury.

15             MR. GILBERT:  No objection, your Honor.

16             THE COURT:  Okay.  Thank you.  Admitted.  1602.2.

17             (Government Exhibit No. 1602.2 was admitted into

18             evidence at about 4:09 p.m.)

**Page 74**

2-26-08.txt

19    BY MR. SCARPELLI:

20    Q.    What are we looking at?

21    A.    This is, as I described, two boxes, two vanilla extract

22    bottles.

23    Q.    Can you tell us the total volume seized?

24    A.    6.0 milliliters was seized.

25    Q.    Did you calculate the density with respect to this item?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            79


1     A.    I did not calculate the density with respect to this item

2     except for on the summary chart.  It's not on my bench notes,

3     but it is 6.266 grams divided by 6.0 mils, which is 1.044 grams

4     per mil.

5     Q.    So in other words, you didn't do it with your bench notes

6     but you did it at a later time?

7     A.    Correct.

8     Q.    Can you tell us the results that you came up with when you

9     tested the liquid that came out of the vanilla extract bottles?

10    A.    This liquid contained both PCP and PCC.

11    Q.    Can you tell us the numbers with regard to that?

12    A.    It contained PCP at 3.2 milligrams per mil, the amount of

13    pure drug is 0.019 grams, and the reserve weight is 4.8

14    milliliters.

15    Q.    And again, the uncertainty rate is what?

16    A.    Plus or minus .207 mill per mill.

17    Q.    With respect to W616686, the results of the PCP, you also

18    have hydrochloride there; is that correct?

19    A.    Yes.

20    Q.    What's the difference between hydrochloride and base?
                          Page 75

2-26-08.txt

21     A.     A molecule can come in several forms.  Let's pretend my

22     hand is a molecule.  This is PCP.  It is PCP no matter what you

23     do.  I can attached something like this calculator to my hand.

24     I still have a hand.  It just has a calculator attached to it.

25     It's the same thing with PCP and PCP hydrochloride.  It's still

Jacqueline M. Sullivan, RPR
Official Court Reporter

80

1      PCP but it may have hydrochloride, which is just a salt,

2      attached to it.  It's just a different form of the molecule,

3      just like my hand with a calculator attached to it is a

4      different form of my hand but it's still hand.

5      Q.     So in conclusion, what was contained within the vanilla

6      extract bottles?

7      A.     They contained PCP and PCC.

8      Q.     Now I want to move on to W16691.  Were you provided an item

9      with respect to that laboratory number?

10     A.     Yes, I was.

11     Q.     And based on your analysis did you prepare bench notes as

12     well as a report?

13     A.     Yes, I did.

14     Q.     I'm going to show you what's been marked as Government's

15     Exhibit 161.1 and ask if you recognize that item.

16     A.     Yes, I do.  This is the report and bench notes generated

17     for W16691.

18     Q.     I'm also going to show you three photographs marked as

19     Government's Exhibit 16012, 16013, and 16014, and ask you if you

20     recognize those photographs.

21     A.     These are photographs that I took on July 19, 2007, when

Page 76

2-26-08.txt

22   they were submitted for separation for sampling.

23       MR. SCARPELLI:  Your Honor, the government would move

24   into evidence and publish to the jury 1601.2, 1601.3, and

25   1601.4.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              81


1            THE COURT:  I'm sorry.  1601.2, 3, and 4, is that what

2    you offered?

3            MR. SCARPELLI:  Yes.

4            THE COURT:  Any objection?

5            MR. GILBERT:  None, your Honor.

6            THE COURT:  Those are admitted.  And as to the 1602,

7    you only offered .2, right?  Okay.

8            (Government Exhibit Nos. 1601.2, 1601.3, and 1601.4

9            admitted into evidence at about 4:14 p.m.)

10   BY MR. SCARPELLI:

11   Q.   Here is Government's Exhibit 1601.2.  What are we looking

12   at?

13   A.   This is a photograph again that I took on July 19, 2007.

14   It is a picture of a Dole Sparkling something bottle containing

15   yellow liquid.

16   Q.   Go to 1601.3, and what are we looking at in 1601?

17   A.   This is the same bottle as in the previous picture.  It's

18   just been emptied into the graduated cylinder to document how

19   much it contained.

20   Q.   And what are we looking at in the last photograph?

21   A.   The last photograph is a picture of the empty bottle, the

22   graduated cylinder, and the one-ounce sample that was taken for

23   submission for analysis.

                          Page 77

2-26-08.txt

24    Q.    Did you determine the total volume seized with respect to
25    W16691?

Jacqueline M. Sullivan, RPR
Official Court Reporter

82

1     A.    Yes.  I determined the total volume seized on July 19, 2007
2     to be 218.0 mils.
3     Q.    Did you also calculate the density with respect to the PCP?
4     A.    Yes.  The density for this particular sample is 0.8173
5     grams per milliliter.
6     Q.    And finally, did you calculate the total mixture and
7     substance of PCP in grams with respect to that item?
8     A.    By multiplying the total volume of 218 mils times the
9     density, which is the 0.8173, I determined that it was 178.1
10    grams of liquid submitted, or seized.  Excuse me.
11    Q.    Can you tell us your conclusion with respect to the liquid
12    that you found inside the Dole plastic container, plastic
13    bottle?
14    A.    Lab number W16691 contained PCP and PCC.  Of that, 81.3
15    milligrams per mil of PCP and none of the actual drug is 2.2
16    grams of the amount submitted.
17    Q.    Okay.  Let's move on to laboratory number W16083.  Did you
18    receive that item and conduct an analysis on the item?
19    A.    Yes.  I received W16083 for analysis.
20    Q.    And based on your analysis did you prepare bench notes and
21    a report?
22    A.    Yes, I did.
23    Q.    What is Government's Exhibit 1603.1?
24    A.    160 --

2-26-08.txt
25              THE COURT:  Give me the number again.


                        Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            83



 1              THE WITNESS:  1603.1.
 2    BY MR. SCARPELLI:
 3    Q.   All right.
 4    A.   This is the report and bench notes I generated in response
 5    to lab number W16083.
 6    Q.   I'm also going to show you what's been marked as
 7    Government's Exhibit 1603.2 and 1603.3.
 8    A.   These are pictures that I took on, it looks like 1/30,
 9    January 30th 2007, of this exhibit.
10    Q.   The exhibit that was submitted to you was what?
11    A.   The exhibit that was submitted for separation for
12    submission of the one-ounce sample to be taken was a green Real
13    Lime bottle, as the picture depicts.
14              MR. SCARPELLI:  At this time the government would move
15    into evidence 1603.2 and 1603.3.
16              THE COURT:  Admitted.
17              (Government Exhibit Nos. 1603.2 and 1603.3 admitted
18              into evidence at about 4:18 p.m.)
19    BY MR. SCARPELLI:
20    Q.   Very quickly, what are we looking at?
21    A.   You're looking at the Real Lime bottle that was submitted
22    containing yellow liquid.
23    Q.   What are we looking at in 1603.3?
24    A.   You are looking at the Real -- the empty bottle with the
25    yellow liquid that it contained.

                            Page 79

2-26-08.txt

1    Q.    And did you conduct an analysis of that liquid, the

2    one-ounce sample?

3    A.    The one-ounce sample, yes, I did.

4    Q.    And what were your results?

5    A.    I determined that this liquid contained PCP and PCC.

6    Q.    And were you able to determine the total volume in

7    milliliters?

8    A.    The total volume seized that I used to take my one-ounce

9    sample was 241 mils.

10   Q.    And were you able to determine the density and grams per

11   milliliter?

12   A.    Yes.  The density of this exhibit is 0.8721 grams per mil.

13   Q.    And were you able then to calculate the total mixture and

14   substance of PCP in grams?

15   A.    By multiplying the two numbers I was able to calculate that

16   the total amount seized was 210.1 grams.

17   Q.    And with regards to your conclusion is what is this, what

18   is this liquid?

19   A.    The liquid contained PCP and PCC.

20   Q.    And with respect to the examination, in this report you

21   didn't have an uncertainty value on the PCP; is that correct?

22   A.    That is correct.

23   Q.    Why is that?

24   A.    This exhibit was analyzed prior to the uncertainty policy

25   for DEA being generated.

2-26-08.txt

85

1              MR. SCARPELLI:  Your Honor, at this time the
2    government would move in Government Exhibit 1604 and publish it
3    to the jury.
4              THE COURT:  1604 is your summary?
5              MR. SCARPELLI:  Yes.
6              THE COURT:  Anything on this issue?
7              MR. DONAHUE:  May we approach?
8              THE COURT:  Yes.
9              (Bench conference as follows):
10              THE COURT:  You're going to bring in this stuff and
11    then we'll call it a day.
12              MR. SCARPELLI:  Um-hmm.
13              THE COURT:  Then it goes out the door.  Any objection
14    to the summary?  She's given us more than detailed information
15    so what could be the problem?
16              MR. DONAHUE:  My approach to cross-examination is
17    probably going to make this chart look different, but maybe
18    that's cross.
19              THE COURT:  You can do whatever you want.  Yes, right.
20    You can do it.  But she has certainly supported her figures, and
21    the summary chart is not a summary of every little thing.  I
22    mean, her report has figures that are not different, but in
23    addition to is what I thought, I figured it out.  It took me a
24    little while, so it's going to be admitted.  You're welcome to
25    cross-examine.

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

86

2-26-08.txt

1          MR. DONAHUE:  And we'll cross tomorrow, I take it?

2          THE COURT:  Absolutely.  Thank you.

3          (End of bench conference.)

4          THE COURT:  All right.  1605 is admitted.

5          (Government Exhibit No. 1604 admitted into evidence at

6          about 4:22 p.m.)

7          MR. SCARPELLI:  I believe it was 1604, your Honor.

8          THE COURT:  Yes, 1604.

9          And 1605, what was that, Gwyn?  I forgot to write it

10    down.  That's already been admitted.

11          COURTROOM DEPUTY:  That's a conversion chart.  That's

12    been admitted.

13          THE COURT:  I'm sorry, conversion chart?

14          COURTROOM DEPUTY:  Yes.

15          MR. GILBERT:  It's a recipe, your Honor.

16          THE COURT:  Oh, I'm sorry.  Right, for those of us who

17    cook, that's what it is.  Thank you.

18          MR. SCARPELLI:  That's what the test is on.

19          THE COURT:  Very good.  Let's publish this.

20          We have one or two more exhibits and then we can call

21    it a day.  You've been very patient.

22          Great, we can't see it after all this.

23          MR. SCARPELLI:  I'm going to help us, Judge.  Stick

24    with me.

25          THE COURT:  All right.

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              87

2-26-08.txt

1  BY MR. SCARPELLI:

2  Q.   Your summary chart, let's first start to the left.   The

3  column that listed FBI Exhibit No, where did that number come

4  from?

5  A.   That is a number that is assigned to the evidence by the

6  law enforcement and the DEA and the FBI.

7  Q.   The DEA lab numbers?

8  A.   It's a unique identifier that is assigned once the sample

9  is submitted for analysis.

10  Q.   Those are the four DEA numbers that we just spoke about?

11  A.   That is correct.

12  Q.   And obviously the description is self-explanatory.

13        THE COURT:  It's self-explanatory.  That's the way it

14  came from, that is what you mean?

15        MR. SCARPELLI:  Right.

16        THE COURT:  That's the location where these samples

17  came from.  Okay.  Go ahead.

18  BY MR. SCARPELLI:

19  Q.   And the result?

20  A.   The result is the result of the analysis.

21        THE COURT:  And to remind, that's the description is

22  13 bottles is what is 16400, right?

23        THE WITNESS:  Yes.  16400 actually had 14 bottles, 13

24  containing liquid.

25  BY MR. SCARPELLI:


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

1  Q.   So total volume seized, for instance, under 16400, the

2  8,800 milliliters is from all 13 bottles?

2-26-08.txt

```
 3    A.    That is correct.

 4    Q.    And then the way you calculated the total mixture and

 5    substance of PCP is you multiplied total volume seized by

 6    density and that's how you came up those numbers?

 7    A.    That is correct.

 8              MR. SCARPELLI:  I'm going to step out for a minute and

 9    get one more exhibit.

10              THE COURT:  Yes, that's fine.

11              Anyone want to stretch?  We're close to the end here.

12    BY MR. SCARPELLI:

13    Q.    I'm going to show you what's been marked as Government's

14    Exhibit 100E22, E20, and Government's Exhibit 100E21.  These

15    three items are the bulk of PCP that you returned to Special

16    Agent Steve Naugle with respect to Government's Exhibit W16400?

17    A.    Yes.

18              MR. DONAHUE:  Objection; speculation.

19              THE COURT:  Don't say that.  Do you know by looking at

20    that whether they are or they aren't?

21              THE WITNESS:  They look like they are.

22              THE COURT:  Do you have some way of identifying them?

23              THE WITNESS:  My initials are not on those.

24              MR. DONAHUE:  I move to strike.

25              THE COURT:  Well, one second.
```

                          Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                89

```
 1              MR. SCARPELLI:  Can we approach?

 2              THE COURT:  No.  Get it out of here.  Thank you.

 3              22, 21.  All right.  Is there anything else for this
```

                              2-26-08.txt
4   witness?

5               MR. SCARPELLI:  No.

6               THE COURT:  And we'll take up that.

7               MR. SCARPELLI:  No.

8               THE COURT:  This is a very good time to break.  Okay.

9   Thank you, ladies and gentlemen.  Please, we'll start tomorrow

10  by 9:30 again.  The government's case I think will end tomorrow.

11              MR. MARTIN:  Your Honor, I'd like to approach.

12              THE COURT:  About jurors?

13              MR. MARTIN:  No, not with respect to the jurors.

14  About another matter.  They can go.  It doesn't involve them.

15              THE COURT:  Well, yes, one minute.

16              Thank you very much, ladies and gentlemen.  We'll see

17  you tomorrow at 9:30.  Please do not discuss the case, don't

18  read anything about it, don't talk about it.  See you tomorrow.

19              THE COURT:  What's up?

20              (Jury exits courtroom at about 4:28 p.m.)

21              THE COURT:  Why do you need to, is there something you

22  have to take up?

23              MR. MARTIN:  Yes.

24              THE COURT:  Can we excuse the witness, please?

25              MR. SCARPELLI:  Yes.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              90



1               THE COURT:  All right.  Thank you.

2               (Witness excused at about 4:28 p.m.)

3               THE COURT:  Okay.  Mr. Martin, there is something you

4   wish to address first?

5               MR. MARTIN:  I'd like to caucus very quickly with the
                              Page 85

2-26-08.txt

6    other attorneys if I could.  If you could just give me two

7    minutes, your Honor.  I just want to let them know what's on my

8    mind.

9             THE COURT:  I don't know.

10            MR. MARTIN:  Let me put this on the record, your

11   Honor.

12            THE COURT:  Fine.

13            MR. MARTIN:  I have the utmost respect for government

14   trial counsel, but I think that he probably knew that in

15   prepping this witness that he couldn't get those items in and he

16   brought them in here anyway, and I don't want to go so far as to

17   say that he did that in bad faith, but I don't think that he

18   should try something like that again.

19            THE COURT:  I don't think it's really a question of

20   whether he did it in bad faith or didn't do it in bad faith.  If

21   he wants to put in the evidence, we have all these pictures.  If

22   anything he's cumulative.  He's going to call the guy that she

23   gave it to.  I thought she had some way of identifying it.

24            MR. SCARPELLI:  There was no bad faith on my part and

25   I'm sorry that Mr. Martin thinks that, but what I had explained

Jacqueline M. Sullivan, RPR
Official Court Reporter

91

1    to everybody, I think from the beginning, was that she poured it

2    into the jugs in front of Special Agent Naugle and that's why I

3    asked her does it appear to be the stuff.  She says yes, and

4    we're saving a witness.  What I'll do tomorrow morning is I'll

5    put Special Agent Naugle on for two seconds.

6             THE COURT:  Yes.  I think you have to.  We didn't

2-26-08.txt

7   understand it, and I don't really have to worry about whether

8   it's bad faith or not bad faith.  First of all, there's a lot of

9   pictures so this is not in any way harmful to anybody, and

10  besides that, sir, it really applies to Mr. Donahue, and I'm

11  sure he joins in your motion, but the fact of the matter is

12  right at the moment 21, 22, and 20E, 21, 22, they would be

13  stricken so to speak if in fact he doesn't tie it up, but it

14  doesn't take much to tie it up, but I have to say I think before

15  it is a pretty potent smell for some of these people.  I'm

16  sitting farther away.  I'm frankly not, I think that we can have

17  Naugle come and testify that he looked at the stuff out there,

18  unless you want him to come in there and look at the stuff again

19  and have it come in.  We now know what it is and what the

20  numbers are.  I just assume ask the government unless somebody

21  insists, I don't know, does he have initials on the thing, the

22  bags?  I didn't look at them.  Nobody has looked at the bags we

23  run them out of here so quickly.

24       MR. SCARPELLI:  In a box, and the box is how he

25  identifies it, by sealing it into a box, so we're going to go


Jacqueline M. Sullivan, RPR
Official Court Reporter


92


1   through, we're going to have Naugle on the stand saying on such

2   and such day I opened it for defense counsel, on such and such

3   date I opened it for the government.  We'll go through that

4   whole process.  I assumed that that was not going to be an

5   objection and I figured we could get it in very quickly through

6   her.

7        THE COURT:  It is.  But the question is whether you

8   come back in here with this stuff, and I just assume you don't.
Page 87

2-26-08.txt

```
 9    It's very smellie.  You've made your point in that regard, and I
10    doesn't ascribe to Mr. Martin's objection in terms of good or
11    bad faith whatsoever, but I'm just asking whether we can't have
12    Naugle complete the circle without having it come back in here.
13          MR. DONAHUE:  Maybe we should talk about it.  The
14    Court should know Mr. Scarpelli and I did talk about a question
15    going to this witness.  I'm not sure that the discussion went
16    further than Mr. Scarpelli and I.  I don't think we quite agreed
17    or understood on what the question was, but he and I had talked
18    about the prospect of not having to bring Naugle in.
19          THE COURT:  Well, I can't remember.  Somebody
20    objected, and in a sense when she says "I believe it is" or "I
21    guess it is" I kind of think I have to sustain it, so I don't
22    know that you made the objection anyways, but I think that all
23    I'm saying is would you just take a few minutes now after I
24    leave to just see whether we can agree not to have the stuff
25    brought back in here in order to complete the chain of custody?
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

93

```
 1    That's what it is.  I don't see why any of you want it.  He can
 2    come in and say where he got it from, where he put it, and that
 3    he looked at it out in the hall and that's what it is.  That
 4    stuff is not going back into the jury room even if requested.
 5          MR. MARTIN:  Again, your Honor, the reason I stood up
 6    was primarily because of the smell.  I've worked with Mr.
 7    Scarpelli on other cases and that's never happened before and I
 8    guess what I'm trying to do is avoid something like that.  We've
 9    always been able to talk things like that through before, you
```

Page 88

2-26-08.txt

10     know.

11              THE COURT:  I think we've said all we need to say

12     about this.  I'm just suggesting we don't have it come back.

13              MR. GILBERT:  I was going to suggest we consider those

14     as demonstrative exhibits, because she did say it looked like

15     them and he's shown them and he doesn't need to show it again,

16     so that's how I would suggest we handle it.  He held them up and

17     said it looks like she was pouring it into.

18              MR. SCARPELLI:  That's what I was originally trying to

19     do and you persuaded me to move it in.  That's why I was just

20     going to have it as an demonstrative aid, show it and walk right

21     back out with it.

22              THE COURT:  Well, I can tell them -- demonstrative aid

23     makes it sound completely misleading.  It isn't a demonstrative

24     aid.  I mean, that's when somebody does a sketch of a body and

25     says this is the right arm with the triceps.  This is the real

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                 94


1      stuff.  This is evidence.  I mean, that's just confusion.

2      Either you all agree to admit it without Naugle or Naugle comes

3      and it comes in as exhibits.  I am just saying it may be one of

4      the bags is not as smellie as another.  I don't know.  I just

5      want to avoid having that smell in here again.  That's all I'm

6      asking, but I think that calling it demonstrative in some way

7      makes it sound like it's not the stuff that was seized.  It is

8      the stuff and that's what it's going in on, and it's, you know,

9      my view is mildly if not outright misleading to the jury.  I'm

10     just saying once is enough.  Okay?

11              MR. GILBERT:  So --

2-26-08.txt

12          THE COURT:  We'll bring Naugle to say that I looked at

13     the bags and --

14          MR. GILBERT:  Suppose we agree that wasn't necessary?

15          THE COURT:  Fine.  Then it will be admitted.

16          MR. GILBERT:  But they're never going to see it again

17     anyway, right?

18          THE COURT:  Well, I would prefer they not because of

19     the smell.  I'm going to tell them that this is one exhibit that

20     we're not sending back to the jury.

21          MR. GILBERT:  I don't have a problem with admitting it

22     based on her testimony that she poured it into the big viles.

23          THE COURT:  Fine.  We'll do it tomorrow in front of

24     the jury.  We're not bringing her back in, but you couldn't have

25     stayed in here much longer anyway, so if anybody disagrees with


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                95


 1     Mr. Gilbert, we will admit E20, 21, and 22, and then you'll be

 2     able to rest with her tomorrow and they'll take over cross.

 3     Anyone object to its admission as exhibits?  I'm not presenting

 4     it in as demonstrative.

 5          MR. MARTIN:  No, your Honor.

 6          THE COURT:  Very good.  They will now be admitted.

 7          (Government Exhibit Nos. E20, E21, and E22 admitted

 8          into evidence at about 4:36 p.m.)

 9          THE COURT:  What do you want to say, Mr. Han?  All

10     right.  Anything further?  We're about to pass out to you jury

11     instructions and verdict forms, so I don't know whether we'll

12     have time to talk about them tomorrow afternoon without the jury

                           Page 90

2-26-08.txt

13    or not.  I really have -- do you think what, another hour cross

14    plus?  What do you have, an hour or two?

15            MR. SCARPELLI:  Direct on the chemist?

16            THE COURT:  No.  You're finished with the chemist, is

17    my understanding.  I assume they'll take about an hour about.

18    What do you have after that?

19            MR. SCARPELLI:  We have Helery Price calls and --

20            THE COURT:  I'm trying to figure out time.  That's

21    all.

22            MR. SCARPELLI:  I think we'll finish tomorrow.

23            THE COURT:  In the morning or in the afternoon?

24    That's all I'm asking.

25            MR. SCARPELLI:  I defer to Mr. Gilbert on that because

Jacqueline M. Sullivan, RPR
Official Court Reporter

96

1     he's going to be doing the cross-examination.

2             THE COURT:  All right.  That's fine.  I'll give you

3     these.  I don't assume that you'll have taken care of these jury

4     instructions tomorrow, but they are yours to look at.

5             MR. BOYKIN:  Your Honor, I just have a brief matter in

6     another courtroom tomorrow morning.  I've already advised my

7     client and he said okay.

8             THE COURT:  About what time?

9             MR. BOYKIN:  I should be in by eleven.

10            THE COURT:  All right.  Well, I have a feeling if the

11    government completes tomorrow afternoon, I'm assuming they do,

12    then Thursday we'll take off and we'll resume on Monday.  By

13    Monday, though I want to have any, I will ask for written

14    objections to the jury instructions.  I'm going with the red

Page 91

2-26-08.txt

15    book wherever necessary or possible.  The government keeps

16    coming in with these new reasonable doubt.  I'm going over the

17    red book anyways, okay?  Help yourself.  Thank you.  We'll talk

18    about these tomorrow and get the schedule.  All right.

19           (Proceedings adjourned at about 4:38 p.m.)

20                              - - -

21

22

23

24

25


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              97


1                        I N D E X

2

3    WITNESSES:                                      PAGE:

4    CONNIE KLINKAM

5        Direct Examination by Mr. Scarpelli            24

6

7                     E X H I B I T S

8    Defendant
     Exhibit
9    No.              Identification        Marked      Admitted

10   None.

11
     Government
12   Exhibit
     No.              Identification        Marked      Admitted
13
     1605                                                41
14
     1600.2, 1600.3                                      53
15
     1600.4, 1600.5, 1600.6                              54

2-26-08.txt
16
      1600.7, 1600.8, 1600.9                          55
17
      1600.10, 1600.11, 1600.12                       56
18
      1600.13, 1600.14, and 1600.15                   57
19
      1600.16, 1600.17, 1600.18                       58
20
      1600.1A                                         61
21
      1600.19, 1600.20                                70
22
      1602.2                                          78
23
      1601.2, 1601.3, 1601.4                          81E
24
25    EXHIBITS con't. on next page.


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter

                                                       98



 1
 2    Government
      Exhibit
 3    No.              Identification          Marked      Admitted
 4
      1603.2, 1603.3,                                      83
 5
      1604                                                86
 6
      E20, E21, E22                                        95
 7
 8
 9
10
11
12
13
14
15
16
17
                        Page 93

2-26-08.txt

18

19

20

21

22

23

24

25

Jacqueline M. Sullivan, RPR
Official Court Reporter

99

1                       CERTIFICATE

2

3

4            I, JACQUELINE M. SULLIVAN, Official Court

5    Reporter, certify that the foregoing pages are a correct

6    transcript from the record of proceedings in the above-entitled

7    matter.

8            _____

             JACQUELINE M. SULLIVAN
9

10

11

12

13

14

15

16

17

18

Page 94

2-26-08.txt
19
20
21
22
23
24
25


                    Jacqueline M. Sullivan, RPR
                     Official Court Reporter