2-27-08.txt

1

```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3
        UNITED STATES OF AMERICA,     .
 4                                     .
                 Plaintiff,            .
 5                                     .  CR No. 07-152
            v.                         .
 6                                     .
        ANTHONY SUGGS and              .  Washington, D.C.
 7      GLENDALE LEE,                  .  Wednesday, February 27, 2008
                                       .  At about 2:14 p.m.
 8               Defendants.           .
                                       .
 9      . . . . . . . . . . . . . .

10

11              TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12                   UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Government:        ANTHONY SCARPELLI, ESQ.
                                   JOHN K. HAN, ESQ.
15                                 U.S. Attorney's Office
                                   555 Fourth Street, NW
16                                 Room 4816
                                   Washington, D.C.  20530
17                                 202-353-1679

18      For the Defendant:        PATRICK M. DONAHUE, ESQ.
        Suggs                      Donohue Law Firm
19                                 18 West Street
                                   Annapolis, Maryland  21401
20                                 410-280-2023

21      For Defendant:            RON EARNEST, ESQ.
        Lee                        8121 Georgia Avenue, Suite 406
22                                 Silver Spring, Maryland  20910
                                   240-401-5277
23

24
        APPEARANCES con't. on next page.
25
```

Jacqueline Sullivan, RPR
Official Court Reporter

2

2-27-08.txt

```
 1      APPEARANCES, con't.

 2

 3      For Defendant:          RICHARD K. GILBERT, ESQ.
        Price                   P.O. Box 70448
 4                              Washington, D.C.  20024
                                202-898-0857
 5

 6      For Defendant:          ANTHONY D. MARTIN, ESQ.
        Ernest Glover           7841 Belle Point Drive
 7                              Greenbelt, Maryland  20770
                                301-220-3700
 8
        For Defendant:          CURTIS A. BOYKIN, ESQ.
 9      Ernest Glover           1850 M Street, NW
                                Suite 640
10                              Washington, D.C.  20036
                                202-776-0370
11

12

13

14      Court Reporter:              JACQUELINE M. SULLIVAN, RPR
                                     Official Court Reporter
15                                   U.S. Courthouse, Room 6720
                                     333 Constitution Avenue, NW
16                                   Washington, D.C. 20001
                                     202-354-3187
17

18

19
        Proceedings reported by machine shorthand, transcript produced
20      by computer-aided transcription.

21

22

23

24

25


                            Jacqueline Sullivan, RPR
                            Official Court Reporter
                                                                    3


                                Page 2
```

```
                              2-27-08.txt
```

1                     P R O C E E D I N G S

2           THE COURT:  At my request the government has given me,

3    and perhaps you can give copies to the defendants, these are the

4    calls played to date or the ones that you intend to call total.

5           MR. MAZETELLI:  Those are the calls played to date.

6           THE COURT:  To date.  Okay.  I wanted to make sure

7    because there's a lot in this book that's not in evidence and

8    it's going to end up being taken out.

9           Okay.  We're ready to go, I think.

10          MR. HAN:  A few short matters to make sure things move

11   smoothly.

12          In this next set of calls towards the end I'm going to

13   introduce a summary analysis of pen register analysis.  I gave

14   that to defense counsel and they indicated they have no

15   objection to it subject to cross-examination.  Number two, after

16   this witness is done we're going to present a witness who

17   participated in the arrest of Anthony Suggs and recovered a wad

18   of money and two cell phones.  He did not count the money, the

19   next agent did, and it came out to three thousand nine hundred

20   some odd dollars.

21          THE COURT:  Mr. Donahue, do you want to extend the

22   agony or do you want to just say he can testify or stipulate?

23          MR. DONAHUE:  We agree.

24          MR. HAN:  I will show him a piece of paper that

25   indicates the amount and we'll get into it that way if there's

                       Jacqueline Sullivan, RPR
                        Official Court Reporter

                                                                 4

1    no objection.

2           MR. DONAHUE:  Okay.
                              Page 3

2-27-08.txt

3          MR. HAN:  And second, this witness who arrested Mr.

4     Suggs recovered the cell phones from him but did not put it into

5     evidence and did not sign the cell phones.  I have another

6     witness who can say that, but I think Mr. Donahue and I have

7     agreed that chain of custody is not an issue.

8          THE COURT:  Fine.  Then just put them into evidence

9     and mark them.  Do we happen to have pictures of the cell

10    phones?

11         MR. HAN:  We have pictures of the cell phones.  That's

12    something we're not willing to stipulate.  That's something that

13    should go back to the jury.  It should be under ten pictures.

14         THE COURT:  What's up?

15         MR. GILBERT:  We'll see.  I'd like to hear their

16    foundation for those pictures.

17         THE COURT:  He was talking about Suggs.

18         MR. GILBERT:  Oh, I'm sorry.  You looked at me.  I

19    apologize.

20         THE COURT:  You were standing up so I wondered why you

21    were standing.

22         MR. DONAHUE:  I think he's referring to the ten photos

23    of --

24         MR. HAN:  They're photos from I think mostly from

25    Suggs' phone, but I think two pictures are from Helery Price's


                    Jacqueline Sullivan, RPR
                    Official Court Reporter

                                                            5


1     phone.

2          THE COURT:  You going to call the person who took it?

3          MR. HAN:  I'm going to call Agent Bevington, who says

                    Page 4

2-27-08.txt

4   he turned on the phones, examined them, and this number was

5   there, and therefore he can authenticate the picture.  It should

6   be very short, your Honor.

7              THE COURT:  Okay.  Let's bring the jury in.

8              Something else?

9         MR. HAN:  That's all.

10             THE COURT:  Good.

11             (Jury enters courtroom at about 2:17 p.m.)

12             THE COURT:  Good afternoon, ladies and gentlemen.

13             THE JURY:  Good afternoon.

14             THE COURT:  Hope you had a good lunch.  Is everybody

15   okay?

16             THE JURY:  I think so.

17             THE COURT:  All right.  Let us go.  No more chemistry,

18   just calls.  Let's go.

19       SPECIAL AGENT JOHN BEVINGTON, WITNESS FOR THE GOVERNMENT,

20                          PREVIOUSLY SWORN

21                        DIRECT EXAMINATION

22   BY MR. HAN:

23   Q.   Please turn to tab 27, activation number 564, Bates stamp

24   0039, and tell us the -- 27, tab 27.

25             THE COURT:  27.  Sorry.  Bates stamp 39.


                        Jacqueline M. Sullivan, RPR
                         Official Court Reporter

                                                              6



1              Okay?  One second, please.  I want you to stick with

2    the tab that is just mentioned, 27.

3    BY MR. HAN:

4    Q.   Could you tell us the date, time, and participants of that

5    call?

2-27-08.txt

6   A.   The date is January 15th, 2007.  The time is 7:10 p.m., and

7   the participants are Anthony Suggs and Helery Price.

8              (Audio tape played.)

9   BY MR. HAN:

10   Q.   If you can go to tab 30, activation 596, Bates stamp 0042,

11   tell us the time, date, and participants of this call.

12   A.   The date is January 16th, 2007, the time is 2:51 p.m., and

13   the participants are Anthony Suggs and Helery Price.

14              (Audio tape played.)

15   BY MR. HAN:

16   Q.   Please turn to tab 31, activation 606, Bates stamp 0043.

17   Tell us the date, time, and people in this call.

18   A.   Again, January 16th, 2007, 3:36 p.m., and the speakers are

19   Anthony Suggs and Helery Price.

20              (Audio tape played.)

21   BY MR. HAN:

22   Q.   Please turn to tab 32, activation 621, Bates stamp 0044,

23   and tell us the date, time, and participants of that call.

24   A.   The date is January 16th, 2007, the time is 5:08 p.m., and

25   the speakers are Anthony Suggs and Helery Price.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                        7


1              (Audio tape played.)

2   BY MR. HAN:

3   Q.   Turn to the next tab, tab number 33, activation 623, and

4   Bates stamp 0045, and tell us about the participants and date

5   and time of this call.

6   A.   The date is again January 16th, 2007, the time is 5:11

2-27-08.txt

7    p.m., and the participants are Anthony Suggs and Helery Price

8              (Audio tape played.)

9    BY MR. HAN:

10   Q.   Based on that last series of calls which occurred on

11   January 16th, 2007, did you and other members of law enforcement

12   try to conduct any surveillance?

13   A.   Yes, we did.

14   Q.   Please tell us about that.

15   A.   Based on the earlier calls we established surveillance in

16   two different locations.  On January 15th, the day before, Mr.

17   Suggs had come down 1st Street, Southwest somewhere around 1st

18   and Q Street, so myself and another agent set up in that area,

19   and the other units set up over along that southwest waterfront

20   near like Philips and the Channel Inn hotel along that

21   waterfront there.

22   Q.   Was Special Agent Ryan Pardee there?

23   A.   Yes, he was.

24   Q.   Was he in a car?

25   A.   Yes, he was.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            8



1    Q.   What color was his car?

2    A.   He was in a brown Pontiac.

3    Q.   Was Allison Samuels there?

4    A.   Yes, she was.

5    Q.   Is she employed by the FBI?

6    A.   Yes.  She's an agent.

7    Q.   What color car was she in?

8    A.   She was in a grayish or silver-colored car.
                          Page 7

2-27-08.txt

9    Q.   Now, these cars, do they have antennas?

10   A.   These particular -- Agent Pardee's car and Agent Samuels'

11   car both had antennas, yes.

12   Q.   Is there any difference with the way they looked from a

13   standard car antenna?

14   A.   They're not standard car radio antennas.  They're more like

15   the old cell phone antenna, and they're used for our FBI radios

16   so we can communicate from car to car.

17   Q.   Will you turn to tab 34, activation 628, and tell us the

18   date, time, and activation -- date, time, and participants of

19   this call?

20   A.   The date is again January 16th, 2007.  The time is 5:30

21   p.m., and the speakers are Anthony Suggs and Helery Price.

22   Q.   This is the same date you're doing the surveillance?

23   A.   Yes.

24   Q.   Approximately the same time?

25   A.   Yes.  Just a few minutes after the last call.

                         Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                   9

1                   (Audio tape played.)

2    BY MR. HAN:

3    Q.   Mr. Price said something about it looked -- they're getting

4    ready to go into H2O.  Do you see that?

5    A.   Yes.

6    Q.   What is H2O in this context?

7    A.   H2O is a club down on the southwest waterfront.

8    Q.   Did you receive information from the wiretap room about

9    this call as it came in?

                            Page 8

2-27-08.txt

10    A.    Yes, we did.

11    Q.    And what was told to you?

12    A.    That Mr. Suggs and Mr. Price were talking about our cars,

13    and we decided to discontinue the surveillance at that time.

14    Q.    Were you able to get any photos or video footage of Mr.

15    Price or Mr. Suggs during this meet?

16    A.    No, we were not.

17    Q.    Let's turn to tab 34.

18            THE COURT:  I'm sorry, 34?  You just did 33 and 34, if

19    I'm not mistaken, right?

20            MR. HAN:  The Court's indulgence.

21            THE COURT:  I'm sorry?  Do you agree?

22    BY MR. HAN:

23    Q.    Tab 41, which is activation 843, Bates 0054, and tell us

24    the date, time, and activation -- date, time, and participants

25    of that call.


                    Jacqueline M. Sullivan, RPR
                    Official Court Reporter

                                                              10


 1    A.    The date is January 18th, 2007.  The time is 6:49 p.m., and

 2    the participants are Anthony Suggs and Helery Price.

 3            (Audio tape played.)

 4            THE COURT:  Stop it, please.  Can you stop it?

 5            We're going to play tab 41.

 6    BY MR. HAN:

 7    Q.    Go back to tab 41, call 843.  Just tell us how many days

 8    past between the day you did surveillance on the waterfront and

 9    this call.

10    A.    This is two days later.

11            (Audio tape played.)

2-27-08.txt

12   BY MR. HAN:

13   Q.   Please turn to tab 43, which is activation 853, Bates

14   number 0057, and tell us the date, time, and people in that

15   call.

16   A.   The date is January 18th, 2007, the time is 8:26 p.m., and

17   the speakers are Anthony Suggs and Helery Price.

18   Q.   Please turn to tab 47, which is activation 943, Bates

19   number 0062, and tell us the information for that phone call.

20   A.   The date is January 19, 2007, the time is 9:14 p.m., and

21   the speakers are Anthony Suggs and Helery Price.

22            (Audio tape played.)

23   BY MR. HAN:

24   Q.   In the middle of that conversation Mr. Suggs says, Yeah, I

25   know it.  I'm laying on it, you know.  I'm just waiting on a

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              11


1    call.  Do you see that?

2    A.   Yes.

3    Q.   What's your opinion on what "I'm laying" refers to?

4    A.   It again refers to waiting.  He uses it in the same

5    sentence with waiting.  I'm laying, I'm waiting on a call.

6    Q.   Turn to tab 53, which is activation 1121, Bates stamp 0070,

7    and tell us the date, time, and participants of this call.

8    A.   The date is January 22nd, 2007, the time is 5:17 p.m., the

9    participants are Anthony Suggs and Helery Price.

10   Q.   Do you see the row of asterisks across the bottom third of

11   the page?

12   A.   Yes.

2-27-08.txt

13   Q.   What does that refer to?

14   A.   This is another example of where the call has been

15   shortened or redacted.

16             MR. HAN:  Please play the call.

17             THE COURT:  Tab 53?

18             MR. HAN:  Yes, your Honor.

19             (Audio tape played.)

20   BY MR. HAN:

21   Q.   Please turn to tab 70, which is activation 2093, Bates

22   stamp 0097, and tell us the date, time, and participants of that

23   call.

24   A.   The date is February 3rd, 2007, the time is 6:57 p.m., and

25   the participants are Anthony Suggs and Helery Price.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                              12


1             THE COURT:  What's the tab, please?

2             MR. HAN:  Tab 70, Bates 0097.

3             THE COURT:  One minute.  Wait, don't play it.

4             And what tab was just before that 70, and 53 was the

5   one just before?

6             MR. HAN:  53 was the previous tab, your Honor.

7             (Audio tape played.)

8   BY MR. HAN:

9   Q.   What's the date of this call?

10   A.   February 3rd, 2007.

11   Q.   And through your investigation did you learn Mr. Price's

12   birthday?

13   A.   Yes, I did.

14   Q.   And what is that?
                        Page 11

2-27-08.txt

15     A.    February 3rd, 1963.

16     Q.    There is a reference to an apartment.  Do you see that?

17     A.    Yes, I do.

18     Q.    What do you believe that refers to and why?

19     A.    I believe that's Mr. Suggs letting Mr. Price know that he

20     should have PCP for sale the following week, and I believe that

21     because during the course of the investigation there was never

22     any indication that Mr. Suggs was renting apartments or owned

23     property.

24     Q.    Going to tab 75, activation 3245, Bates 0104, and before we

25     play this call, tell us what's going on in this phone call.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    13


1      A.    Mr. Price is calling Mr. Suggs, and during the conversation

2      Mr. Price is having a background conversation and that's what it

3      is.  The call was answered by voicemail so there was never a

4      conversation between Mr. Price and Mr. Suggs.

5                    (Audio tape played.)

6      BY MR. HAN:

7      Q.    Please turn to tab 82, which is activation 5231, Bates

8      0115, and tell us the date, time, and participants and who's in

9      this call.

10     A.    The date is March 19th, 2007.  The time is 5:10 p.m., and

11     is Mr. Price calling Mr. Suggs, and it's again answered by

12     voicemail and Mr. Price leaves a message.

13                   (Audio tape played.)

14     BY MR. HAN:

15     Q.    Please turn to tab 83, the next tab, activation 5239, Bates

2-27-08.txt

16    01167, and give me the date, time, and participants of that

17    call.

18    A.   The date is again March 19th, 2007.  The time is 5:40 p.m.,

19    and the participants are Anthony Suggs and Helery Price.

20              (Audio tape played.)

21    BY MR. HAN:

22    Q.   Please turn to activation tab 84, which is activation 5255

23    and Bates 0117, and give us the date, time, and speakers of that

24    call.

25    A.   March 19th, 2007.  7:40 p.m. is the time, and the speakers

Jacqueline M. Sullivan, RPR
Official Court Reporter

14


1     are Anthony Suggs and Helery Price.

2               (Audio tape played.)

3     BY MR. HAN:

4     Q.   Turn to tab 87, which is activation 5355, Bates 0120, and

5     tell us the date, time, and people in that call.

6     A.   The date is March 21st, 2007.  The time is 9:18, and the

7     participants are Anthony Suggs and Helery Price.

8               (Audio tape played.)

9     BY MR. HAN:

10    Q.   Turn to the next tab, 88, which is activation 5443 and

11    Bates stamp 0121, and tell us before I play this call what's

12    going on in this call recording-wise.

13    A.   This is another one where it was answered by voicemail.

14    Mr. Price was calling Mr. Suggs.  It was answered by voicemail

15    and Mr. Price left a message.

16              (Audio tape played.)

17    BY MR. HAN:

Page 13

2-27-08.txt

18    Q.   Let's turn to the next tab, tab 89, which is activation

19    5652, Bates -- I can't read my Bates number.

20          THE COURT:  122.

21    BY MR. HAN:

22    Q.   122, and give us the date, time, and activation of this

23    phone.

24    A.   The date is March 26th, 2007, the time is 12:22 p.m., and

25    the participants are Anthony Suggs and Helery Price.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            15


1     Q.   Was this call shortened?

2     A.   Yes, it was.

3              (Audio tape played. )

4     BY MR. HAN:

5     Q.   In the second half of the call they talked about a new

6     number and locking it in.  Do you see that?

7     A.   Yes.

8     Q.   Does the wiretap information that you received include what

9     number Mr. Suggs was connecting with?

10    A.   Usually.  On most occasions, yes, it does.  There are

11    occasions where a number comes up blank, and I don't know the

12    reason, but most of the time we do get the incoming and the out-

13    going numbers.

14    Q.   In this case was the other phone used by Mr. Helery Price

15    recorded?

16    A.   Yes, it was.

17    Q.   Do you remember that number?

18    A.   Yes, I do.

                        Page 14

2-27-08.txt

19   Q.   What is the number?

20   A.   It's (24) 832-9586.

21   Q.   With regard to Government's Exhibit No. 1200 which as been

22   entered into evidence as a phone from Helery Price, did you get

23   the number on this phone?

24   A.   Yes.

25   Q.   What's the number on this phone?


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                                16


1    A.   (240) 832-9586.

2    Q.   They match?

3    A.   Yes.

4            THE COURT:  When you referred to the phone, what

5    exhibit were you referring to?

6            MR. HAN:  Government's Exhibit 1200.

7    BY MR. HAN:

8    Q.   Please turn to tab 100, which is activation 6206, Bates

9    number 0138, and tell us the date, time, and people in this

10   call.

11   A.   The date is April 3rd, 2007, the time is 12:05 p.m., and

12   the participants are Anthony Suggs and Helery Price.

13            (Audio tape played.)

14   BY MR. HAN:

15   Q.   Turn to tab 101, which is activation 6215, Bates 0139, and

16   tell us the date, time, and participants of that call and its

17   time in relation to the previous call.

18   A.   This is also on April 3rd, 2007.  The time is 3:01 p.m.

19   The speakers are Anthony Suggs and Helery Price.  And the prior

20   call was at 12:05, so it's just about three hours later.

2-27-08.txt

21          (Audio tape played.)

22    BY MR. HAN:

23    Q.   Turn to the next tab, 102, activation 6225, Bates stamp

24    0140, and give us the information of that call and its time in

25    relation to the previous call.


                        Jacqueline M. Sullivan, RPR
                          Official Court Reporter

                                                                    17


1     A.   Again, April 3rd, 2007 is the date, the time is 4:48 p.m.,

2     and the speakers are Anthony Suggs and Helery Price.  The prior

3     call was just after three.  This call is twelve minutes before

4     five in the afternoon.

5               (Audio tape played.)

6     BY MR. HAN:

7     Q.   Turning to the next tab, 103, give us date, time, and

8     speakers of that call, and this is activation 6229, Bates stamp

9     0141.

10    A.   The date is again April 3rd, 2007.  The time is 5:16 p.m.,

11    and the speakers are Anthony Suggs and Helery Price.

12              (Audio tape played.)

13    BY MR. HAN:

14    Q.   During any time in this investigation was a search warrant

15    executed at the residence of Helery Price?

16    A.   No, it was not.

17    Q.   Why not?

18    A.   Because we weren't sure where he was actually living.

19    Q.   If you turn to the next tab, tab 104, which is activation

20    6233, Bates 0142, and give us the date, time, and participants

21    of that call.

                              Page 16

2-27-08.txt

22    A.    April 3rd, 2007.  6:09 p.m. is the time, and the speakers

23    are Anthony Suggs and Helery Price.

24              (Audio tape played.)

25    BY MR. HAN:

Jacqueline M. Sullivan, RPR
Official Court Reporter

18

1     Q.    Please turn to tab 107, which is activation 6245, Bates

2     0146, and give us date, time, and activation of that number.

3              THE COURT:  I'm sorry, 107.  The one just before that

4     was 104, right?

5              MR. HAN:  104, yes.

6              THE WITNESS:  The date is April 3rd, 2007, the time is

7     8:37 p.m., and the speakers are Anthony Suggs and Helery Price.

8     BY MR. HAN:

9     Q.    This is the same day as the previous call; is that correct?

10    A.    Yes.

11             (Audio tape played.)

12    BY MR. HAN:

13    Q.    What is the date of this call?

14    A.    April 3rd, 2007.

15    Q.    What date was the wiretap for Anthony Suggs' phone taken

16    down?

17    A.    It terminated on April 7th of 2007.

18    Q.    Did the investigation continue?

19    A.    Yes, it did.

20    Q.    Why was the wiretap taken down for Mr. Suggs' line?

21             MR. DONAHUE:  Objection.

22             THE COURT:  Do you want to approach?  Do you want to

23    give me a clue?  Okay, let's approach.

2-27-08.txt

24          (Bench conference as follows):

25          THE COURT:  What's the answer?  I don't know.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              19


 1          MR. DONAHUE:  I don't know why it's relevant why they

 2     didn't reapply.  I mean, it seems to me that whatever we had

 3     here we're going to get into hearsay, what a judge would or

 4     wouldn't do or what the law does or doesn't allow.

 5          MR. HAN:  The wiretap went down April 7th.  The take-

 6     down wasn't for two months later until June.  During that time

 7     no one was arrested, and we're going to be playing a truck

 8     conversation on May 4th, and we're going to show pen register

 9     analysis between Suggs and Price around that time.  I think the

10     jurors are going to want to know why didn't we keep this wire

11     up.  All he's going to say is that we began focusing on Lonell

12     Glover, his suppliers and his other customers.

13          THE COURT:  And this is the truck?

14          MR. HAN:  And his truck.

15          THE COURT:  You kept the wire on the truck?

16          MR. HAN:  Yes.

17          THE COURT:  When did you get that?

18          MR. SCARPELLI:  March 29th.

19          THE COURT:  I think that's a fair answer.  They will

20     wonder why it took them a of couple months for making the

21     arrests, and they're basically saying that we'll focus towards

22     him as well at that point.

23          MR. HAN:  One of the real reasons is they didn't have

24     the man power to do Lonell Glover's and Anthony Suggs' line at

                              Page 18

2-27-08.txt
25      the same time, but we've been avoiding that.


                          Jacqueline M. Sullivan, RPR
                          Official Court Reporter
                                                                    20



 1              THE COURT:  All right.

 2              (End of bench conference.)

 3      BY MR. HAN:

 4      Q.   You said that the wiretap on Anthony Suggs' line went down

 5      when?

 6      A.   April 7th of 2007.

 7      Q.   Did the investigation continue to this PCP conspiracy?

 8      A.   Yes, it did.

 9      Q.   Why did you take down the wiretap for Mr. Anthony Suggs

10      when the investigation was continuing?

11      A.   Because at that point we were focused on his supplier,

12      Lonell Glover, in identifying Lonell Glover's customers in

13      addition to Mr. Suggs as well as Lonell Glover's source of

14      supply.

15      Q.   Was the truck bug still active?

16      A.   Yes, it was.

17      Q.   And when did the truck bug start and when did it end?

18      A.   The court order authorizing the truck mike was signed March

19      19th.  The installation and activation was completed on March

20      22nd and continued until June 19th, all of 2007.

21      Q.   You had a pen register on Anthony Suggs after April 7th

22      when the wire was taken down?

23      A.   Yes, we did.

24      Q.   And what information can you get from the wire -- what

25      information can you get from the pen register?


                          Page 19

2-27-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

21

1    A.    The pen register identifies the numbers being called by a
2    phone or the numbers calling a phone, and the date, time, and
3    duration of those particular calls.
4    Q.    If we could turn to tab 117, which is truck mike or truck
5    bug 604, Bates 0180, and give us the date, time, and speakers in
6    this call.
7              THE COURT:  I'm sorry.  What tab?
8              MR. HAN:  Tab 117, your Honor.
9              THE WITNESS:  The date is May 4th of 2007.  The time
10   when the activation was initiated is 7:32 p.m.  Mr. Suggs is
11   actually overheard talking to Mr. Glover on the mike at
12   approximately 8:03 p.m.  That was the first time that he was
13   intercepted that night on the truck microphone.
14   BY MR. HAN:
15   Q.    This is Mr. Lonell Glover; is that correct?
16   A.    Correct.
17   Q.    Even though the speakers are Mr. Lonell Glover and Anthony
18   Suggs, do they mention "brother"?
19   A.    Yes, they do.
20   Q.    What do they talk about with regard to brother?
21   A.    Mr. Suggs explains that brother wants a gallon, and he says
22   that several times.  Several times he indicates that he wants a
23   gallon.  He has a brother, has another customer, but he's not
24   sure what that customer wants because they didn't want to talk
25   over the phone.  He needs to go meet him to find out what the

2-27-08.txt

1    complete order is going to be, and toward the end of the call

2    they discuss whether they're going to give brother the old water

3    or the new water, the old PCP or the new PCP.

4    Q.   Did you run a pen register analysis for May 4, 2007?

5    A.   Yes.

6    Q.   Did you look specifically at the people or phone numbers

7    associated with Mr. Suggs and Mr. Price?

8    A.   Yes.

9    Q.   I'm showing the witness what's been marked as Government's

10   Exhibit No. 1212.  Do you see that?

11   A.   Yes.

12   Q.   And what is it?

13   A.   This is a timeline based on the pen register of Mr. Suggs'

14   cellular telephone from May 4, 2007.

15   Q.   And there is a red box, do you see that?

16   A.   Yes.

17   Q.   What does that refer to?

18   A.   The red box indicates the conversation that occurred

19   between Mr. Suggs and Mr. Lonell Glover inside the truck between

20   8:03 p.m. and 8:28 p.m.

21   Q.   Is that summary chart accurate to the best of your

22   knowledge?

23   A.   Yes, it is.

24        MR. HAN:  At this time the government would move in

25   the summary chart, Government's Exhibit 1212, subject to

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-27-08.txt

1    cross-examination.

2              THE COURT:  All right.  1212.  Do you want to put it

3    on the screen?

4              MR. HAN:  I will, your Honor.

5              (Government Exhibit No. 1212 was admitted into

6              evidence at about 3:07 p.m.)

7    BY MR. HAN:

8    Q.    And can you read the top of the chart?

9    A.    May 4th, 2007, Suggs, Price, Pen Register Summary.

10   Q.    You previously mentioned a red box.  Do you see that box?

11   A.    Yes, I do.

12   Q.    And there's a time stamp.  Do you see that?

13   A.    Yes.

14   Q.    What does that time refer to?

15   A.    8:03 p.m. is the time that we began intercepting Mr. Suggs

16   and Lonell Glover over the truck microphone.

17   Q.    Can you read what's in the red box, please?

18   A.    Suggs tells Lonell Glover I know brother need a gallon.

19   Brother:  I know what he want, a gallon.  I know brother wants a

20   gallon.  Which shit we going to give brother, the old water or

21   the new water?  Those were not said all together.  They were

22   dispersed throughout the conversation.

23   Q.    But those are fair quotations from truck bug 604?

24   A.    Yes, there are.

25   Q.    When they talk about brother in truck bug 604, who do you

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                  24


                              Page 22

2-27-08.txt

1  believe that to be?

2  A.   Helery Price.

3  Q.   Do you see some gray boxes?

4  A.   Yes.

5  Q.   Starting with, say, 12:33 p.m.?

6  A.   Yes, I do.

7  Q.   What do those boxes indicate?

8  A.   Phone calls between Mr. Price and Mr. Suggs.

9  Q.   Do you we know if there's an actual conversation at that

10  time?

11  A.   No, we do not.

12  Q.   What do we know?

13  A.   We know the date and time of the call and the numbers being

14  called.  The pen register was on Mr. Suggs' phone so we know it

15  was to that phone and we know the number that he either dialed

16  or the number that called his number.

17  Q.   And then there's another entry at 12:41 that's reversed,

18  Suggs calls Price.  Do you see that?

19  A.   Yes.

20  Q.   What does that indicate?

21  A.   That indicates at 12:40 p.m. Mr. Suggs called Mr. Price.

22  Q.   And you see little lightening bolts in the middle of the

23  timeline?

24  A.   Yes.

25  Q.   What do they refer to?


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            25



1  A.   They indicate spaces where the time has been condensed to

2  make room to get the timeline on one page.

                        Page 23

2-27-08.txt

3    Q.   In the bottom left-hand corner there's a little legend that

4    says Suggs' phone number.  Do you see that?

5    A.   Yes.

6    Q.   How do you know that's Suggs' phone number?  How do you

7    associate it with Mr. Suggs?

8    A.   That is the number that we had a court order to do wiretap

9    interceptions for and we listened to numerous phone calls over

10    that line and heard Mr. Suggs speaking on that telephone.

11    Q.   And there's two numbers associated with Mr. Price.  How do

12    you associate those numbers with Mr. Price?

13    A.   Those are both numbers that called Mr. Suggs' telephone

14    number, and Mr. Price was the speaker from both of those.  The

15    first one is an apartment and that was the location where Mr.

16    Price was arrested on June 16th, June 19th of 2007.

17    Q.   What was that address?

18    A.   220 O Street, Southwest, Washington.

19    Q.   Was that a cell phone or a hard line?

20    A.   That is a hard line.

21          THE COURT:  I'm sorry.  What period of time does the

22    21 activations cover?

23          THE WITNESS:  May 4th of 2007, your Honor.

24          THE COURT:  Just one day?

25          THE WITNESS:  Yes.

Jacqueline M. Sullivan, RPR
Official Court Reporter

26

1          THE COURT:  21 activations in one day, but activations

2    don't necessarily mean the people talk?

3          THE WITNESS:  That's correct.

2-27-08.txt

4          The second number is the cellular telephone number

5     that Mr. Price gave to Mr. Suggs toward the end of March and

6     indicated that that was his new number.

7     BY MR. HAN:

8     Q.   So in total, on this day, May 4th, 2007, which is the same

9     date as truck bug 634, how many activations were between Mr.

10    Price and Mr. Suggs?

11    A.   21.

12    Q.   If we could go to the call, I would like to just start on

13    Bates stamp page 182, right below the row of asterisks.

14              THE COURT:  What tab?

15              MR. HAN:  Tab 117.

16    BY MR. HAN:

17    Q.   If we could go to the third page, which is Bates number

18    182, and there is a row of asterisks, if I can start from right

19    there, and I will ask Mr. Mazetelli to stop recording about five

20    lines down where Mr. Glover says, That's the only thing about

21    brother.  Brother's like a crackhead.  He might get him one of

22    them tables and go kaboom.  I'll stop at that point so everyone

23    can catch up.

24              (Audio tape played.)

25    BY MR. HAN:


                         Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                              27


1     Q.   Did you see where we are, brother's like a crackhead?

2     A.   Yes.

3              THE COURT:  What's the Bates stamp?

4              MR. HAN:  0128, about one, two, brother's like a

5     crackhead.  And we'll continue from there.

2-27-08.txt

6                    (Audio tape played.)

7                    MR. HAN:  No further questions, your Honor.

8                    THE COURT:  Okay.  Mr. Bevington, Mr. Gilbert, we'll

9       take a short recess at this time.

10                   MR. GILBERT:  Just one line of questions before we

11      break.

12                   THE COURT:  Okay.

13                   Everybody okay?  As long as it doesn't have to do with

14      chemistry.

15                           CROSS-EXAMINATION

16      BY MR. GILBERT:

17      Q.   And I'm going to ask Mr. Mazetelli if he would be kind

18      enough to bring up -- one moment -- activation 3245.  That's at

19      -- we don't have tabs, but it's at page 104.

20                   THE COURT:  What's the activation?  I mean what's the

21      tab for those of us who have -- I know, I know.  I'm asking Mr.

22      Mazetelli.

23                   JUROR:  75.

24                   THE COURT:  75.  Thank you.

25                   That's 104?  That's it.


                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter
                                                                    28


1                    MR. GILBERT:  Yes, your Honor.

2                    THE COURT:  Okay.

3                    (Audio tape played.)

4       BY MR. GILBERT:

5       Q.   Special Agent Bevington, at the time that Mr. Price says

6       these words about he doesn't have anything, the phone for Mr.

                                 Page 26

2-27-08.txt

7    Suggs is still ringing, right?

8    A.    Correct.

9    Q.    It hasn't picked up?

10   A.    Correct.

11   Q.    How did you do that?

12   A.    You mean how did we --

13   Q.    How did you capture conversations that Mr. Price is having

14   before the phone on which you have the wiretap is even picked

15   up?

16   A.    I'm not a technical person, but the way it's been explained

17   to me, it depends on how the phone company sends the information

18   to our office.

19   Q.    So you are able, and I believe there were other places

20   where you could hear conversation in the background on incoming

21   calls before the phone -- the person either answered or the

22   voicemail picked up.

23   A.    Correct.

24   Q.    So you're able to essentially turn, in this case, Mr.

25   Price's cell phone into a microphone for your benefit even


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              29


1    though it has not yet been connected to the phone where there's

2    a wiretap in place?

3    A.    I wouldn't say that I do that.  I'm not the person that

4    wires or sends the information into our office.  It depends on

5    the phone company and the way they send it to our office.

6         MR. GILBERT:  Your Honor, this might be a good place

7    to take a break and address some matters out of the presence of

8    the jury.

                        Page 27

2-27-08.txt

 9          THE COURT:  Okay.

10          Ladies and gentlemen, we'll take about a ten-minute

11    recess or a little more maybe.

12          (Jury exits courtroom at about 3:22 p.m.)

13          THE WITNESS:  Am I excused, your Honor?

14          THE COURT:  Yes.

15          (Witness excused.)

16          MR. GILBERT:  Your Honor, I couldn't play those

17    conversations on my computer so I've been relying on my

18    investigator.

19          THE COURT:  Which conversations?

20          MR. GILBERT:  Well, in particular the one 3245,

21    activation 3245, but my concern is, that when I looked at that,

22    it indicated the conversation occurred before the voicemail

23    picked up, and indeed that is what happened.  And it is my view

24    that what we have is an interception on Mr. Price that is beyond

25    the scope of what Judge Collier authorized in terms of an

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              30

 1    interception on Mr. Suggs' phone.

 2          THE COURT:  What tab was this again?

 3          MR. GILBERT:  3245.  I don't know what tab it is, your

 4    Honor.

 5          THE COURT:  Mr. Mazetelli, can you tell me?

 6          MR. MAZETELLI:  75, your Honor.

 7          THE COURT:  75, tab 75?

 8          MR. MAZETELLI:  It was tab 75, Bates stamp 0104.

 9          THE COURT:  Okay.  He says, I know he ain't got

                              Page 28

2-27-08.txt

10    nothing.  That's before.  Does this occur any other time that
11    you're aware of?
12          MR. GILBERT:  There is nothing to my knowledge the
13    government has sought to introduce.  This is the incriminating
14    phone call that occurs beforehand, but I think it raises a
15    larger issue, to be frank with you.
16          THE COURT:  Who is he talking to?
17          MR. GILBERT:  I feel quite confident the government
18    doesn't have an answer for that, and I'm not going to provide
19    that, but ...
20          THE COURT:  Well, it may raise an issue, but frankly,
21    so far I got one of these.  I don't know.  What do you want me
22    to do?
23          MR. GILBERT:  What I'd like to do is to strike that
24    phone call.  I'd like to suppress any conversations, any
25    background conversations that occur apparently on an

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              31


1     interception of Mr. Price's cell phone, and I would move for a
2     mistrial.
3           THE COURT:  Well, the latter is easy.  No.  So far you
4     pointed out one call to me, that's it.  You don't have anything
5     else.  Listen, I'm not declaring a mistrial on the grounds of
6     arguably I know Mr. Han's going to answer to it.
7           MR. HAN:  I would like to know when Mr. Gilbert
8     learned of this phone call.  He's had these phone calls for
9     quite some time.  It's quite convenient that he raises it for
10    the first time when we're in the middle of trial.  We've had it.
11    We've had objection.  It's quite convenient.
                         Page 29

2-27-08.txt

12       THE COURT:  I don't see any prejudice, frankly.  The

13  only question in some fashion is whether or not if there's only

14  one of these if that's what you're telling me, and we can have

15  some testimony presented about some technological issue.  We're

16  going to move along, that's what I'm saying.

17       MR. HAN:  Furthermore, I can double-check the language

18  of the order, but the order allows for background conversations

19  to take place.  It is perfectly lawful, and I think the

20  insinuation of Mr. Gilbert at this juncture is quite

21  inappropriate.

22       THE COURT:  I've already denied the mistrial.  The

23  only question in my mind is I'd like to sort of understand out

24  of the presence of the jury exactly what happens.  I don't have

25  any idea if this is good, bad, or indifferent.  But a two-liner


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                32


1   here isn't going to give you a mistrial, sorry, so we're moving

2   on.

3        MR. GILBERT:  I understand that.  I understand that

4   ruling, but the authorizations, what was provided to Judge

5   Collier when she authorized was background conversations in the

6   vicinity of the target telephone when it's off the hook or

7   activated, something completely different --

8        THE COURT:  You can put it in writing.

9        MR. HAN:  I'd like to ask Mr. Gilbert through the

10  Court why he didn't raise this before he started with these.

11       THE COURT:  Because he's a defense counsel.

12       MR. HAN:  I understand that.

                    Page 30

2-27-08.txt

13          MR. GILBERT:  Actually I made representations why I

14    didn't.  I said I have been unable to play these on my computer.

15    I've been relying on my investigator.  My investigator has been

16    listening for the context and correctness.  Remember we did make

17    one correction to one wiretap, but it was only when I'm sitting

18    there and I'm parsing them out that I realized, wait a minute,

19    this is before the voicemail, not on the voicemail.

20          THE COURT:  I'd like the government -- you can put it

21    in writing if you want me to suppress this call, but before you

22    do that the government is going to have the opportunity to

23    explain how these things happen.  In a sense there may be an

24    explanation.  Bevington seemed to think there is one but he

25    doesn't know it.  But over one two-liner that's cumulative at

Jacqueline M. Sullivan, RPR
Official Court Reporter

33

1     best I'm not terribly moved by your motion.  So far what I'm

2     doing is taking under advisement your motion to suppress tab 75,

3     because as far as I know this is the only one that's been played

4     that's in that category, and I'm sure you would know if there

5     were more, so I'd like to hear the explanation from a

6     technological point at some point.

7           MR. HAN:  There are a number of issues here that he

8     raises for the first time conveniently during the course of

9     cross-examination.  One is the technological person.  We can

10    provide that through a technical person.  I'm sure we could call

11    someone.

12          THE COURT:  You don't have to call it before the jury.

13    Nothing is going before the jury, or you could if you want.

14          MR. HAN:  The other issue, your Honor, is the

2-27-08.txt

15  legality, whether or not this should have been suppressed.  This

16  is something we should have done a long time ago, certainly

17  before the afternoon of the last day of trial, when he's had

18  this information for quite some time.  For the most part I would

19  say Mr. Gilbert has not done anything -- I'm not going to say

20  anything on the record about that, your Honor, but I think it's

21  completely inappropriate.  Completely inappropriate.

22       THE COURT:  I'm going to take under advisement -- I've

23  denied the motion for a mistrial.  I will take under advisement

24  whether to suppress these two lines.  I would like to have some

25  small explanation about how it works.  I suspect there is an

Jacqueline M. Sullivan, RPR
Official Court Reporter

34

1  explanation.  If you want to put a tech person on at some point

2  that's your -- you have the ability in rebuttal, so to speak,

3  and wait for rebuttal.

4       MR. HAN:  Your Honor --

5       THE COURT:  You don't have to because I don't see that

6  it raises squat.  I'm only concerned about I'd like to get a

7  little better information about it all before I rule on the

8  motion to suppress.  He's saying that you're taping a telephone

9  call that wasn't authorized.  That's all I hear.  And I'll

10  consider it.  But I'm not having an evidentiary hearing at the

11  moment.

12       MR. HAN:  I would like an instruction for the jury

13  that the legality of these wiretap calls is not for them to

14  consider.  You submitted a wiretap and a call just for that, and

15  what Mr. Gilbert has done quite underhandedly I will say on the

2-27-08.txt

16    record, is put that issue before the jury.

17          THE COURT:  Not yet.  The call is in.  The instruction

18    that you read in the standard instruction about wiretaps says

19    they don't have to worry about the legality.  If I decide to

20    suppress it they'll be told to take it out of the book and

21    forget it.  It's two lines.  It's hardly anything other than

22    cumulative, but I think that's probably a perfectly fine

23    explanation and we'll hear about it, so if the government can

24    find out something I'm going to tell you you have to put it in

25    writing, sir.  If this is all we're talking about I wouldn't


                        Jacqueline M. Sullivan, RPR
                         Official Court Reporter

                                                                35


1    worry about it.  Mr. Han, I can either suppress it out of an

2    abundance of caution or alternatively it stays in if there's

3    some reason to understand why it is a cell phone is being heard

4    before it connects with the subject.

5          MR. HAN:  I challenge Mr. Gilbert as an officer of the

6    court to stand here and tell me he didn't know about this call

7    before we started.

8          THE COURT:  Yes, but it's okay.

9          MR. HAN:  It's not okay.

10         THE COURT:  Mr. Han, I don't quite understand that

11    they're obligated to tell you their cross-examination.

12         All right, we'll be back in ten minutes.

13         Are we going anywhere else with this kind of stuff?

14    Because I agree with him to the extent that it's suggesting

15    there's some illegality.  I want to hear about it out of the

16    presence of the jury.  Is this the only --

17         MR. GILBERT:  Yes.  That's why I wanted to ask this
                              Page 33

2-27-08.txt

18   question before you broke, so that we could talk about it out of

19   the presence of the jury.  I don't have technical issues with

20   this.

21          THE COURT:  He's not going to agree with that.

22          MR. HAN:  No.

23          THE COURT:  Are there any other things that you're

24   going to suggest there's been some impropriety or some deviation

25   from the legality of the wiretap?


                        Jacqueline M. Sullivan, RPR
                           Official Court Reporter

                                                                    36


 1          MR. GILBERT:  No, your Honor, because I don't

 2   understand that any of the other conversations recorded the same

 3   way are in the transcripts or put before the jury.  This is the

 4   only one the government put into writing.

 5          THE COURT:  Right, okay.

 6          And Mr. Boykin, was there something that you wanted to

 7   say before we broke?

 8          MR. BOYKIN:  No, your Honor.  I was just standing.

 9          THE COURT:  You were just standing?

10          MR. BOYKIN:  I was just standing.  I thought we were

11   getting ready to break.

12          THE COURT:  All right.

13          (Recess taken at about 3:32 p.m.)

14          (Back on the record at about 3:48 p.m.)

15          THE COURT:  Are we ready for the cross-examination?

16          MR. GILBERT:  Yes.

17          MR. SCARPELLI:  I'm having a copy made of the order.

18   I'd like the Court to see the order to see the wording of the

2-27-08.txt

19    order.

20            THE COURT:  I'd like to just get the jury out here.

21            MR. SCARPELLI:  But I think that the jury should be

22    instructed -- please let me finish -- that this is a legal issue

23    and they're not to consider the legality of whether the call is

24    admissible.

25            THE COURT:  I will, I will.  The call is admissible at


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            37


1     the moment.  The call is in evidence.  There is no issue of

2     legality for them whatsoever at the moment.  I'm not instructing

3     them on anything until I resolve the whole matter.  You can show

4     me the warrant later.  I have to leave early.  I have a juror

5     who is not feeling terribly well.  I'd like to finish his cross.

6     I don't see any harm.

7             You're not going back to that phone call?

8             MR. GILBERT:  I'm not.

9             MR. SCARPELLI:  Your Honor, I'm just going to step out

10    for a minute because someone is making a copy of the order.

11            THE COURT:  Fine.  I must have those, though.

12            MR. GILBERT:  You do.

13            (Jury enters courtroom at about 3:50 p.m.)

14            THE COURT:  Okay, Mr. Gilbert.

15            MR. GILBERT:  Thank you, your Honor.

16    BY MR. GILBERT:

17    Q.    Good afternoon, Special Agent Bevington.

18    A.    Good afternoon.

19    Q.    Sir, let's talk about the pen register.  The pen registers,

20    I guess, plural in this case.

                        Page 35

2-27-08.txt

21    A.   Yes.

22    Q.   And the pen registers in this case all together total about

23    one hundred thousand activations?

24    A.   I don't know that, Mr. Gilbert.

25    Q.   All right.  They're on two separate large files.  Have you

Jacqueline M. Sullivan, RPR
Official Court Reporter

38

1     looked at all the pen register data?

2     A.   No, I have not.

3     Q.   Let's talk about Mr. Suggs.  The pen register activation

4     for Mr. Suggs are about what, over twenty thousand of them over

5     the course of the pen registers?

6     A.   I don't know the total number of activations on the pen

7     register.

8     Q.   Do you have an approximate idea?

9     A.   I do not.  I know the number of activations during the

10    course of the wiretap interception, but the pen register in

11    total, no, I do not.

12         THE COURT:  I'm sorry, your question was how many

13    pen --

14         MR. GILBERT:  Activations on the pen register

15    involving Mr. Suggs.

16         THE COURT:  Involving Mr. Suggs.  And what period of

17    time again?  You have over twenty thousand for what period of

18    time?

19         THE WITNESS:  I don't know, your Honor.

20         THE COURT:  Oh, okay.

21    BY MR. GILBERT:

Page 36

2-27-08.txt

22    Q.   Well, let me ask you this question:  In terms of you have

23    the government exhibit that's the summary chart?

24    A.   No, I do not.

25    Q.   As you were putting this together, this pen register

Jacqueline M. Sullivan, RPR
Official Court Reporter

39

1     summary chart together, were you just picking a particular date,

2     looking at a particular target, Mr. Suggs, and then looking for

3     a particular other phone, that is, Mr. Price?

4     A.   Yes.

5     Q.   So do you have any idea how many phone activations on the

6     pen register there were for Mr. Suggs on the day in question?

7     A.   No, I do not know the total number of activations on May

8     4th, 2007.

9     Q.   All right.  But you had to look at least at data to extract

10    it, right?

11    A.   Yes.

12    Q.   So you say well over a hundred activations?

13         THE COURT:  In a day?

14         MR. GILBERT:  On May 4th, 2007.

15         THE WITNESS:  I don't know, Mr. Gilbert, because when

16    I did it you look at a computer screen, and at the time I think

17    per screen there's like four activations you can see, so I'm

18    scrolling through the screens counting the activations between

19    Mr. Suggs and Mr. Price and actually Mr. Glover as well, and so

20    it's hard for me to estimate a total number of activations.

21    BY MR. GILBERT:

22    Q.   When you say "Glover" are we talking Lonell Glover or

23    Ernest Glover?

Page 37

2-27-08.txt

24     A.   Both.

25     Q.   Were there calls between Suggs and Ernest Glover?


Jacqueline M. Sullivan, RPR
Official Court Reporter

40


1     A.   I believe there were two or three.

2     Q.   And --

3               THE COURT:  On that day?

4               THE WITNESS:  On May 4th, yes, your Honor.

5     BY MR. GILBERT:

6     Q.   Do you recall what time of day they were?

7     A.   No, I don't recall off the top of my head what time of day

8     those were.

9     Q.   All right.  Do you -- well, let me ask you this:  Let me

10    not ask you this.  Let me move on.

11              With respect to Mr. Price and Mr. Suggs, it's clear

12    that these gentlemen knew each other socially, right?

13    A.   I mean, they made reference to social.  Yes, I think that's

14    correct.

15    Q.   Well, I mean, we have the one activation you played, I

16    believe activation 2003 at page 97, where Mr. Suggs finds out at

17    the end of the call that it's Mr. Price's birthday, he's home by

18    himself and Mr. Suggs says, well, hold on and I'll come and get

19    you, right?

20    A.   Well, that call was shortened, Mr. Gilbert, and during the

21    call Mr. Price was with a female and it did not appear that he

22    was going to be going out with Mr. Suggs that evening.

23    Q.   He was with a female?

24    A.   There's a female voice I believe in that activation.  You

Page 38

25     can hear a background female.  I think Mr. Price, if I'm

                         Jacqueline M. Sullivan, RPR
                            Official Court Reporter

                                                                  41



1      remembering the activation correctly, he said something to her

2      about using her car to meet up with Mr. Suggs, and I believe she

3      indicated that he would not be doing that.

4      Q.    Because she wasn't going to let him have the car?

5      A.    Correct.

6      Q.    Because Mr. Price doesn't have a car, right?

7      A.    I don't believe he does, no.

8      Q.    There's a discussion, you know, activation 186, where Mr.

9      Glover and Mr. Suggs are complaining about the fact that Price

10     doesn't have a car, right?

11     A.    Correct.

12     Q.    All right.  We have an activation -- let me find my number

13     here -- where activation 562 -- no.  5652 at page 122.  That's

14     an activation where Mr. Suggs and Mr. Price end up talking about

15     Mr. Suggs says give me about four, we can get together at

16     Georgetown and do some shopping and stuff.  Do you remember that

17     conversation?

18     A.    Yes, I do.

19     Q.    You have the book in front of you, right?

20     A.    Yes.

21     Q.    And so this is at page 122?

22     A.    Yes.  It's tab 89, I believe.

23     Q.    All right.  And you didn't have any reason to believe that

24     getting together at Georgetown and doing some shopping was drug

25     conversation, did you?

2-27-08.txt

Jacqueline M. Sullivan, RPR
Official Court Reporter

42

1      A.    I don't believe that they were going to get together and do
2      some shopping and stuff at Georgetown that night, no, I don't
3      believe they were.
4      Q.    And that's based on?
5      A.    During these conversations they make reference at different
6      times to going and getting some drinks, or in this case going
7      and doing some shopping, but there were never any indications
8      that they actually did those things.  For instance, in the
9      conversations between Mr. Suggs and Mr. Ernest Glover there were
10     conversations about getting together socially.  Then there were
11     subsequent conversations where Mr. Suggs confirmed that they had
12     in fact gotten together socially, and he talked about that, both
13     with Mr. Price and Mr. Lonell Glover, and I never heard any of
14     those references with respect to social events between Mr. Suggs
15     and Mr. Price.
16     Q.    I see.  And you had Mr. Suggs or was it Mr. Price you had
17     under surveillance then?
18     A.    Which particular moment?
19     Q.    Let's take March 26.
20     A.    I don't think that we were doing surveillance on either of
21     those gentlemen that day.
22     Q.    So you don't have any idea whether they went to Georgetown
23     then, right?
24     A.    I do not know, but I don't believe that that's the case.
25     Q.    Because nobody talked about later having gone to

Jacqueline M. Sullivan, RPR
Official Court Reporter
Page 40

2-27-08.txt

43

1      Georgetown, right?

2      A.   No.  It's more than that.  It's the context and it's the

3      way -- Mr. Suggs was very skillful at the way he talked on the

4      phone.  He would arrange to meet and then he would throw in

5      something like, yeah, we'll get together and have some drinks,

6      or in this case we'll get together and go to Georgetown and do

7      some shopping and stuff.

8      Q.   Let's take that same call because that has some asterisks

9      there, right, like something's been redacted?

10     A.   Yes.

11     Q.   And what's been redacted is about a minute-and-a-quarter of

12     time where Mr. Suggs and Mr. Price are talking about the

13     Georgetown-Ohio State basketball game, right?

14     A.   I don't recall exactly what occurred in between or what has

15     been deleted from this conversation.  I wouldn't argue with you

16     that that's the fact.  I just don't remember without hearing it

17     or seeing it.

18     Q.   Well, this conversation takes place in March of 2007,

19     right?

20     A.   Yes.

21     Q.   Georgetown made it to the final four, right?

22     A.   Yes.

23     Q.   Where they played Ohio State, right?

24     A.   Correct.

25          THE COURT:  Did they lose?

Jacqueline M. Sullivan, RPR
Official Court Reporter

44

2-27-08.txt

```
 1              MR. GILBERT:  Ohio State beat Georgetown in that game,
 2      your Honor.
 3              THE COURT:  I thought so.
 4              MR. GILBERT:  And lost to University of Florida in the
 5      finals, just like they did in football.  No offense to our Gator
 6      fans here.
 7      BY MR. GILBERT:
 8      Q.   So let's talk about the question of brother.  Now, you have
 9      given the jury your opinion that in the activation, the truck
10      activation 604, the reference to brother is a reference to
11      Helery Price, correct?
12              THE COURT:  I'm sorry.  Can we have a translation?
13      604 is the truck?
14              MR. GILBERT:  First of all, I don't have Bates stamps
15      for that one.
16              THE COURT:  Oh, you don't?
17              MR. GILBERT:  The copies we were given didn't have the
18      Bates stamp.  This is the one that was added later, your Honor.
19              MR. MAZETELLI:  Bates stamp 180, your Honor.
20              THE COURT:  I'm sorry?
21              MR. MAZETELLI:  Bates stamp 180.
22              MR. GILBERT:  Activation 604.
23              MR. MAZETELLI:  Tab 17, your Honor.
24              THE COURT:  Thank you.  117.
25      BY MR. GILBERT:
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

45

Page 42

2-27-08.txt

1   Q.   And this truck conversation is in fact the red conversation

2   that's highlighted on Government's Exhibit 1212, right?

3   A.   The quotes from that are from the truck conversation, yes.

4   Q.   All right.  And there is of course no reference in there to

5   Mr. Price per se, correct, the name "Price" is not mentioned?

6   A.   They do not use the name "Price," no.

7   Q.   They use the name "brother," right?

8   A.   Yes.

9   Q.   You have told the jury that it is your opinion that this

10   reference is to Mr. Price?

11   A.   That's correct.

12   Q.   All right.  Well, let's talk about the issue of brother.

13   Now, we know that when Ernest Glover and Anthony Suggs talk

14   about brother they're talking about Mr. Price, right?

15   A.   I believe so, yes.

16   Q.   I mean, there is activation 2083 at page 96.

17        THE COURT:  Bates stamp 96, you mean?  Is that what

18   you mean by "page"?

19        MR. GILBERT:  Yes.

20        THE WITNESS:  Bates stamp 69, your Honor.

21        THE COURT:  Thank you.

22   BY MR. GILBERT:

23   Q.   And you know the part that is left in the transcript

24   actually has Mr. Suggs asking if he talked to old Helery Price,

25   and Mr. Glover didn't recognize that right away.  Mr. Suggs says


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              46



1   talk to bro, and then Mr. Glover says that he hasn't talked to

2   brother, right?

                    Page 43

2-27-08.txt

```
3    A.   Yes.
4    Q.   And that's the same conversation where it says brother
5    ain't hitting on anything, brother don't want nothing, man.
6    That joker don't want nothing, jack?
7    A.   Yes.
8    Q.   The only thing brother do walk around look slick and talk
9    slick, you know, and then Mr. Suggs says old brother Price,
10   right?
11   A.   Yes, that is correct.
12   Q.   And this is clearly a conversation which "brother" between
13   these two men refers to my client, Mr. Price?
14   A.   I believe that's correct.
15   Q.   And we played earlier activation 186.  That's at 218, and
16   that's the one where they don't mention Mr. Price by name but
17   they are talking about oh, brother?
18   A.   I'm sorry.  I'm not sure which ...
19   Q.   I'm sorry, page 218, activation 186.  It's one we added
20   later on in the trial.
21            THE COURT:   Tab 132.
22   BY MR. GILBERT:
23   Q.   And you know on the second page they're clearly talking
24   about brother, right?
25   A.   I don't have it in front me, but, yes, they are.
```

<div align="center">
Jacqueline M. Sullivan, RPR<br>
Official Court Reporter
</div>

47

```
1    Q.   All right.
2    A.   I recall the activation, yes, they're talking about Mr.
3    Price.
```

2-27-08.txt

4   Q.   And although they don't mention Mr. Price's name, they use

5   virtually the same language when they say he don't want to work

6   a job, man, he don't want to do nothing, man.  He just want to

7   walk around, look slick, talk slick and gamble, you know.  That

8   man ain't trying to do nothing concrete and serious?

9   A.   Correct.

10  Q.   So that's virtually the same language as in the

11  conversation in which Ernest Glover and Anthony Suggs refer to

12  Helery Price's brother.  All right.  But this conversation

13  that's on Government's Exhibit 1212 is not a conversation with

14  Ernest Glover and Anthony Suggs, it's a conversation between

15  Anthony Suggs and Lonell Glover, correct?

16  A.   Correct.

17  Q.   Lonell Glover is Ernest Glover's brother?

18  A.   Yes, he is.

19  Q.   Now, we have a -- I don't -- let me ask the government if

20  you have it available on your computer Bates stamp 177,

21  activation 441.

22          Now, that's a conversation --

23          THE COURT:  177?

24          MR. GILBERT:  Yes.  Bates stamp 177, activation truck

25  441, truck activation.

                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter
                                                              48


1           THE COURT:  That hasn't been played before.

2           MR. GILBERT:  It hasn't.

3           THE COURT:  Are we putting it into evidence?

4           MR. GILBERT:  I'd like to.

5           THE COURT:  Can you accommodate us and everybody turn

2-27-08.txt

6     to tab 116, and can you bring it up on the computer?
7                (Audio tape played.)
8                MR. GILBERT:  Is this the truck activation?  It sounds
9     like perhaps that's the wiretap activation.
10               THE COURT:  No.  It says truck.  It's 0177, tab 116,
11    right?
12               (Audio tape played.)
13               THE COURT:  Wait a minute.  Sorry.
14               THE WITNESS:  If I can explain a little bit.
15               THE COURT:  Certainly.
16               MR. GILBERT:  There's multiple conversations in that
17    particular activation and it's not been qued to this particular.
18               THE COURT:  You want it to be qued to the transcript?
19               MR. GILBERT:  Yes, yes.
20               THE COURT:  Can you do that, Mr. Mazetelli?  Can you
21    get it on to where we start on 177 on your transcript?
22               MR. MAZETELLI:  I should be able to.
23               THE COURT:  All right.  So that we come up with the
24    transcript simultaneously.
25               MR. GILBERT:  Yes, that looks correct, your Honor.


                         Jacqueline M. Sullivan, RPR
                         Official Court Reporter
                                                                   49



1                (Audio tape played.)
2     BY MR. GILBERT:
3     Q.   So that's a conversation between John Crumb, who is one of
4     Lonell Glover's alleged conspirators, correct?
5     A.   Correct.
6     Q.   And the person that they're talking about as fish is Ernest
                             Page 46

2-27-08.txt

```
 7   Glover, right?
 8   A.   That's correct.
 9   Q.   Because Ernest Glover had at least back then had a heroin
10   habit, right?
11   A.   Yes.
12   Q.   But in this conversation he is referred to by brother,
13   right, Glover says, brother don't know nothing about this?
14   A.   Yes.  And prior to that he indicated my brother.
15   Q.   All right.  But when he talks about him in this
16   conversation to John Crumb and he uses the name "brother" he is
17   referring to Ernest Glover?
18   A.   Correct.
19   Q.   Now, without playing 604 at the moment, one of the things
20   about 604 that we played --
21             THE COURT:  When you say 604.
22             MR. GILBERT:  I'm sorry.  Truck activation 604.
23             THE COURT:  I know, I know.
24             MR. GILBERT:  We decided that's at tab 117 perhaps.
25   Everybody should keep their finger on that one.  We'll come back
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

50

```
 1   to it.
 2   BY MR. GILBERT:
 3   Q.   But I want to ask you a few questions right now.
 4             THE COURT:  Okay, it's tab 117.
 5   BY MR. GILBERT:
 6   Q.   When they're talking about brother and the conversation at
 7   604 at the part where you -- where Mr. Han had you start up
 8   again, it's on page three of the transcript, there is an earlier
```

2-27-08.txt

```
 9    reference to brother, say he got a man that's selling joints,

10    right?

11    A.   Correct.

12    Q.   And that's selling something, whatever joints are, right?

13    A.   Yes.

14    Q.   But in the part that we're talking about, they say

15    something to the effect that brother ain't wrong, don't get me

16    wrong, the only thing with brother, you got to make sure he

17    ain't gambling, right?

18    A.   Correct.

19    Q.   Mr. Price gambles, right?

20    A.   Yes.

21    Q.   Then they go on and talk about brother is like a crack-

22    head, he might get with them tables and go kaboom, right?

23    A.   Yes.

24    Q.   But then they say, but he can hustle?

25    A.   Yes.
```

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        51


```
 1    Q.   Oh, man, brother hustles the only thing, right?

 2    A.   Yes.

 3    Q.   Now, in the conversation we just played in which Lonell

 4    Glover is talking about his brother Ernest Glover, Lonell Glover

 5    makes the comment that Ernest Glover can hustle, right?

 6    A.   Yes.

 7    Q.   And the conversations that we played in which people are

 8    talking about Mr. Price is basically that he doesn't want to do

 9    anything but walk around and look and talk slick, right?
```

                         **Page 48**

2-27-08.txt

10          MR. MARTIN:  Your Honor, may we approach?

11          (Bench conference as follows):

12          MR. MARTIN:  I object to the question regarding Ernest

13     Glover hustling, a comment allegedly made by his brother, and I

14     move for a severance or in the alternative a mistrial.

15          THE COURT:  It's in the tape.  It was already played.

16     Where were you?

17          MR. MARTIN:  Was it played?

18          THE COURT:  It's part of 604.

19          MR. GILBERT:  Yes, and it's part of 441, which we just

20     played.

21          THE COURT:  Yes, but it's already played.  It's Lonell

22     talking about his brother saying he's a hustler.  It's too late.

23          MR. MARTIN:  All right if it's all right there.

24          THE COURT:  It was played a long time ago as far as I

25     know.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              52


1          MR. HAN:  My understanding is that the call where the

2     reference to Ernest Glover hustling was from truck bug 441,

3     which we did not play.

4          THE COURT:  Is that the one with Crumb?

5          MR. GILBERT:  Yes.

6          MR. SCARPELLI:  I believe you took that one out

7     because of the conspiracy issue with John Crumb.

8          THE COURT:  Right.

9          MR. SCARPELLI:  And we didn't put it in.

10          THE COURT:  Right.  But isn't a reference in 604 also

11     to Ernest?

2-27-08.txt

12          MR. HAN:  No.

13          MR. GILBERT:  Well, that's the issue, that's indeed

14     the issue, and we'll pursue that a little further.

15          THE COURT:  You have the guy, you say it's a heroin

16     addiction?

17          MR. MARTIN:  Yes, but not a hustler.

18          THE COURT:  I'm a little confused as to what exactly

19     are you objecting to?

20          MR. MARTIN:  I'm objecting to the suggestion that he

21     sells.

22          THE COURT:  What number did you just play?

23          MR. GILBERT:  I just played 441 and --

24          THE COURT:  If you can't give me some other --

25          MR. GILBERT:  I can go get it.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                         53


1          THE COURT:  I know some of them is Crumb.  Wait a

2     minute.

3          MR. GILBERT:  I want to say --

4          MR. SCARPELLI:  No, you're too far.  What number is

5     that, 86?  It should be a couple ...  That one was the one we

6     were not playing because he has to do with John Crumb.

7          THE COURT:  I know, but it doesn't matter anymore

8     because he played it.

9          MR. GILBERT:  For what it's worth, I'm only playing it

10     to show that Lonell Glover refers to his brother as brother.

11          THE COURT:  I know that, but where's the part that

12     says he's a hustler?  He's got a $500 habit a day.  Fish then

2-27-08.txt

13   and everybody else, he's talking about your guy with the $500

14   habit a day.

15        MR. GILBERT:  Yes, we stopped right after that.  But

16   the reference to the hustler is on the first page, your Honor.

17   It's about three-quarters of the way down.  They're talking

18   about you got to stop getting high but he's a good hustler.

19        THE COURT:  Overruled.

20        MR. MARTIN:  I don't remember it being played, but if

21   your Honor's recollection is different ...

22        THE COURT:  No, it was just played now, and I agree

23   with that, but I don't see that it's prejudicial one bit given

24   the fact that he's also talking about a $500-a-day habit.  If

25   he's got a $500-a-day habit he's got to be doing something, but


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                               54


1    that doesn't mean he's selling PCP.

2         Okay.  Let's finish up, please.

3         (End of bench conference.)

4    BY MR. GILBERT:

5    Q.   All right.  Let me just talk very briefly about gambling,

6    sir.  First of all, Mr. Suggs bet on sports, correct?

7    A.   Yes.

8    Q.   There's the conversation that we played at activation 384

9    which is at Bates stamp 27.  We played that earlier.  That's

10   where Mr. Suggs admitted that on the Baltimore game, Baltimore

11   Ravens playoff game, that he lost $500?

12   A.   Yes.

13   Q.   And there was a conversation with James Parker back in the

14   week before, the 14th of January which we haven't played yet,

2-27-08.txt

15   but do you recall that's where Mr. Suggs tells Mr. Parker he

16   lost money betting on football?

17   A.   I remember them having a conversation about betting on

18   football.  I don't remember all of the content of it.

19               (Defendant Price Exhibit No. 16 marked for

20               identification at about 4:17 p.m.)

21   BY MR. GILBERT:

22   Q.   I'm showing you what's been marked at Defendant Price's

23   Exhibit 16 for identification.  It's what purports to be a

24   transcript of the activation I just referred to.  I'll just

25   direct your attention to the first couple of paragraphs.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                              55


1               THE COURT:  Did you show them?  You're just asking to

2    refresh his recollection?

3               MR. GILBERT:  Right.

4               THE COURT:  I don't want people looking for something

5    in the book that we haven't put into evidence.

6    BY MR. GILBERT:

7    Q.   Does that refresh your recollection about the conversation?

8    A.   Yes.

9    Q.   And Mr. Suggs lost on the football games, right?

10   A.   One of them is Baltimore, which may be the same game that

11   you were just talking about before that, but he also said

12   something about Phillie in that one.

13   Q.   And because back in January of 2007 that's when the NFL

14   playoffs were going on, right?

15   A.   Correct.

                            Page 52

2-27-08.txt

16  Q.    And when Mr. Price is talking to Mr. Suggs and talking

17  about people impressing him, those calls, one of them we played

18  was activation 1121.  That was a phone call that occurred on

19  January 22nd of 2007?

20            THE COURT:  You don't have to look through the book.

21  If you want people to focus on it then let us know and we'll

22  find the tab.  Otherwise I don't want people perusing the book.

23            MR. GILBERT:  What I'm trying to do, I'm trying to

24  direct this agent to it so that he can see what I'm talking

25  about, but I'm not planning to play the tapes.


                    Jacqueline M. Sullivan, RPR
                       Official Court Reporter

                                                                56


1            THE COURT:  Right.  So if everybody would just close

2  their binder for the time being, if you don't mind.  He's not

3  trying to replay the tapes.

4            MR. HAN:  Can I have the activation number, your

5  Honor?

6            THE COURT:  Yes.

7            MR. GILBERT:  That activation number was 1121.

8            THE WITNESS:  And the Bates stamp?

9  BY MR. GILBERT:

10  Q.    Page, I'm sorry.  Bates stamp 70.

11            There's one other conversations that Mr. Price is

12  calling and, you know, he's talking about the people pressing

13  him, right?

14  A.    Yes.

15  Q.    All right.  And that occurred January 22, 2007?

16  A.    Yes, it did.

17  Q.    All right.  And by the way, the asterisk that we have down

                              Page 53

2-27-08.txt

18    there on that transcript, they were talking about football for

19    about two minutes?

20    A.    I don't remember exactly, but I believe they were talking

21    about football for a period of time.

22    Q.    Right.  The conversations with not only Mr. Price and Mr.

23    Suggs but also with the other defendants and involved a lot of

24    talk about sports, right?

25    A.    I wouldn't say a lot.  I would say sporadic, but I won't


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                    57


1     say a lot.

2     Q.    Focusing primarily on football and NCAA basketball, right?

3     A.    And some professional basketball as well, I believe.

4     Q.    When Gilbert Redus lit up the Lakers for 51 points, right?

5     A.    Correct.

6     Q.    And some of the -- all right.  Well, let me --

7           I am dropping stuff out here, your Honor.  I'm not

8     trying to prejudice Mr. Price.

9     BY MR. GILBERT:

10    Q.    I want to talk about the reference in 604 about the

11    gambling.  It's not only a reference to gambling but it's a

12    reference to this business about going kaboom, somebody being

13    like a crackhead, talking about gambling, right?

14    A.    Correct.

15    Q.    That would indicate to you the concern that the person that

16    they're talking about, that is, that Mr. Suggs and Mr. Lonell

17    Glover are talking about in 604, they're worried about that

18    person being someone who loses control, correct?

**Page 54**

2-27-08.txt

19    A.   I take it more to be, I mean control, yes, but they're

20    concerned that he's going to lose money that is owed to them.

21    Q.   Well, they're talking about him going kaboom, right?

22    A.   Right.  They're saying, I believe the quote is he could get

23    on one of those tables and go kaboom, which I would take to mean

24    a crack -- or not a crack table but a crap table, and he might

25    lose all his money.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                                58


 1    Q.   And there were in fact concerns expressed, and this was,

 2    you know, last year there were concerns expressed precisely

 3    about Mr. Glover being the one that would lose control.  Well,

 4    let me give you --

 5              MR. MARTIN:  Objection, your Honor.

 6    BY MR. GILBERT:

 7    Q.   Let me direct your attention to some specific questions.

 8    Let me talk about activation 534.  That's at Bates stamp 33.

 9    Now, that's a situation in which Mr. Price and Mr. Suggs are

10    talking about Ernest glover, right?

11    A.   Just give me one second.

12              THE COURT:  Has this been played before?  Yes, okay.

13              MR. GILBERT:  Yes.

14              THE WITNESS:  You're talking about toward the latter,

15    I guess, half.

16    BY MR. GILBERT:

17    Q.   Actually I'm talking, it starts about, at least on my page

18    it starts about two-thirds of the way down.  There is a

19    reference about Ernie owe Big Fish?

20    A.   Yes.

                        Page 55

2-27-08.txt

21  Q.   And then Mr. Suggs says to Mr. Price, say, you jive cut him
22  off, you know?
23  A.   Yes.
24  Q.   Implying that Mr. Price in some way cut off Mr. Glover?
25  A.   Yes, that's correct.

                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                                59


1   Q.   All right.  Now, the board we have over there, we're not
2   going to rearrange that and put Mr. Price up at the top
3   distributing down to Mr. Ernest Glover, right?
4   A.   In conversation is about a different drug, I believe.
5   Q.   That's about a different drug involving Mr. Price?
6   A.   Mr. Price and Mr. Ernest Glover.
7           MR. HAN:  I think we should approach.
8           THE COURT:  Okay.
9           (Bench conference as follows):
10          THE COURT:  You opened up the door here.  What are you
11  doing?
12          MR. GILBERT:  I don't have no idea what they're going
13  to say this is about.  It doesn't strike me as about -- I have
14  no knowledge of Mr. Price being involved in other drugs.  He's
15  not been charged with anything.  There's been no 404(b)
16  evidence.
17          MR. HAN:  There was a heroin relationship we believe
18  between Mr. Price and Mr. Ernest Glover, and we did not go there
19  to avoid that situation, but he's opening the door.
20          MR. GILBERT:  Well, I think I was entitled to notice
21  of that.  What evidence do they have to support that?
                        **Page 56**

2-27-08.txt

22          THE COURT:  They didn't introduce it so you're not

23   entitled to notice of it.  They didn't ask to introduce it.  I

24   didn't let them have cuts or somebody moving for severance on

25   other drugs, so either you shut the door or quit it.  I mean,


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                            60


1    he's already admitted his guy's got a heroin problem, but I

2    should think you'd want to stop now and move on to something

3    else.

4          MR. GILBERT:  Very well.

5          THE COURT:  I told you.  I warned you.

6          Okay.  Finish up.

7          (End of bench conference.)

8    BY MR. GILBERT:

9    Q.   Mr. Price in that conversation says that he can't go there,

10   right, in reference to Mr. Ernest Glover?

11   A.   Yes, he does.

12   Q.   All right.  And at the activation we just were at a little

13   while ago, 1121, again at page 70, Bates stamp 70, Mr. Price is

14   talking about he doesn't know what fish did, he's not fooling

15   with fish, right?

16   A.   I believe this is again a reference to a different drug.

17   Q.   All right.  The last thing that I would like to do, Special

18   Agent Bevington, is I'd like to go back and I'd like to play

19   truck activation 604, start from the same place that we started

20   before, that is, after the second redaction.

21          THE COURT:  Okay.  So we're at tab 117.

22          Can you plug it up, tee it up to that?

23          MR. MAZETELLI:  Yes, your Honor.

2-27-08.txt

24              (Audio tape played.)
25    BY MR. GILBERT:


                    Jacqueline M. Sullivan, RPR
                        Official Court Reporter

                                                            61


 1    Q.   Let me stop right there.  All right.  What we have is after
 2    the statement about brother being able to hustle and --
 3              MR. MARTIN:  Objection again, your Honor.  For the
 4    record, objection again.
 5              THE COURT:  This was played before, correct?  We've
 6    heard this before?
 7              JUROR:  Yes.
 8    BY MR. GILBERT:
 9    Q.   Mr. Suggs then starts talking about --
10              THE COURT:  Overruled then.
11    BY MR. GILBERT:
12    Q.   Starts talking about somebody, the paragraph right after
13    the brother talks about somebody owing him money, right, talking
14    about give me thirty-five hundred but he only had eight-five
15    hundred, or he told me eighty-five hundred?
16    A.   Yes.  He's talking about Ernest Glover at that point.
17    Q.   Because Lonell Glover then says, Hey, hey.  Do you know
18    what I see, he was telling me about the dope, right, correct?
19    A.   Correct.
20    Q.   And Lonell Glover is talking about talking about brother
21    Ernest Glover, correct?
22    A.   That is correct at that point, yes.
23    Q.   Then it goes on, and the next where we have, if we could
24    play it, it's right where it's highlighted here, "Indirectly

```
                                2-27-08.txt
25    last night" ...


                            Jacqueline M. Sullivan, RPR
                              Official Court Reporter
                                                                    62



 1            (Audio tape played. )
 2    BY MR. GILBERT:
 3    Q.   So that part of the conversation about 604 is unequivocally
 4    about Ernest Glover; is that correct?
 5    A.   Yes.
 6            MR. GILBERT:  Your Honor, I don't have any further
 7    questions of Special Agent Bevington.
 8            THE COURT:  Anything else?  Anything?
 9            MR. MARTIN:  Just one question.
10                     CROSS-EXAMINATION
11    BY MR. MARTIN:
12    Q.   So Agent Bevington -- I'm sorry, sir.  Good afternoon.
13    A.   Good afternoon.
14    Q.   So Agent Bevington, are you telling the ladies and
15    gentlemen of the jury that after you listened to a number of
16    conversations you determined that Ernest glover was in fact an
17    addict?
18    A.   I believe Mr. Ernest Glover used heroin, yes.
19    Q.   And would it be fair to say that he had a habit?
20    A.   Yes.
21            MR. MARTIN:  Nothing further.  Thank you, your Honor.
22            THE COURT:  Mr. Donahue?
23            MR. DONAHUE:  No.
24            THE COURT:  Mr. Han?
25            MR. HAN:  Thank you, your Honor.
```

Jacqueline M. Sullivan, RPR
Official Court Reporter

63

1          THE COURT:  I take it it will be short.

2          MR. HAN:  Yes, your Honor.

3          THE COURT:  Okay.

4                    REDIRECT EXAMINATION

5    BY MR. HAN:

6    Q.   Referring you back to truck bug 604, which is at tab 117,

7    directing you specifically to Bates numbered page 0182, do you

8    see that page?

9    A.   Yes, I do.

10   Q.   There's a reference to brother's like a crackhead.  He

11   might get at one of them tables and go kaboom.  Do you see that?

12   A.   Yes.

13   Q.   Who do you believe they referred to as brother there?

14   A.   Helery Price.

15   Q.   A little bit down it says old man brother hustles.  Do you

16   see that?

17   A.   Yes.

18   Q.   And who do you think they're referring to there?

19   A.   Helery Price.

20   Q.   The next paragraph says, oh, I'm just saying the same

21   situation with, and there's an unintelligible there?

22   A.   Yes.

23   Q.   Who do you believe they're talking about there?

24   A.   They're talking about Ernest Glover.  You can almost hear

25   it in there.  He says fish.  We have it UI, err on the side of

2-27-08.txt

1    caution, but if you listen to it closely I believe you can hear

2    him say fish.

3    Q.    So the conversation switches from Helery Price brother to

4    Ernest Glover fish at that point?

5    A.    At that point when they first start that conversation Mr.

6    Suggs is explaining to Mr. Lonell Glover that he has people to

7    sell drugs, and there is a part that's very hard to hear, but I

8    believe he's talking about both Ernest Glover, fish, and

9    brother, Helery Price.

10   Q.    If you continue to the next page to 183, there is a

11   reference by Mr. Glover, the whole thing with fish is he got to

12   get clean.  Fish ain't going to get clean.  Do you see that?

13   A.    Yes.

14   Q.    By fish who are they referring to?

15   A.    That's Ernest Glover.

16   Q.    Then to the next page, 184, about five or six speakers

17   down, Suggs says:  That's what you got to do.  You maneuvering

18   with this shit, you know, you know how to do it.  I need to run

19   down there and see brother.  I know brother needs a gallon.  Do

20   you see that?

21   A.    Yes.

22   Q.    Who are they referring to there?

23   A.    He's referring to Helery Price.

24   Q.    Putting Government's Exhibit 1212 back on the screen.  And

25   the quotation on the summary chart, I know brother needs a

Jacqueline M. Sullivan, RPR
Official Court Reporter

2-27-08.txt

1    gallon, brother, I know he wants a gallon.  I know brother wants
2    a gallon, and which shit we going to give brother, the old water
3    or the new water?  Why do you believe that they're talking about
4    brother Helery Price as opposed to Ernest Glover in these
5    references?
6    A.   Because he, first all it's Mr. Suggs making those
7    references and not Lonell Glover, so it's -- I don't think Mr.
8    Suggs would call fish brother.  He calls him fish, Ernie or
9    something like that.  On this particular day there were a lot of
10   phone activity between Mr. Suggs and Mr. Price.  As a matter of
11   fact, the conversation inside the truck concludes at 8:28 p.m.
12   There's a phone call from Mr. Suggs to Mr. Price at 8:28 p.m.,
13   so those are some of the reasons I believe that's the case.
14   Q.   In previous conversations that defense brought out where
15   Mr. Lonell Glover said fish my brother, when he says that, how
16   is that different from the brother used in this context?
17   A.   He makes reference to my brother or he's my brother, things
18   like that, indicating a familiar relationship, whereas this is
19   referring to a person who has the nickname brother.
20        MR. HAN:  No further questions, your Honor.
21        THE COURT:  Okay.  I think we're finished.  Okay.
22   Thank you.
23        Is this the last time we're calling Agent Bevington?
24   I'm sorry?  Tomorrow morning again.
25        We'll see you tomorrow then.  Thank you.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter
                                                            66


                              Page 62

2-27-08.txt

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  Ladies and gentlemen, this is a good time

3     to break.  Well finish the government's case tomorrow.  No

4     question about that.  Have a good evening.

5          Do not discuss the case.

6          We're moving right along.

7          Same time, same breakfast.

8          Please be well.  Be back tomorrow by 9:30 at the

9     latest.

10         (Jury exits courtroom at about 4:35 p.m.)

11         THE COURT:  Good night.  Have a good evening.

12         Anything further at this time?  No.

13         I now know what tapes are in so we can just go over

14    that tomorrow.  I want you to also make sure that your exhibits

15    agree with Ms. Franklin's so that there isn't any question about

16    what's in what's not in.  I know you've done it up to some

17    point.  The government will rest after.  I know we have the

18    arrest of Mr. Suggs, the cell phone, and Mr. Suggs, some money.

19         MR. HAN:  That's it.

20         THE COURT:  That's it?  It's going to take minutes.

21    I'm sorry that we have to do it that way, but why is Bevington

22    coming back?  He's involved in the arrest?

23         MR. HAN:  No.  He examined the cell phones and can say

24    that the photos, the cell phones with the printed numbers are

25    accurately reflected in the photos.


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                              67


1          THE COURT:  So we'll take up those few matters.  The

2     government will rest.  I'll take any motions.  I don't know, I

know you're not putting on any evidence tomorrow, the defense. I'll take up any motions. We can consider your motion to suppress tomorrow if you have anything more, but the affidavit is pretty clear, the order authorizing the wiretap. It would be helpful just to put the matter to rest, which I'm a great believer in, for the government. I just don't quite understand how it happened here. Are they close to each other in some fashion, the phones? You can address that tomorrow. Maybe somebody knows. I can't tell from the transcripts I have.

Tomorrow, Mr. Donahue, we're going to have to know what you're going to do the following week.

MR. DONAHUE: Very well.

THE COURT: So let us know. And the way I understand it, Mr. Gilbert has nothing, Mr. Earnest has three short witnesses, and we'll go over it. I want a final determination tomorrow after the government rests who's testifying, who's not testifying, and whether there are any experts, any identifying date of births for the government, and we'll finish it. The defense case I think we'll take Monday.

If anybody has a chance tonight to do jury instructions I'll be happy to hear. I'm happy to know whether I've got problems on my hands, so if you can look, we won't take up anything in writing, but if you can look and see if anything

comes to mind we can start to address it.

You've got my draft.

MR. HAN: I do. I have some comments, but we can do

2-27-08.txt

4    it whenever you're ready, your Honor.

5         THE COURT:  Yes, tomorrow.  I won't be ready until

6    tomorrow.  All right.  And then we will not sit after tomorrow

7    afternoon.  We'll resume on Monday.  We'll finish the defense

8    case.  You'll have to tell me how long closing you all want

9    because I'll hold you to it including the rebuttal, and the

10   rebuttal is not going to subsume the closing of the government.

11   Okay.  Then we'll be all set.  I assume we'll be out of here be

12   mid-day tomorrow.  Thank you.

13        (Proceedings adjourned at about 4:39 p.m.)

14                          - - -

15

16

17

18

19

20

21

22

23

24

25


                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        69


1                      I N D E X

2

3    WITNESSES:                                      PAGE:

4    SPECIAL AGENT JOHN BEVINGTON

5         Direct Examination by Mr. Han               5

2-27-08.txt

```
            Cross-examination by Mr. Gilbert          27
6           Cross-examination by Mr. Martin           62
            Redirect examination by Mr. Han           63
7
```

```
8                    E X H I B I T S
    Price
9   Defendant
    Exhibit
10  No.           Identification        Marked      Admitted

11  No. 16                               54

12
    Government
13  Exhibit
    No.           Identification        Marked      Admitted
14

15  No. 1212                                          23

16

17

18

19

20

21

22

23

24

25
```

                    Jacqueline M. Sullivan, RPR
                      Official Court Reporter

                                                        70


```
1                    CERTIFICATE

2

3

4              I, JACQUELINE M. SULLIVAN, Official Court

5   Reporter, certify that the foregoing pages are a correct

6   transcript from the record of proceedings in the above-entitled
```

2-27-08.txt

7   matter.

8                          _____
                            JACQUELINE M. SULLIVAN
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25