# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES,** ) | |
| ) | |
| **v.** ) | **Crim. No. 07-0152-01 (ESH)** |
| ) | |
| **ANTHONY MAURICE SUGGS,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 28 U.S.C. § 2255, defendant Anthony Maurice Suggs has filed a motion to vacate his conviction.  (*See* Suggs' Mot. Under § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Oct. 23, 2013 [ECF No. 323] ("Suggs Mot."), as supplemented, *see* Supplemental Motion Under 28 U.S.C. § 2255 & Supplemental Memorandum in Support, June 26, 2015 [ECF No. 363] ("Suggs Supp.").)  The government opposes any relief.  (*See* United States' Resp., Apr. 1, 2014 [ECF No. 349] ("1st Gov't Resp."); United States' Resp., Sept. 4, 2015 [ECF No. 370] ("2d Gov't Resp.").)  For the reasons stated herein, the motion will be denied.

## BACKGROUND

On June 12, 2007, a federal grand jury indicted Suggs and six co-defendants, Julian Johnson, James Lawrence Parker, Ernest Milton Glover,[1] Glendale Earl Lee, Helery Price and Ngozi Joy, for conspiracy to distribute and to possess with intent to distribute one kilogram or more of phencyclidine (PCP) and also charged Suggs with one count of unlawful possession with

---

[1] As there are several Glovers mentioned in this Memorandum Opinion, the Court will use their full names throughout.

intent to distribute ("PWID") one kilogram or more of PCP, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iv) & 846. (*See* Indictment, June 12, 2007 [ECF No. 1].)  A superseding indictment against Suggs, Parker, Ernest Glover, Lee, and Price was filed on October 16, 2007. (Superseding Indictment, Oct. 16, 2007 [ECF No. 65].)  Parker entered a plea of guilty to conspiracy to distribute one kilogram or more of PCP (*see* Plea Agreement, Feb. 11, 2008 [ECF No. 151]), and the remaining defendants proceeded to trial.[2]

At trial, the government's evidence included, *inter alia*, visual and video surveillance of Suggs and others; approximately 80 conversations recorded by a wiretap on Suggs' cell phone, which was active from January 9, 2007 until April 7, 2007; five conversations recorded by a bug installed in alleged co-conspirator Lonnell Glover's truck, which was active from March 22, 2007 to June 19, 2007 (the "truck bug");[3] testimony from FBI Agent John Bevington, the case agent, who gave his opinion as a lay witness under Federal Rule of Evidence 701 as to the meaning of some of the recorded conversations; evidence that Suggs was living with Joy at Joy's house; evidence seized from Joy's house, including 7.7 kilograms of PCP; evidence seized from the residences of Parker, Ernest Glover, and Lee;  and expert testimony from a federal drug investigator about modus operandi of PCP distribution operations in the District of Columbia, two forensic chemists and a fingerprint expert.

---

[2] Defendants proceeded to trial on a "retyped indictment."  In addition to the conspiracy count against the remaining defendants and the PWID count against Suggs, there were two counts of distribution of PCP against Suggs, and one count of PWID PCP against Ernest Glover. (*See* Retyped Indictment, Feb. 11, 2008 [ECF No. 154].)  The substantive counts, other than the PWID count against Suggs, were dismissed by the government before the case went to the jury. (*See* Minute Entry, Mar. 4, 2008.)

[3] Identified as a co-conspirator by the indictment in the present case, Lonnell Glover was separately indicted, along with several others, for conspiracy to distribute PCP and heroin. *See* Indictment, *United States v. Lonnell Glover*, No. 07-cr-0153 (D.D.C. June 12, 2007).

The jury found Suggs, Ernest Glover and Price guilty of conspiracy and found Suggs

guilty of PWID, in each instance finding that the offense involved one kilogram of more of PCP.

(*See* Verdict Forms, Mar. 13, 2008 [ECF Nos. 171, 172, 173].)  The jury was unable to reach a

verdict as to Lee, resulting in a mistrial.  (Minute Entry, Mar. 18, 2008.)  At his second trial, Lee

was acquitted.  (*See* Judgment of Acquittal, May 8, 2008 [ECF No. 211].)  The three convicted

defendants were each sentenced to the statutory mandatory minimum: 240 months for Suggs and

life imprisonment for Ernest Glover and Price.[4]  (*See* Judgment, Aug. 11, 2008 [ECF No. 281];

Judgment, Aug. 11, 2008 [ECF No. 283]; Judgment, Aug. 11, 2008 [ECF No. 277].)  On appeal,

the Court of Appeals affirmed all three convictions and sentences.  *See United States v. Ernest*

*Glover*, 681 F.3d 411, 416 (D.C. Cir. 2012).[5]  Defendants' petitions to the Supreme Court

seeking writs of certiorari were denied.

---

[4] Suggs had one prior felony drug conviction, so his statutory sentencing range was 20 years to life.  *See* 21 U.S.C. § 841(b) (penalty for a violation of 21 U.S.C. § 841(a) involving one kilogram or more of PCP, "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final[,] . . . may not be less than 20 years and not more than life imprisonment").  Ernest Glover and Price both had at least two prior felony drug convictions, triggering a mandatory minimum of life imprisonment.  *See* 21 U.S.C. § 841(b) (penalty for a violation of 21 U.S.C. § 841(a) involving 1 kilogram or more of PCP "after two or more prior convictions for a felony drug offense have become final" is "a mandatory term of life imprisonment").

[5] On the issues before it, the Court of Appeals ruled as follows: (1) there was no abuse of discretion in the Court's decision to deny Price's motion to sever his trial from that of his co-defendants; (2) the initial warrantless entry into Joy's house did not render inadmissible evidence later seized pursuant to a valid and independently obtained search warrant; (3) even if the warrant authorizing the search of Joy's house was lacking in probable cause, the evidence seized pursuant to that warrant was properly admitted under *United States v. Leon*, 468 U.S. 897, 920 (1984); (4) the authorizing judge acted within her discretion in finding that the statutory necessity requirement was met for the extension of the wiretap of Suggs' cell phone beyond the initial 30–day period; (5) law enforcement officers' efforts to minimize the wiretap's interception of irrelevant conversations from Suggs' cell phone were reasonable; (6) any potential error in the admission of Price's statement, which was captured by the wiretap on Suggs' cell phone before the call went to co-defendant's voicemail, was harmless; (7) any error in the admission of FBI Agent Bevington's testimony as lay testimony under Federal Rule of Evidence 701 rather than as expert testimony under Federal Rule of Evidence 702 was harmless because he could have been

After the appeals in the instant case were final, the Court of Appeals considered appeals

by defendants in two related cases. *See United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013)

and *United States v. Lonnell Glover*, 736 F.3d 509 (D.C. Cir. 2013). The first case was an appeal

by Jerome Hampton, who had been indicted, along with Lonnell Glover and others, for

conspiracy to distribute PCP and heroin (*see supra* note 3) and convicted after a jury trial. *See*

Judgment, *United States v. Jerome Hampton*, No. 07-cr-0153 (D.D.C. Aug. 6. 2010). At

Hampton's trial, as at Suggs' trial, the evidence included recorded conversations accompanied by

FBI Agent Bevington's lay opinion testimony explaining the meaning of those conversations.

*Hampton*, 718 F.3d at 981. On appeal, the Court concluded that Agent Bevington's testimony

had exceeded the scope of lay opinion testimony permitted by Federal Rule of Evidence 701[6]

when he "interpreted . . . [intercepted] conversations on the basis of his listening to all of the

calls" (approximately 20,000 in total), even though only 100 calls were admitted into evidence

and available to the jury. *Hampton*, 718 F.3d at 983. According to the Court, "[w]hen an agent,

particularly a case agent, provides interpretations of recorded conversations based on his

'knowledge of the entire investigation,' 'the risk that he was testifying based upon information

not before the jury, including hearsay, or at the least, that the jury would think he had knowledge

beyond what was before them, is clear." *Id*. at 982-83 (quoting *United States v. Grinage*, 390

---

qualified as an expert; (8) there was no abuse of discretion in the Court's decision to dismiss a
juror, who realized during the trial that she knew Ernest Glover's wife, and to empanel an
alternate juror; (9) there was no abuse of discretion in the Court's decision not to provide a
supplemental jury instruction in response to a jury note; and (10) the evidence was sufficient to
sustain the jury's verdict against Ernest Glover and Price. *See United States v. Glover*, 681 F.3d
411 (D.C. Cir. 2012).

[6] Rule 701 permits lay testimony in the form of an opinion that is "(a) rationally based on the
witness's perception; (b) helpful to clearly understanding the witness's testimony or to
determining a fact in issue; and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702."

F.3d 746, 750 (2d Cir. 2004) (internal citations omitted)).  Under those circumstances, the Court

held that "the jury had no way of verifying his inferences or of independently reaching its own

interpretations" and the testimony, "'rather than being helpful to the jury, . . . usurped the jury's

function.'"  *Id*. at 983 (quoting *Grinage*, 390 F.3d at 751).  Noting that "[t]he government's

evidence consisted largely of wiretap interceptions and recordings from a listening device" and

Agent Bevington's interpretation of those recorded conversations, the Court concluded that the

error was not harmless and reversed Hampton's conviction.  *Id*. at 984.[7]

    The second case was an appeal by Lonnell Glover from his conviction for conspiracy to

distribute cocaine.  At his trial, as at Suggs' trial, the evidence included conversations recorded

by the truck bug.  On appeal, the Court held that the warrant authorizing installation of the truck

bug was "facially insufficient" under Title III of the Omnibus Crime Control and Safe Streets

Act of 1968, 18 U.S.C. § 2510, *et seq*., and Federal Rule of Criminal Procedure 41[8] and

therefore, that none of the conversations recorded by the truck bug should have been admitted

into evidence.  *See Lonnell Glover*, 736 F.3d at 513-14.  Noting that the truck bug evidence

constituted "some of the 'most incriminating' and 'most powerful' evidence at trial," the Court

further held that the error required reversal of Lonnell's Glover's conviction.  *Id.* at 516 (quoting

*United States v. Saro*, 24 F.3d 283, 287 (D.C. Cir. 1994)).  Subsequently, and for the same

reason, the Court of Appeals granted the government's unopposed motion to vacate Lonnell

---

[7] On remand, the district court granted the government's motion to voluntarily dismiss with prejudice the indictment against Hampton.  *See* Order, *United States v. Hampton*, No. 07-cr-0153 (D.D.C. Oct. 16, 2013).

[8] The Court concluded that the warrant was facially insufficient because it was issued in the District of Columbia but the bug was actually installed in the District of Maryland.  *See United States v. Lonnell Glover*, 736 F.3d at 515.

Glover's conviction in a separate case for conspiracy to distribute PCP and heroin.  *See* Order,

*United States v. Lonnell Glover*, No. 10-3075 (D.C. Cir. July 29, 2014).[9]

Suggs has now filed a motion pursuant to 28 U.S.C. § 2255(a), asking the Court to vacate

his conviction.  His two primary claims, which were fully developed in a supplemental brief filed

by appointed counsel, stem from the Court of Appeals' decisions in *Hampton* and *Lonnell*

*Glover*.  Relying on those cases, he claims that he was deprived of his Sixth Amendment right to

effective assistance of counsel at trial and on appeal due to his counsel's failure to object to the

admission of the truck bug recordings and his counsel's failure to object to the scope of Agent

Bevington's testimony.  He has also adopted the ineffectiveness claims made by his co-

defendants that apply to him: (1) that appellate counsel was ineffective for failing to challenge

the Court's response to a jury note; and (2) that trial and appellate counsel were ineffective in

failing to object to the jury's exposure to the odor of PCP from containers that were brought into

the courtroom.  (*See* Suggs' Motion to Adopt, Jun. 26, 2015 [ECF No. 365]; Minute Order

granting Motion to Adopt, June 27, 2015).  Finally, Suggs' *pro se* motion included two

additional claims: (1) that the government committed a *Brady* violation; and (2) that Agent

Bevington impermissibly testified as an expert.  As these claims cover a wide range of events,

the additional facts underlying each claim will be set forth in the analysis portion of this

Memorandum Opinion.

## ANALYSIS

### I.    LEGAL STANDARD FOR § 2255 MOTION

Section 2255(a) provides that:

---

[9] Both cases were remanded for further proceedings and remain pending before the Honorable
Thomas F. Hogan, who tried the original PCP/heroin conspiracy case.  (*See supra* note 3.)

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the sentence was in excess of
> the maximum authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or correct the
> sentence.

28 U.S.C. § 2255(a).  "A district judge must grant a prompt hearing under § 2255 unless 'the

motion and the files and records of the case conclusively show that the prisoner is entitled to no

relief.'"  *United States v. Pollard*, 959 F.2d 1011, 1030 (D.C. Cir. 1992) (quoting 28 U.S.C. §

2255(b)).  "The decision whether to do so is committed to the district court's discretion." *Id*. at

1030-31; *see also United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996) (A "district

judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally

respected as a sound exercise of discretion when the judge denying the § 2255 motion also

presided over the trial in which the petitioner claims to have been prejudiced.")  "Only where the

§ 2255 motion raises 'detailed and specific' factual allegations whose resolution requires

information outside of the record or the judge's 'personal knowledge or recollection' must a

hearing be held."  *Pollard*, 959 F.2d at 1131 (quoting *Machibroda v. United States,* 368 U.S.

487, 495 (1962)).  Here, although the claims made are not insubstantial, their resolution does not

call for an evidentiary hearing.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Suggs raises four claims of ineffective assistance of counsel.  In general, "claims not

raised on direct appeal may not be raised on collateral review unless the petitioner shows cause

and prejudice," but "an ineffective-assistance-of-counsel claim may be brought in a collateral

proceeding under § 2255, whether or not the petitioner could have raised the claim on direct

appeal."  *Massaro v. United States*, 538 U.S. 500, 504 (2003).

**A.      Legal Standard for Ineffective Assistance Claims**

In order to establish ineffective assistance of counsel in violation of the Sixth

Amendment, a defendant "must show that counsel's performance was deficient" and "that the

deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687

(1984). "An error by counsel, even if professionally unreasonable, does not warrant setting aside

the judgment of a criminal proceeding, if the error had no effect on the judgment." *Id*. at 691.

Thus, "[f]ailure to make the required showing of either deficient performance or sufficient

prejudice defeats the ineffectiveness claim." *Id*. at 700.

A counsel's performance is deficient if it "fell below an objective standard of

reasonableness" or "prevailing professional norms." *Id*. at 688. "A fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Id*. at 689.

As for establishing prejudice, "[t]he defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id*. at 690. "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id*. In assessing prejudice, courts "must consider the totality of the

evidence before the judge or jury," *id*. at 695, and then determine "if the defendant has met the

burden of showing that the decision reached would reasonably likely have been different absent

the errors." *Id*. at 696; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) ("burden [is] on the

defendant, not the [government], to show a reasonable probability that the result would have

been different").

**B.     Ineffectiveness Claims Based Upon Failure to Object to Admission of Allegedly Inadmissible Evidence**

Suggs' first two claims of ineffectiveness will be considered together as both are based upon counsel's failure to object to the admission of allegedly inadmissible evidence.  His first claim, relying on the Court of Appeals' decision in *Lonnell Glover*, is that his counsel should have moved to suppress the five truck bug recordings that were introduced at trial based on the facial insufficiency of the underlying warrant.  Suggs's second claim, relying on the Court of Appeals' decision in *Hampton*, is that on four occasions his counsel should have objected to Agent Bevington's testimony about conversations recorded by the cell phone wiretap as exceeding the scope of lay opinion testimony permitted under Federal Rule of Evidence 701.

### 1.     Deficient Performance – Truck Bug Claim

The government does not dispute that the truck bug evidence was inadmissible against Suggs[10] or that his counsel's failure to object to its admission or raise the issue on appeal satisfies the "deficient performance" prong of *Strickland*.  (*See* 2d Gov't Resp. at 10-11.)  Nor is there any doubt that this evidence was highly incriminating, so the only issue for resolution is whether defendant suffered prejudice, which is addressed in Section B.3, *infra*.

---

[10] Under Title III, an "aggrieved person" has standing to move to suppress an intercepted conversation on the ground that the warrant was facially invalid.  *See* 18 U.S.C. § 2518(10)(a).  An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  *See id* § 2510(11).   As a party to three of the five truck bug conversations, Suggs clearly has standing to object to their admission.  As for the remaining two conversations, the government has not contested Suggs' standing.

## 2.      Deficient Performance – *Hampton* Claim

As for the *Hampton* claim, the government argues that none of Agent Bevington's testimony violated *Hampton,* and that if it did, counsel's failure to object did not constitute deficient performance.  Moreover, the issue of prejudice must be resolved.

As in *Hampton*, the number of recorded conversations that Agent Bevington listened to (approximately 2,500) greatly exceeded the number introduced into evidence (approximately 80) (*see* 2/19/08pm Tr. at 27, 68), and Agent Bevington was proffered as a lay opinion witness who would be able to explain the meaning of certain otherwise innocuous "code words" based on his having listened to all 2,500 interceptions and, more generally, knowledge gleaned during the course of the investigation.  (*See id*. at 5.)  However, unlike *Hampton*, before Agent Bevington ever took the stand, counsel for one of the defendants (Price) raised an objection to allowing Agent Bevington to "base his opinion not just on the phone call or the phone calls around it but on his overall knowledge of the investigation."[11]  (*Id*. at 7.)  Although the Court overruled the objection, apparently following Judge Lamberth's decision in *United States v. Eiland*, No. 04-cr-0379, 2006 WL 2844921 (D.D.C. Oct. 2, 2006), and held that Agent Bevington could "say I listened to all the tapes and they used this word consistently" (2/19/08pm Tr. at 7, 14), the Court noted that it had serious reservations about both the utility and appropriateness of such testimony.  (*See id*. ("I don't like these kind of witnesses one bit to begin with.  I think that it crosses the line.  If a jury can't figure out what people are talking about on a tape, he doesn't add anything.").)  It cautioned the government against "try[ing] to make their case through some police officer who listens to all the tapes" because "[i]f the jury doesn't listen to the tapes and

---

[11] The objection was on several additional occasions by Price's counsel and since all objections were deemed to have been adopted by all co-defendants unless explicitly stated otherwise, Suggs' counsel joined in the objections and cannot be faulted for failing to object.

agree with you, Officer Bevington isn't going to make one bit of difference," urging them instead to play the recorded conversations for the jury and argue based on that evidence.  (*See id.* at 9 ("I have an inbred dislike of having a government agent trying to tell the jury what a tape means.  You can tell them what it means based on the tapes.  That's what argument is.").)

Perhaps in light of this colloquy, for many of the recorded conversations played for the jury, the government only asked Agent Bevington to identify the participants and the date and time of the conversation.  Indeed, out of a trial that lasted nine days, during which Agent Bevington took the stand on eight separate occasions to introduce approximately 80 recordings from Suggs' cell phone, Suggs has identified only four specific instances[12] where he claims that Agent Bevington's testimony violated *Hampton.*

After a careful review of the challenged testimony, the underlying recorded conversation, and the entire trial record, the Court is convinced that as two of the four instances no *Hampton*

---

[12] Suggs identifies a fifth occasion, but in that instance Agent Bevington's testimony concerned a truck bug recording and was thus inadmissible on other grounds.

error occurred,[13] and for the remaining two the question is at best debatable.[14]  Given the

minimal nature of any transgression, it follows that counsel's failure to specifically object to the

---

[13] Suggs challenges Agent Bevington's testimony that the word "tray," was a "code word" for "three thousand," and 'boat' was a code word for a "thousand dollars, like a grand piano, a grand." (*See* 2/21/08pm Tr. at 7-8 (Activation 2227).)  However, there is no reason to believe that Agent Bevington's understanding of these words comes from this particular investigation rather than his knowledge of generic drug slang drawn from his experience as a federal drug investigator.  *See, e.g., United States v. Ernest Glover*, 681 F.3d at 422 (expert testimony included testimony about the "meaning of slang terms used by defendant in the wiretapped conversations – terms such as 'water' (PCP), 'boat' (marijuana laced with PCP), '16th Street' (16 ounces) and '32nd street' (32 ounces)" along with testimony about "where PCP is manufactured, in what quantities it is sold, and at what price").  As such, Agent Bevington's testimony may have strayed into the realm of expert testimony, but there was no *Hampton* error.

Suggs also challenges Agent Bevington's testimony that Suggs' use of the phrase "apartment available" is code for his having PCP for sale.  (*See* 2/27/08pm Tr. at 11-12 (Activation 2093).)  At trial, though, Agent Bevington explained that his opinion was based on the fact that "during the course of the investigation there was never any indication that Mr. Suggs was renting apartments or owned property." (*Id*. at 12.).  Under these circumstances, there is no *Hampton* error because the jury was informed of the specific basis for Agent Bevington's opinion, giving it all the information that it needed to decide whether to accept or reject his interpretation.

[14] Suggs challenges Agent Bevington's testimony that the inquiry "you dead now" really means "does that mean you don't have any PCP." (2/19/08pm Tr. at 52-55 (Activation 89).)  Initially, Agent Bevington explained that he based his opinion on "a little bit of common sense and a little bit of hearing these calls and context," which sounds like a possible *Hampton* violation.  But then Agent Bevington went on to analogize this phrase to when defendants would say things like "stand still, laying on a call," which are other "things that indicate that they're waiting or they don't have what the other person is looking for at that particular time." (*Id*. at 55)  Then, during cross-examination, Agent Bevington explained that the "context" he was referring to was "the part [of the call] that precedes it." (*Id*. at 80-81.)  Given this additional information about the basis for Agent Bevington's opinion, there is no valid basis for arguing that his testimony was based on information that was not before the jury.

Finally, Suggs challenges Agent Bevington's testimony that a series of calls between Suggs and Ernest Glover on January 12, 2007, where they appear to be talking about women (*see* Activations 199, 200, 248) are really about PCP, specifically the PCP that Suggs sold Ernest Glover the day before, which Ernest Glover resold to two other customers, one of whom had complaints about the quality. (*See* 2/21/08am at 78.)  Although it is possible that Agent Bevington's opinion is based on evidence that was before the jury, it is certainly not clear that is the case.  In addition, any possible error was mitigated when, on cross-examination, defense counsel made the point that given the actual words used, these conversations could well have been about women and not drugs, giving the jury the information it needed to reach its own conclusion. (*See* 2/21/08pm Tr. at 23-24.)

testimony about those two conversations did not constitute deficient performance.  (*See also supra* note 14.)  This conclusion alone would be enough to defeat this claim of ineffectiveness.  However, as explained *infra*, even if Agent Bevington's challenged testimony should not have been admitted, this claim would nonetheless fail because its admission was not prejudicial.

### 3.      Prejudice

To find prejudice based on the erroneous admission of the truck bug evidence and Agent Bevington's testimony, the Court must be persuaded that there is a reasonable probability that the jury would have reached a different result in the absence of that evidence.  *See United States v. Wood,* 879 F.2d 927, 934 (D.C. Cir. 1989) (defendant must show a "reasonable possibility that the verdict would have been different absent the excludable evidence"); *see also United States v. Weaver,* 234 F.3d 42, 48 (D.C. Cir. 2000) (no prejudice where "strength of the government's evidence . . . would remain virtually unchanged" even setting aside testimony tainted by alleged deficiency).  A "reasonable probability" means that "[t]he likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86 (2011).  The fact that the wrongfully admitted evidence was incriminating is not determinative.  Nor does it matter if the government, as it did in this case (*see, e.g.*, 2/19/08am Tr. at 14; 3/5/08am Tr. at 21), relied on the inadmissible evidence in making its arguments to the jury.  *See Morrison*, 98 F.3d at 625 ("But the simple fact that the government used evidence in its closing argument does not prove that the jury found the evidence compelling or determinative.").  Rather, it is the totality of the admissible evidence that the Court must consider.

After carefully reviewing the trial record and having presided over the trial, the Court is persuaded the strength of the other evidence against Suggs was such that there is no reasonable probability that the jury would have reached a different result in the absence of the truck bug

evidence and Agent's Bevington's challenged testimony.  In particular, the Court is persuaded

that the following evidence, all of which predated the truck bug and none of which is subject to

challenge herein, would be more than sufficient to cause the jury to convict.

*Controlled Buy from Co-Conspirator Parker*:  On January 4, 2007, an FBI agent set up

and completed a controlled buy of PCP from Parker using a cooperator.  (2/20/08pm Tr. at 35,

74.)  The cooperator paid $3,500 and received in exchange an eight ounce bottle that later tested

positive for PCP.  (*Id*. at 47.)  During their meeting (which was taped), Parker told the cooperator

that he needed to make a call.  (*Id*. at 45.)  Pen register evidence established that the call was to

Suggs.[15]  (*Id*. at 49-50.)

*Recorded Conversations Regarding Drugs with Parker, Ernest Glover, Johnson, and*

*Price from Wiretap of Suggs' Cell Phone*:  The government began intercepting calls from

Suggs' cell phone on January 9, 2007, and continued to do so until April 7, 2007.  (2/19/08pm

Tr. at 24.)  At trial, approximately 80 of these calls were introduced into evidence.  As the

administrative agent for this wiretap, Agent Bevington reviewed all of the interceptions,

introduced the calls into evidence and, on occasion, testified about the content of a particular

call.  (*Id*. at 27.)  Although the admissibility of his testimony regarding a handful of these calls

has been challenged (*see supra* notes 13-14), the vast majority has not.  Thus, the evidence

properly before the jury from the wiretap on Suggs' cell phone included the following

conversations with Parker, Ernest Glover, Johnson, and Price:

*Calls with Parker*:  On January 11, 2007, Parker left a voicemail left on Suggs' phone

telling him "I definitely you know want my order to get off.  You know what I'm saying?"

---

[15] From January through June 2007, the government had a pen register on Suggs' phones,
tracking all of his incoming and outgoing phone numbers.  (*See* 2/19/08pm Tr. at 74-75.)

(2/21/08am Tr. at 31-32 (Activation 193).)  On January 17, 2007, Parker told Suggs, "I told you I need to holler," and Suggs replied, "I know it, I ain't gonna be able to get to you until later on tonight though."  (*Id*. at 32-33 (Activation 712).)  A little later that same day, Parker told Suggs, "I'll be up there later on and holler at you a little later on though."  (*Id*. at 33 (Activation 1467).)

*Calls with Johnson*:  On January 11, 2007, Johnson told Suggs that he was "waiting on you to slide back," and that he "thought you would have my little luggage with you or something." (2/19/08pm Tr. at 58 (Activation 181).)  On January 21, 2007, the government intercepted a call between Suggs and Johnson during which, according to Agent Bevington, the references to "16th Street" and "32nd Street" were actually references to a previous sale of 32 ounces of PCP from Suggs to Johnson and the fact that Suggs presently had 16 ounces for him.[16] (*See id*. at 59-60 (Activation 1054).)

*Calls with Ernest Glover*:  On January 13, 2007, Ernest Glover told Suggs, "just hit me in the morning or something, you know." (2/21/08am Tr. at 78 (Activation 292).)  On January 22, 2007, Suggs told Glover he's "waiting on cuz to hit me back," and that he was "just laying on him.  He said he was gonna come holler at me . . . ." (2/21/08pm Tr. at 6 (Activation 1135).)  On January 30, 2007, Ernest Glover asked Suggs, "Cuz ain't call you back yet," and Suggs responded that he was "still laying" and that he was "frustrated as a mother***." (*Id*. (Activation 1800).)  On February 10, 2007, Ernest again asked Suggs, "old cousin though ain't got back at you?  What's up with old cuz though man?"  Suggs replied "mother*** just got us laying." (*Id*. at 8 (Activation 2545).)

---

[16] On appeal, the Court of Appeals held that Agent Bevington's testimony about the meaning of slang terms such as "16th Street" and "32nd Street" was expert, not lay, opinion testimony. *Ernest Glover*, 681 F.3d at 422.

*Calls with Price*:  On January 12, 2007, Price told Suggs "give me a sample of that book

man.  I got a somebody want, a \*\*\* might want to holler and look at the book man." (2/27/08am

Tr. at 94 (Activation 205).)  Suggs responded: 'I'm gonna just hit you as soon as I get off." (*Id*.)

On January 15, 2007, Price asked Suggs, "you got that information I wanted you us, I wanted

somebody to look at?"  Suggs responded: "Yeah, I have it for you later on Fool, I'm just doing

some moving around.  Yeah, but yeah I already put that to the side though." (*Id*. at 98-99

(Activation 534).)  Agent Bevington testified as to this exchange that: "I believe that [Price]

wants to know if Mr. Suggs has the drugs he was looking for." (*Id*.)  He then explained that he

came to this opinion because:

> For several days they've been talking back and forth.  And originally, Mr. Price
> had asked for a sample of that book.  Then when Mr. Suggs called him back later,
> he made references to a Sister Sister magazine.  And now, it's information, and
> it's in that series of conversations.  They've changed the code multiple times.  But
> they're clearly not talking about or using the same words to talk about what
> they're talking about.

(*Id*. at 99.)  Finally, he explained that the reference to putting something "on the side" helped

form his opinion because "it doesn't make sense that you put information to the side. . . .  It

sounds more like something, a quantity of something that you would set aside or hold onto for

him." (*Id*.)  On January 16, 2007, there was a series of calls between Suggs and Price, all about

trying to set up a meeting.  (*See* 2/27/08pm at 6 (Activations 596, 606, 621, 623).)  In the first

call, Price told Suggs he was "just waiting on you," and Suggs responded "give me about 30

minutes.  I'll hit you right back then."  The government was listening to the calls in real time and

tried to set up surveillance.  But, during the next call, Suggs told Price: "that other car just pulled

back up man.  You better be careful down there at that spot man." (*Id*. at 8 (Activation 628).)

Suggs also said to Price: "did you look at the antenna on the back of the joint" and "I just don't

like that look down there man."  Price initially said it was "nothing," but then he told Suggs,

"Might got to get another venue then." (*Id*.) After hearing all this, the government decided to discontinue its surveillance. (*Id*. at 9.) A few days later, on January 18, 2007, Suggs told Price "I just ain't like that look the other day, though, you know." (*Id*. (Activation 843).) On January 19, 2007, Suggs told Price that he's still "waiting," that he's "laying on," but "[t[hey gonna hit me tonight I'm just waiting on my call," and then "as soon as he hits me I gonna hit you." (*Id*. at 10-11 (Activation 943).) On January 22, 2007, Price told Suggs, "Man mother*** pressing me baby that's all, you know," and Suggs responded, "Yeah. They still got us at a stand still though champ you know." (2/27/08pm Tr. at 11 (Activation 1121).) Price then told Suggs, "I thought maybe you got spooked or something." (*Id*.)

   ***Recorded Conversations and Meetings with Lonnell Glover***: On January 18, 2007, the government intercepted a call between Suggs and Lonnell Glover, and as a result, they conducted surveillance of a meeting between the two. (2/19/08pm Tr. at 46-48 (Activation 825).) On January 20, 2007, the government intercepted another call between Suggs and Lonnell Glover, which again led it to conduct video surveillance of a meeting between the two later that same day. (*Id*. at 48 (Activation 971).) Thereafter, the government used a cooperating witness to make a controlled purchase of PCP from Suggs. (*Id* .at 50.)

   ***Recorded Conversations with Ngozi Joy, Search of Suggs and Joy's Residence and Evidence Seized Therein***: But perhaps most damning of all to the defendant is the extensive evidence relating to his calls with his girlfriend, Ngozi Joy, and the government's seizure of large quantities of PCP from their residence. On March 27, 2007, the government intercepted a call from Joy to Suggs during which she told him that there was a strong odor coming out of their house that could be smelled from the sidewalk. (*See* 2/19/08pm Tr. at 65 (Activation 5773) ("I could smell it when I got out of the car.").) Suggs tells Joy that he'll "get something." (*Id*.)

Later that same night, the government executed a search warrant at their home.  (*See* 2/20/08am Tr. at 9.)  As a result of that search, the government seized and introduced the following as evidence at trial: $7,000 in currency found in the pocket of a jacket belonging to Suggs, which was identified by the ATM cash withdrawal receipts also found in the jacket; thirteen bottles of PCP, weighing a total of 7.7 kilograms; four buckets, one of which later tested positive for PCP residue; air fresheners; and a measuring cup and funnel.  (*See* 2/20/08am Tr. at 15, 18-20, 23, 27, 44; 2/26/08am Tr. at 64, 76-78, 85-88; 2/27/08am Tr. at 12-13.)  Suggs' fingerprint was identified on one of the buckets.  (2/25/08am Tr. at 77-78, 87.)

On March 28, 2007, the day after the search, Joy asked Suggs if he had been to see the lawyer, and he said he "got him with me now"; Suggs then told Joy, "I'm going to take the beef, I mean it's my beef."  (2/20/08am Tr. at 64 (Activation 5812).)  On March 30, 2007, Suggs told Joy, after talking about her having gotten a lawyer, "I'm not trying to take you with me like I said I'm responsible for this."  (*Id.* at 70 (Activation 5916).)

* * *

This evidence provided the jury with compelling untainted evidence of Suggs' guilt on both counts.  Suggs' phone calls with Joy before and after the search along with the 7.7 kilograms of PCP seized during the search of the house where he resided provided ample evidence of guilt on the PWID count.  As for the conspiracy count, this same evidence, especially the massive amount of PCP discovered during the search, in conjunction with the recorded conversations, controlled buys and surveillance that proved that Suggs was a distributor of PCP, was more than enough to demonstrate Suggs' guilt and to convince the Court that the

jury would have reached the same verdict without the truck bug evidence and Agent Bevington's challenged testimony.[17]  Thus, Suggs cannot carry his burden of showing prejudice.

### C.    Ineffectiveness Claim Based on Appellate Counsel's Failure to Challenge the Court's Response to a Jury Note

Suggs' third claim of ineffective assistance is based upon appellate counsel's failure to challenge the Court's response to a jury note.

The note in question read: "Is a co-conspirator responsible for the total amount of PCP of all co-conspirators even if the co-conspirator in question did not know all of the co-conspirators and did not know the specific amounts each co-conspirator possessed?"  (Jury Note, Mar. 12, 2008 [ECF No. 169].)  After discussing the matter with counsel, and over the objection of co-defendant Price's counsel (*see* Price Mot. at 29 (citing 3/12/08am Tr. at 7-9)), the Court advised counsel that it would respond to the jury's question by "referring them to the whole instruction on [conspiracy.]  I will read the whole instruction and all the instruction in context but I'm not undertaking to define the words yet until they ask another question."  (3/12/08am Tr. at 13).)  The Court then called the jury into the courtroom and basically reread its prior instruction about

---

[17] When it comes to the question of prejudice, the present case is materially different from either *Lonnell Glover* or *Hampton*.  In both of Lonnell Glover's trials, the inadmissible truck bug evidence constituted the bulk of the evidence against him.  At Hampton's trial, "[a]part from the recorded conversations, the government's other major source of evidence was the testimony of [a single witness]," whose credibility the jury had reasons to doubt, and the government "was unable to point to any money, drugs, weapons, or other evidence seized by law-enforcement personnel that could be tied to Hampton's alleged role in the conspiracy.  *Hampton*, 718 F.3d at 984.

By contrast, although the truck bug evidence and Agent Bevington's testimony were certainly incriminating, they were not critical to establishing Suggs' guilt on either count.  A more analogous precedent in the Court's view is *United States v. Miller*, where the Court held that the admission of testimony by FBI Agents that violated *Hampton* was harmless because there was more than sufficient evidence of appellants' guilt, including four kilograms of cocaine seized from another defendant's car, which the untainted evidence at trial clearly tied to appellants.  738 F.3d at 374.

how to determine quantity in a conspiracy.  The Court, however, opted not to reread the part of

the instruction that went through the specific quantity findings that the jury would be asked to

make on the verdict form, instead paraphrasing that portion and telling the jury that the

instruction "asks you for determinations, unanimous determinations about quantities, the

range."[18]  (3/12/08am Tr. at 15.)

Suggs now claims that appellate counsel should have challenged the Court's failure to

reread the conspiracy instruction in its entirety.[19]  According to Price's motion, "[b]y omitting

any reference to the different ranges," the jury "could have felt required to find [a defendant]

guilty if it concluded that he possessed only a detectable amount, regardless of what the verdict

---

[18] The omitted part of the instruction read:

> Specifically, the verdict form asks you to decide whether the amount of PCP was:
>
> 1.      1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP).  If you are unable to unanimously find that the drug quantity was within this range, then consider whether it was;
>
> 2.      100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP).  If you are unable to unanimously find that the drug quantity was within this range, then consider whether it was;
>
> 3.      A mixture or substance containing a detectable amount of phencyclidine (PCP).
>
> Your decision as to whether one of these three drug quantity ranges has been proven beyond a reasonable doubt must be unanimous.

(Jury Instruction 34.)

[19] The government's argument that this claim is precluded because it has already been ruled on by the Court of Appeals is not persuasive.  As noted *supra* note 5, appellate counsel challenged the Court's refusal to give a supplemental instruction in response to the jury note, not the content of the response actually given.

form said."  (Price Mem. in Support of Mot. Under § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody at 30, Oct. 25, 2013 [ECF No. 329-1].)

There are two ways to read this argument, but neither has merit.  First, if the claim is that

the jury should not have found Suggs guilty of conspiracy if it concluded that he possessed only

a detectable amount of PCP, that is not the law.  *See* 21 U.S.C. § 841(a)(1).  Second, if the claim

is that the jury could have been misled by the Court's omission into finding defendant

responsible for one kilogram of PCP while actually believing him only responsible for a

"detectable amount," the record offers no support for that claim.  Both the jury instructions and

the verdict form clearly required the jury to first determine whether defendant was guilty of

conspiracy and then to make a separate determination of drug quantity.  (*See* Jury Instruction 34;

Verdict Form, Mar. 13, 2008 [ECF No. 171].)

The only case cited to support defendant's argument, *United States v. Mouling*, 557 F.3d

658, 665 (D.C. Cir. 2009), *abrogated on other grounds by Henderson v. United States*, 133 S. Ct.

1121 (2013), has significantly different facts.  In *Mouling*, the Court of Appeals reversed a

conviction for possession of "50 grams or more of cocaine base" where the jury was only

instructed "that it had to find beyond a reasonable doubt that [the defendant] possessed a

'detectable amount' of cocaine base" and the verdict form, although it reflected that defendant

was actually charged and convicted of possessing "50 grams or more," did not require a separate

finding on quantity.  The Court of Appeals held that "[i]ncluding the quantity in the verdict form

cannot cure the omission from the jury instructions."  *Id*. at 665.  In the instant case, by contrast,

there was no discrepancy between the jury instructions and the verdict form and no reason to

think that the Court's decision not to *reread* the specific drug quantity portion of the instructions

in response to the jury's note created a *Mouling*-type problem, especially given that the verdict

form in the present case required the jury to first find whether a defendant was guilty of

"conspiracy to distribute and possess with intent to distribute a mixture or substance containing a

detectable amount of [PCP]" and then, if the jury found him guilty, asked the jury to make a

separate finding as to the amount of drugs he was responsible for.

As there was no error in the Court's decision to paraphrase the drug quantity portion of

the conspiracy instruction in responding to the jury's note, the failure of appellate counsel to

raise this issue on appeal cannot constitute deficient performance. *See United States v.*

*Stubblefield*, 931 F. Supp. 2d 118, 127 (D.D.C. 2013).  Accordingly, this claim of ineffective

assistance is without merit.

> **D.   Ineffectiveness Claim Based on Failure to Move for a Mistrial Based on Exposing the Jury to the Odor of PCP**

Suggs' fourth claim of ineffective assistance is based upon his trial counsel's failure to

move for a mistrial after the jury was exposed to the "highly potent smell of PCP."

During its examination of a forensic chemist at the Drug Enforcement Administration

("DEA"), the government brought three containers of PCP into the courtroom.  (2/26/08pm Tr. at

88.)  After the witness was unable to positively identify the three containers as the PCP that she

had analyzed, the Court ordered them removed.  (2/26/08pm Tr. at 89.)  Later that day, after the

jury had been excused, Ernest Glover's trial counsel suggested that the government had known it

could not get this evidence admitted through that witness, but that it had brought the containers

in anyway to expose the jury to the very distinct and unpleasant smell of PCP.  (2/26/08pm Tr. at

90.)  After further discussion, though, it was established that the government would be able to

put on a witness to "tie up" the loose end in the chain of custody and, furthermore, that once it

did so, the Court would admit the containers into evidence.  (2/26/08pm Tr. at 90-95.)  At that

point, and with the understanding that the containers would not be brought back into the

courtroom or sent back to the jury room during deliberations, defense counsel dropped any objection to admitting the containers into evidence.  (2/26/08pm Tr. at 94-95.)

Suggs now claims that trial counsel should have moved for a mistrial on the ground that "the highly potent smell of PCP . . . was highly inflammatory" and "caused irrevocable prejudice."  (Ernest Glover's Supp. Mem. in Support of Mot. to Vacate, Set Aside, or Correct Sentence Pursuant to 18 U.S.C. § 2255, at 33-34, June 26, 2015 [ECF No. 364].)  Although the Court obviously agrees that the smell of PCP is potent (*see, e.g.*, 2/26/08pm Tr. at 92), counsel's failure to move for a mistrial on this ground would constitute deficient performance only if there were a possibility that such a motion would have been granted, which there was not.

"'A mistrial is a severe remedy-a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor.'"  *United States v. Foster*, 557 F.3d 650, 655 (D.C. Cir. 2009) (quoting *McLendon,* 378 F.3d at 1112 (quoting *United States v. Clarke,* 24 F.3d 257, 270(D.C.Cir.1994))).  The "most important consideration in ruling on a motion for a mistrial is the extent to which the defendant was unfairly prejudiced."  *Id.*

There is no authority cited to support the claim that the "highly potent" smell of a drug could be prejudicial.  Nor does the Court believe that the odor of PCP, as offensive as it is, would be likely to prejudice a jury toward a finding of guilt.  Accordingly, the Court concludes that a motion for mistrial would not have succeeded and, therefore, that counsel was not deficient in failing to make such a motion.

## III.    OTHER CLAIMS

Suggs raises two other claims in addition to his ineffective assistance claims, as well as a cumulative error claim.

A.      **Newly Discovered Evidence / "Brady" Claim**

Suggs claims that there is "newly discovered evidence" about one of the members of the investigating task force that the government should have turned over to him under *Brady v. Maryland* and that its failure to do so entitles him to a new trial.  In seeking evidence to support this claim, he asks the Court to order discovery.  As explained herein, this claim can be denied based on the existing record.

Reginald Jones, formerly a member of the Metropolitan Police Department, was a member of the task force whose investigation led to the arrest and prosecution of Suggs.  He was also present for and participated in the search of Suggs' home on March 27, 2007.  Jones did not testify at trial, but his role in the search was described by another MPD officer, Officer Robert Edelen.  (2/20/08am Tr. at 9-10.)  During cross-examination, Suggs' counsel asked Edelen about the $7,000 found by Jones in the pocket of a coat belonging to Suggs, suggesting that the fact that there were bank withdrawal slips in the coat showing withdrawals totaling $15,000 meant that $8,000 was unaccounted for.  (*Id.* at 42.)

On or about December 15, 2009, Jones was arrested and charged with felony murder for his participation in an unrelated conspiracy to rob a drug dealer which resulted in a fatal shooting.  He entered a plea of guilty and was sentenced to 15 years in prison.

Suggs now claims that the government violated its obligation under *Brady v. Maryland* because

> [T]he crimes committed by Jones were ongoing while he was involved in the search of Petitioner's residence that led to Petitioner['s] arrest and conviction in the instant case.  The government knew or should have known that the investigation and conviction were tainted by Jones' criminal misconduct during the instant case.  Moreover, the government had an obligation under Brady v. Maryland, 373 U.S. 83, 87 (1963) to disclose the investigation that led to Jones' conviction of serious crimes.

(Suggs Mot. at 6.)  To support this claim, Suggs has made a request for discovery, asking the Court to order the government "to produce all documents in connection to the Conviction and Sentence of Officer Reginald Jones of the D.C. Police, who was a member of the Task force and Prosecution Team in the case at bar" and "[a]ll documentation as to Metropolitan Police detective Robert Edel[e]n's involvement with Officer Jones criminal activity."  (Suggs Discovery Mot. at 1.)

The Supreme Court held in *Brady* that the Due Process Clause imposes upon the prosecution an obligation to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  In *Giglio v. United States* and *United States v. Bagley,* the Court held that "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley,* 473 U.S. 667, 676 (1985) (citing *Giglio,* 405 U.S. 150, 154 (1972)).

The fatal flaw in Suggs' *Brady* claim is that the events that led to Officer Jones' prosecution and conviction took place on December 1, 2009, long after the end of the investigation that led to Suggs' prosecution and conviction.  Thus, Suggs' allegation that there was an ongoing investigation into Jones' "criminal misconduct" back in 2007 is pure speculation.  Nor is Suggs entitled to discovery simply in the hope of finding evidence to support his claim.  Discovery in a § 2255 proceeding is allowed, but the party seeking discovery bears the burden of showing "good cause," which requires making specific allegations that give the Court reason to believe that if the facts are fully developed, defendant will be able to demonstrate a right to relief.  Suggs has not met this standard.  He has suggested no reason to believe that even if Officer Jones were engaged in the criminal misconduct that Suggs suspects (*i.e.*, stealing some of the money found during the search of Suggs' house) such evidence could

have been used to impeach or to exculpate or could have affected the outcome of Suggs' trial. As the Supreme Court has explained, a "true *Brady* violation" has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. at 281-82 ("strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"); *see also United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008).  As Suggs has not plausibly alleged a Brady violation, this claim is rejected.

### B.   Expert Testimony by FBI Agent Bevington

Suggs also claims that the trial court committed error by allowing Agent Bevington to proffer expert testimony without being qualified as an expert.  However, as noted (*see supra* note 5), this claim was raised in the direct appeal, and the Court of Appeals ruled that there had been error, but the error was harmless.  *See Ernest Glover*, 681 F.3d at 422.

### C.   Cumulative Error

Suggs' final claim is that the cumulative effect of individual errors caused a denial of his right to due process.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  Having already extensively addressed the lack of prejudice from both the truck bug evidence and Agent Bevington's potentially impermissible testimony and having concluded that there was no error in the Court's response to the jury note, no prejudice from exposing the jury to the odor of PCP, and no *Brady* violation, Suggs cannot prevail on a cumulative error theory.

**CONCLUSION**

For the reasons stated above, it is hereby **ORDERED** that defendant Anthony Maurice

Suggs' motion to vacate his conviction pursuant to 28 U.S.C. § 2255 is **DENIED**.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   November 24, 2015